UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KATIANA SOENEN, CARTER WOODRUFF,
TAJA HIRATA-EPSTEIN, CHLOE BURNS,
and on behalf of all others similarly situated,
                              Plaintiffs,

v.                                                    C.A. NO.: 21-325-JJM-PAS

BROWN UNIVERSITY,
                              Defendants.

**DEFENDANT BROWN UNIVERSITY'S BRIEF IN SUPPORT
OF ITS MOTION TO DISMISS PLAINTIFFS' CLAIMS,
STRIKE THE CLASS ACTION ALLEGATIONS,
AND/OR SEVER CLAIMS**

Steven M. Richard (#4403)
Caitlyn Horbert (#10361)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1020
Fax: 401-454-1030
srichard@nixonpeabody.com
chorbert@nixonpeabody.com

4872-1690-2403.4

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**................................................................................................1

**SECTION I: OVERVIEW OF TITLE IX AND BROWN'S POLICIES**................................4

    A.  Title IX's Statutory Language, Administrative Oversight, and Implied Cause of Action ................................................................................................4

    B.  The Department of Education's Title IX Sexual Harassment Regulations Effective August 14, 2020 .................................................................8

    C.  Brown's Sexual Misconduct Policies from the 2015/16 Academic Year to the Present ......................................................................................12

**SECTION II: BROWN'S ARGUMENTS FOR THE RULE 12(B)(6) DISMISSAL OF EACH PLAINTIFF'S CLAIMS** ................................................................16

    A.  Chloe's claims are time-barred beyond the three-year limitations period...................17

    B.  Plaintiffs' Title IX counts and RICRA count fail to state claims upon which relief can be granted ...................................................................19

        1.  Counts I and II:  Plaintiff's "Deliberate Indifference to Sex/Gender Discrimination" and "Hostile Environment" claims should be analyzed under Davis and fail to meet the required elements to impose institutional liability ...................................................................................20

            a.  Chloe.............................................................................20
            b.  Carter............................................................................20
            c.  Katiana .........................................................................22
            d.  Taja ..............................................................................23

        2.  Count III:  The First Circuit has not recognized a "Heightened Risk" Title IX claim, and even if the Court were to do so, Plaintiffs have not pled the required showing.........................................................................24

            a.  Katiana and Carter .......................................................25
            b.  Taja ..............................................................................26
            c.  Chloe............................................................................26

        3.  Count IV:  None of the four named Plaintiffs have pled particularized facts to support a Title IX erroneous outcome claim ...................................................26

            a.  Chloe............................................................................28
            b.  Katiana, Carter, and Taja .............................................30

        4.  Count V:  No Plaintiff has pled actionable Title IX retaliation .............................30

            a.  Katiana .........................................................................31
            b.  Carter............................................................................32
            c.  Taja ..............................................................................32
            d.  Chloe............................................................................32

i

C. Counts VI, VII, and X: Plaintiffs' negligence claims fail to plead any legally recognized duty. ..................................................................................33

    1. *Davis'* deliberate indifference standard cannot be circumvented by invoking negligence theories .........................................................33

    2. Plaintiffs cannot premise a negligence duty based upon their contractual relationship with Brown .....................................................36

    3. Plaintiffs have not pled a special relationship to create any duty to hold Brown responsible for the alleged actions by third-parties ...................37

    4. Plaintiffs have not plausibly pled claims to hold Brown liable under negligent supervision or retention theories ...................................39

D. Count VIII: Plaintiffs have not identified any contractual breach by Brown .............40

E. Count IX:  Plaintiffs have not pled extreme and outrageous conduct by Brown ........43

**SECTION III: BROWN'S ARGUMENTS TO STRIKE PLAINTIFFS' CLASS ACTION ALLEGATIONS** ...............................................................................45

A. A putative class action may be stricken on the pleadings ...............................45

B. A federal class action must satisfy all four requirements of Rule 23(a) and at least one of the categories under Rule 23(b) ............................................47

C. Plaintiffs' allegations do not satisfy all four of Rule 23(a)'s requirements ...............49

    1. Numerosity (Rule 23(a)(1)) .........................................................49

    2. Commonality (Rule 23(a)(2)) .......................................................49

    3. Typicality (Rule 23(a)(3)) ...........................................................52

    4. Adequacy (Rule 23(a)(4)) ...........................................................55

D. Plaintiffs do not satisfy the criteria for any of the allowable types of class actions under Rule 23(b)(1)-(b)(3) ....................................................57

    1. Plaintiff have not shown the predominance required for a Rule 23(b)(3) class action ..........................................................................57

    2. Plaintiffs have not shown that this action meets the criteria for a Rule 23(b)(1) "limited fund" class action ...............................................62

    3. A single Rule 23(b)(2) injunction cannot be entered for all class members, and Plaintiffs' claims for monetary damages are not incidental to the requested injunctive relief ...........................................................62

**SECTION IV: BROWN'S ARGUMENTS TO SEVER EACH PLAINTIFF'S CLAIMS ...65**

**CONCLUSION** .......................................................................................68

4872-1690-2403.4

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Abramson v. Univ. of Haw.*,
    594 F.2d 202 (9th Cir. 1979) ................................................18

*Acevedo v. Allsup's Convenience Stores, Inc.*,
    600 F.3d 516 (5th Cir. 2010) ................................................68

*Adams v. Town of Burrillville*,
    249 F. Supp. 2d 151 (D.R.I. 2003)................................................17, 18

*Alvarardo-Morales v. Dig. Equip. Corp.*,
    843 F.2d 613 (1st Cir. 1988)................................................46

*Amgen Inc. v. Connecticut Ret. Plans & T. Funds*,
    568 U.S. 455 (2013)................................................58

*In re Asacol Antitrust Litig.*,
    907 F.3d 43 (1st Cir. 2018)................................................58, 59

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
    12 F.4th 81 (1st Cir. 2021) (Barron, J. concurring) ................................................59

*Barrett v. Avco Fin. Servs. Mgmt. Co.*,
    292 B.R. 1 (D. Mass. 2003) ................................................46, 47

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (U.S. 2007)................................................42

*Bessette v. Avco Fin. Servs.*,
    279 B.R. 442 (D.R.I. 2002)................................................47

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979)................................................5

*Cash v. Lees-McRae Coll.*,
    No. 1:18CV52, 2018 WL 7297876................................................35

*Champlin v. Wash. Tr. Co., of Westerly*,
    478 A.2d 985 (R.I. 1984)................................................43

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)................................................58, 59

iii

*Cruz v. Bristol-Myers Squibb Co., PR, Inc.*,
  699 F.3d 563, 568–69 (1st Cir. 2012) ...................................................................66

*Dan-Harry v. PNC Bank, N.A.*,
  C.A. No. 17-136-WES, 2017 U.S. Dist. LEXIS 218699 (D.R.I. Oct. 17, 2017)....................43

*Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*,
  526 U.S. 629 (1999)............................................................................. *passim*

*Delaware St. Coll. v. Ricks*,
  449 U.S. 250 (1980)..................................................................................18

*Doe 12 v. Baylor Univ.*,
  336 F. Supp. 3d 763 (W.D. Tex. 2018)........................................................40, 42

*Doe v. Columbia Coll. Chi.*,
  299 F. Supp. 3d 939 (N.D. Ill. 2017), *aff'd.*, 933 F.3d 849 (7th Cir. 2019) ...........................26

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*,
  220 F.3d 380 (5th Cir. 2000) ........................................................................7

*Doe v. Trs. of Bos. Coll.*,
  892 F.3d 67 (1st Cir. 2018)...............................................................19, 26, 29

*Doe v. Trs. of Bos. Coll.*,
  942 F.3d 527 (1st Cir. 2019) ........................................................................4

*Doe v. University of the South*,
  No. 4:09-cv-62, 2011 WL 1258104 (E.D. Tenn. Mar. 31, 2011) ......................................34, 35

*Doe v. Vanderbilt Univ.*,
  No. 3:18-cv-00569, 2019 WL 4748310 (M.D. Tenn. Sept. 30. 2019) ....................................35

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)..................................................................................59

*Erie R. Co. v. Tomkins*,
  304 U.S. 64 (1938)....................................................................................4

*Faiaz v. Colgate Univ.*,
  64 F. Supp. 3d 336 (N.D.N.Y. 2014) ...........................................................36, 37

*Fitzgerald v. Barnstable Sch. Comm.*,
  504 F.3d 165 (1st Cir. 2007), *reversed on other grounds*, 555 U.S. 246 (2009)....................23

*Flores v. Starwood Hotels & Resorts Worldwide, Inc.*,
  No. SACV141093AGANX, 2015 WL 12912337 (C.D. Cal. Mar. 16, 2015)........................47

iv

*Franklin v. Gwinnett Cty. Pub. Schs.*,
   503 U.S. 60 (1992) .................................................................................................5

*Frazier v. Fairhaven Sch. Comm.*,
   276 F.3d 52 (1st Cir. 2002) ................................................................................30

*Gaffney v. Riverboat Servs. of Ind., Inc.*,
   451 F.3d 424 (7th Cir. 2006) .............................................................................68

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998) .................................................................................. *passim*

*Gen. Tel. Co. of Sw. v. Falcon*,
   457 U.S. 147 (1982) .................................................................................. *passim*

*Guckenberger v. Boston Univ.*,
   957 F. Supp. 306 (D. Mass. 1997) .....................................................................44

*Havlik v. Johnson & Wales Univ.*,
   509 F.3d 25 (1st Cir. 2007) ................................................................................36

*Hoffman v. Davenport-Metcalf*,
   851 A.2d 1083 (R.I. 2004) ...........................................................................43, 44

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...........................................................................................30

*Jane Doe v. Brown Univ.*,
   304 F. Supp. 3d 252 (D.R.I. 2018) ............................................................ *passim*

*Jane Doe v. Rhode Island School of Design*,
   432 F. Supp. 3d 35 (D.R.I. 2019) ...........................................................3, 38, 60

*John Doe v. Brown Univ.*,
   210 F. Supp. 3d 310 (D.R.I. 2016) .........................................................13, 40, 51

*John Doe v. Brown Univ.*,
   327 F. Supp. 3d 397 (D.R.I. 2018) .............................................................17, 19

*John Doe v. Brown Univ.*,
   505 F. Supp. 3d 65 (D.R.I. 2020) ...............................................................19, 44

*John Doe v. Brown Univ.*,
   C.A. No. 16-17-WES (Doc No. 62 dated 9/28/16) ............................................51

*John Doe v. Brown University*,
   166 F. Supp. 3d 177 (D.R.I. 2016) .............................................................36, 37

v

*John Doe v. Michigan St. Univ.*,
Case No. 1:18-cv-1413 (W.D. Mich.) ......................................................................64

*Jue v. Costco Wholesale Corp.*,
No. 10-cv-000333-WHA, 2010 WL 889284 (N.D. Cal. Mar. 11, 2010) ...............................47

*Karasek v. Regents of the Univ. of California*,
956 F.3d 1093 (9th Cir. 2020) ..............................................................................25

*Kiossovski v. Forest Labs, Inc.* (*In re Clexa & Lexapro Mtkg. & Sales Practices Litig.*),
325 F.R.D. 529 (D. Mass. 2017) .........................................................................59

*Leader v. Harvard Univ. Bd. of Overseers*,
No. 16-10254-DJC, 2017 WL 1064160 (D. Mass. Mar. 17, 2017) .........................................7

*Lipian v. Univ. of Mich.*,
453 F. Supp. 3d 937 (E.D. Mich. 2020) ..................................................................27

*In re Loestrin 24 FE Antitrust Litig.*,
No. 1:13-MD-2472, 2019 WL 3214257, (D.R.I. July 2, 2019) .............................................53

*Malodonado Cordeiro v. AT&T*,
190 F.R.D. 26 (D.P.R. 1999) ..............................................................................65

*Manning v. Boston. Med. Ctr. Corp.*,
725 F.3d 34 (1st Cir. 2013) ...........................................................................45, 46

*Manning v. Boston Med. Ctr. Corp.*,
Civil Action No. 09-11463-RWZ, 2012 U.S. Dist. LEXIS 54692 (D. Mass
Apr. 18, 2012), *aff'd in part, vacated in part*, 725 F. 3d 34 (1st Cir. 2013) ...........................47

*Monteferrante v. Williams-Sonoma, Inc.*,
241 F. Supp. 3d 264 (D. Mass. 2017) ...................................................................46

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
522 F.3d 6 (1st Cir. 2008) ...............................................................................46

*Nungesser v. Columbia Univ.*,
169 F. Supp. 3d 353 (S.D.N.Y. 2016) ...................................................................42

*Patrick Collins, Inc. v. Does 1-38*,
941 F. Supp. 2d 153 (D. Mass. 2013) ...................................................................65

*Pilgrim v. Universal Health Card, LLC*,
660 F.3d 943 (6th Cir. 2011) ............................................................................46

*Porto v. Town of Tewksbury*,
488 F. 3d 67 (1st Cir. 2007) ......................................................................19, 20, 60

vi

*Puerto Rico v. M/V Emily S*,
   158 F.R.D. 9 (D.P.R. 1994) ....................................................................................53

*Reilly v. U.S.*,
   547 A.2d 894 (R.I. 1988) .......................................................................................45

*Rohr v. Metro. Ins. & Cas. Co.*,
   No. CIV. A. 06-10511, 2007 WL 163037 (E.D. La. Jan. 17, 2007)......................68

*Roskin-Frazee v. Columbia Univ.*,
   No. 17 CIV. 2032 (GBD), 2018 WL 1166634 (S.D.N.Y. Feb. 21, 2018).............25

*Ross v. Univ. of Tulsa*,
   No. 14-CV-484-TCK-PJC, 2015 WL 4064754 (N.D. Ok. July 2, 2015) ..............35

*S.E.C. v. Tambone*,
   597 F.3d 436 (1st Cir. 2010) ..................................................................................16

*Simpson v. University of Colarado at Boulder*,
   500 F.3d 1170 (10th Cir. 2007).........................................................................24, 25

*Smilow v. Sw. Bell Mobile Sys., Inc.*,
   323 F.3d 32 (1st Cir. 2003).....................................................................................46

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
   No. CV 14-MD-02503, 2017 WL 462177 (D. Mass. Oct. 16, 2017) ....................61

*Theidon v. Harvard Univ.*,
   948 F.3d 477 (1st Cir. 2020)...................................................................................30

*Tubbs v. Stony Brook Univ.*,
   No. 15-cv-0517 (NSR), 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) ..................25

*Tyson Foods, Inc. v. Bouphakeo*,
   577 U.S. 442 (2016)................................................................................................58

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................... *passim*

*W. Reserve Life Assur. Co. v. Caramadre*,
   No. CV 09-470S, 2015 WL 13704429 (D.R.I. Nov. 16, 2015)..............................65

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000)...................................................................................59

*Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc.*,
   474 A.2d 436 (R.I. 1984).........................................................................................39

*Yusuf v. Vasser Coll.*,
    35 F.3d 709 (2d Cir. 1994).................................................................29

*Z.J. v. Vanderbilt Univ.*,
    355 F. Supp. 3d 646 (M.D. Tenn. 2018)............................................35

**Statutes**

20 U.S.C. § 1232g.................................................................................55

20 U.S.C. §§ 1681-88 .............................................................................1

20 U.S.C. § 1681(a) ............................................................................4, 5

20 U.S.C. § 1682......................................................................5, 6, 8, 12

20 U.S.C. 1687 ........................................................................................5

R.I. Gen. Laws § 9-1-14 (b)......................................................17, 33, 44

R.I. Gen. Laws § 10-7.1-1 ....................................................................43

R.I. Gen Laws § 42-112-1 *et seq.* .........................................................17

**Other Authorities**

34 C.F.R. § 99.3 ...................................................................................56

34 C.F.R. § 99.31(a)(9)(i)......................................................................56

34 C.F.R. § 99.31(a)(9)(ii).....................................................................56

34 C.F.R. § 99.31(a)(9)(iii)....................................................................57

34 CFR Part 106.................................................................................9, 12

34 C.F.R. § 106.8(b) .............................................................................34

34 CFR § 106.2(h) ................................................................................10

34 CFR § 106.30 ...................................................................................10

34 CFR § 106.44(a)..........................................................................10, 11

34 CFR § 106.45 ...................................................................................11

83 Fed. Reg. 61,462 ................................................................................9

85 Fed. Reg. 30,026 ................................................................................9

85 Fed. Reg. 30,037 ................................................................................................................11

85 Fed. Reg. 30,061 ..................................................................................................................9

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 8 .........................................................................................42

Federal Rule of Civil Procedure 12(b)(6) ............................................................... *passim*

Federal Rule of Civil Procedure Rule 20 .....................................................................65, 66, 67

Federal Rule of Civil Procedure Rule 21 ...................................................................................65

Federal Rule of Civil Procedure 23 ........................................................................ *passim*

4872-1690-2403.4

## **INTRODUCTION**

Plaintiffs have actively sought to generate highly-slanted publicity for their lawsuit, while their Complaint stands before the Court devoid of any factual and legal merit.  Brown University ("Brown" or the "University") will present its strong legal arguments only in the courtroom and will let them speak for themselves under the law.

This lawsuit should end at its beginning.  Brown has no liability because the four named Plaintiffs fail to state any claims upon which relief can be granted.  Even if any claim by these Plaintiffs is allowed to proceed, they cannot possibly satisfy the rigorous analysis mandated under Federal Rule of Civil Procedure 23 and United States Supreme Court precedent to obtain a class action certification, so their class allegations must be stricken now.

Consistent with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-88, Brown has acted proactively to prevent sexual assault and harassment within its education programs or activities.  Brown has adopted and applied detailed sexual misconduct policies to ensure the safety and protection of its community.  The University has implemented prompt and equitable responses to sexual misconduct allegations and complaints, which have included appropriate supportive measures and fully respected the respective rights of complainants and respondents.

Throughout their Complaint, Plaintiffs rely predominantly on unsubstantiated generalizations and subjective beliefs.  Regarding Plaintiff Chloe Burns, she faces an insurmountable hurdle because her allegations are time-barred under the three-year limitations period controlling her Title IX and tort claims.  Most significant, Plaintiffs contort and conflate basic elements of Title IX and Rhode Island law throughout the Complaint and causes of action.

To provide the Court with a roadmap, Brown summarizes the structure of its brief:

- In **Section I**, Brown overviews (1) Title IX's framework as codified by Congress under the United States Constitution's Spending Clause and interpreted by the Supreme Court and (2) the University's sexual misconduct policies as they have been adopted and amended to comply with Title IX's evolving requirements.  This overview puts the issues in this lawsuit in their proper perspective and exposes the fundamental flaws of Plaintiffs' Title IX analysis and pleading.  *See* pp. 4-16.

- In **Section II**, addresses each of the eleven counts pled in the Complaint, Brown argues that each Plaintiff's implausibly pled claims fail as a matter of law.  When standing on her own, rather than trying to buttress and blend her allegations with those of others, each Plaintiff cannot withstand a Federal Rule of Civil Procedure 12(b)(6) dismissal of her claims.  *See* pp. 16-45.

- In **Section III**, to the extent that any of the Plaintiffs' claims may survive, Brown analyzes step-by-step the four prerequisites to certify a class under Rule 23(a), and then analyzes the prerequisites to proceed with one of the three categories of class actions allowed under Rule 23(b).  Applying Rule 23 and Supreme Court precedent and as authorized by the First Circuit, the Court should strike Plaintiffs' implausible class action allegations on the pleadings.  Because each class member's claims would entail a myriad of individualized liability and damages issues, Plaintiffs will never satisfy the rigorous requirements to certify a putative class of purportedly "thousands of students." In the interests of judicial economy and basic fairness, Brown should not be subjected to expansive discovery and substantial costs through what would be a futile class certification endeavor by Plaintiffs.  *See* pp. 45-64.

4872-1690-2403.4

- In **<u>Section IV</u>**, Brown shows that there is no justification to allow any of the four named Plaintiffs to litigate together in a single lawsuit.  There is no "common transaction or occurrence" among any of them supporting a permissive joinder.  If this litigation goes forward, the Court should require each Plaintiff to proceed individually in a separate case, standing on its own merits and subject to Brown's defenses particular to the claims.  *See* pp. 65-68.

At the outset of this brief, Brown must raise an overriding and paramount concern to the University, as well as to all of our state's institutions of higher education.  Plaintiffs' expansively pled tort and contract theories of university liability extend far beyond established Rhode Island common law, which would substantially redefine the legal boundaries of the university-student relationship.  Plaintiffs seek to impose tort and contractual liability under the general premise of the risk of sexual assault and sexual harassment among adult university students, as they interact, socialize, and live not only on campus and but also anywhere off campus.  As the Court has held, neither the Rhode Island General Assembly nor the Rhode Island Supreme Court has recognized such a broad duty under the university-student relationship, nor universally held universities liable for the tortious conduct of its students.  *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d 252, 261 (D.R.I. 2018) (declining to create a special relationship and recognizing that "courts across the country have determined . . . that the general foreseeability of sexual assault on campus is insufficient to warrant negligence liability [against colleges and universities].") (citations omitted); *Jane Doe v. Rhode Island School of Design*, 432 F. Supp. 3d 35, 43 (D.R.I. 2019) (acknowledging vexing public policy considerations arising under the university-student relationship, including (1) the very limited circumstances under a university may have a special relationship duty to a student

and (2) the disappearing doctrine of *in loco parentis* "in the face of the realities of modern college life") (citations omitted).

Plaintiffs' tort and contractual theories seek to alter the legal boundaries of the university-student relationship under Rhode Island law, with serious and immediate implications for every Rhode Island college and university.  A federal court is not the forum to create new state law.  *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d at 260-62.  *See also Erie R. Co. v. Tomkins*, 304 U.S. 64, 78 (1938) (a federal court must apply the state law as "declared by its Legislature in a statute or by its highest court in a decision."); *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) ("Federal courts are not free to extend the reach of state law.") (applying *Erie*).  Respectfully, if the Court is not inclined to dismiss Plaintiffs' generalized negligence and contract theories of liability, then Brown submits that the Court should stay this litigation before any discovery commences and should promptly certify appropriate questions to the Rhode Island Supreme Court in accordance with Article I, Rule 6 of the Rhode Island Supreme Court Rules of Appellate Procedure.  Such certification would ensure that not only Brown, but also all of our state's other colleges and universities as *amici*, would have the opportunity to be heard by the state's highest court regarding the significant implications of the unprecedented liability that Plaintiffs seek to create and impose under Rhode Island law.

## SECTION I:
## OVERVIEW OF TITLE IX AND BROWN'S POLICIES

### A. Title IX's Statutory Language, Administrative Oversight, and Implied Cause of Action

Title IX prohibits discrimination "on the basis of sex" of any person in an education program or activity receiving federal funding.  20 U.S.C. § 1681(a).  Specifically, Title IX prescribes that "[n]o person in the United States shall, on the basis of sex, be excluded from

4872-1690-2403.4

participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id*.

Under the Constitution's Spending Clause at Article I, Section 8, Clause 1, Congress enacted Title IX to mandate nondiscrimination as a condition to receive federal funding in an education program or activity. *Id*. Title IX applies to federally-funded schools at all levels of education, including elementary schools, secondary schools, and higher education institutions. When any part of an institution or a school district receives federal funding, all of the recipient's operations are covered by Title IX. *Id*. at § 1687. Brown is subject to Title IX.

Title IX directs federal agencies to establish requirements to effectuate the nondiscrimination mandate and allows the agencies to enforce their funding requirements, including ultimately the right to suspend or terminate the funding. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998). Title IX administrative enforcement encompasses the oversight of the funding recipient's policies and their implementation. Federal agencies may issue regulations and orders to enforce their Title IX compliance requirements. 20 U.S.C. § 1682. In a judicial lawsuit, liability cannot be based on a funding recipient's "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment claims." *Gebser*, 524 U.S. at 291. As *Gebser* makes clear, Title IX policy compliance is ordinarily the subject of federal administrative oversight, review, and enforcement.

Title IX does not expressly provide for a private right of action. The Supreme Court has recognized a limited implied right of action under Title IX, which allows for the recovery of monetary damages. *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979). Because Congress enacted Title IX under the Spending Clause, "private damages actions are available only where recipients of federal funding had adequate notice that

5

they could be liable for the conduct at issue." *Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

A law, such as Title IX, that relies on Congress's spending power essentially offers a deal to federal funding recipients. The federal government provides funding, and the recipient agrees to prescribed conditions. For such a funding agreement to be knowing and voluntary, the recipient must have fair notice of its assumed obligations and potential liabilities.

As the Supreme Court held in *Davis*, "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct. The recipient itself must 'exclud[e] [persons] from participation in, . . . den[y] [persons] the benefits of, or . . . subject[t] [persons] to discrimination under its program[s] or activit[ies] in order' to be liable under Title IX. The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and [the Supreme Court has] not extended damages liability under Title IX to parties outside the scope of this power." *Id*. at 640-41 (citations omitted).

Under Title IX, a funding recipient may be held civilly liable only upon proof of its own intentional gender discriminatory conduct. *Id*. at 642. The Supreme Court rejected the application of agency or constructive notice principles to impute Title IX liability to a funding recipient and declined to impose the equivalent of a negligence standard. *Id*. (citing *Gebser*, 524 U.S. at 283). In a private Title IX cause of action, the recoverable injury is the deprivation of an *educational opportunity in the funding recipient's programs or activities*. *Id*. at 650 (identifying injury as harassment that "can be said to deprive the victims of *access to the educational opportunities or benefits provided by the school*.") (emphasis added).

*Gebser* and *Davis* prescribe the requirements to hold an educational funding recipient liable under Title IX for damages arising from actionable sexual harassment in its programs or activities.

*Gebser* prescribes the standards applicable to a funding recipient's response to reported faculty-on-student sexual harassment, and *Davis* prescribes the standards applicable to the recipient's response to reported student-on-student sexual harassment.  Liability attaches only if a funding recipient acts with "deliberate indifference" upon its "actual notice" of the sexual harassment. *Gebser*, 524 U.S. at 290-91; *Davis*, 526 U.S. at 642.  "Deliberate indifference" sets a high bar for plaintiffs to recover under Title IX. *Davis*, 526 U.S. at 643.  The standard "has been purposely set high to eliminate any risk that the [Title IX funding] recipient would be liable in damages not for its own official decision but instead for a [third party's] independent actions." *Leader v. Harvard Univ. Bd. of Overseers*, No. 16-10254-DJC, 2017 WL 1064160, at * 4 (D. Mass. Mar. 17, 2017) (quoting *Davis*, 526 U.S. at 643) (internal quotation marks omitted).

The "deliberate indifference standard" does not dictate that funding recipients "can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Davis*, 526 U.S. at 648.  Rather, a funding recipient's response to harassment will amount to deliberate indifference only where its "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances." *Id*.

Because *Gebser* and *Davis* require that Title IX liability must be based only upon the recipient's "own failure to act" in response to actually (not constructively) known sexual misconduct within its educational programs or activities, a school is not held liable for the sexual misconduct itself.  Thus, an institution will not be liable absent a showing of deliberate indifference, even when the underlying alleged sexual misconduct could easily be characterized as extreme and egregious. *See*, *e.g.*, *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 381-82, 384, 388 (5th Cir. 2000) (finding no Title IX liability on the part of a school district for a third-grade teacher's sexual molestation of several students over a four-year period, explaining

7

that under the Supreme Court's "high" standard for liability, a federal funding recipient is liable for damages under Title IX only when a plaintiff can show the funding recipient acted with deliberate indifference in response upon its actual notice of the alleged abuse).

Additionally, the funding recipient's deliberate indifference must cause the deprivation of educational opportunities and benefits. *Davis* 526 U.S. at 660. Liability arises where the funding recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. *Id*. at 645. Only then can the recipient be said to expose its students to harassment or cause them to undergo it in education programs or activities. *Id*.

Contrary to what Plaintiffs suggest through their expansive allegations and prayers for relief, they cannot pursue in a Title IX private lawsuit much of what they seek to litigate. The Supreme Court made clear in *Gebser*, in addressing the roles of the Department of Education and judiciary in the Title IX enforcement paradigm, that a funding recipient's alleged failure to comply with Department of Education regulatory requirements "does not establish the requisite actual notice and deliberate indifference." *Gebser*, 524 U.S. at 292 (reviewing the Department's Title IX administrative regulatory oversight under 20 U.S.C. § 1682). Moreover, the Supreme Court has "never held, [], that the implied right of action under Title IX allows recovery in damages for violation of [Department of Education] administrative requirements." *Id*.

**B. The Department of Education's Title IX Sexual Harassment Regulations Effective August 14, 2020**

On November 16, 2018 (which falls within the time period pled in Plaintiffs' Complaint), the United States Department of Education published a *Notice of Proposed Rulemaking on Title IX*. The Department sought public comments to its proposed significant regulatory amendments designed for the first time to specifically address Title IX sexual harassment. This rulemaking

8

constituted the Department's most significant Title IX regulatory amendment process, since it first issued in 1975 its Title IX regulations codified at 34 C.F.R. Part 106.[1]

On May 19, 2020, after a year-and-a-half public comment period, generating the submission of nearly 125,000 comments, the Department of Education's Office for Civil Rights ("OCR") issued the long-awaited final regulations governing sexual harassment under Title IX, effective on August 14, 2020.  The final regulations specify how federal funding recipients must address and respond to sexual harassment, as defined by Title IX, consistent with the statute's prohibition against sex discrimination.

Significantly, for purposes of this litigation, OCR made clear in its lengthy preamble to the final regulations (spanning over 500 printed pages in the Federal Register) and subsequent Title IX guidance documents that "**the Department will not enforce these regulations retroactively**." 85 Fed. Reg. 30,061 (May 19, 2020) (emphasis added).[2]  *See also* OCR's *Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021)*, at p. 10 ("The 2020 amendments took effect on August 14, 2020 and are not retroactive.  This means a school must follow the requirements of the Title IX statute and the regulations that were in effect at the time of the alleged incident . . . This is true even if the school's response was on or after that date.").[3]

Under the 2020 Title IX regulations, the definition of sexual harassment, which specifies the conduct that triggers the application of Title IX, mirrors *Davis'* standards and is narrower than

---

[1]     *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Assistance*, 83 Fed. Reg. 61,462 (proposed November 29, 2018) (to be codified at 34 C.F.R. pt. 106).

[2]     *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (final Title IX rule published on 5/19/20 to take effect on 8/14/20).

[3]     *See* https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf. (OCR's July 2021 Q&A Document).

the definitions previously stated in OCR guidance documents issued during the Obama Administration.  Under the new Title IX regulations effective August 14, 2020, sexual harassment subject to Title IX's requirements is defined as either (1) a quid pro quo by a school employee for unwanted sexual conduct, (2) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," or (3) sexual assault as defined in the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (known as the "Clery Act") and domestic violence, dating violence, and stalking as defined in the Violence Against Women Act."  34 CFR § 106.30 (definition of Title IX "sexual harassment").

Where and under what circumstances an incident will invoke Title IX obligations present vexing issues for colleges and universities, given the number of students who live off-campus and the fact that schools often offer programming and activities in a wide range of settings such as study abroad programs.  Under Title IX's statutory and regulatory definitions of "education program or activity," as clarified by 34 CFR § 106.44(a), a federal funding recipient's obligations will apply to Title IX "sexual harassment" occurring off-campus only if one of three conditions is met:

- The off-campus incident occurs as part of the recipient's "operations" as that term is defined by 20 U.S.C. 1687 and 34 CFR § 106.2(h);

- The recipient exercised substantial control over the respondent and the context of the alleged sexual harassment that occurred off-campus; or

- The incident of sexual harassment occurs at an off-campus building owned or controlled by a student organization recognized by a postsecondary institution.

The Title IX regulations **do not** apply when sexual misconduct **does not** meet the definition of "sexual harassment," under 34 CFR § 106.30, and/or **has not** occurred within the recipient's

"education program or activity," as defined under 34 CFR § 106.44(a).  In its lengthy preamble to the new regulations, OCR has made clear that regarding prohibited conduct that does not meet Title IX's definition of sexual harassment or jurisdictional boundaries within the education program or activity, a school may still elect to address and adjudicate such conduct through its other codes of conduct or non-Title IX policies.  *See*, *e.g*, 85 Fed. Reg. at 30,037 (noting that when conduct does not meet the definition of Title IX "sexual harassment," a federal funding recipient may "address[]the alleged misconduct under other provisions of the recipient's own code of conduct.").

In addition to the definitional and jurisdictional provisions, the Title IX regulations prescribe a funding recipient's responsive actions upon the reporting of alleged Title IX sexual misconduct (such as the provision of interim supporting measures) and the required grievance process triggered by the filing of a written, formal complaint, during the investigation, at a live hearing (with cross-examination of witnesses), and through an appeal.  34 CFR §§ 106.44 (Recipient's response to sexual harassment) and 106.45 (Grievance process for formal complaints of sexual harassment).

Of current and future significance, the Biden Administration's Department of Education will propose further amendments to the Title IX regulations through a rule making process within the next few months.  Specifically, the Executive Branch's Office of Management and Budget announced in May 2021:

> The Department [of Education] plans to propose to amend its regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., consistent with the priorities of the Biden-Harris Administration, including those of set forth in the Executive Order on Preventing and Combatting Discrimination on the Basis of Gender Identity or Sexual Orientation and the Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation and Gender Identity (EO 14021).

11

Specifically, the Department of Education intends to publish a Notice of Intended Rulemaking by May 2022, seeking public comments responding to proposed amendments to the Title IX regulations. Which provisions of the 2020 Title IX regulatory amendments will stay in effect remains to be seen, and the regulatory Title IX landscape will change once again within the next year. A copy of the notice is attached as <u>Exhibit A</u>.

Obviously, as has been widely publicized and debated, Title IX's administrative landscape has evolved significantly during the past decade, since the issuance on April 4, 2011 of the Obama Administration's Dear Colleague Letter and additional guidance documents thereafter, through the Trump Administration's rescission of those guidance documents and ultimate issuance of the Title IX regulations on sexual harassment that took effect on August 14, 2020, and now with the Biden Administration's intention to issue early next year further amendments to the Title IX regulations.[4] Title IX's regulatory requirements are changing as the parties stand before the Court.

Plaintiffs seek to rewrite Title IX law and impose substantial judicial oversight over Brown's Title IX compliance. Plaintiffs' demand for a mandatory and permanent injunction "requiring [the University's] compliance with Title IX and recurring external audits of Brown's Title IX compliance" would result in the Court encroaching substantially upon the Department of Education's Title IX regulatory authority under 20 U.S.C. § 1682 and 34 CFR Part 106.

### C. Brown's Sexual Misconduct Policies from the 2015-16 Academic Year to the Present

For historical background regarding the University's Title IX policies and procedures, Brown refers the Court to the University's 2014-15 academic year. As the Court has addressed in

---

[4]   On September 22, 2017, the Department of Education rescinded the Obama Administration's April 4, 2011 Dear Colleague Letter and its April 29, 2014 Questions and Answers of Title IX and Sexual Violence. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

4872-1690-2403.4

prior cases, during the fall 2014 semester, Brown convened a Task Force on Sexual Assault, which included members of Brown's administration, faculty, and student body, to review Brown's sexual misconduct policies and procedures. *See John Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 315-16 (D.R.I. 2016).[5]

As a result of the Task Force's year-long engagement with Brown's campus and diverse external experts, at the start of the 2015/16 academic year, Brown adopted a new *Sexual and Gender-Based Harassment, Sexual Violence, Relationship, and Interpersonal Violence and Stalking Policy*. *Id*.   Brown represents to the Court, and does not believe that Plaintiffs will dispute, that this sexual misconduct policy remained in effect, as amended over time, between academic years 2015-16 through 2019-20.  The policy addressed prohibited sexual misconduct that occurred on Brown's premises, in the context of a Brown employment, education or research program or activity (including study abroad programs), and conduct that occurred outside of Brown's program or activity that had continuing effects on Brown's campus or within its programs or occurred in close proximity to Brown's campus and was connected to hostile conduct on campus.  Also, as a result of the Task Force's extensive year-long work and at the start of the 2015-16 academic year, Brown implemented a new *Complaint Process*, which delineated the procedures for the receipt, investigation, and informal and formal resolution of complaints involving alleged sexual misconduct. *John Doe v. Brown Univ.*, 210 F. Supp. 3d at 316.

In August 2020, in response to the Department of Education's Title IX regulations effective on August 14, 2020, Brown adopted the *Sexual and Gender-Based Harassment, Sexual Assault,*

---

[5]   Brown recognizes that many of the citations within this brief refer to several cases brought in this Court by "John Doe" and "Jane Doe" plaintiffs.  Because each "Doe" case involved distinct claims, timelines, facts, and results, Brown has attempted to be as detailed as possible when referring to the "Doe" citations in order to distinguish one case from the several others.

4872-1690-2403.4

*Intimate Partner Violence, and Stalking Policy* (to address sexual misconduct falling within the Department's definition of Title IX sexual harassment), as well as the *Sexual and Gender-based Misconduct Policy* (to address sexual misconduct falling outside of the Department's definition of Title IX sexual harassment).  Brown also issued the *Title IX Grievance Procedure* (delineating its processes in response to reported Title IX sexual harassment) and the *Sexual and Gender-based Complaint Process* (delineating its processes in response to sexual misconduct falling outside of the Department's definition of Title IX sexual harassment).

As published on Brown's website, its *Sexual and Gender-Based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Polic*y states the following regarding its applicability in compliance with the jurisdictional scope of the Title IX regulations:

**To Whom the Policy Applies**

This policy applies broadly to the entire Brown University ("Brown" or "the University") community including applicants, employees, invitees, students, and contractors collectively together known as Covered Persons. This policy pertains to acts of Prohibited Conduct committed by or against Covered Persons when:

i.) the conduct that occurs, in the United States, on property owned, leased or controlled by Brown University; and/or

ii.) the conduct occurs off-campus, in the United States, in the context of a program, activity, or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred, including but not limited to off-campus research, internships, mentorships, summer sessions, clerkships, graduate student fellowships, or other affiliated programs.

As also published on the its website, Brown's *Sexual and Gender-based Misconduct Policy*, which addresses sexual misconduct falling <u>outside</u> of Title IX that is prohibited conduct under Brown's community standards, states the following regarding its applicability:

14

### 2.   To Whom the Policy Applies

This policy applies broadly to employees and students collectively known as "Covered Persons." This policy pertains to acts of Prohibited Conduct committed by or against Covered Persons when:

(i.)      the conduct occurs on property owned, leased, used or controlled by Brown University,

(ii.)     the conduct that occurs in University programs or activities abroad; and/or

(iii.)    the conduct occurs off-campus, in the United States, outside of the context of a program, activity, or location of Brown when Brown exercises substantial control over both Complainant and the Respondent, and the effects of the Prohibited Conduct have a continuing discriminatory effect at Brown.

***Note:*** *Complaints involving student Respondents who are participants in Summer@Brown or Pre-College Programs should refer to the policies and procedures governing students enrolled in those programs.*

As shown in the above-stated chronology, the University's sexual misconduct policies and procedures have changed over ensuing academic years to ensure the fullest protection of its community members and adapt to Title IX administrative guidance documents and regulations. As should be clear (but what Plaintiffs omit to address in their pleading), the four named Plaintiffs reported allegations at different times, during different academic years, and when different policies (or versions thereof) were in effect at Brown.

Plaintiff Katiana Soenen alleges that she was subjected to sexual misconduct during 2020-21 academic year and after the Title IX regulations took effect, when Brown had two sexual misconduct policies and procedures in place (covering Title IX sexual misconduct and prohibited sexual misconduct outside of Title IX's scope). By contrast, the three other Plaintiffs reported allegations before the 2020-21 academic year that were addressed under Brown's prior *Sexual and*

*Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy*, which initially took effect at the start of the 2015-16 academic year and was amended over time through the 2019-20 academic year. The same differing policies and procedures would be true among members of the putative class, which Plaintiffs wish to have extend back to 2018. Accordingly, no single policy or complaint procedure would be at issue within the putative class, so there cannot possibly be class action commonality and predominance, as discussed in more detail *infra* at pages 49-52, 57-61.

## SECTION II:
## BROWN'S ARGUMENTS FOR THE RULE 12(B)(6)
## DISMISSAL OF EACH PLAINTIFF'S CLAIMS

While Brown strongly disagrees with and categorically denies substantially all of Plaintiffs' allegations, the University recognizes that the Court must accept the truth of any well-pled factual allegations at this stage of the legal proceedings. *S.E.C. v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010). Within its argument below, Brown addresses the factual allegations particular to Plaintiffs Katiana Soenen ("Katiana"), Carter Woodruff ("Carter"), Taja Hirata-Epstein ("Taja"), and Chloe Burns ("Chloe"). Brown refers to the students by the first name to be consistent with the manner pled in the Complaint.

Plaintiffs' purported "Class Action Allegations" are not well-pled with supporting facts and merely rely upon conclusory assertions. Particularly, paragraph 124 lists twenty-four purported "common questions" that allegedly apply uniformly to all Plaintiffs and "Class Members." Other than stating the questions, the pleading offers no factual allegations showing how just a single question, never mind twenty-four of them, could apply to not only the four named Plaintiffs, but also among the purported "thousands" of students that Plaintiffs claim would comprise their putative class. As the Court knows from its adjudication of prior lawsuits

16

addressing similar issues posed among the listed questions, the answer to each question involves a highly-individualized, fact-specific inquiry and there cannot possibly be a uniform answer achievable across-the-board through a class action.

**A. Chloe's claims are time-barred beyond the three-year limitations period.**

Chloe's allegations span just six generally pled paragraphs (Compl. ¶¶ 109-114), which evidence clear statute of limitation prohibitions on their face.  With the exception of the breach of contract claim (Count VIII), all of the causes of action pled in the Complaint (Counts I-VII and IX-XI) are subject to a three-year limitations period.  *See John Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 407, n.7 (D.R.I. 2018) (noting that Title IX borrows the Rhode Island limitations period applicable to personal injury claims), R.I. Gen Laws § 42-112-2 (Rhode Island Civil Rights Act ("RICRA") limitation period); R.I. Gen. Laws § 9-1-14 (b) (personal injury limitation statute).

Plaintiffs filed their Complaint on August 6, 2021, so all of the claims subject to a three-year limitation period can reach only to August 6, 2018 or after.  The allegations in the Complaint generally, and especially those particular to Chloe, fail to state any basis to apply the "continuing violations doctrine" to extend the limitation period before August 6, 2018.[6]

Chloe alleges that she was sexually assaulted on April 14, 2016 – two years and four months before the August 6, 2018 starting date of the three-year limitation period.  Compl. ¶ 109. As is evident in the pleading, Chloe's causes of action <u>accrued</u> before August 6, 2018.  A claim

---

[6]   In *Doe*, the Court applied *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), and analyzed the factual criteria that must be pled to support the application of the continuing violation doctrine to a Title IX hostile environment claim.  327 F. Supp. 3d at 408-10.  The Court held that the doctrine has no applicability to a Title IX erroneous outcome claim.  *Id*. at 410.  Under Rhode Island law, RICRA contains no language that the doctrine can extend its statutory limitations period.  Regarding state common law, "Rhode Island has not fully recognized the continuing violation doctrine in the tort context."  *Adams v. Town of Burrillville*, 249 F. Supp. 2d 151, 155 (D.R.I. 2003) (citing *Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29, 39 (1st Cir. 2000)).

accrues when the plaintiff becomes aware of both the fact and injury and its causal connection to the defendant. *Delaware St. Coll. v. Ricks*, 449 U.S. 250, 288 (1980). "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the act become most painful." *Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (9th Cir. 1979). *See also Adams*, 249 F. Supp. 2d at 155. Consequently, all of Chloe's claims relating to the alleged April 16, 2016 sexual assault are time-barred, with the possible exception of only her breach of contract claim.

Seeking to shield Chloe's clear statute of limitation problems, Plaintiffs plead her allegations in an out-of-sequence manner. To provide the proper context and chronology, the cited student newspaper article in paragraph 112 was published on December 1, 2017 and was updated in January 2018, after the result of the respondent's appeal. *See* https://thetab.com/us/brown/2017/12/01/assault-brown-title-ix-4306. As stated in the referenced article, Brown adjudicated in November 2017 the disciplinary case involving Chloe's allegations against the respondent, and the University determined the respondent's appeal in early January 2018. Brown's mid-year graduation ceremony occurred during January 2018, and the respondent did not speak at the event. The actual chronology shows that Chloe's claims are clearly time-barred (accruing before August 6, 2018), no matter how she tries to disguise that fact through the out-of-sequence pleading. Also, Chloe's allegations are silent regarding the eight-month gap between January 2018 and August 2018.

Chloe pleads only generally that beginning sometime in August 2018 (the actual starting date is unspecified), she was allegedly retaliated against for having publicly spoken about her alleged sexual assault over two years earlier. *Id*. at ¶¶ 109-114. These allegations starting in August 2018, not any events preceding that date, are the only ones that have arguably been timely

18

pled.  As Brown addresses *infra* the failings of each of the eleven counts pled in the Complaint, it does so incorporating its arguments that Chloe's allegations and claims are time-barred.

**B.  Plaintiffs' Title IX counts and RICRA count fail to state claims upon which relief can be granted.**

Plaintiffs have pled five Title IX counts and a RICRA count:

- <u>Count I</u>:      Title IX - Deliberate Indifference to Sex/Gender Discrimination;
- <u>Count II</u>:     Title IX - Hostile Environment;
- <u>Count III</u>:    Title IX - Heightened Risk;
- <u>Count IV</u>:    Title IX - Erroneous Outcome;
- <u>Count V</u>:     Retaliation by Withholding Protection Otherwise Conferred by Title IX;
- <u>Count XI</u>:    Violation of RICRA

As the Court has held, "[c]ourts generally recognize two theories of Title IX claims against universities, (1) where schools exhibit 'deliberate indifference' to 'severe, pervasive, and objectively offensive' sexual harassment, *Porto v. Town of Tewksbury*, 488 F. 3d 67, 72 (1st Cir. 2007), and (2) where university disciplinary proceedings result in either an 'erroneous outcome' or 'selective enforcement' of codes of conduct or disciplinary procedures.  *Doe v. Trs. of Bos. Coll*. 892 F.3d 67, 90 (1st Cir. 2018) (citing *Yusuf v. Vasser Coll.*, 35 F.3d 709, 716 (2d Cir. 1994))." *John Doe v. Brown Univ.*, 505 F. Supp. 3d 65, 75 (D.R.I. 2020), *on appeal*, No. 20-2023 (1st. Cir.) (argued 11/1/21).  <u>Counts I-III</u> sound in the first theory; <u>Count IV</u> is rooted in the second theory. <u>Count V</u> is a distinct theory of Title IX liability, focused on alleged retaliation for engaging in a protected activity.  Brown addresses each Title IX count *in seriatim*.[7]

---

[7]    Plaintiffs' RICRA claim alleges a failure to "enforce the requirements set forth under the R.I.G.L," Compl. ¶ 207, but the Complaint does not plead any other alleged violation of the Rhode Island General Laws.  Brown assumes that Plaintiffs meant to incorporate Title IX into their RICRA claim.  The RICRA claim "rises and falls with [the] Title IX claims." *John Doe v. Brown Univ.*, 327 F. Supp. 3d at 413.  Plaintiffs wrongly plead that their RICRA claim should be analyzed under a "reckless or callous indifference" standard (Compl. ¶ 208), which is not stated in RICRA and is not an applicable standard under Title IX.

1. <u>**Counts I and II**</u>:   Plaintiff's "Deliberate Indifference to Sex/Gender Discrimination" and "Hostile Environment" claims should be analyzed under *Davis* and fail to meet the required elements to impose institutional liability.

Count I and II overlap and largely duplicate each other.  *See* Count I (Compl. ¶ 129 alleging that Brown "created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX . . . .); Count II (Compl. ¶ 142 alleging "an abusive and sexually hostile environment on Brown's campus . . . .).  Both counts are subject to *Davis'* deliberate indifference framework, which Brown has detailed on pages 6-8 above.

Consistent with *Davis*, a plaintiff must allege:

> (1)    that he or she was subject to "severe, pervasive, and objectively offensive" sexual harassment by a school peer, . . . (2) that the harassment caused the plaintiff to be deprived of educational opportunities or benefits . . . (3) [that the funding recipient] knew of the harassment, (4) in its programs or activities and (5) it was deliberately indifferent to the harassment such that its response (or lack thereof) is clearly unreasonable in light of the known circumstances.

*Porto*, 488 F. 3d at 72-73 (quoting *Davis*, 526 U.S. at 650).

### a.  Chloe

Chloe's allegations are the easiest to address, which are limited to the time period from August 6, 2018 forward.  The mere six paragraphs pertaining to Chloe (Compl. ¶¶ 109-114) do not satisfy the requirement of pleading sufficient and timely "deliberate indifference" allegations to meet the high bar established by *Davis* and elements prescribed by *Porto*.

### b.  Carter

Carter's allegations make no reference to any on-campus conduct.  They relate to an "off-campus" party held on December 6, 2019, in which she alleged that a male student secretly recorded her and then took her to his off-campus house, where he made sexual advances that Carter rebuffed.  (Compl. ¶¶ 74-79).  This single incident is Carter's sole Title IX claim.

20

Under *Davis*, a school is "properly held liable in damages **only where** [it is] deliberately indifferent to sexual harassment, of which [it] has actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis* 526 U.S. at 650 (emphasis added). Regarding the single alleged incident between Carter and the male student, even assuming *arguendo* that it could be deemed "severe" and "objectively offensive," it was not "pervasive" which *Davis* refers to as "systemic" or "widespread." *Id.* at 652-53.

*Davis* cautions against Title IX institutional liability arising from a single incident of peer harassment, except only in the most extreme circumstances:

> Moreover, the provision that the discrimination occur "under any educational program or activity" suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity. Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such an effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment . . . .

*Id.* [8] Carter's single incident pleading does not clear this threshold.

As a further fundamental flaw in Carter's allegations, she does not plead any actionable sexual harassment that occurred on Brown's campus. Instead, she pleads conduct that occurred entirely off-campus during one evening and into the early morning hours – first at an off-campus party and later at the male student's house. Under *Davis*, "[Title IX's] plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs. If a funding recipient does not engage in harassment

---

[8]   *Davis* involved claims that a fifth grader was repeatedly harassed by another student over a period of many months and her parents reported the conduct to the school, but the school did almost nothing about it. 526 U.S. at 633-45. The harassment thus continued unabated. *Id.*

directly, it may not be liable for damages unless its deliberate indifference 'subject[s]' its students to harassment.  That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id*. at 645 (citations omitted).

All of the alleged misconduct took place off-campus at locations outside of Brown's control.  Carter has pled nothing to suggest that the off-campus party was a school-sponsored event or that it was tied in any way to Brown's education programs or activities.  Further, she does not allege that she was subjected to additional sexual harassment by the male student within Brown's education program or activities.  Consequently, there can be no Title IX liability under *Davis*.

### c.  Katiana

 Like Carter, Katiana does not allege that she was subjected to Title IX sexual harassment within Brown's education programs or activities, such that Brown had control over the premises where the sexual assaults occurred.  She alleges that, in May 2021, she was sexually assaulted by a male student at "an off campus party" and that, on June 12, 2021, she was sexually assaulted in an "off-campus, unsanctioned frat house affiliated with the Men's Water Polo Team at Brown." Compl. ¶¶ 64, 67.   The omission of any facts that Brown had control over either off-campus site prevents Katiana from proceeding with a Title IX claim under *Davis*.

As Katiana alleges, when she interacted with Brown administrators after the first alleged sexual assault, they correctly told her that the reported conduct would not fall within the jurisdictional scope of its Title IX policy, but rather would be subject to Brown's *Sexual Violence & Gender-based Misconduct Policy*, *see supra* at pp. 14-15, which addresses prohibited conduct outside of Title IX.   *Id*.  Katiana has not alleged actionable Title IX sexual harassment within a Brown education program or activity, so she has no Title IX claim against the University.

### d.  Taja

Taja references an alleged abusive dating relationship from 2017 to 2018 and a later second dating relationship that allegedly "devolved into physical and emotional abuse."  Compl. ¶¶ 84, 104.  The allegations are insufficient to assess whether they rise to *Davis'* requirement of "severe, pervasive, and objectively offensive" student-on-student sexual harassment.

The crux of Taja's allegations relate to contentions that Brown responded with deliberate indifference when it addressed reports against her first partner.  Under *Davis*, Plaintiffs have no right "to make particular remedial demands," and "courts should refrain from second guessing the disciplinary decisions made by school administrators."  526 U.S. at 648.  Brown responded by allowing the accused student to vacate his common residence hall with Taja and relocate to off-campus housing.  Compl. ¶ 88.  An informal resolution process resulted in a mediated no-contact agreement (*id*. ¶ 96), and Taja has not alleged that she was subjected to any further interactions with the accused student.  Taja later moved to a different on-campus residence hall.  *Id.* ¶ 99.

As the First Circuit has held, "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents.  The test is objective – whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable."  *Fitzgerald v. Barnstable Sch. Comm.,* 504 F.3d 165, 174 (1st Cir. 2007), *reversed on other grounds,* 555 U.S. 246, 248-49 (2009).  "Title IX was not intended either to pretermit thoughtful consideration of students' rights or to demand a gadarene rush to judgment."  *Id.*  "After all, in situations involving charges of peer-on-peer harassment, a…school has obligations not only to the accuser but also to the accused."  *Id.*  Taja has not alleged that Brown acted with deliberate indifference, in a manner that was so clearly unreasonable in light of the known circumstances.

23

Regarding Taja's allegations concerning her second partner, she acknowledges that she did not report the "physical and emotional abuse" until July 2020, two months after the accused student had completed his Brown education and graduated from the University in May 2020.  Compl. ¶¶ 105-06.  As of Taja's reporting in July 2020, Brown did not have "control over the harasser," so it cannot be subject to liability under *Davis*.  526 U.S. at 645.

2.  <u>Count III</u>:  **The First Circuit has not recognized a "Heightened Risk" Title IX claim, and even if the Court were to do so, Plaintiffs have not pled the required showing.**

In Count III, Plaintiffs seek to hold Brown responsible under Title IX "due to the heightened risk of sex/gender discrimination *on Brown's campus*."  Compl. ¶ 150 (emphasis added).  As pled, the count makes no reference to any off-campus conduct, which is where the alleged sexual misconduct particular to two of the Plaintiffs occurred (Katiana and Carter).  Further, through this count, Plaintiffs seek to back door into Title IX negligent training theories by alleging that Brown failed "to adequately train its employees on how to prevent and respond to reports of sex/gender based discrimination and harassment," (*id.* ¶ 151), which contravene *Gebser* and *Davis'* clear precedent that funding recipients cannot be held liable under Title IX through negligence theories.  *See* pp. 33-40 *infra* (Brown's analysis of Plaintiffs' negligence claims).

The "heightened risk theory" is often called the "pre-assault theory" of Title IX liability, which the First Circuit has yet to adopt.  While some courts have recognized a pre-assault theory, they have only done so in markedly different circumstances from those alleged by each Plaintiff here.  The leading case of *Simpson v. University of Colorado at Boulder*, for example, held that an officially sanctioned but unsupervised football recruiting program in which high school recruits were paired with female "ambassadors" for the purpose of being shown a "good time" created a significantly heightened risk of sexual assault within that athletic program, of which the university knew.  500 F.3d 1170, 1184-85 (10th Cir. 2007).  That included actual sexual assaults that had

24

previously occurred within the football program and warnings from law enforcement. *Id.* at 1184. The risk of sexual misconduct inherent in such a program was so "obvious" that a jury could reasonably find that the university's continuation of the program amounted to deliberate indifference. *Id.* at 1184-85.

In "pre-assault" cases, universities may be held responsible where "they have 'actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators.'" *Roskin-Frazee v. Columbia Univ.,* No. 17 CIV. 2032 (GBD), 2018 WL 1166634, at *5 (S.D.N.Y. Feb. 21, 2018) (quoting *Tubbs v. Stony Brook Univ.*, No. 15-cv-0517 (NSR), 2016 WL 8650463, at * 8 (S.D.N.Y. Mar. 4, 2016)). In other words, "something more than general knowledge of assaults campus-wide (i.e. some greater specificity) is required to satisfy the actual knowledge requirement for [Title IX liability]." *Tubbs*, 2016 WL 8650463, at * 9 (collecting cases); *see also Karasek v. Regents of the Univ. of California*, 956 F.3d 1093, 1113-14 (9th Cir. 2020) (While the court would "not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus," it acknowledged that doing so would be "difficult" and made clear that "Title IX does not require [a university] to purge its campus of sexual misconduct to avoid liability") (citing *Davis*, 526 U.S. at 648).

### a. Katiana and Carter

Katiana and Carter seek to assert a "pre-assault, heightened risk" theory of Title IX liability extending beyond the perimeters of Brown's campus, by claiming that the theory should reach alleged entirely off-campus activity. *See* Katiana's allegations (Compl. ¶¶ 64-67) and Carter's allegations (*id*. ¶¶ 75-79). Yet, in Count III, Plaintiffs plead that they are limiting their heightened risk theory to only "on campus" conduct (*id*. ¶¶ 150-51), so they have acknowledged that Katiana's and Carter's "heightened risk" claims, relating only to off-campus conduct, must be dismissed.

**b. Taja**

Taja's allegations are unique compared to the other three Plaintiffs, given that she alleges to have entered consensually into two separate dating relationships which became abusive. (Compl. ¶¶ 84-109). Respectfully, even if adopted by the Court as a permissible Title IX cause of action, the "heighted risk" theory has not and should not be extended to the extent alleged by Taja. While Brown does not minimize what Taja alleges, she has not pled in any way how Brown could possibly be held to have actual knowledge under a heightened risk theory as to how each relationship would devolve over time.

**c. Chloe**

Chloe's time-barred Title IX claims are even more evident in this claim, as she alleges that she was sexually assaulted on April 14, 2016 (Compl. ¶ 109), which would require the examination of "pre-assault" events before April 2016 to some prior unspecified date – years before the August 8, 2018 starting date of the three year limitations period.

**3. <u>Count IV</u>:  None of the four named Plaintiffs have pled particularized facts to support a Title IX erroneous outcome claim.**

A Title IX claim challenging a disciplinary procedure as an "erroneous outcome" requires that a plaintiff must offer evidence "'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'" *Trs. of Bos. Coll.*, 892 F.3d at 90 (quoting *Yusuf*, 35 F.3d at 715); *see also Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017), *aff'd.*, 933 F.3d 849 (7th Cir. 2019) ("general allegations about public pressure to resolve sexual assault complaints are insufficient to show that gender bias was the motivating factor in the erroneous result") (citing cases in support).

As the Court knows from its docket, erroneous outcome cases are filed by respondents who seek to challenge a finding of responsibility and/or the imposed sanction. At least one federal

court has doubted that a complainant may file a Title IX erroneous outcome lawsuit to contend

that a respondent should have been found responsible for sexual misconduct charges or sanctioned

more severely.  *See Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937, 965 (E.D. Mich. 2020).  As the

*Lipian* court stated:

> Defendant[] notes that Plaintiff's pleadings seem to proceed under theories of
> erroneous or selective enforcement, and that this cause of action is typically
> reserved for students accused of misconduct challenging a disciplinary proceeding.
> Indeed, all the relevant cases cited by Plaintiff involve respondents who alleged
> that they were discriminated against in their disciplinary proceedings . . . Plaintiff
> seems to be asking the Court to find a novel cause of action for complainants in
> school disciplinary proceedings to sue for gender discrimination.

*Id.* (citations omitted).

Regarding Plaintiffs' erroneous outcome allegations, Brown first responds to their citations

to the University's Annual Outcome Reports published by its Title IX Office.  Compl. ¶ 59.  As

the reported statistics show, cases in which formal complaints were filed and adjudicated under

Brown's policies have resulted in determinations of both responsibility and non-responsibility.  In

fact, according to the allegations particular to Taja, Brown's Title IX Office informed her during

the Fall of 2018 that approximately half of the adjudicated Title IX formal complaints at Brown

have resulted in findings of non-responsibility of the respondent (meaning that approximately half

of the cases were adjudicated with findings of responsibility).  Compl. ¶ 95.

While Plaintiffs subjectively believe that the number of responsible findings should have

been higher, that does not objectively show any gender bias in Brown's implementation of its

processes.  Further, as the Court also knows from its docket over the past decade, several male

respondents who were found responsible under Brown's processes have brought lawsuits alleging

the exact opposite of what Plaintiffs contend here.  All of this shows that Brown implements its

processes fairly and in a gender neutral manner, by investigating and adjudicating each case on its facts and not based upon any gender bias.

In the ensuing sections, Brown addresses the many flaws in Plaintiffs' class action allegations, particularly the lack of commonality, typicality, and predominance. As a preview, Brown notes that the undisputed fact that some sexual misconduct disciplinary cases have resulted in findings of responsibility, while others have not, exemplifies a simple and clear reason why a class action is totally implausible. Understandably, complainants who were involved in disciplinary cases where the respondents were not held responsible may believe that the results were caused by deliberate indifference or were erroneous. However, the broadly pled putative class stated in paragraph 116 of the Complaint would certainly include cases in which the respondents were held responsible for sexual misconduct policy violations – Would those complainants too be claiming that there was a Title IX violation and that the adjudicated result was erroneous, and how and why would they do so? This is yet another factual distinction that Plaintiffs have overlooked completely when pleading a putative class action so boldly. Each sexual misconduct adjudication involves a myriad of underlying individualized factual issues with many nuances distinguishing it from other sexual misconduct cases.

Having provided this preview of the absence of a plausible class action, Brown next addresses why each of the four named Plaintiffs has not pled a plausible erroneous outcome claim, even if such a cause of action may be brought by a complainant.

### a. Chloe

To reiterate, Chloe's erroneous outcome claim is time-barred under the three-year limitations period, which cannot be extended under the continuing violation doctrine. Compl. ¶¶ 109-114. She alleges that she was sexually assaulted on April 14, 2016 (two-years and two months before the start of the three-year limitations period starting on August 6, 2018). Chloe pleads only

28

that the male respondent was found responsible and the findings were reversed on his appeal.  As Brown notes above, the disciplinary case was fully resolved by January 2018.

While Chloe alleges that she was wrongfully subjected to the respondent's filing of a retaliation claim and an adverse finding (sometime after August 2018), she has not alleged a single fact "cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and indicating that gender bias was a motivating factor."  *Trs. of Bos. Coll.*, 892 F.3d at 90.  To plead a plausible erroneous outcome claim, a student may meet the first part of the analysis by alleging, for example, an evidentiary weakness at the hearing level, such as "a motive to lie on the part of *a complainant* or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715 (emphasis added).[9]  "However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."  *Id*.  Rather, a plaintiff must allege particularized facts that support a "causal connection between the flawed outcome and gender bias."  *Id*.  "A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  *Id*.  "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."  *Id*.  The Complaint's mere six-paragraphs particular to Chloe fail to come anywhere close to meeting these necessary pleading requirements, so her erroneous outcome claim (to the extent that it is even timely pled) must be dismissed.

---

[9]    *Yusuf's* reference to a showing that *the complainant* had a motive to lie further evidences that that an erroneous outcome claim is brought by the respondent in a disciplinary matter.

29

### b. Katiana, Carter, and Taja

Katiana, Carter, and Taja have not pled any allegations that they were ever a party to a disciplinary case with an adjudicated outcome. Complaint ¶¶ 63-114. Consequently, there is simply no plausible basis for their erroneous outcome claims. Further, even if an erroneous outcome claim is possible, each has failed to plead individually the particularized facts required under *Boston College* and *Yusuf* to support such a claim.

### 4. <u>Count V</u>: No Plaintiff has pled actionable Title IX retaliation.

In *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), the Supreme Court held that the private cause of action implied by Title IX encompasses claims "where the funding recipient retaliates against an individual because he [or she] has complained about sex discrimination." *Id*. at 171. The Court reasoned that the funding recipient's "retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action[,]" because "[r]etaliation is, by definition, an intentional act." *Id*. at 173-74.

Citing to analogous law under Title VII of the Civil Rights Act of 1964, the First Circuit has delineated the elements of a Title IX retaliation claim. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002). A plaintiff may establish a *prima facie* case of Title IX retaliation by alleging facts sufficient to show that "she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." *Id*. The First Circuit has also required that a plaintiff must show that a university's "desire to retaliate was the but-for cause of the challenged [adverse] action." *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020).

Brown first addresses the unique manner in which Plaintiffs caption their retaliation claim in Count V, calling it "Retaliation by Withholding Protection Otherwise Conferred by Title IX." Paragraph 166 states the crux of their misapplied retaliation theory:

> Brown engaged in materially adverse actions against Plaintiffs where staff failed to report Plaintiffs' disclosures of sexual misconduct, where Brown's Title IX Office failed to properly investigate Plaintiffs' claims of sex/gender discrimination, where Brown's Title IX Office failed to initiate appropriate interim measures to ensure their safety and ongoing equal access to educational opportunities and benefits, and where Brown's Title IX Office failed to implement appropriate sanctions and responsive measures to remedy the sexually hostile environment and prevent its occurrence.

Compl. ¶ 166.

Plaintiffs totally conflate a Title IX deliberate indifference claim into a Title IX retaliation claim. The Court should reject this clear misapplication of Title IX law, which itself justifies its Rule 12(b)(6) dismissal. If dismissal is not granted on that ground, it is still appropriate based upon what each Plaintiff has pled individually applying *Jackson* and *Frazier*.

### a. Katiana

Katiana alleges that she was sexually assaulted off-campus on two occasions – first at an off-campus party hosted by members of Brown's rugby team in May 2021 and second at an off-campus house where certain members of the Men's Water Polo team lived on June 12, 2021. She describes her interactions with Brown's Title IX Office, which she claims forced an informal resolution of her reporting of the first alleged assault and was not responsive to her questions after she reported the second alleged assault. (Compl. ¶¶ 63-73). Brown has addressed these allegations in the deliberate indifference analysis above, which is where they should be properly analyzed and not under a contorted retaliation claim.

Katiana has not pled any adverse action by Brown that can support a Title IX retaliation claim. This pleading omission compels the dismissal of her Title IX retaliation claim.

### b.  Carter

Carter alleges a single incident regarding her off-campus interactions with a Brown student in December 2019, in which he made unwelcomed sexual advances and she discovered that he had made secret recordings of her.  Compl. ¶¶ 74-79.  She alleges that "nothing" came of her reporting of her allegations to Brown, which caused her distress and required her to take a medical leave of absence from Brown.  *Id*.  ¶¶ 80-83.  Nothing that Carter has pled suggests a retaliatory adverse action by Brown.

### c.  Taja

Taja's allegations pertain to "sexually abusive" dating relationships with two different partners.  Compl.  ¶¶ 84-108.  Regarding the first relationship, she alleges issues with her living arrangements, but she does not allege any retaliatory actions by Brown.  Concerning her reporting of allegations against her second partner, she informed Brown in July 2020 – over two months after he had graduated from Brown in May 2020.  Again, no actionable retaliation has been alleged.

### d.  Chloe

Under the three-year limitations period, Chloe cannot proceed with Title IX retaliation regarding any events pre-dating August 6, 2018.  Chloe merely alleges that before August 2018, she was involved in a disciplinary case against a respondent during which he was ultimately adjudicated to be not-responsible for the charges, and that the respondent later filed a retaliation complaint against her.  Chloe's thinly pled allegations state only that she was found responsible for a retaliation complaint – nothing else.

Nothing that Chloe has pled evidences any unlawful, intentional Title IX retaliation by Brown.  She has merely stated the results of Brown's adjudication of two complaints – her complaint against the respondent alleging sexual misconduct and his complaint against her alleging retaliation.  Chloe simply speculates that because the results of the cases were not what

32

she wanted, Brown must have engaged in Title IX retaliation against her.  Even putting aside her clear statute of limitations issues, Chloe's subjective speculation is simply not enough to clear the initial hurdle of pleading a *prima facie* case to show Title IX retaliation.

C. <u>Counts VI, VII, and X</u>:   **Plaintiffs' negligence claims fail to plead any legally recognized duty.**

1. *Davis'* **deliberate indifference standard cannot be circumvented by invoking negligence theories.**

Plaintiffs proffer three negligence claims (Count VI – Negligence, Count VII – Negligent Supervision, and Count X – Negligent Failure to Warn, Train or Educate).[10] All three negligence theories are purely an attempted end-run around the deliberate indifference standard controlling their Title IX claims under *Davis* and *Gebser*.  *Davis*, 526 U.S. at 642, *Gebser*, 524 U.S. at 290. For example, in Count VI (Negligence), Plaintiffs allege that "[a]t all relevant times, Brown owed Plaintiffs a duty of reasonable care to ensure their safety and freedom from sex/gender based-assault, harassment, and abuse by, among other things, conducting an investigation into their claims of sex/gender-based assault, sexual misconduct, and abuse and enforcing the Title IX Policy."  Compl. ¶ 172.  Similarly, in Count VII (Negligent Supervision), Plaintiffs allege "negligent supervision by Brown in its response to reports of sexual misconduct. Brown had a duty to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies . . . ."  *Id.* ¶ 178.  Further, in Count X (Negligent Failure to Warn, Train or Educate), Plaintiffs allege "Brown breached its duty to take reasonable protective measures to protect Plaintiffs and the Class Members from the risks of sex/gender-based discrimination, sexual

---

[10]   Once again, Chloe's claims are time-barred as to any allegations pre-dating August 8, 2018 under R.I.G.L. § 9-1-14(b).

assault, including rape, sexual harassment and dating violence by failing to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies." *Id*. ¶ 201.

*Davis* and *Gebser* prescribe that more than negligence is required to hold an educational institution liable under Title IX.  Before liability can attach under Title IX, there must be proof that Brown acted with deliberate indifference to sexual harassment of which it had actual knowledge, i.e., that it made an official decision not to remedy the violation.  *Davis*, 526 U.S. at 642 (discussing *Gebser*, 524 U.S. at 290-91).  Yet, Plaintiffs seek to create a backdoor by suggesting that Brown's Title IX compliance should be evaluated under their negligence claims.

In doing so, without explicitly labeling their counts as "negligence per se, Plaintiffs premise their negligence claims upon assertions that Brown has negligently failed to adhere to and implement Title IX's requirements.  *Doe v. University of the South*, No. 4:09-cv-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011), supplies cogent reasoning why Plaintiffs' negligence causes of action fail as a matter of law.  In that case, the plaintiffs premised a negligence duty citing to 34 C.F.R. § 106.8(b) (requiring a school receiving Title IX funds to establish "procedures providing for prompt and equitable resolution of student complaints' relating to all forms of sexual harassment, including sexual assault") and the Office of Civil Rights of the Department of Education's guidance (requiring a school's procedures to "accord[] due process to both parties involved").  *Id.*

> Plaintiffs' arguments fail on several grounds, but most importantly, their arguments would vitiate the Supreme Court's ruling in *Gebser* [].  In that case, the Court, interpreting precisely the same regulation at issue here, 34 C.F.R. § 106.8(b), said that "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX.  Of course, the Department of Education could enforce the requirement administratively . . . [but] we have never held, however, that the implied right of action under Title IX allows recovery in damages for those sorts of administrative requirements. [*Gebser*, 524 U.S. at 292].  If the Court were

34

to allow a regulation used in administering a federally-created right to create a state negligence per se claim, it would effectively eviscerate the *Gebser* rule.

*Id*.

Accordingly, Plaintiffs cannot advance their broadly alleged, but legally erroneous, claims of negligent administration of Brown's Title IX processes. *Davis*, 526 U.S. at 649 ("This is not a mere 'reasonableness' standard . . . ."). Applying the Supreme Court's clear directive, courts have rejected plaintiffs' strategies seeking to effectuate "an end run around [Title IX] principles by asserting state-law negligence-based claims and relying on Title IX regulations and OCR guidance to establish the duty element of those claims." *Univ. of South,* 2011 WL 1258104, at *14.[11]

Plaintiffs' allegations that Brown breached duties imposed by Title IX (not to discriminate, to provide equal treatment and opportunities, to prevent harassment on the basis of sex, and to hire employees and train its community consistent with Title IX's requirements) do not support a negligence claim as Supreme Court precedent and well-established national case law implementing *Gebser* and *Davis* make clear. The Court must reject Plaintiffs' impermissible effort to recast their Title IX claims and recover under a negligence standard for actions premised upon Brown's Title IX compliance.

---

[11]   *See also Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 WL 4748310, at * 18 (M.D. Tenn. Sept. 30, 2019) (it would be illogical for negligence per se liability to exceed or circumvent Title IX liability); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 702 (M.D. Tenn. 2018) ("[t]he negligence per se doctrine is not a magic transformational formula") (citation omitted); *Cash v. Lees-McRae Coll.*, No. 1:18CV52, 2018 WL 7297876, at *14 (granting motion to dismiss in Title IX action and rejecting argument that "Title IX supplies a duty actionable in negligence"), *R&R adopted by*, 2019 WL 276842 (W.D.N.C. Jan. 22, 2018), *aff'd*., 811 Fed. Appx. 190 (Mem.) (4th Cir. 2020) *Ross v. Univ. of Tulsa*, No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *3-4 (N.D. Ok. July 2, 2015) (dismissing negligence claim "premised upon [university's] alleged violation of Title IX and its implementing regulations.").

## 2. Plaintiffs cannot premise a negligence duty based upon their contractual relationship with Brown.

Under Rhode Island law, "[a] student's relationship to [her] university is based in contract." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)). "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." *Id.*

Plaintiffs have separately pled a breach of contract claim against Brown, which is addressed at pp. 40-43 *infra*. Yet, they seek to proceed simultaneously with negligence claims premised upon their contractual relationship with the University. For example, in paragraph 174 of their Complaint, they allege "Brown's failure to follow its own policies in reviewing, investigating, and resolving complaints of sexual assault and harassment constitutes a breach of its duty of care to Plaintiffs."

In *John Doe v. Brown University*, 166 F. Supp. 3d 177 (D.R.I. 2016), this Court made clear that, under Rhode Island law, "[i]f a contract claim and a tort claim are based upon the same duty, the plaintiff cannot maintain the tort claim." *Id.* at 196 (quoting *Ciccone v. Pitassi*, C.A. No. PB 97-4180, 2004 R.I. Super. LEXIS 150, at *23 (R.I. Super. Aug. 13, 2004) (Silverstein, J.)). By analogy in the context of sexual misconduct claims, this Court cited with approval the Northern District of New York's ruling in *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) ("[T]he facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim – that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline. [S]imply alleging a duty of care does not transform a breach of contract [claim] into a tort claim." (internal quotation marks and citation

omitted)). *Id*. Simply put, Plaintiffs cannot reframe their contractual relationship to create tort claims based upon the duties required under applicable university policies.

### 3. Plaintiffs have not pled a special relationship to create any duty to hold Brown responsible for the alleged actions by third-parties.

To the extent that Plaintiffs are claiming that Brown should be held liable in negligence for alleged sexual harassment by other students, they have not pled any special relationship that would create a duty to hold Brown responsible for a third party's tortious conduct.

In *Jane Doe v. Brown University*, 304 F. Supp. 3d at 260-62, the Court dismissed the plaintiff's negligence claims against Brown because there was no special relationship recognized under Rhode Island law between the University and the plaintiff under the alleged facts. The plaintiff alleged that she and her friend, both of whom were Brown students, attended a fraternity party hosted in its on-campus, residential house owned by the university. *Id*. at 256. During the prior four years, the university had charged the fraternity with five disciplinary infractions involving unregistered parties and serving alcohol to minors. *Id*. at 262.

At the party, the plaintiff's friend was served an alcoholic beverage by a fraternity member acting as a bartender. *Id*. at 256. The plaintiff and her friend shared the beverage and promptly suffered a loss of motor functions, cognitive awareness, and memory. *Id*. The plaintiff and her friend separated due to their disorientation. *Id*. The plaintiff interacted with another Brown undergraduate student and left the party with him. *Id*. The student escorted the plaintiff to her campus residence hall where they had sex. *Id*. The next day, the plaintiff reported that she was drugged at the fraternity house and sexually assaulted in her residence hall. *Id*. at 256-57.

The plaintiff alleged that the university should be held liable under negligence for its supervision of the fraternity. *Id*. at 261. The Court carefully examined the parameters of the special relationship doctrine under Rhode Island law. *Id*. In doing so, the Court cited with

approval to rulings "across the country . . . that the general foreseeability of sexual assault on campus is insufficient to warrant liability [against universities]." *Id.* (quoting *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 619 (W.D. Tex. 2017)).

As the Court has acknowledged, the Rhode Island Supreme Court has noted the "serious implications" resulting from judicial expansions of negligence liability under the special relationship doctrine. *Id.* (citing *Ferreira v. Strack*, 652 A.2d 965, 967-68 (R.I. 1995)). This Court has held "that similarly serious implications would attend to holding universities . . . liable for the torts of their students. Therefore, discretion dictates dismissing this claim; any change in this area of third-party liability law must come from the legislature." *Id.*

While this Court later recognized a special relationship in the *RISD* case, it did so solely because of the unique circumstances, which involved a study abroad program in Ireland and the school's provision of mandatory housing for the program's participants. 432 F. Supp. 3d at 42-44. The plaintiff was sexually assaulted in the mandated housing by another student during the first evening of program. *Id.* at 37. The Court held that "[i]n organizing the Ireland Program, RISD undertook to provide housing to Ms. Doe in a foreign country and Ms. Doe reasonably relied on RISD to act with due care." *Id.* at 42. "This undertaking and reliance altered the relationship between RISD and Ms. Doe to one that [went] beyond the university and adult student relationship that led courts to abandon the doctrine of *in loco parentis*." *Id.* at 42 (citations omitted). The Court cautioned that "summarily holding universities liable for the torts of their students would cause serious implications that would be better dealt with by the legislature," but it "did not see such concerns" under the unique facts of the RISD case. *Id.*

Plaintiffs have not pled any comparable unique circumstances to prompt the recognition of a special relationship duty. Two of the Plaintiffs allege entirely off-campus conduct outside of

Brown's education programs or activities.   (Katiana, Compl. ¶¶ 64, 67; Carter, *id*. ¶ 75). Consequently, there is no basis to impose a special relationship between Brown and Katiana or Carter.

Plaintiff Chloe alleges that she was sexually assaulted by a Brown student on April 14, 2016, without providing any information regarding the location or preceding events, so there is no basis to infer that a special relationship existed. *Id*. ¶ 109.  Regardless, the three-year limitations period again presents an insurmountable barrier to Chloe's claims.

Finally, while Taja alleges that she was harassed on campus by both a male student with whom she was involved in a dating relationship and his friends and was later involved in an abusive dating relationship with a different student, her allegations fall far short of the justification for the Court's imposition of a special relationship in the *RISD* case, and fall on the side of the federal judicial restraint invoked in the *Brown University* case.   Holding Brown responsible under negligence law for the alleged tortious student conduct in Taja's allegations would invoke the "serious implications" of expanded liability in the university-student relationship, which should be first established under Rhode Island law by either the state's legislature or its highest court, not the federal judiciary.

### 4.  Plaintiffs have not plausibly pled claims to hold Brown liable under negligent supervision or retention theories.

In *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc.*, 474 A.2d 436 (R.I. 1984), the Rhode Island Supreme Court recognized the viability of a cause of action against an employer when a third party is injured by the acts of unfit or incompetent employees.  The Court held that an employer has a duty "to exercise reasonable care in selecting [and retaining] an employee who, as far as could be reasonably known, [is] competent and fit for the [employment]."  *Id*. at 440. Plaintiffs' boilerplate allegations are devoid of any factual details specifying how Brown may have

39

breached this duty as to each of them individually, nor do they specify who the offending employees may have been or how any such employees may have actually harmed each of them individually.

Further, Plaintiffs have not sufficiently pled that Brown failed to meet the standards of care for universities in the training, educating, and supervising employees, nor that such a standard extends to how employees handle reports of sexual assault.  *See, e.g.*, *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 788 (W.D. Tex. 2018) (dismissing claims of breach of duty to adequately hire, train, and supervise employees regarding the university's Title IX compliance).

## D.  <u>Count VIII</u>: Plaintiffs have not identified any contractual breach by Brown.

In *John Doe v. Brown University*, 210 F. Supp. 3d 310, 311 (D.R.I. 2016), the Court articulated the deferential legal analysis applicable to a claim alleging a breach of an educational contract:

> To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." *Barkan v. Dunkin' Donuts, Inc.*, 627 F.3d 34, 39 (1st Cir. 2009) (citing *Petrarca v. Fid. & Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005)).  "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." *Id.* (citing *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1191 (R.I. 1994)).  "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's handbook." *Havlik*, 509 F.3d at 34 (citation omitted).  Rhode Island courts interpret the terms of a student's handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university should reasonably expect the student to take from them." *Id.* (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 84 (1st Cir. 1998).  Any "[a]mbiguities in a contract must be construed against the drafter of the document," *Haviland v. Simmons*, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.
>
> However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 34 (R.I. 2004); *see also Schaer v. Brandeis Univ.*, 432 Mass. 474, 735 N.E. 2d 373, 381 (2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. . . . 'A college

must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting *Coveney v. President & Trustees of the College of the Holy Cross*, 388 Mass. 16, 445 N.E.2d 136, 139 (1983)).  Therefore, the rules set out in a university's handbook are "enforceable as long as [they are] not against public policy or law."  *Gorham*, 853 A.2d at 39.  A rule "violates public policy only if it is: '[1] injurious to the interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'"  *Id*. (quoting *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1218 (R.I. 1984)).  Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations."  *King v. Grand Chapter of Rhode Island Order of E. Star*, 919 A.2d 991, 998 (R.I. 2007).

*Id*. at 330-31.

The Court further stressed its limited role in its judicial review of a university sexual misconduct disciplinary process:

It is not the Court's role to determine the facts of what happened between [the respondent] and [the complainant]; to decide whether the Court would have, in the panel's position, found [the respondent] responsible for sexual misconduct; to evaluate whether the Court would have made the same judgment calls on evidence and other issues as Brown did; or to determine whether the procedure [the respondent] received was optimal.  This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to Brown on how it should handle these messy and unfortunate situations.  *Id*. at 313.

. . .

To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for [a university's] disciplinary decisions.  Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court."  *Id*. at 331 . . . Brown, as a private university, has ample discretion in designing its disciplinary process; the Court may only intervene if the process violates public policy or the law.  *Id*. at 332 (citing *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 39 (R.I. 2004)).

Applying this deferential framework here, the Court should not consider nor grant the dramatic injunctive relief sought by Plaintiffs – to invalidate and declare null Brown's Title IX and sexual misconduct policies and complaint procedures.  Compl. ¶ 189.  What Plaintiffs seek would totally contravene the Court's limited role.

Also, as noted at the outset of this brief, Plaintiffs' contract theory is premised upon the

41

expansive contention that a university may be held contractually liable whenever a student is sexually assaulted or harassed, even in situations where the conduct occurred off-campus and entirely outside of the school's education programs and activities.  Such an unprecedented contractual framework would dramatically alter the university-student contractual relationship.  In its ultimate effect, such a theory of contractual liability would be wholly contrary to Title IX's deliberate indifference framework, would contravene the rejection of *in loco parentis* responsibility for adult university students, and would equate to "special relationship" liability for the acts of third-parties that the Court has declined to adopt universally under Rhode Island negligence law.

Beyond these global concerns, what Plaintiffs have pled individually fails to pass pleading muster.  Plaintiffs plead only generally that "Brown's Sexual and Gender-based Misconduct Policy, Title IX Policy, Equal Opportunity Policy, and other governing documents outline clear contractual obligations to all students at Brown, including Plaintiffs." Compl. ¶ 184.  This is true, but these stated policies and any "other governing documents" do not apply universally to all situations and conduct (e.g., the differences between on-campus and off-campus conduct).  For each Plaintiff, the Complaint fails to identify specifically which of the policies were applied to her allegations, nor state any particular contractual provisions that Brown allegedly breached. "Without these factual allegations, Plaintiffs' breach of contract claim does not provide [Brown] with the fair notice of their claim required by Federal Rule of Civil Procedure 8.  *See* [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (U.S. 2007)]."  *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d at 789 (rejecting similarly pled breach of contract claims); *see also Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 370 (S.D.N.Y. 2016) ("In order to state a claim for breach of [an educational] contract, a student must identify 'specifically designated and discrete promises'") (citation

omitted).

Additionally, Plaintiffs seek redress for alleged emotional distress injuries, which are generally not recoverable in contract actions under Rhode Island law.  *See Dan-Harry v. PNC Bank, N.A.*, C.A. No. 17-136-WES, 2017 U.S. Dist. LEXIS 218699, at * 22-24 (D.R.I. Oct. 17, 2017).   Finally, as an especially indicative example of Plaintiffs' excessive "kitchen sink" approach in their pleading, they claim that "Brown intended to cause nonpecuniary damages, as alleged herein; thus, these damages may be recovered pursuant to Rhode Island General Laws [§] 10-7.1.1."  Compl. ¶ 188.  This statutory provision is codified in the Rhode Island Wrongful Death Act, which has absolutely no applicability to this litigation.

In sum, each Plaintiff's breach of contract claim must be dismissed because of the above-described legal fallacies and pleading flaws.

**E.  <u>Count IX</u>:  Plaintiffs have not pled extreme and outrageous conduct by Brown.**

To state a claim for intentional infliction of emotional distress, Plaintiffs must individually show "(1) that the conduct [was] intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct [was] extreme and outrageous, (3) there [was] a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question [was] severe."  *Champlin v. Wash. Tr. Co., of Westerly*, 478 A.2d 985, 989 (R.I. 1984).  The conduct required to state an intentional infliction of emotional distress claim under Rhode Island law must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (emphasis deleted) (quoting *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 707 (R.I. 2003)).  This is a "very high standard."  *Id*. at 1089.

43

4872-1690-2403.4

As the Court has held, intentional infliction of emotional distress claims must be cautiously applied in matters involving sexual misconduct complaints and investigations:

> Student disciplinary investigations and the face-to-face meetings no doubt could cause a wide range of emotional distress.  Universities must strike a balance between taking allegations of sexual assault seriously, investigating those fully and in accordance with school policies, and ensuring that the student accused is treated with fairness and dignity.  Courts must be "chary about interfering with the academic and disciplinary decisions made by private colleges and universities." *Schaer v. Brandeis University*, 432 Mass. 474, 478, 735 N.E. 2d 373 (2000) (quotations and citations omitted).

*John Doe v. Brown Univ.*, 505 F. Supp. 3d at 82.

None of the four Plaintiffs has pled any facts meeting this "very high standard" to state a claim for intentional infliction of emotional distress.  In just six very generally pled paragraphs, Chloe's allegations are devoid of any details about any of her interactions with any Brown administrator or dean.  Compl. ¶¶ 109-114.  Also, once again, Chloe's claims are limited by the three-year limitations period of R.I.G.L. § 9-1-14(b), so her claims cannot reach back beyond August 6, 2018 and certainly not back to the April 14, 2016 date referenced in the Complaint.  *Id*. ¶ 109

The other three plaintiffs – Katiana (¶¶ 63-83), Carter (¶¶ 74-83), and Taja (¶¶ 94-108) – merely plead few generalized details about their interactions with administrators and deans and their frustrations with the alleged responses.  Nothing that these three plaintiffs have pled shows conduct by anyone at Brown "so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hoffman*, 851 A.2d at 1090.  Even the "fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress."  *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing

44

*Marques v. Fitzgerald*, 99 F.3d 1, 6-7 (1st Cir. 1996)).

Finally, this claim requires a showing of physical symptomatology resulting from the alleged improper conduct. *Reilly v. U.S.*, 547 A.2d 894, 898 (R.I. 1988). Each Plaintiff does not specify any alleged physical symptomatology that she has suffered. Instead, Count IX merely provides a single-paragraph list of conditions that all "Plaintiffs" and members of the putative class allegedly suffered collectively. Compl. ¶ 195. Each Plaintiff must sufficiently plead and support her own claim through facts specific <u>to her</u>, not aggregate her claim with others.

# SECTION III:
## BROWN'S ARGUMENTS TO STRIKE
## PLAINTIFFS' CLASS ACTION ALLEGATIONS

### A. A putative class action may be stricken on the pleadings.

If any of Plaintiffs' individual claims survive Rule 12(b)(6) dismissal, then the Court must review now and strike their class action allegations. As detailed below, even at the pleadings stage, it is evident that this case cannot come anywhere close to meeting the rigorous requirements to certify a class action under Federal Rule of Civil Procedure 23 and United States Supreme Court precedent.

Rule 23(c)(1) directs courts to make certification decisions "[a]t an early practicable time." The Supreme Court has recognized that "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim[.]" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

When class allegations are challenged on the pleadings, the "dispositive question . . . is whether the complaint pleads the existence of a group of putative class members whose claims are susceptible of resolution on a classwide basis." *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013). The First Circuit has instructed that "[a] district court must conduct a rigorous

analysis" of Rule 23's prerequisites.  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 25 (1st Cir. 2008) ("noting that the common presumption at early stages of litigation that 'the complaint's allegations are necessarily controlling' does not apply in class certification situations because 'class action machinery is expensive and in our view a court has the power to test disputed premises early on if and when the class action would be proper on one premise but not another'" (quoting *Tardiff v. Knox Cty.*, 365 F.3d 1, 4-5 (1st Cir. 2004)).

Rule 12(f) allows a district court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," which includes insufficient allegations concerning a putative class action.  *See Monteferrante v. Williams-Sonoma, Inc.*, 241 F. Supp. 3d 264, 273 (D. Mass. 2017).  Relatedly, Rule 23(d)(1)(D) allows a district court to issue an order "requir[ing] that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly . . . ."  Under appropriate circumstances, courts have not hesitated to grant motions to strike class allegations from putative class action complaints.  *See Monteferrante*, 241 F. Supp. 3d at 273; *Barrett v. Avco Fin. Servs. Mgmt. Co.*, 292 B.R. 1, 2 (D. Mass. 2003).

While the First Circuit has instructed district courts to "exercise caution when striking class action allegations based solely on the pleadings," *Manning*, 725 F.3d at 59, district courts retain "considerable discretion" to strike material under Rule 12(f), *Alvarardo-Morales v. Dig. Equip. Corp.*, 843 F.2d 613, 618 (1st Cir. 1988).  When "it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis, district courts use their authority under Federal Rule of Civil Procedure 12(f) to delete the complaint's class allegations."  *Manning*, 725 F.3d at 59; *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)

46

(noting "[t]hat the motion to strike came before the plaintiffs had filed a motion to certify the class does not by itself make the court's decision reversibly premature" and affirming the district court's grant because it "cannot see how discovery or for that matter time would have helped [the plaintiffs]").  When a defendant files a pre-discovery challenge to class certification on the basis of the allegations in the complaint, trial courts in this circuit have generally applied the same standard as a motion to dismiss for failure to state a claim.  *Manning v. Boston Med. Ctr. Corp.*, Civil Action No. 09-11463-RWZ, 2012 U.S. Dist. LEXIS 54692, at * 4 (D. Mass Apr. 18, 2012), *aff'd in part*, *vacated in part*, 725 F. 3d 34 (1st Cir. 2013); *Barrett.*, 292 B.R. at 2; *Bessette v. Avco Fin. Servs.*, 279 B.R. 442, 450 (D.R.I. 2002).

Finally, the mere pleading of class actions should not be designed as a discovery vehicle. This is especially important because "if a class action complaint could survive a motion to dismiss based merely on the need for class discovery, then many, if not all, class action complaints would have expansive class allegations and definitions to permit a fishing expedition during discovery." *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, No. SACV141093AGANX, 2015 WL 12912337, at * 4 (C.D. Cal. Mar. 16, 2015); *see also Jue v. Costco Wholesale Corp.*, No. 10-cv-000333-WHA, 2010 WL 889284, at * 6 (N.D. Cal. Mar. 11, 2010) ("[C]lass certification discovery is not a substitute to the pleading requirements of rule 8 and *Twombly*.  Class allegations must [be] supported by sufficient factual allegations demonstrating that the class device is appropriate and discovery on class certification is warranted.").

**B.  A federal class action must satisfy all four requirements of Rule 23(a) and meet at least one of the categories under Rule 23(b).**

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court reaffirmed the proposition that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual names parties only.' " 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442

U.S. 682, 700-01 (1979)).  Class representatives must "'possess the same interest and suffer the same injury' as the class members." *Id*. at 348-49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Rule 23 mandates a two-step process to determine whether an action may be maintained as a class action.  First, the Court must determine that the proposed class meets all of Rule 23(a)'s four prerequisites – numerosity, commonality, typicality, and adequacy of representation.  A putative class may be certified only if "the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Falcon*, 457 U.S. at 161.  The Rule's four requirements "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart*, 564 U.S. at 349 (quoting *Falcon*, 457 U.S. at 156).  "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *Falcon*, 457 U.S. 160.

Second, if Rule 23(a)'s four prerequisites are satisfied, then the Court must determine whether the proposed class falls within one of the categories of Rule 23(b).  Rule 23(b)(1) applies to cases where class members or the defendant might suffer adverse effects if the issues were resolved in separate actions, rather than on a class-wide basis.  Rule 23(b)(2) applies to cases seeking class-wide injunctive and declaratory relief.  Rule 23(b)(3) is intended for cases seeking damages where class issues predominate over individual issues.  Plaintiffs seek to proceed under some or all of the three categories allowed under Rule 23(b).  Compl. ¶¶ 123-125.

Plaintiffs allege to represent a class defined as the following:

> All present and past women students who attended Brown University's Providence, Rhode Island campus from 2018 to present, who experienced sexual assault, harassment, or other forms of sexual misconduct and were harmed by Defendant's failure to provide resources for students who experience discrimination on the basis of sex, including perceived sexual orientation, and/or gender presentation.[12]

---

[12]   Brown strongly denies that it has any liability to members of this putative class as pled.  Further, the putative class proceeds on an erroneous assumption that only female students are

Compl. at ¶ 116.  Brown analyzes below the fatal shortcomings of Plaintiffs' class allegations applying Rule 23(a) and (b) step-by-step.

Before doing so, Brown notes that, just like Chloe individually, many members of this putative class would face statute of limitation constraints.  It is not the attendance or graduation dates of each student that would control; it is the <u>accrual date</u> of each cause of action that matters.  For example, a student who attended Brown in 2018 may have alleged claims that accrued well before August 8, 2018 (the first date in the three-year limitation period), which would be time-barred.

### C.  Plaintiffs' allegations do not satisfy all four of Rule 23(a)'s requirements.

#### 1.  Numerosity (Rule 23(a)(1))

Plaintiffs purport that the putative class consists of "thousands of women" and states that the exact size would have to be ascertained through records maintained by Brown.  Brown strongly disputes that the putative class would total anywhere near the speculative number pled by Plaintiffs.  For the sole purposes of this motion only and with Brown reserving all rights, Brown will assume, *arguendo*, that Plaintiffs can satisfy the numerosity requirement.  Regardless, Plaintiffs' class allegations otherwise fall far short for reasons discussed below.

#### 2.  Commonality (Rule 23(a)(2))

The requirement of commonality is satisfied if "there are questions of law and fact common to the class."  Fed. R. Civ. P. 23(a)(2).  However, "[t]hat language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Wal-Mart*, 564 U.S. at 349 (internal citations and quotations omitted).   "Commonality requires the plaintiff to

---

complainants who allege sexual misconduct.  Actually, male students can be complainants but Plaintiffs apparently do not seek to represent them.

demonstrate that the class members 'have suffered the same injury,'" *id*. at 349-50 (quoting *Falcon*, 457 U.S. at 157), which takes more than "merely . . . hav[ing] all suffered a violation of the same provision of law," *id*.

The test for commonality has become more demanding since the Supreme Court's decision in *Wal-Mart*. As noted above, *Wal-Mart* repeats a standard first articulated by the Court in *Falcon* in 1982, requiring that a trial court may only certify a class if it determines, "after a rigorous analysis, the prerequisites of Rule 23(a) have been satisfied." *Id*. at 350-51 (citing *Falcon*, 457 U.S. at 160. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id*. at 351.

The proponent of certification must identify a "common contention . . . of such a nature that it is capable of classwide resolution." *Id*. at 350. It is not enough to show a common question or multiple common questions, "even in droves." *Id*. Rather, the plaintiff must show "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id*. (quoting Nagareda, *Class Action Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). In short, a common contention is one that "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

As this Court knows well from its adjudication over the past decade in several lawsuits raising alleged sexual misconduct involving college and university students (filed by both complainants and respondents), each case involved a particularized application of its facts to the law. Discovery in a single lawsuit is typically voluminous entailing tens of thousands of pages, comprised of the school's relevant files, the investigative report, email communications, witness statements, text messages, social media postings, academic records, and counseling records.

50

Before the Court, each of these lawsuits has presented circumstances unique to the parties and their interactions, the context particular to the incident(s) at issue and locations (*e.g.*, off-campus vs. on-campus), and the school's responsive actions (e.g., determining appropriate interim measures pending adjudication or appropriate sanctions upon a finding of responsibility).   The Court's adjudication of a single sexual misconduct case has required as long as a seven-day trial, as it did in one lawsuit during 2016, resulting in an eighty-four-page slip opinion by Judge Smith detailing the Court's Findings of Fact and Conclusions of Law.  That trial focused predominantly on liability issues with a request for an equitable remedy (reinstatement), and it would have certainly spanned longer if monetary damages were at issue.  *John Doe v. Brown Univ.*, C.A. No. 16-17-WES (Doc No. 62 dated 9/28/16) (reported at 210 F. Supp. 310 (D.R.I. 2016)).

Here, individualized issues abound among the allegations particular to each of the four named Plaintiffs, as is evident from just a few of the many distinctions in their allegations:

- Two of the Plaintiffs (Taja and Chloe) have graduated from Brown.  Carter took a leave from Brown in January 2020 and describes herself as a "former Brown student" (Compl. ¶ 33).  Only Katiana is a student enrolled at Brown.

- Some of the alleged matters pre-date the August 14, 2020 effective date of the Title IX regulations, while others post-date the effective date.

- Katiana and Carter raise alleged events that occurred off-campus, while Taja and Chloe raise alleged on-campus events.

- Differing academic years are at issue pertaining to each Plaintiff involving interactions with different administrators and alleged conduct provisions and complaint procedures under differing versions of Brown's applicable policies in effect at the time.

- Some of Plaintiffs' claims allege events entirely off-campus, posing individualized questions of whether or not those particular locations were within the scope of Brown's authority.

- Taja raises issues relating to her relationships with two partners who became abusive, which pose distinct issues compared to what is alleged by the other three Plaintiffs.

51

- The individual respondents in each matter are distinct as is the nature of the alleged misconduct.

In short, neither discovery nor factual development would alter the lack of commonality among the four named Plaintiffs themselves (never mind a purported class of "thousands" of current and former Brown women students). Stopping at this Rule 23(a)(2) stage of the analysis, Plaintiffs' putative class action allegations are fatally flawed and should be stricken. But, the allegations fare no better in the rest of the Rule 23(a) analysis and moving onto the additional criteria to pursue any of the three categories of class actions under Rule 23(b).

### 3. Typicality (Rule 23(a)(3))

In *Wal-Mart*, the Supreme Court stated:

We have previously stated in this context that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest. [*Falcon*, 457 U.S. at 157-58, n. 13]. In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied their typicality and adequate-representation requirements of Rule 23(a).

564 U.S. at 349, n. 5.

Further, the First Circuit has stated:

Courts have noted some uncertainty as to the independent significance of Rule 23's typicality requirement. *See* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1764 (rev. 4th ed. 2018). "[M]any courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Id.* (citations omitted). Other courts have used Rule 23(a)(3) "to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law and fact are present." *Id.* (citations omitted).

52

*In re Loestrin 24 FE Antitrust Litig.*, No. 1:13-MD-2472, 2019 WL 3214257, at *11 (D.R.I. July 2, 2019).

Brown submits that this is such a case, as pled, that compels the Court to screen out this putative class action on the pleading, because Plaintiffs' Complaint is so deficiently unable to satisfy Rule 23(a)(3)'s typicality requirement. A class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. Plaintiffs have not shown that each of them possesses the "same interest" and has suffered the "same injury" as all other alleged sexual misconduct victims they purport to represent. For example, some students, by their own personal choice, may have preferred to have had their reporting resolved through an informal resolution with the accused, rather than a formal grievance process requiring a hearing. Additionally, the wide array of potential liability questions in the putative class is seemingly limitless.

Nor can damages be readily ascertainable on a class-wide basis. "This is even more clearly the case when one considers the alleged class claim for emotional distress, which is intractably individual in character." *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 16 (D.P.R. 1994) (citations omitted). Plaintiffs plead that class members "suffered severe emotional distress, including, but not limited to, headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, depression, anxiety, post-traumatic stress disorder, obsessive compulsive disorder, eating disorders, substance dependency, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter." Compl. ¶ 195. How can one named plaintiff alone, or the four named plaintiffs together, possibly claim that there is any typicality regarding these alleged conditions across the board among the "thousands" that they purport to represent?

53

In fact, under the "Damages" section of their pleading, Plaintiffs list the following thirteen categories of "past, present, and future" damages that are among some, but not all, of the alleged damages:

(a) Pain, suffering, and emotional distress;

(b) Physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

(c) Medical expenses;

(d) Pharmaceutical expenses;

(e) Loss of education in education opportunities;

(f) Additional unnecessary educational expenses;

(g) Loss of employment and earning capacity;

(h) Travel and travel-related expenses;

(i) Prevention from performing daily activities and obtaining the full enjoyment of life;

(j) Expenses from psychological treatment, therapy, and counseling;

(k) Fractured family and personal relationships;

(l) A loss of consortium society and companionship; and

(m) All other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

Compl. at ¶ 211. Even making the gigantic leap to assume that each putative class member has suffered all thirteen of the above-listed categories of economic and emotional damages on a "past, current, and future" basis (including the broad catch-all final item), each damages claim would still not "be the same" and would require a fact-intensive, individualized inquiry about extent and duration that would hardly meet the typicality requirement.

As a paramount concern, the Court must consider Brown's Seventh Amendment due process rights and ability to defend itself fully.  Plaintiffs claim that they should be allowed to proceed on behalf of absent "[c]lass members [who] may suffer from severe mental health issues related to sexual misconduct they experienced while at Brown and do not have the physical ability to withstand a deposition or trial to seek redress of their claims."  Compl. ¶ 123.  What Plaintiffs propose would substantially prejudice Brown.  The University must have the right to depose and cross-examine at trial – both on liability and damages issues – all individuals who seek to recover relief in this action.  Plaintiffs' suggestion that the alleged typicality of their claims (which actually does not exist) should forego the need for depositions of many class members would absolutely destroy Brown's due process right to mount a defense to each class member's claims.

### 4.  Adequacy (Rule 23(a)(4))

The adequacy analysis has two elements: (1) adequacy of the named plaintiff(s) and (2) adequacy of counsel.  Brown incorporates its above-stated and interrelated commonality and typicality arguments into its contention that Plaintiffs cannot not meet the adequacy requirement.

Of particular importance to the analysis, the privacy protections and requirements of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, demonstrate the total unmanageability of what Plaintiffs propose and show how neither they nor their counsel are adequate representatives for the unnamed putative class members.  Subject to certain exceptions, FERPA enables university students to control the disclosure of their "education records" to others.  Moreover, the FERPA rights continue to exist after the student's graduation and expire only upon either the destruction of the relevant records or the student's death.

All of FERPA's protections revolve around the central term "educational records," which is defined in the implementing regulations as follows:

4872-1690-2403.4

"Education records" . . . means those records that are:

(1) Directly related to a student; and
(2) Maintained by an educational agency or institution or by a party acting for the agency or institution.

34 C.F.R. § 99.3. Given the vast breath of this definition, an "education record" includes not only such standard "academic" records as student transcripts, papers, and exams, but also virtually any records or communications about a student in any record that is "maintained" by Brown. Certainly, Brown's records relating to student reporting of alleged sexual misconduct and any resulting disciplinary proceedings fall within FERPA's confidentiality and non-disclosure requirements.

Disclosure of education records under FERPA typically requires a student's written consent. Otherwise, Brown must first redact all "personally identifiable information" from the records or one of sixteen exceptions must apply. 34 C.F.R. § 99.31(a)-(b). The exception most relevant to litigation is a disclosure made to "comply with a judicial order or lawfully issued subpoena." 34 C.F.R. § 99.31(a)(9)(i). Before complying with such a judicial order or subpoena, Brown must first make a "reasonable effort to notify the . . . student of the order or the subpoena in advance of compliance, so that the . . . student may seek protective action." 34 C.F.R. § 99.31(a)(9)(ii).

Under FERPA, neither Plaintiffs and nor their counsel stand before the Court with any right to receive any education records pertaining to any class members, unless that they obtain and provide Brown with a proper written consent from each student, or serve upon Brown an order from the Court or a subpoena, which would require Brown to provide all such class members with the opportunity to appear before the Court and object to the production of their education records.

FERPA rights apply not only to the four-named Plaintiffs[13] and all of the members of the putative class, but also to all of the accused students and all of the student witnesses who participated in Brown's investigations of sexual misconduct complaints.  The unmanageability of Plaintiffs' proposed class action would quickly devolve into an unwieldly monstrosity, with easily several hundred and possibly thousands of students who must be advised in writing and afforded reasonable notice of their FERPA rights to object to the production of any of their education records to Plaintiffs and their counsel, which would foreseeably result in immediate and prolonged motion practice.  Alternatively, Brown could be compelled to incur the substantial time and expense to review line-by-line at least tens of thousands or even hundreds of thousands of pages of education records and redact all personally identifiable information before any production could occur to Plaintiffs and their counsel.  Plaintiffs claim that they "are unaware of any difficulty which will be encountered in the management of this litigation precluding its maintenance as a class action."  Compl. ¶ 126.  Clearly, they overlook totally or fail to appreciate fully FERPA's requirements.

### D. Plaintiffs do not satisfy the criteria for any of the allowable types of class actions under Rule 23(b)(1)-(b)(3).

#### 1. Plaintiff have not shown the predominance required for a Rule 23(b)(3) class action.

Although Plaintiffs claim that they wish to proceed with a class action in accordance with Rules 23(b)(1), (b)(2), and/or (b)(3), the bulk of their class allegations pertain to an intention to proceed with damages claims under a Rule 23(b)(3) class.   Rule 23(b)(3)'s predominance

---

[13]   As to the four named plaintiffs, FERPA allows for disclosure to a court in the context of a lawsuit that the student brought against the institution.  34 C.F.R. § 99.31(a)(9)(iii).

requirement is a foremost factor in whether a class can be certified where the sought remedy is monetary damages.

The relevant inquiry for the predominance requirement addresses whether "the questions of law and fact common to class members predominate over any questions affecting only individual members," and whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).   Rule 23(b)(3)'s predominance requirement is "even more demanding than Rule 23(a)."   *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

The Courts must inquire "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."   *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).   Cohesiveness should be addressed by examining the relation between common and individual questions in a case.   "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'"   *Tyson Foods*, 577 U.S. at 454 (quoting 2 W. Rubenstein, *Newberg on Class Actions* §4:50, pp. 196-97 (5th ed. 2012)).

Further, as the First Circuit has held:

> The aim of the predominance inquiry is to test whether any dissimilarity among the claims of class members can be dealt with in a manner that is not "inefficient or unfair."   [*Amgen Inc. v. Connecticut Ret. Plans & T. Funds*, 568 U.S. 455, 469 (2013)] (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).   Inefficiency can be pictured as a line of thousands of class members waiting their turn to offer testimony and evidence on individual issues.   Unfairness is equally well pictured as an attempt to eliminate inefficiency by presuming to do away with the rights a party would customarily have to raise plausible individual challenges on those issues.

*In re Asacol Antitrust Litig.*, 907 F.3d 43, 51-52 (1st Cir. 2018).

Analysis of predominance under Rule 23(b)(3) "begins . . . with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The Court must consider the "probable course of the litigation" to "formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

Under Rule 23(b)(3), courts should deny certification of a class seeking damages where individualized issues of fact predominate over common questions. *See, e.g.*, *Kiossovski v. Forest Labs, Inc.* (*In re Clexa & Lexapro Mtkg. & Sales Practices Litig.*), 325 F.R.D. 529, 538-40 (D. Mass. 2017). In *Comcast*, the Supreme Court made clear the named plaintiffs must show that "damages are capable of measurement on a classwide basis," warning that "[q]uestions of individual damages calculations will inevitably overwhelm questions common to the class." 569 U.S. at 34. As detailed above, there is no conceivable way that the vast damage claims pled in the Complaint could avoid a student-by-student damages assessment. On this ground alone, the Court should strike the claim for a Rule 23(b)(3) class.

Regarding the liability issues pled in this action, the claims by their very nature require an individualized assessment of each student's claims. Simply put, Brown would be subjected to a stream of "mini-trials" on the other side of certification. *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 99 (1st Cir. 2021) (Barron, J. concurring). What Plaintiffs propose through a mass class action adjudication of highly individualized claims would be entirely inefficient and totally unfair to Brown. *See In re Asacol Antitrust Litig.*, 907 F.3d at 51-52.

For example, the Title IX "deliberate indifference" analysis as applied to each student involves individualized questions, such as (1) whether the student was subjected to "severe,

4872-1690-2403.4

pervasive, and objectively offensive sexual harassment?;" (2) whether and to what extent such harassment may have caused the student to be deprived of educational opportunities?; (3) whether Brown had actual notice of such harassment through an official authorized to take corrective action?; and (4) whether Brown's responsive actions can meet the high standard of deliberate indifference to the harassment, such that the response was clearly unreasonable in light of the known circumstances? *See Porto*, 488 F.3d at 72.  No single across the board determinations could possibly answer all of these questions as to the four named Plaintiffs, and especially not to the putative class members as a whole.

To the extent that negligence claims can be pursued here (which Brown contends above are not legally applicable), no "clear cut formula" exists under Rhode Island law for the determination of whether or not Brown may have owed a duty to an adult student and to what extent.  *RISD*, 432 F. Supp. 3d at 41 (D.R.I. 2019) (citing *Gushlaw v. Milner*, 42 A.3d 1245, 1256 (R.I. 2012)).  For each student, the Court would have to employ a fact-specific, *ad hoc* approach in the duty analysis.  *Id.*  Beyond the fact-specific duty analysis (if one were recognized), questions of proximate causation, by their nature, pose inherently individualized factual issues that cannot be addressed collectively on an aggregate basis.

Additionally, to the extent that some or all of the proposed class members would claim that Brown owed them a "special relationship" and should be held responsible for the conduct of a student or third party, this Court has recognized that such an analysis raises "sweeping social implications." *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d 252, 262 (D.R.I. 2018).  In doing so, the Court has declined to recognize a special relationship between a university and its adult students on an across-the-board basis.  *Compare Brown Univ.* (declining to find a special relationship concerning claims of an alleged drugging at an on-campus fraternity party resulting in a subsequent

60

sexual assault in an on-campus dormitory room) and *RISD* (finding a special relationship arising from the unique facts of the school's provision of required lodging in a study abroad program, where a sexual assault occurred).

Similarly, the breach of contract claims will require individualized analysis that renders a Rule 23(b)(2) class certification totally inappropriate. Each student's contract claim will raise factually distinct definitional and jurisdictional questions particular to the nature, extent, and location of the alleged prohibited conduct. As detailed above, Brown's policies have been amended over time, most recently in response to the Department of Education's Title IX regulations effective August 14, 2020. Consequently, there would be wide divergence among the class members regarding which substantive and procedural policies apply to each member's contract claim. Further, there would certainly be individualized questions in the interpretation and application of the controlling policies (e.g., were the specific investigative and adjudicatory steps undertaken in the disciplinary case in accordance with the applicable policy requirements?)

Plaintiffs' clearly cannot ever meet Rule 23(b)(3)'s predominance requirement. Brown should not be required to incur the substantial time and costs for a wide-ranging discovery fishing expedition by Plaintiffs (raising a myriad of FERPA concerns and anticipated objections by current and former students). The Court to strike the class allegations now, both in the interests of justice and judicial economy.[14]

---

[14]   Under Rule 23(b)(3), the Court must also consider whether a class action is a "superior" method of resolving the suit, taking into account the several factors outlined above. Fed. R. Civ. P. 23(b). The superiority requirement "ensures that litigation by class action will achieve the economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 462177, at * 21 (D. Mass. Oct. 16, 2017). Brown incorporates all of its above-stated arguments to support its contention that Plaintiffs similarly fail to satisfy the "superiority" requirement.

## 2. Plaintiffs have not shown that this action meets the criteria for a Rule 23(b)(1) "limited fund" class action.

In a single paragraph of their Complaint (¶ 125), Plaintiffs merely restate the requirements of Rule 23(b)(1) without any factual justification to certify a class of this type.  Rule 23(b)(1) class actions are appropriate only if either (i) there is a risk of separate adjudications to the non-class party, and separate actions would result in inconsistent adjudications (Rule 23(b)(1)(A)); or (ii) where adjudications would, as a practical matter, be dispositive of the interests of members not parties to the adjudications or substantially impair or impede their ability to protect their interests (Rule 23(b)(1)(B)).  Rule 23(b)(1) class actions are typically appropriate in so-called "limited fund" cases, where allocations of the available funds must be addressed and adjudicated.  *Wal-Mart*, 564 U.S. at 361 n.11.  A Rule 23(b)(1) class action "provides no opportunity for . . . class members to opt out," nor does it "even oblige the District Court to afford [the class members] notice of the action."  *Id*. at 362.

A Rule 23(b)(1) class would be totally misplaced here because of the highly individualized liability and damages issues among the four named plaintiffs themselves and that would certainly exist across the putative class members.  Given their purely cursory pleading of their Rule 23(b)(1) class certification request, Plaintiffs likely recognize that a Rule 23(b)(1) class is not proper.

## 3. A single Rule 23(b)(2) injunction cannot be entered for all class members, and Plaintiffs' claims for monetary damages are not incidental to the requested injunctive relief.

Just as they did with their single paragraph addressing their Rule 23(b)(1) request, Plaintiffs plead only a boilerplate allegation for a Rule 23(b)(2) injunction in the same paragraph.  Compl. ¶ 125.  Regarding the requested class-wide injunctive relief, Plaintiffs merely state in their prayers that the Court should issue "[a] permanent injunction requiring compliance with Title IX and recurring external audit of Brown's Title IX compliance."  Compl. ¶ 212.  As condition of its

62

receipt of federal funding, Brown must adhere to Title IX (which it does) or otherwise run the serious risk of the administrative withdrawal of its federal funding.  Plaintiffs' boldly pled requested injunction would accomplish nothing other than what the law already requires.  Further, there is no need for this Court to mandate "recurring external audits of Brown's Title IX compliance," because the Department of Education's Office for Civil Rights has administrative oversight of Brown's Title IX compliance.

As another fatal flaw, three of the named Plaintiffs (Carter, Taja, and Chloe) state that they are "former Brown student[s]," (Compl. ¶¶ 33-35), and two graduated from Brown over a year ago (Taja in May 2020 and Chloe in 2019, *id*. ¶¶ 84, 109).  These Plaintiffs (especially the two alumna) have no ability to seek injunctive relief as former students to compel Brown's Title IX actions going forward.  Their claims are purely for monetary relief only.  Similarly, the putative class, which seeks to reach back to 2018, would likewise include former students who have either since graduated or may have left Brown for other reasons.

Under Rule 23(b)(2), class certification is proper only if resolution of a common question "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  (reversing certification of a Rule 23(b)(2) class that sought injunctive and declaratory relief, punitive damages, and back-pay, where the plaintiffs failed to show commonality).  Like a Rule 23(b)(1) class action, there is no ability for any class member to elect to opt of a Rule 23(b)(2) class action.  *Id*. at 363.

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or none of them."  *Id*. at 360 (citation omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief

to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id*.

Again, as shown above, Plaintiffs' proposed class members do not share a common question, the resolution of which will "resolve an issue that is central to the validity of the claims in one stroke." *Id*. at 350.  Rule 23(b)(2) requires the injunctive relief must be final to "the class as a whole," a prospect totally at odds with the fact-intensive character of sexual misconduct claims.  As Brown points out above, the putative class action is filled with individualized issues spanning different academic years, scenarios, circumstances, locations, and applicable policies.  A Rule 23(b)(2) injunction is impossible here because "[d]issimilarities within the proposed class . . . impede the generation of common answers."  *Wal-Mart*, 564 U.S. at 350.

Finally, Plaintiffs primary claim for relief seeks substantial monetary damages.  Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages," which is precisely what is sought here.  *Id*. at 360-61.  In *Wal-Mart*, recognizing a defendant's due process rights, the Supreme Court determined that class claims for monetary relief required individualized determinations and therefore were not incidental to claims for injunctive or declaratory relief.  *Id*. at 363.  *Wal-Mart* compels the dismissal of Plaintiffs' request for a Rule 23(b)(2) certification in this litigation.  *See also John Doe v. Michigan St. Univ.*, Case No. 1:18-cv-1413 (W.D. Mich.), Opin. and Order dated 9/1/20 (ECF No. 77) (striking class allegations on the pleadings in Title IX case, where the plaintiff proposed a Rule 23(b)(2) class of all university students and/or former students who were subjected to disciplinary process without first being afforded a live hearing and opportunity to cross-examine witnesses).

# SECTION IV:
# BROWN'S ARGUMENTS TO SEVER EACH PLAINTIFF'S CLAIMS

Misjoinder of parties is addressed under Rule 21 of the Federal Rules of Civil Procedure.[15] The rule does not define the grounds for misjoinder, but it is well-settled that parties are misjoined when the preconditions for permissive joinder in Rule 20(a) are not met. *Malodonado Cordeiro v. AT&T*, 190 F.R.D. 26, 28 (D.P.R. 1999).

Rule 20(a) allows for permissive joinder of plaintiffs when two requirements are met. First, the plaintiffs must "assert any right to relief, jointly, severally, or in the alternative with respect to or arising out of the same transaction or occurrence," and second, "any question of law or fact common to all plaintiffs" must "arise in the action." Fed. R. Civ. P. 20(a)(1). "[T]he Court must consider both equity and judicial economy; efficiency cannot prevail at the expense of justice." *W. Reserve Life Assur. Co. of Ohio v. Caramadre*, No. CV 09-470S, 2015 WL 13704429, at *3 (D.R.I. Nov. 16, 2015) (citation omitted). The Court must also examine whether a permissive joinder of plaintiffs comports with fundamental fairness and would not prejudice the defendant. *See Patrick Collins, Inc. v. Does 1-38*, 941 F. Supp. 2d 153, 164 (D. Mass. 2013).

> Multiple plaintiffs may join together in a single action if they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and any question of law or fact common to all plaintiffs will arise in the action. Fed.R.Civ.P. 20(a)(1)(A)–(B). If both elements of this test are not satisfied, 'a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance. In such a case, the court can generally dismiss all but the first named plaintiff without prejudice to the institution of new, separate lawsuits by the dropped plaintiffs . . . [.]

---

[15]   Federal Rule of Civil Procedure 21 states:

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against any party.

4872-1690-2403.4

*Cruz v. Bristol-Myers Squibb Co., PR, Inc.*, 699 F.3d 563, 568–69 (1st Cir. 2012) (internal quotation marks and citation omitted).

Reviewing the "Named Plaintiffs' Factual Allegations" (Compl. ¶¶ 63-114), Katiana, Carter, Taja and Chloe are not asserting any right to relief "jointly and severally" (Rule 20(a)(1)(A)), so they must assert a right to relief "out of the same transaction, occurrence, or series of transactions or occurrences." (Rule 20(a)(1)(B)).  Even accepting the truth of what they have pled and applying the "same transaction or occurrence" standard as liberally as possible, the four named Plaintiffs' allegations do not come close to satisfying this mandatory requirement for a permissive joinder of individual claims collectively into a single lawsuit.

Plaintiffs do not allege that they suffered any assaultive conduct, harassment, or retaliation from common alleged perpetrators.  They do not allege that their claims relate to the same educational programs and activities at Brown.  They do not allege that the alleged harassment or retaliation occurred in temporally close time periods (or even during the same academic year). They do not allege any common locations, and, in fact, two of them (Katiana and Carter) allege conduct that occurred entirely outside of Brown's campus.  They do not allege with any specificity that they interacted with the same or an overlapping set of Brown deans or administrators.  Under Title IX, a global or consolidated adjudication of these diverse factual matters cannot be reached in one swoop under the "deliberate indifference analysis," which must review whether Brown's responses to each individual's reporting "was clearly unreasonable in light of known circumstances."

By way of a simple example showing why joinder is improper, looking at the enrollment periods of the four Plaintiffs at Brown, there is not even much overlap of their time together collectively at the University.  Using Katiana's enrollment in September 2020 (the 2020-21

66

academic year) for comparative purposes, Chloe (who enrolled at Brown in the 2015-16 academic year) graduated from Brown in 2019 before Katiana enrolled.  Carter, who enrolled at Brown in 2016, took a leave of absence from Brown in January 2020, so her enrollment and Katiana's overlapped only for a single semester.  Taja graduated from Brown in May 2020, so her enrollment overlapped with Katiana's for just one academic year.  Different Brown sexual misconduct policies applied over the course of the academic years (2015-16 – 2020-21) at issue in the Plaintiffs' allegations collectively, so their claims are subject to different policies.  Only Katiana's allegations post-date the Department of Education's Title IX regulations that took effect on August 14, 2020.

The analysis should stop at the Rule 20(a)(1)(A) step because Plaintiffs have not sufficiently pled facts to come close to satisfying the same transaction or occurrence standard.  And, they fare no better under the Rule 20(a)(1)(B) analysis, requiring that they show "any question of law or fact common to all plaintiffs will arise in the action."  Because of the clear disparities in the academic years at issue among the four Plaintiffs (as well as the statute of limitations problems that Chloe faces in her ability to proceed at all), there is not commonality in the legal analysis (even though they have all pled the same eleven causes of action).

Beyond the many evident variations in the liability issues, the highly individualized nature and analysis of each Plaintiff's alleged damages are even more profound.  This is true not only as to any alleged physical or emotional injuries suffered by each Plaintiff, but also regarding any alleged deprivation of access to educational opportunities.  The many differences in each Plaintiff's liability and damages issues cannot be easily reconciled, managed, and isolated during discovery.  The resulting case-management challenges would be substantially burdensome, and there is no judicial economy that would outweigh them.  Looking ahead, the potential for juror confusion at a trial would be very real and very prejudicial to Brown because wholly distinct

67

liability and damages claims would be blended together.  *See Rohr v. Metro. Ins. & Cas. Co.*, No. CIV. A. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan. 17, 2007) (granting defendant's motion to sever, in part, because of the potential undue prejudice to defendant of defending multiple claims, with different factual scenarios, in one trial, and noting "[a] court may also consider whether jury confusion would result from the volume of evidence if the plaintiffs were joined.").

Applying Rule 21, severance is appropriate because one Plaintiff's claims are capable of resolution regardless of the outcome of the other three's claims.  *See*, *e.g.*, *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 442 (7th Cir. 2006) (severance under Rule 21 is proper if one claim is "capable of resolution despite the outcome of the other claim.").  Because each of the four Plaintiff's alleged sexual assaults or harassment gave rise to separate interactions with Brown administrators and separate responses in different time periods, each Plaintiff will substantially rely on different evidence to support each of their claims.  *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 522 (5th Cir. 2010) (noting "district courts have considerable discretion to deny joinder [under Rule 21] when it would not facilitate judicial economy and when different witnesses and documentary proof would be required for plaintiffs.").  The disposition of one Plaintiff's claims is "discrete and separate" – Katiana's claims will have no bearing on the disposition of Carter, Taja and Chloe's claims and vice versa.

## CONCLUSION

None of the four named Plaintiffs has pled any plausible claims to hold Brown liable under Title IX, RICRA, or the Rhode Island common law claims.  If any Plaintiff has claims that survive past the Rule 12(b)(6) stage, then the Court should address now precisely how this litigation will proceed going forward.

4872-1690-2403.4

Simply put, this is not a class lawsuit strictly applying the Rule 23(a) and (b) analysis. Plaintiffs' class action allegations should be stricken to avoid what would be a clearly futile pursuit of trying to show that the asserted causes of action, with their highly individualized liability and damages analyses, can somehow be combined into a large class action resulting in uniform determinations.  Brown should not be forced to incur the substantial legal fees and costs and administrative burdens of defeating class certification later, when Plaintiffs' stated justifications for their putative class action are so obviously futile on the face of their pleading.

Additionally, the Court should not allow Plaintiffs to litigate together in one action (even assuming that any of their individual claims may survive Rule 12(b)(6) dismissal).  Each Plaintiff's allegations and claims present distinct underlying facts.  This is the only fair way to proceed without substantially prejudicing Brown's rights to defend itself.   Bundling four discrete lawsuits into one does not aid any form of disposition.

Finally, as Brown submits at the outset, if the Court is not inclined to dismiss Plaintiffs' negligence and contract theories contending that a university may be held liable under Rhode Island law for the general risk of student-on-student sexual misconduct (both on-campus and anywhere off-campus) and the tortious acts of third-parties (under a special relationship theory), then appropriate questions regarding such highly precedential issues (impacting every Rhode Island higher education institution) should be certified to the Rhode Island Supreme Court.

BROWN UNIVERSITY

By Its Attorneys,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Caitlyn Horbert (#10361)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1000
Fax: 401-454-1030
srichard@nixonpeabody.com
chorbert@nixonpeabody.com

## CERTIFICATE OF SERVICE

I certify that, on this 19th day of November 2021, this brief was filed and served through

the Court's CM/ECF system.

/s/ Steven M. Richard

4872-1690-2403.4