## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KATIANA SOENEN, TAJA HIRATA-EPSTEIN, CHLOE BURNS, EMMA DENNIS-KNIERIEM, JANE DOES 1-2, individually and on behalf of all others similarly situated, | CLASS ACTION<br><br>C.A. No. 1:21-cv-00325-JJM-PAS |
| *Plaintiffs,* | |
| v. | Jury Trial Demanded |
| BROWN UNIVERSITY, | |
| *Defendant.* | |

### FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, Katiana Soenen ("Katiana"), Taja Hirata-Epstein ("Taja"), Chloe Burns ("Chloe"), Emma Dennis-Knieriem ("Emma"), and Jane Does 1-2 ("Jane 1" and "Jane 2," respectively),[1] (collectively, "Plaintiffs"), on behalf of themselves and the class defined herein (the "Class"), bring this action against Defendant Brown University ("Brown" or "the University"), based upon personal knowledge of Plaintiffs and based upon the investigation of counsel regarding all other matters, for the University's failure to comply with the law in connection with its systematic mishandling of complaints of sexual misconduct made by female[2] students to the University and its staff. In support of Plaintiffs' First Amended Complaint (the

---

[1] Jane Does 1-2 will file a motion to proceed under a pseudonym, setting forth the legal and factual authority for protecting their identities due to the sensitive nature of the acts perpetrated upon them and to mitigate against additional extreme emotional distress that would result from being publicly identified.

[2] Plaintiffs use the term "female" throughout this Amended Complaint to describe both the Plaintiffs and the proposed Class. Plaintiffs recognize, however, that "female" is often used only to describe biological sex, and in some circumstances, may not properly reflect gender identity or presentation. For purposes of these pleadings, Plaintiffs' use of the term "female" is defined broadly to include biological sex, gender identity, and/or gender presentation. Under this definition, this includes, but is not limited to, all individuals who were assigned female at birth and individuals who identify or present as women.

"Amended Complaint"), Plaintiffs state as follows:

## **INTRODUCTION**

1.      The sexual misconduct response program at Brown has been in a state of neglect and dysfunction at all dates relevant to this Amended Complaint.  As set forth in more detail herein, despite its known duty to protect its female students from harm, Brown not only failed to carry out this duty but actively prevented the reporting of such harm.  Had Brown simply done what it was required to do by law to protect and support its female students, countless sexual assaults, including those perpetrated on Plaintiffs and other members of the Class, could have been avoided.  This complete breach of trust by an institution to the female students within its care is inexcusable.

2.      Despite its knowledge that sexual assault on its campus is endemic and that female students are routinely injured, Brown failed and continues to fail to take effective preventive measures and has allowed this dangerous situation to persist and cause harm to female students, including Plaintiffs and other members of the Class, creating a campus culture that ignores and even tacitly allows trauma to be inflicted upon women.

3.      Plaintiffs, individually and on behalf of the Class they seek to represent, are current and former female Brown University students who attended the Providence, Rhode Island campus during the time period from 2018 through the present and who are survivors of sex/gender-based discrimination, sexual assault, including rape, sexual harassment, and/or stalking while attending Brown.

4.      Pursuant to Title IX of the Education Amendments of 1972 ("Title IX"), no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance.

5.      Brown has had a systemic problem of improperly handling sexual harassment and sexual abuse allegations, contrary to its federal mandates under Title IX.  Brown's failures discussed herein constitute discrimination based on sex/gender in violation of Title IX.

6.      Brown students have attempted, unsuccessfully, to push Brown for reform from within.

7.      On or about June 27, 2020, the Instagram account Voices of Brown ("VOB") was founded.  VOB allowed sexual assault survivors at Brown to discuss anonymously instances of sexual assault on campus and their experiences in reporting those assaults to Brown.  VOB quickly amassed strong student support and a large online presence.  The account was followed by over half of the student population at Brown.  For the first time, Brown students were made aware of Brown's systemic failures on campus in preventing sexual violence and responding to Title IX complaints.  Brown has never responded to or addressed the existence of the VOB account.

8.      In February 2021, in the wake of over 100 survivor reports to VOB, and silence from Brown, the Instagram account End Sexual Violence at Brown ("ESV") was created.  ESV was and is a coalition of Brown students and student-run organizations created for and dedicated to facilitating community-based anti-sexual violence mobilization.

9.      In April 2021, ESV posted an open letter on Instagram denouncing the Brown administration and recounting a decades-long history of institutional survivor-silencing and suppression of student activism.  The letter went viral, garnering attention both online and by the media.

10.     Galvanized by the open letter, ESV organized a large-scale poster protest.  Students at Brown, mobilized by ESV, taped up over 2,000 posters on Brown's campus.  The

posters read "End Sexual Violence @ Brown" and "End the Silence, End the Violence."  Some provided a list of resources for survivors on campus.

11.    ESV also organized an in-person, outdoor, COVID-safe protest on April 7, 2021.  Students marched to the Brown president's house, gave speeches, and provided itemized demands to the University for reform.  Local newspapers covered the protests.

12.    On April 15, 2021, ESV published demands for Brown's administration through an organized email campaign; hundreds of Brown students emailed Brown with demands for reform.

13.    Brown administrators never responded to the actions of ESV directly.  In fact, Brown only begrudgingly agreed to meet with ESV leaders after numerous email exchanges with repeated requests.  The meeting between ESV members and administrators resulted in no material changes to Brown's policies or conduct.

14.    Despite this history, Brown has failed and continues to fail at taking steps to address or prevent sexual misconduct from occurring at its institution.  In fact, Brown set up a system that dissuades and actively thwarts reporting of sexual assault and misconduct despite its knowledge of a pervasive and ongoing problem.

15.    Reports to the University's Title IX Office were useless because Brown employees, who were mandatory reporters under Title IX, discouraged or even overtly prevented the proper reporting of sexual assault and abuse allegations and failed to provide students with resources and support as required by law.

16.    Those complaints that were filed with the Title IX Office were ignored and inadequately investigated or addressed, effectively ratifying the abusive acts committed against Plaintiffs and the Class and creating a hostile educational environment.

17.     Further, Brown engaged in retaliatory conduct against students who publicly discussed their experiences, publicly raised complaints about Brown, and/or engaged in publicly-organized protests against Brown's failures in responding to and investigating claims of sexual misconduct, including sexual assault and other forms of sex/gender-based discrimination as set forth herein, thereby creating and perpetuating a culture of silence and a hostile educational environment with respect to such claims.

18.     As a result of Brown's treatment of Title IX reports and the students who made them, the Title IX Office had a reputation on campus as being unhelpful and useless at best to hostile and retraumatizing at worst.

19.     Brown's investigation of and response to complaints of sexual assault, misconduct, and harassment is insufficient and does not comply with (a) federal law, including Title IX response requirements as outlined in guidance issued by the U.S. Department of Education Office for Civil Rights ("OCR"); (b) Rhode Island state law, including the Rhode Island Civil Rights Act ("RICRA"), § 42-112-1 *et seq*., and (c) Brown's own internal policies and procedures discussed herein.

20.     As a result of Brown's pattern and practice of misconduct, Plaintiffs have been excluded from participation in, have been denied the benefits of, and have been subjected to discrimination at the University.

21.     In multiple instances, Plaintiffs were forced to leave Brown to the detriment of their educational and career opportunities because of the severity of the harm caused to them by Brown's failure to comply with Title IX, state law, and its own policies and procedures.

22.     Brown routinely failed to follow its own policies and procedures in responding to and investigating claims of sexual misconduct, including sexual assault and other forms of

sex/gender-based discrimination. Brown did not provide appropriate training to its staff and faculty on how to handle and address complaints subject to Title IX protection.

23. Moreover, Brown's Title IX policies are contradictory, confusing, and difficult to understand both for students and employees. Moreover, multiple requests for Brown to reform its policies and response to complaints subject to those policies fell on deaf ears.

24. Brown's failure to appropriately respond to and investigate Plaintiffs' claims, as well as the sex/gender discrimination and other harms perpetrated by Brown against Plaintiffs, caused Plaintiffs severe harm, violated the law, and denied Plaintiffs, and the other students they seek to represent, the ability to participate fully in their education as Brown students.

## JURISDICTION AND VENUE

25. This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*

26. This Court has subject matter jurisdiction over this case based on 28 U.S.C. § 1331, which grants the district court jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

27. This Court has subject matter jurisdiction over the class claims in this case pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which

explicitly provides for the original jurisdiction of the federal courts over any class action in which any member of the Plaintiff Class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.

28.    Plaintiffs and the putative Class allege that the total claims of the individual members of the proposed Plaintiff Class are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5).  As set forth below, Plaintiffs are domiciled in several states and are citizens of Texas, the District of Columbia, Colorado, Massachusetts, Rhode Island and California.  Defendant Brown is a citizen of Rhode Island.  Therefore, minimal diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

29.    Plaintiffs' claims are cognizable under the United States Constitution, 42 U.S.C. § 1681 *et seq*. and under Title IX.

30.    This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

31.    The events giving rise to this lawsuit occurred in the city of Providence, Rhode Island, which sits in this District.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred.

32.    Brown is subject to the Court's personal jurisdiction with respect to this action.

## **THE PARTIES**

33.    Katiana is a person of the age of majority and a current student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Katiana is a citizen of the State of Texas.

34.     Taja is a person of the age of majority and a former student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Taja is a citizen of the District of Columbia.

35.     Chloe is a person of the age of majority and a former student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Chloe is a citizen of the State of Colorado.

36.     Emma is a person of the age of majority and a former student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Emma is a citizen of the State of Massachusetts.

37.     Jane 1 is a person of the age of majority and a current student at Brown, and at all times pertinent to this suit resided either on campus at Brown, or in private housing in the city of Providence, Rhode Island.  Currently, Jane 1 is a citizen of the State of California.

38.     Jane 2 is a person of the age of majority and a current doctoral student at Brown, and at all times pertinent to this suit resided in private housing in the city of Providence, Rhode Island.  Currently, Jane is a citizen of the State of Rhode Island.

39.     Plaintiffs and the other members of the Class are natural persons and, at all times relevant to this Amended Complaint, were female students at Brown University.

40.     Defendant Brown was at all relevant times and continues to be an educational institution in Providence, Rhode Island, organized and existing under the laws of the State of Rhode Island, with an address at 1 Prospect Street, Providence, RI 02912.

## FACTS RELEVANT TO ALL PLAINTIFFS AND ALL OTHER SIMILARLY-SITUATED STUDENTS

41.     Brown has two policies which guide the University's response to potential Title IX violations: (1) the Title IX Policy,[3] last approved February 23, 2021; and (2) the Sexual and Gender-based Misconduct Policy.[4]

42.     The Title IX Policy includes the following statement of purpose:

This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy. It also defines Prohibited Intimate Relationships between individuals where one individual has power or authority over another which could create a hostile environment.

This policy is in accordance with Title IX of the Education Amendments of 1972; relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

43.     The Title IX Policy further reads: "Taking meaningful action when conduct prohibited by this policy occurs is a critical component to Brown's commitment to a campus that is free from discrimination and harassment. Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist us in these efforts by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer. Such reports amplify the University's ability to know what is occurring within its programs and activities and to respond accordingly. The Title IX Program Officer will

---

[3]  https://www.brown.edu/about/administration/title-ix/Sexual%20and%20Gender-Based%20Harassment%2C%20Sexual%20Assault%2C%20Interpersonal%20Violence%2C%20and%20Stalking%20Policy (last visited January 26, 2022).

[4]  https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy (last visited January 26, 2022).

conduct an initial assessment of these reports and will do so in a manner consistent with the privacy choices of the Complainant or reporting party."

44.    The Sexual and Gender-based Misconduct Policy includes the following statement of purpose:

> This policy prohibits Sexual Harassment, Gender-Based Harassment, Sexual Assault, Dating Violence, Domestic Violence, and Stalking, in addition to Sexual Exploitation and Provision of Alcohol and/or Other Drugs for Purposes of Prohibited Conduct. This policy also prohibits Retaliation against an individual for making a report of conduct prohibited under this policy or for participating in an investigation of an alleged violation of this policy.

> This policy is in accordance with relevant provisions of the Violence Against Women Reauthorization Act of 2013; Title VII of the Civil Rights Act of 1964; the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act; their implementing regulations; and other applicable federal and Rhode Island state laws and regulations.

45.    The Sexual and Gender-based Misconduct Policy addresses prohibited conduct, including sexual assault, that occurs off-campus and is a complement to the Title IX Policy.

46.    Pursuant to Section 3.1.4 of Brown's Sexual and Gender-based Misconduct Policy regarding Mandatory Reports, "Brown asks faculty and staff in varying leadership roles who oversee the welfare of faculty, staff, students, and University programs to assist [] by reporting all disclosures or knowledge of Prohibited Conduct to the Title IX Program Officer."[5]

47.    Pursuant to Section 3.1.5 of Brown's Sexual and Gender-based Misconduct Policy, "[t]he University will accept a report of Prohibited Conduct at any time" and "[t]here is no time limit on submitting a Formal Complaint." Additionally, "the University will provide reasonably available and appropriate support measures, assist the Complainant in identifying

---

[5]    *Id.*

external reporting options, and may take appropriate action to address the Prohibited Conduct," even if the "the Complainant and/or Respondent is no longer affiliated with Brown."[6]

48.    Pursuant to Section 6.0 of Brown's Sexual and Gender-based Misconduct Policy, the "[f]ailure to comply with this and related policies is subject to disciplinary action, up to and including suspension without pay, or termination of employment or association with the University, in accordance with applicable (e.g., staff, faculty, student) disciplinary procedures."[7]

49.    Furthermore, Section 4.0 of Brown's Sexual and Gender-based Misconduct Policy defines retaliation as "any action, statement, or behavior meant as reprisal or retribution against an individual in response to the individual's good-faith report or participation in a proceeding related to this policy.  Any retaliatory action taken directly or indirectly against a person who has made a report, filed a complaint, or participated in an investigation is prohibited."[8]

50.    Both the Title IX Policy and Sexual and Gender-based Misconduct Policy incorporate by reference Brown's Title IX Grievance Procedure, effective February 16, 2021, for responding to Formal Complaints, which are "request[s] for an investigation and initiation of [the] grievance procedure."[9]  "Only a Complainant or the Title IX Program Officer can submit a Formal Complaint."[10]

---

[6]    *Id.*

[7]    *Id.*

[8]    *Id.*

[9]    https://www.brown.edu/about/administration/title-ix/policies/sexual-and-gender-based-misconduct-policy/sexual-and-gender-based-misconduct-complaint-proc, (last visited January 26, 2022).

[10]    *Id.*

51.    Upon receipt of a Formal Complaint, the Title IX Program Officer will make the following determinations to decide upon the applicability of policies:

- Could the facts set forth by the Formal Complaint, if substantiated, constitute conduct prohibited by the Policy?

- Was the Complainant a Covered Persons as defined in the Policy when the alleged Prohibited Conduct occurred?

- Is the Respondent currently enrolled or employed?

- Did Brown University exercise substantial control over both the Complainant and Respondent at the time in which the alleged Prohibited Conduct occurred?

    If the answer to each question is "YES", then the Policy and this procedure applies, and the Title IX Office has the authority to investigate and resolve the Formal Complaint.

52.    Alternatively, the Title IX Grievance Procedure provides for an informal resolution process that "involves a facilitated resolution that is acceptable to the Complainant and Respondent."  Under the informal resolution process, "a full investigation of the allegation is not conducted" and the matter is considered closed once resolved through an informal resolution process."  "In all cases, the Title IX Program Officer [has] the discretion to determine whether an informal resolution or mediation is appropriate to the circumstances."[11]

53.    The Corporation for Brown University, the University's governing body, also has a policy on Equal Opportunity, Nondiscrimination and Affirmative Action ("Equal Opportunity Policy"),[12] last revised on May 1, 2020, which reads: "Brown University provides equal opportunity and prohibits discrimination, harassment and retaliation based upon a person's race, color, religion, sex, age, national or ethnic origin, disability, veteran status, sexual orientation,

---

[11] *Id.*

[12] https://www.brown.edu/about/administration/corporation/corporation-policy-statement-equal-opportunity-nondiscrimination-and-affirmative-action (last visited January 26, 2022).

gender identity, gender expression, or any other characteristic protected under applicable law, in the administration of its policies, programs, and activities."

54.    Moreover, among other things, Title IX requires colleges and universities to: (i) respond promptly to every reported instance of sexual assault, harassment, or violence; (ii) offer supportive measures to survivors, regardless of whether the survivor chooses to file a formal complaint; (iii) refrain from pressuring a survivor into not filing a formal complaint or participating in a grievance process; (iv) protect survivors from having to come face-to-face with their accused in the Title IX process; and (v) not retaliate against a survivor for reporting sexual misconduct, choosing to file a formal complaint, or choosing to participate in a grievance process.

55.    Brown repeatedly engaged in discriminatory, retaliatory, and other unlawful conduct in its interactions with Brown students, including Plaintiffs, in response to Plaintiffs' reports of sexual assault and other sexual misconduct, in violation of Title IX, Brown's own Title IX Policy, Brown's Sexual and Gender-based Misconduct Policy, and the Corporation for Brown University's Equal Opportunity Policy.

56.    Upon information and belief, the training Brown provided for students and employees regarding its sexual misconduct and anti-discrimination policies, definitions, and investigation and reporting procedures falls far short of the OCR's standards in terms of educating community members at higher education institutions about their rights and obligations with respect to sexual misconduct and sex/gender discrimination on campus.

57.     As part of its Common Data Set initiative, Brown reported 10,257 undergraduate and postgraduate students in Fall 2018; 10,333 undergraduate and postgraduate students in Fall 2019; and 9,948 undergraduate and postgraduate students in Fall 2020.[13]

58.     Upon information and belief, institutions of the same size and scale as Brown generally provide significantly more comprehensive training to students and employees to inform them of their rights and obligations under the institution's Title IX policies than Brown does.

59.     Upon information and belief, at all times relevant to this Complaint, the Title IX Office at Brown did not have a dedicated Title IX investigator to ensure that an institution with approximately 10,000 students and numerous other employees remained free of sex/gender-based discrimination.

60.     Upon information and belief, at all times relevant to this Amended Complaint, the Title IX Office at Brown relied on only two investigators supplied by the Office of Institutional Equity and Diversity (OIED), consisting of an Institutional Equity Officer and an Institutional Equity Investigator, both of whom have responsibilities within OIED unrelated to Title IX.

61.     Brown's Title IX Office was woefully inadequate and insufficiently staffed to meet the needs of its campus and fell well outside the scope of standards required for an institution of Brown's size.

62.     On September 16, 2019, the research firm Westat published a report describing the results of a 2019 Campus Climate Survey on Sexual Assault and Misconduct ("Campus Climate Survey") administered at Brown.[14]

---

[13] As set forth on Brown's website, the Common Data Set is a standardized set of questions most often asked by parents, students, and other members of the higher education community. https://oir.brown.edu/institutional-data/common-data-set (last visited August 5, 2021).

63.     According to the Campus Climate Survey, nearly 3,100 undergraduate, graduate, and medical students participated in the Westat survey—a 31.5% response rate.  The results of this survey were shocking and showed, at a minimum:

- **A Frequency and Nature of Victimization by Physical Force or Incapacitation**:

  o   24.5% of undergraduate women reported experiencing nonconsensual sexual contact since arriving at Brown.

- **A Prevalence of Sexual Harassment:**

  o   48.2% of students reported experiencing at least one type of offensive or inappropriate behavior of a sexual nature.

- **A Prevalence of Intimate Partner Violence:**

  o   9.5% of students reported experiencing at least one type of controlling, threatening or physical harm from an intimate partner.

- **A Prevalence of Stalking:**

  o   6.3% of students reported experiencing behavior associated with stalking.

- **Characteristics of offenders**:

  o   78.4% of offenders were current Brown students.

64.     The detailed data within the Campus Climate Survey demonstrates that, at all times relevant to this Amended Complaint, campus sexual and gender-based harassment and violence was and continues to be a serious issue at Brown.  Additionally, the data revealed that:

- 22.1% of students reported that they believe that *sexual misconduct is very or extremely problematic on Brown's campus*;

- 6.9% of students reported that they believe it is very or extremely likely that *they will experience sexual assault or misconduct while enrolled at Brown*;

- 8.5% students reported that they believe that it is *unlikely or very unlikely that campus officials would take the report seriously*; and

---

[14]  https://www.brown.edu/web/documents/climatesurvey-2019/Brown_University_Full_Westat_Report_2019.pdf (last visited August 5, 2021).

- 14.5% students reported that they believe it would be *unlikely or very unlikely that the investigation would be fair*.

65.     Upon information and belief, to curb reporting of the increasing number of incidents at Brown, Title IX complaints are purposefully buried or diverted, which means that complaints are never properly investigated or addressed, and offending students are not negatively impacted.  The concealment of Title IX complaints benefits Brown both financially and reputationally, while causing further harm to Plaintiffs and other similarly-situated students.

66.     The Title IX Office publishes an Annual Outcome Report on complaints of sexual misconduct brought to the attention of Brown officials and the outcomes of those complaints. According to those Annual Outcome Reports:

- 59 incidents were reported to the Title IX Office between July 2016 and June 2017, but only 12 formal complaints were filed and only 4 findings of responsibility at the time of publication;[15]

- 92 incidents were reported to the Title IX Office between July 2017 and June 2018, but only 9 formal complaints were filed and only 3 findings of responsibility;[16]

- 99 incidents were reported to the Title IX Office between July 2018 and June 2019, but only 11 formal complaints were filed and only 4 findings of responsibility;[17] and

- 103 incidents were reported to the Title IX Office between July 2019 and June 2020 but only 9 formal complaints were filed and only 5 findings of responsibility.[18]

---

[15]  https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/AnnualOutcomeReportsOctober2017_final%20%281%29.pdf  (last visited August 5, 2021).

[16]  https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/106390_OIED_Title%20IX%20Annual%20Outcomes%20Report_0419%20FNL_0.pdf (last visited August 5, 2021).

[17]  https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/Title%20IX%20Annual%20Outcomes%20Report_2018-2019.pdf  (last visited August 5, 2021).

67.     Brown's Title IX Office also regularly fails to provide survivors of sex/gender-based discrimination and/or harassment who report sexual abuse or misconduct with supportive measures, as required by Title IX and its own policies.

68.     Brown's insufficient response to Plaintiffs' reports of Title IX violations subjected Plaintiffs and other similarly-situated students to further harassment and created a sexually hostile and toxic environment on campus.

69.     Plaintiffs and all other similarly-situated students suffered harm as a direct and indirect result of Brown's common pattern of actions and inactions, as detailed herein.

## **NAMED PLAINTIFFS' INDIVIDUAL FACTUAL ALLEGATIONS**

### *Katiana*

70.     Katiana began her education at Brown in 2020, and at all relevant times was and is a student at Brown, majoring in Public Health and International and Public Affairs with a focus on Governance and Policy, specifically Health Policy.

71.     In May 2021, at an off-campus party hosted by student athletes of Brown's rugby team, Katiana was sexually assaulted by a male student athlete.

72.     The party and the sexual assault happened inside the male student's apartment, which was located at 339 Thayer Street, Providence, RI 02906 and situated directly adjacent to Brown's campus.  This residence was commonly referred to by students as the "Rugby House" because several members of the Brown rugby team lived there.

73.     Following Katiana's assault, on or about May 19, 2021, she reached out to a SHARE advocate, a University employee, who connected her with Brown's Title IX Office.

---

[18] https://www.brown.edu/about/administration/title-ix/sites/brown.edu.about.administration.title-ix/files/uploads/TIXAnnualReport20192020_FNL.pdf (last visited August 5, 2021).

74. On or about May 24, 2021, Katiana met with Jeana Horton ("Horton"), who is Brown's current Interim Title IX Program Officer, and Rene Davis ("Davis"), who was the Title IX Program Officer at that time, to report the assault.

75. During that meeting, Katiana was discouraged from filing a Formal Complaint because the incident happened off campus, and Horton claimed the assaulter would not be found responsible because there were no witnesses to the assault and no evidence thereof.

76. Instead, Katiana was encouraged to either (i) make an informal report and proceed with the informal resolution process or (ii) report the assault anonymously using Brown's Sexual Violence & Gender-based Harassment Incident Reporting Form to establish a trend of misconduct involving the male student.

77. Katiana was later informed that Davis was resigning from Brown in June 2021. Brown used Davis' resignation as a means to coerce Katiana into an informal resolution process. Davis instructed Katiana that if she proceeded with the informal resolution process, then Davis would be able to handle her matter; however, a Formal Complaint would take several months, which would extend past the time of Davis's departure.

78. Katiana, still vulnerable from the sexual assault, was further told by the Title IX Office that the informal resolution process would benefit her because she could dictate the terms or conditions of a resolution.

79. Despite Katiana informing the Title IX Office of the goals she hoped to accomplish if she were to proceed with the information resolution process, *i.e.*, that her abuser be made to understand that she had not given consent and that preventative measures be put in place to prevent the abuser from engaging in the same conduct with other women, Katiana was not given any clarity or guidance on how to formulate terms and conditions that would likely be

accepted by her abuser while accomplishing her goals—guidance she needed because the informal resolution process was voluntary for the abuser.

80.     Following the May 24, 2021 meeting, Katiana received a form email from Davis, which included a web link to the "Support Measures" page of the Sexual Violence & Gender-based Misconduct Policy.  Katiana had not been advised of these measures in her meeting with the Title IX Office and did not understand their implications.

81.     There was no equitable investigation.  Rather, Katiana wanted to make a Formal Complaint but was coerced into the informal resolution process.

82.     Once Katiana made the informal report, the Title IX Office reached out to Katiana's assaulter and blindly accepted his version of the events, even going so far as forwarding Katiana, on or about May 29, 2021, an email "apology" that the assaulter had prepared.

83.     The email forwarding the apology, sent by Davis, characterized the apology as "affirming and appropriate," despite the assaulter stating in the email that he had "enjoyed talking with [Katiana]," insinuating that he had enjoyed assaulting her.  Katiana's receipt of this email was extremely triggering and re-traumatizing.

84.     The Title IX Office took no further action with respect to Katiana's May 2021 assault.

85.     On June 12, 2021, Katiana was raped in an off-campus, unsanctioned frat house adjacent to Brown's campus, located at 249 Hope Street, Providence, RI 02906.

86.     The rape occurred in the basement of the unsanctioned frat house.  Katiana's rapist then tried to take her upstairs to his bedroom before being stopped by another party attendee who came to Katiana's aid and transported Katiana to her on-campus dorm.

87.    The unsanctioned frat house belonged to the Sigma Chi fraternity, which Brown had previously suspended from operating on campus for five years on September 6, 2019 after a University investigation found the fraternity guilty of hazing and alcohol violations, misrepresenting information, and violating University operational rules.

88.    By January 2021 when Katiana started at Brown, the Sigma Chi fraternity was back to operating informally at Brown and scheduling mixers and social events with Brown student sororities and athletic teams.

89.    Upon information and belief, the Office of Student Conduct ("OSC") at Brown was aware of Sigma Chi operating informally on campus and hosting parties at the Sigma Chi house.  Specifically, Katiana was later advised by OSC that, while it was aware of parties at the house, no student had come forward to be a witness to the parties.

90.    On the night of her rape, Katiana, who at the time resided on campus, went to the unsanctioned frat house after receiving an invitation to attend a party hosted by Sigma Chi.

91.    Upon information and belief, at the time of Katiana's rape, a majority of the male students that resided at the unsanctioned Sigma Chi frat house were members of Brown's men's water polo team.

92.    Katiana did not know her rapist, but she remembered sufficient details to narrow it down to one student-athlete on the website of the men's water polo team.

93.    Given that Katiana's prior report to the Title IX Office had resulted in no action being taken, Katiana was reluctant to report the June 2021 rape until her SHARE advocate suggested she should.

94.    In July 2021, Katiana had several meetings with the Title IX Office, including with Horton, in which Katiana reported the June 2021 rape.  During one of the meetings, Horton

made statements to Katiana implying that the Title IX Office was aware of prior allegations of sexual misconduct of Brown students at the unsanctioned Sigma Chi frat house.  Horton also advised Katiana that the Title IX Office could treat the rape as on-campus conduct because the Sigma Chi fraternity house was located directly across the street from Brown's campus.

95.    In a subsequent meeting with the Title IX Office, which was also attended by Katiana's SHARE advocate, Katiana advised the Title IX Office that she had been able to narrow down her rapist to one student-athlete.  Katiana asked the Title IX Office how certain she had to be about the identity of her rapist.

96.    The Title IX Office failed to answer Katiana's question, failed to conduct any investigation into the rape, and failed to further assist her in any way.  The Title IX Office also provided Katiana with no resources at all.

97.    Katiana asked the Title IX Office to investigate her rape, but it declined to do so because Katiana was unable to identify the male student athlete who raped her with certainty.  Katiana had concerns about implicating the wrong male student athlete.

98.    Instead, the Title IX Office pushed Katiana to contact OSC, telling Katiana that OSC had the ability to investigate organizations as opposed to individual students.  Having received no assistance from the Title IX Office for the second time, Katiana met with the OSC.

99.    The OSC was the first University department to explain to Katiana the process and implications of a No Contact Order.  The Title IX Office had failed to provide any of this information to Katiana.

100.    Only after Katiana had reached out—on her own and without the assistance of Brown's Title IX Office—to the OSC was she able to secure a No Contact Order against her

rapist, which was issued on or about July 8, 2021.  Katiana also obtained a No Contact Order against the individual involved in her early May 2021 sexual assault.

101.    On or about July 23, 2021, the OSC instructed Katiana that issues of rape and sexual assault were the primary responsibility of the Title IX Office and that she had to go back to that office if she wanted Brown to investigate her rape.

102.    Appalled by the circular instruction and the Title IX Office's utter failure to take any action to respond to her rape complaint, Katiana's SHARE advocate recommended that she seek legal counsel outside of the University's Title IX Office.

103.    Katiana's experience with the Title IX Office had detrimental effects on her mental health and ability to continue her education at Brown.

104.    As a result of her experience with the Title IX Office, Katiana did not want to be on campus anymore.  Approximately two weeks after the June 2021 rape, Katiana left Brown's campus to recover from her traumatic experience at her parents' home in Texas.

105.    At the start of the Summer 2021 semester, Katiana was enrolled in five courses. After the first May 2021 assault, Katiana's dejection resulted in her withdrawing from one of her classes.   After the June 2021 rape, Katiana's condition deteriorated, and she received an incomplete in two additional courses, completing only two classes that semester.

106.    Katiana returned to Brown's campus at the end of the Summer 2021 semester in order to complete a police report for the June 2021 rape.

107.    Following the Summer 2021 semester, Katiana took a leave of absence from Brown for the Fall 2021 and Spring 2022 semesters.  Should she choose to return, Katiana has been re-admitted to the University for the Fall 2022 semester.

***Taja***

108.    Taja graduated from Brown in 2020 with a degree in Political Science.

109.    From 2017 to 2018, she was in a sexually-abusive relationship with a male Brown student.  Over the course of their relationship, Taja's partner raped and sexually abused her on various occasions.

110.    In the Fall 2018 semester, Taja lived in an on-campus dorm affiliated with her co-ed fraternity.

111.    Taja's rapist was also a member of that fraternity and lived in the same on-campus building.

112.    In September 2018, Taja reported the sexually abusive relationship to her fraternity, disclosing the instances of rape and sexual abuse.

113.    As a result of Taja's report, Taja's rapist arranged with Brown's Office of Residential Life to leave the dorm and live nearby, off-campus.

114.    Despite the fact that Taja's rapist moved out of the fraternity dorm, he continued to harass Taja by instructing his fraternity friends (who still lived in the dorm) to badger her when they encountered her in the dorm.

115.    For example, the friends of Taja's rapist would regularly tell her that she was exaggerating, and that her only purpose for reporting her rapist was to be vengeful.  His friends would also routinely pressure Taja to not report her rapist to the Title IX Office and, on multiple occasions, told Taja that her rapist did not want her to report him.

116.    After enduring a month of incessant harassment by her abuser's friends in and around her dorm on campus, in October 2018, Taja told a Dean at Brown about the sexually abusive relationship and that she had been raped.  The Dean advised Taja that (s)he was a mandatory reporter pursuant to Brown's Title IX Policy.  The Dean reported the sexually abusive relationship to the Title IX Office.

117.    The Dean then tried to mediate contact between Taja and the Office of Residential Life in an effort to get Taja housing accommodations and permission to move off-campus.  Taja sought permission to move off-campus because of the continued harassment by her rapist through his friends, as well as her rapist's continued presence within her fraternity's dorm. Taja's request for accommodation was denied without explanation to Taja.

118.    Ten days after the Dean reported Taja's sexually abusive relationship to the Title IX Office, Taja asked the Dean whether she should have received a response from the Title IX Office at that point.  The Dean reissued the request to the Title IX Office to reach out to Taja about her complaint.  It was only after the Dean's second attempt to report Taja's complaint that the Title IX Office contacted Taja.

119.    Following the Dean's second report, the Title IX Office responded to Taja with a form email from Davis, the Title IX Officer.  Taja responded to the email and arranged for a meeting with Davis in early December 2018.

120.    Taja, along with her SHARE advocate, attended the meeting.

121.    Taja inquired into the availability of the Formal Complaint process, but she was heavily pressured by the Title IX Office into a more informal process.

122.    The Title IX Office explained that in its informal resolution process, Taja could request that her rapist take certain actions, such as consenting to a No Contact Order or enrolling in counseling; Brown would then convey her requests to her rapist.

123.    The Title IX Office explained to Taja that if her rapist agreed to her requests and then broke the agreement, it would recommend a Formal Complaint.

124.    The Title IX Office also explained that it had success with getting students to participate in the informal resolution process because students accused of sexual misconduct typically did not want to be the subject of a Formal Complaint.

125.    The Title IX Office further explained that it was a rarity for a Formal Complaint to result in a perpetrator on campus being found responsible.

126.    The Title IX Office also told Taja that the Formal Complaint process would likely be difficult and re-traumatizing.

127.    The Title IX Office also told her that, if she did not file a Formal Complaint, the Title IX Office could not force her rapist to agree to any of her requests in the informal resolution process.

128.    In January 2019, after Taja was pushed into the informal resolution process, Taja's rapist agreed to a No-Contact Order.

129.    During the informal resolution process, Taja requested that the Title IX Office ask her rapist to stay out of the fraternity dorm where she lived.  The Title IX Office advised that they would speak to him.  However, Taja never received any follow-up response or confirmation that they had complied with her request.

130.    During the informal resolution process, Taja requested that the Title IX Office ask her rapist to go to male peer counseling.  The Title IX Office advised that they would speak to him.  However, Taja never received any follow-up response or confirmation that the Title IX Office had complied with her request.

131.    During the informal resolution process, Taja renewed her request to reside off-campus to limit contact with her rapist and his friends.  The Title IX Office denied the request with no explanation.  In fact, the Title IX Office never bothered to ask her for any details

regarding the nature and persistence of the harassment that she was experiencing by her rapist's friends, both on campus and in the dorm in which she resided.

132.    Thereafter, Taja was permitted only to move out of the fraternity dorm to a different on-campus dormitory.

133.    However, Taja continued to worry that she was still at risk because of the proximity of her new residence hall to her rapist and his friends.  Taja was right to worry; her rapist's friends continued to harass her on campus when they saw her.

134.    Having heard nothing from the Title IX Office concerning her request that her abuser be prohibited from entering her prior residence hall, in Spring of 2019 after the No-Contact Order was entered, Taja communicated with the Title IX Office again to request that her rapist be barred from entering her new dorm.  The Title IX Office advised her that they would request that her rapist stay out of her dorm building.  However, Taja never heard back from the Title IX Office about the outcome of this request, whether they had, in fact, spoken to her rapist about her request, or whether he would agree to stay out of her building.

135.    Because she never heard back from the Title IX Office and she was unsure about whether or not her abuser could still enter her building, Taja was scared to leave her dorm room.

136.    As a result of being confined to her room due to Brown's unwillingness to provide support measures, guidance, and accommodation, Taja was forced to rely on her new romantic partner for basic necessities and escorts to class.

137.    However, Taja's new relationship devolved into physical, sexual, and emotional abuse.  But due to Taja's dependence on the partnership for basic necessities, she felt trapped in the relationship and that she could not leave.

138.    In July 2020, Taja learned, through the new partner's ex-girlfriend, that he had raped three other women, and assaulted two others.  Taja ended the relationship and went to the Title IX Office with six women in total, including herself, to report her own abuse, as well as the prior rapes experienced by the other women.

139.    The Title IX Office knew that this specific male student had a history of prior misconduct against women, but despite this knowledge, instructed Taja and the other women that there was nothing Brown could do because he had graduated in May 2020.

140.    Specifically, Davis from the Title IX Office advised Taja that "Brown does not have a way of addressing conduct issues of individuals after they graduate."  Taja and the other women were told that the best the Title IX Office could do was ask him to not attend the graduation ceremony for the class of 2020, which had been rescheduled due to COVID-19.

141.    After speaking with Davis, Taja emailed the former student's academic advisor about what she had experienced while they were in a relationship.  The academic advisor replied to Taja that she was not surprised to hear her experience, given what the department already knew about this student.

142.    The Title IX Office further advised Taja that they were unable to contact her former partner because his Brown email had been disabled.  Taja provided a new contact email for him, but she never heard back from the Title IX Office about whether he was successfully contacted or whether he had agreed to not attend the Class of 2020 graduation ceremony.

143.    At all times relevant to this Amended Complaint, Taja's main contact at the Title IX Office was Brown's Title IX Officer, Davis.

144.    Again, Taja received no accommodations or resources to deal with the trauma she experienced by her second abuser while on Brown's campus.

27

145.    As a result of these experiences at Brown, and a lack of support from the Title IX Office, Taja consistently missed class and received "No Credit" for a Global Governance course in the Fall of 2018.  As a result of the "No Credit" grade, Taja was no longer qualified to apply for the Political Science Honors Society.  Taja's continued stress resulted in her having to take a reduced course load for the Fall 2018 and Spring 2019 semesters.

146.    Taja was fearful of leaving her dorm and experienced panic attacks whenever she had to be on campus by herself, outside the confines of her room.  Taja stopped being an active participant in her fraternity, stopped studying in the library, and stopped eating in dining halls or going to professor office hours for her classes.

147.    As a result of these experiences at Brown, Taja has and continues to receive treatment from a therapist.

### *Chloe*

148.    Chloe graduated from Brown in 2019 with a degree in Cognitive Neuroscience.

149.    On August 6, 2018, Chloe was found responsible for a charge of retaliation in violation of Brown's Sexual and Gender-based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy.

150.    The finding against Chloe was itself part of Brown's retaliation against her for having publicly spoken out about her April 14, 2016 sexual assault by a male Brown student at her on-campus sorority house, while she was incapacitated.

151.    During the assault, Chloe was mostly unconscious, but awoke for a moment to discover her assaulter naked and on top of her before passing out again.  Chloe later woke up to bruises on her arms, lip, and inner thighs, and she discovered blood on her bra.

152.    Following the assault, Chloe's abuser repeatedly attempted to initiate contact with her.  This prompted Chloe to obtain a No Contact Order in December 2016 through the OSC.

153.    Despite the No Contact Order, Chloe's assaulter continued to engage in a pattern of harassment and intimidation, including visiting Chloe's dorm, attempting to get her attention at a concert, and initiating contact with Chloe's friends to get her attention.

154.    In May 2017, Chloe filed a Formal Complaint with the Title IX Office against her assaulter.   In response to Chloe's Formal Complaint, the assaulter filed a cross-complaint alleging that it was Chloe who had, in fact, sexually assaulted him.

155.    A hearing on both cross-complaints took placed on or about October 30, 2017. Chloe's assaulter was found responsible for non-consensual sexual touching, sanctioned with an 18-month suspension from Brown, and mandated to complete consent counseling.   Chloe was found not responsible for the cross-complaint filed by her assaulter.

156.    Chloe's assaulter appealed his finding of responsibility and related sanctions. Brown permitted him to remain on campus and attend classes during the pendency of his appeal.

157.    While the appeal was pending, on or about November 8, 2017, Chloe's assaulter was selected to be the mid-year graduation speaker for Brown.

158.    Upon learning of his selection by Brown, Chloe contacted an Associate Dean at Brown who oversaw and was in charge of the mid-year graduation ceremony.   The Associate Dean was shocked to learn of Chloe's history with her abuser and the responsibility finding against him.

159.    The Associate Dean had not been aware of this information at the time Brown selected Chloe's abuser as the graduation speaker and had not been advised of the responsibility finding against him, contrary to the Title IX Grievance Procedure requiring that appropriate campus officials be notified of the outcome and determination of Formal Complaints where there is a finding of responsibility.

160.    Chloe contacted the Title IX Office requesting that her assaulter not be permitted to serve as the graduation speaker, given that there was a finding of responsibility against him for sexual misconduct.   The Title IX Office refused to take any action in response to Chloe's request.

161.    On or about November 30, 2017, Chloe received correspondence directly from the Dean of the College at Brown stating that the University would not change its mind regarding the decision to have Chloe's abuser, a student who had been found responsible for non-consensual sexual touching following a Formal Complaint with the Title IX Office, as its mid-year graduation speaker.

162.    The November 30, 2017 correspondence was Chloe's first and only interaction with the Dean of the College and came as a surprise to Chloe.

163.    Chloe then contacted a college newspaper to highlight the fact that Brown was ignoring a survivor's request that her assaulter not be given the privilege of speaking at Brown's graduation ceremony.

164.    Chloe had no control over the publication by the college newspaper, which was printed on December 1, 2017 and updated in January 2018.[19]

165.    On December 1, 2017, Chloe received a litigation notice from an attorney representing her assaulter regarding publication of the article by the college newspaper.   Upon information and belief, Brown also received a litigation notice from the same counsel.

166.    After receiving the litigation notice, Chloe noticed a change in how the Title IX Office treated her.

---

[19]  https://thetab.com/us/brown/2017/12/01/assault-brown-title-ix-4306  (accessed, January 26, 2022).

167.    The Title IX Office never asked Chloe about her mental health or what prompted her to reach out to the college newspaper.

168.    The Title IX Office also failed to provide Chloe with any resources or support measures, leaving Chloe no choice but to go outside the University for guidance and support. Chloe retained SurvJustice, a legal organization that provides services to survivors of sexual violence, and paid out-of-pocket for representation.

169.    On December 4, 2017, the Title IX Office permitted Chloe's assaulter to file a retaliation claim against her for speaking publicly about her experience.

170.    On December 19, 2017, a three-person committee from the Title IX Council granted the appeal filed by Chloe's assaulter, without a hearing, and overturned the finding of responsibility against him for non-consensual sexual touching.

171.    In April 2018, due to concerns for her safety arising from her assaulter's escalating steps to retaliate against her through a purported defamation claim, as well as her general fear of him arising from the initial sexual assault, Chloe sought to supplement her December 2016 No Contact Order by obtaining a No Trespass Order from the Brown Department of Public Safety.  The request was denied.

172.    Chloe continued to defend against the retaliation claim and sought to have it dismissed.  Chloe asked the Title IX Office if dismissal was possible given the totality of the facts.

173.    Upon information and belief, on or about June 15, 2018, the Brown Title IX Office submitted a request to the Chair of the Title IX Council for the retaliation claim against Chloe to be reviewed for a summary disposition.

174.    On June 22, 2018, Chloe received notice from the Title IX Office that the Chair of the Title IX Counsel had rejected Chloe's request for summary disposition.

175.    A hearing on the retaliation claim against Chloe took place on July 23, 2018.

176.    On August 3, 2018, Chloe received an email from Davis stating that, after the Title IX Committee made a decision on the retaliation claim, the University itself would review the panel's decision.

177.    Chloe was struck by this correspondence from Davis, in light of the correspondence Chloe received directly from the Dean of the College, because review by the University was not a standard practice or process specified in the Title IX Grievance Procedure.

178.    The Title IX Committee found Chloe responsible for retaliation on August 6, 2018, and she received a written reprimand.  Chloe learned of the finding that same day.

179.    On August 9, 2018, Chloe requested an extension from the Title IX Office, until August 15, 2018, to appeal the finding of responsibility for retaliation.  The request was granted.

180.    However, due to her trauma, Chloe felt helpless in pursuing an appeal.   On August 15, 2018, Chloe received correspondence from the Title IX Office stating that her matter was closed in that office because she had not filed an appeal by the deadline.

181.    On October 18, 2018, Chloe received an email from Davis asking how she was doing.  This was Chloe's last contact with the Title IX Office.

182.    Chloe's 17-month ordeal from the time of her assault to the retaliation finding against her, including her experience with the Title IX Office, had deleterious effects on her mental health and her ability to participate in educational programs and academic activities.

183.    As a result of her ordeal, Chloe was diagnosed with a generalized anxiety and major depressive disorder. Chloe sought therapy and received two incompletes in classes in which she was enrolled at Brown.

***Emma***

184.    Emma is a 2021 graduate of Brown University with a degree in Applied Mathematics.

185.    During her freshman year, Emma resided on campus and was in an abusive relationship from October 2017 to May 2018 with a male Brown student in his junior year, who also resided on campus. All acts of abuse occurred on Brown's campus and typically within Emma's and her abuser's respective dorms.

186.    Throughout the abusive relationship, Emma's abuser pressured her into having sex on his command, and repeatedly touched her breasts and buttocks without her consent.

187.    On numerous occasions, Emma's abuser manipulated her into having sex without a condom, even after she explicitly requested the use of condoms.

188.    Emma's abuser was also emotionally abusive towards her, using derogatory language such as "whore," "bitch," and "ho" to refer to Emma.

189.    Emma's abuser enjoyed invalidating her experiences, including undermining her intelligence as a woman within STEM.

190.    Emma's abuser made her feel physically unsafe and exploited an unequal power dynamic that existed in the relationship.

191.    On two separate occasions, March 10, 2018 and sometime in April 2018, Emma called emergency EMS due to her abuser's high level of alcohol intoxication and Emma's concern for his safety. The March 10, 2018 incident required Emma's abuser to be taken to the

hospital due to intoxication.  On both occasions, Emma's abuser was hostile toward her for contacting EMS.

192.    As a result of the abusive relationship, Emma sought treatment on-campus with Brown's office for Counseling and Psychological Services (CAPS). Over the course of several sessions, Emma's therapist at CAPS recommended that she go to the Title IX Office.

193.    On November 14, 2018, Emma made a verbal complaint to the Title IX Office, which was adopted into a Formal Complaint written by the Title IX Office.

194.    On November 30, 2018, following the filing of the Formal Complaint, the Title IX Office placed a No Contact Order between Emma and her abuser.

195.    Despite the No Contact Order, in April 2019, during a scheduled meeting with the Title IX Office, Emma saw her abuser inside the Title IX Office.  Emma became extremely emotional when she saw him at an office whose administrators were acutely aware of her trauma and the complaint process that she was going through, in addition to Emma having taken steps to schedule the meeting in advance.

196.    On one occasion, Emma submitted a written personal note that she requested be sent directly to her abuser to explain her feelings and why she was pursuing a Formal Complaint. Emma was surprised to learn that the Title IX Office had created two versions of this document, whether by error or not, changing and deleting Emma's words, and altering the message she had hoped to convey.

197.    On another occasion, Davis, the Title IX Officer, shared a confidential email with Emma's abuser that contained information Emma had specifically requested not be shared, as it pertained to a subsequent assault Emma suffered at the hands of another Brown student.

198.     Due to this breach of trust, Emma requested that Davis be removed from any investigative role of her Formal Complaint.

199.     Emma did not feel supported by the Title IX Office, and the stress of dealing with the deficiencies of the Title IX Office caused Emma to struggle academically.

200.     The hearing on Emma's Formal Complaint was eventually scheduled for May 1, 2019, *168 days* after the November 14, 2018 filing date.

201.     On April 19, 2019, twelve days before the scheduled hearing, Emma's abuser requested that the Title IX Office ask Emma whether she would reconsider the Formal Complaint in lieu of his consent to the informal resolution process.

202.     Although Emma was reluctant to participate in the informal process, on April 26, 2019, Emma sent the Title IX Office the conditions to which she wanted her abuser to agree in order for her to withdraw her Formal Complaint.  Emma never heard back from the Title IX Office.

203.     On April 30, 2019, exactly one day before the hearing on Emma's Formal Complaint, Emma's abuser filed his own Formal Complaint against Emma with the Title IX Office.

204.     Emma learned of the Formal Complaint against her on the evening of May 1, 2019, after her own hearing, for which she had waited 168 days to take place.  The Title IX Office should have advised Emma of the Formal Complaint against her before her hearing, as this information was relevant to the pattern of manipulation Emma presented to the Title IX Committee.

205.    The abuser based his Formal Complaint on an incident that had occurred on May 16, 2018, following a consensual sexual encounter with Emma, after which the abuser fell asleep and Emma touched him in a sexual manner.

206.    The Title IX Office should have recognized that the abuser's Formal Complaint, strategically filed one day before the hearing on Emma's Formal Complaint, was the same form of abuse and manipulation that ultimately prompted Emma to come forward..

207.    On May 7, 2019, Emma learned that Title IX Committee found Emma's abuser not responsible for the allegation of sexual assault, not responsible for the allegation of relationship and interpersonal violence, and also found insufficient evidence of an unequal power dynamic.

208.    The hearing for the Formal Complaint filed against Emma took place on August 30, 2019.  On or about September 10, 2019, Emma was found responsible for engaging in non-consensual sexual contact and received a punishment of community probation.

209.    Due to her experience with the Title IX Office as detailed above, Emma developed a paranoia of being on campus and experienced emotional instability, traumatic flashbacks, and thoughts of self-harm and suicide, all of which affected her ability to concentrate on her studies.

210.    Emma returned to Brown for the Fall 2019 semester but continued to feel paranoid about her return given that she had been touched and objectified the last time she was on campus, her experience was invalidated by those who were supposed to protect her, she received inadequate support from the Title IX Office, and the Title IX process was allowed to be used manipulatively against her by her abuser in a retaliatory fashion.

***Jane 1***

211.    Jane 1 is currently a junior at Brown.  During her Fall 2020 and Spring 2021 semesters at Brown, Jane 1 was enrolled in the Applied Music Program (AMP).

212.    As part of her course instruction, Jane 1 had one-on-one Zoom instruction with a professor ("offending professor") in the department.

213.    From her first meeting with the offending professor, Jane 1 noticed that he had issues with boundaries and often shared personal details about his life that left Jane 1 feeling uncomfortable.

214.    During a session in October 2021, the offending professor made sexually suggestive comments to Jane 1 about rape that left Jane 1 feeling overwhelmingly disrespected and anxious.

215.    Specifically, the professor told Jane 1 that "we're going into a forbidden place together" and asked he how it "sound[ed] to be violated, to be in agony, to be at wit's end," and that he was suggesting the "grossest and meanest" definition of being violated.  The offending professor then attempted to walk back his statements by saying "[i]t doesn't have to be sexual.  It can be anything."

216.    On November 11, 2020, Jane 1 sent an email to the Director of Choral Activities (the "Director"), stating that she no longer wished to work with the offending professor and requested to work with two other professors in the AMP.  Jane 1 advised the Director that she felt "unable to attend [her] lessons [with the offending professor] out of discomfort and anxiety" and that she did not "feel comfortable bringing it up" directly to the offending professor.

217.    The Director failed to take Jane 1's complaints seriously and did not respond to Jane 1's email until ***January 18, 2021***, when (s)he apologized for having missed the initial email.

The Director dismissed Jane 1's concerns and defended the offending professor, stating that his style was always "incredibly professional."

218.    Prior to receiving the belated response, and because Jane 1 did not receive a timely response from the Director, on November 22, 2020, she emailed the offending professor directly, stating that she was no longer going to attend classes with him.

219.    Jane 1 stopped appearing for lessons with the offending professor, missing the remainder of the sessions for the Fall 2020 semester, amounting to approximately one month of classes.

220.    To her surprise, the offending professor gave Jane 1 an "A" grade for the Fall 2020 semester, which Jane 1 perceived as being provided out of guilt for his prior misconduct.

221.    On December 22, 2020, Jane 1 sent an email to an Administrator in the AMP, which mirrored her earlier email to the Director. This professor responded and asked Jane 1 if she could share the email with the Chair of the Music Department (the "Chair").

222.    On January 20, 2021, during a telephone call with the Chair, Jane 1 asked for an investigation into the offending professor. The Chair was defensive of the offending professor and dismissive of Jane 1's complaint, stating that nothing in the offending professor's history showed any similar conduct.

223.    Following the January 20, 2021 exchange, the Chair assigned Jane 1 a new voice professor (the "new voice professor") for the Spring 2021 semester.

224.    Thereafter, on March 30, 2021, Jane 1 first contacted Davis at the Brown Title IX Office regarding an investigation into the offending professor. Jane 1 met with Davis and Rowan McKenna ("McKenna"), the Administrative Coordinator of the Title IX Office, on April 2, 2021.

225.    Through discussions with the Title IX Office, Jane 1 requested an accommodation so she did not have to perform her end-of-year exam in front of the offending professor.  At that time, it was standard practice for all AMP students to give a final performance in front of all professors in the program.  The performance is known internally in the AMP as a "jury."

226.    Thereafter, on April 2, 2021, Jane 1 asked to file a Formal Complaint with the Title IX Office.

227.    Jane 1 believed the Title IX Office would investigate the offending professor, but it failed to do so.

228.    The Title IX Office advised Jane 1 that they would provide her with an update on the Formal Complaint, but never did.

229.    Jane 1 was never asked by the Title IX Office to submit anything in writing about her experience with the offending professor.

230.    Jane 1 was never advised that any action was taken in response to her Formal Complaint, and, to her knowledge, no action was taken.

231.    Jane 1 is aware that the Title IX Office met with the Chair regarding her requested accommodation of excluding the offending professor from her jury performance.

232.    Specifically, on April 7, 2021, the Chair emailed Jane 1 advising that she had instructed the Director to arrange the then-scheduled April 13, 2021 jury so that Jane 1 would perform first without the offending professor present, such that the offending professor would then join the Zoom after Jane 1 had finished performing.

233.    On April 12, 2021, Jane 1 was contacted by her new voice professor, who told Jane 1 that the Director had called her to ask for an assessment of Jane 1, at which time the

Director also inquired about whether Jane 1 was telling the truth about her experience with the offending professor.

234.    The new voice professor advised Jane 1 that the "[AMP] would make it hard for her" to continue in the program and the accommodation of not performing before the offending professor was a "one-time thing."

235.    Upon information and belief, the Director tried to take Jane 1's accommodation away when (s)he contacted the new voice professor.

236.    Jane 1 gave her performance on April 13, 2021, with the accommodation. Davis sat in on Jane 1's performance.

237.    In May 2021, Davis resigned from her role as Brown's Title IX Officer. After Davis's departure, no one from the Title IX Office ever contacted Jane 1 regarding her Formal Complaint.

238.    Jane 1 left the AMP after the Spring 2021 semester. Jane 1 would have continued in the program but was made to feel unsafe by Brown's actions.

239.    Jane 1 also had concerns about having to perform in front of the offending professor in the future. Jane 1 left the department to avoid being further harassed and to protect her safety.

240.    Jane 1 continued to see the offending professor on campus and does not believe anything was ever put into his file to document her experience or that any other actions were taken to address her complaint.

### *Jane 2*

241.    Jane 2 is a current Doctor of Philosophy (PhD) student in the Department of Religious Studies at Brown.

242.     In March 2019, Jane 2 attended an off-campus party hosted by a fellow Brown student in the religious studies department, which was attended by many other religious studies students.

243.     At the party, Jane 2 was assaulted by an older doctoral student who groped her breasts as he was leaving the party.  Prior to groping her, the assaulter made a comment about Jane 2's breasts before the non-consensual contact.

244.     Jane 2 spoke with other students in the department about the incident and learned that many other women, both graduate and undergraduate, had uncomfortable experiences with the same doctoral student who had groped her.  Jane 2 reached out to these other women to learn more about their experiences.

245.     Based on her own assault and what she learned of her assaulter's history, Jane 2 decided to report her assault to a Director at Brown who told Jane 2 that he was a mandatory reporter to the Title IX Office.

246.     Jane 2 was thereafter placed in contact with Davis and Brown's Title IX Office. Davis initiated contact with Jane 2 on or about May 23, 2019.

247.     Through several exchanges, Davis tried to coerce Jane 2 into the informal resolution process.  However, Jane 2 insisted on filing a Formal Complaint after learning that the informal resolution process required her assaulter to agree to participate in the process.

248.     On or about September 18, 2019, Jane 2 filed a Formal Complaint with the Title IX Office against her assaulter for the groping.

249.     At the instruction of the Title IX Office, Jane 2's Formal Complaint did not include details about her assaulter's pattern of sexual harassment of other students in the

religious studies department, despite the fact that Jane 2 had shared her knowledge of other student concerns with Davis and placed those students in contact with Davis.

250.    Jane 2 had also been made aware that the University Ombudsperson knew about her assaulter's history and prior incidents well before Jane 2's assault took place.

251.    As part of the Title IX complaint process at Brown, both Jane 2 and her assaulter were required to submit statements to the Title IX committee.

252.    Jane 2 was given very strict parameters by the Title IX Office on what her statement should look like, both in terms of length and content.

253.    Jane 2 was explicitly told by the Title IX Office that she could not discuss any patterns of behavior with other women.

254.    Jane 2 was also told by the Title IX Office that she could not include anything in her statement about her assaulter's character, despite knowing that he had been banned from the graduate student bar on campus because of complaints about his conduct.

255.    Jane 2 did as she was instructed and complied with all restrictions placed on her by the Brown Title IX Office in preparing her written statement to the Title IX Committee.

256.    However, Jane 2 was deeply traumatized and humiliated when she received and read her assaulter's statement, which was much longer than the limitation imposed upon her and contained numerous lies about her character and sexual history.

257.    Among other things, her assaulter, in his statement, accused Jane 2 of fabricating her Formal Complaint and exaggerating her interaction with the assaulter.  The assaulter's statement alleged further that Jane 2 had solicited sex from him which he declined, that Jane 2 regularly spoke about sexual deeds and bad experiences with men that left her feeling socially

abused, and that Jane 2 once asked her assaulter about blackmailing men with false allegations of sexual assault.

258.    Jane 2 asked Davis why her assaulter was permitted to include out-of-context and untrue allegations about her and why she had not been permitted to include more detail and context about her assaulter.

259.    Davis told Jane 2 that she could not instruct Jane 2's assaulter to edit his statement.

260.    Ultimately, the Title IX investigative committee convened on January 17, 2020 for a hearing and found Jane 2's assaulter not responsible.

261.    The effects of the Title IX panel's decision and her experience with the Brown Title IX Office on Jane 2 were severe, and they ultimately led to her taking a leave of absence from Brown and missing the Spring 2020 semester due to the trauma she suffered.

262.    As a result of her experience with the Title IX Office, Jane 2 has become very afraid of her assaulter.

263.    Jane 2 limits her presence on Brown's campus to only her teaching responsibilities as a result of this fear because her assaulter remains on-campus (in his 8th or 9th year now).

264.    To this day, Jane 2 maintains a No Contact Order against her assaulter and remains fearful of him.

## CLASS ACTION ALLEGATIONS

265.    Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

266.    The class that the Plaintiffs seek to represent (the "Class") is defined as follows:

All current or former female students who attended Brown University's Providence, Rhode Island campus from 2018 to present, who experienced sexual assault, harassment, or other forms of sexual misconduct and were deprived of educational opportunities or otherwise harmed by Defendant's systematic mishandling of the reporting or investigation of complaints of such misconduct.

267.    Plaintiffs reserve the right to amend the Class definition if discovery and further investigation reveals that the Class should be expanded or otherwise modified. Plaintiffs also reserve the right to establish sub-classes as appropriate.

268.    This action is brought and properly maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3) and satisfies the requirements thereof. As used herein, the term "Class Members" shall mean and refer to the members of the Class.

## A.    EFFICIENCY OF CLASS PROSECUTION OF CLASS CLAIMS

269.    Certification of the proposed Class is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of Plaintiffs and the Class.

270.    Plaintiffs' individual claims, as class representatives, require resolution of the common questions concerning whether Brown has subjected its female students to sex/gender-based discrimination that is sufficiently severe, pervasive, and objectively offensive to interfere with their educational opportunities, undermining and detracting from their school experience. Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives and working conditions, and the working conditions of the Class members, and to prevent Brown's continued sex/gender discrimination.

271.    Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination has had on them individually and on female students at Brown generally. Brown caused Plaintiffs' injuries through its discriminatory practices, policies, and procedures and failure to remedy or correct such discrimination. These injuries are redressable through systemic

relief, such as equitable and injunctive relief and other remedies sought in this action. Plaintiffs have a personal interest in the policies, practices, and procedures implemented at Brown.

272.    To obtain relief for themselves and the Class, Plaintiffs will first establish the existence of systemic gender discrimination as the premise for the relief they seek. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

### B.    NUMEROSITY AND IMPRACTICABILITY OF JOINDER

273.    The Class consists of hundreds of women, making joinder impracticable, in satisfaction of Fed. R. Civ. P. 23(a)(1). The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Brown.

274.    Brown publishes an Annual Outcome Report identifying the number of incidents reported to the Title IX Office: 99 incidents were reported from July 2018-June 2019, and 103 incidents were reported from July 2019-June 2020. *See* ¶ 65. Brown is yet to publish the July 2020-June 2021 report.

### C.    TYPICALITY OF CLAIMS AND RELIEF SOUGHT

275.    The claims of Plaintiffs are typical of the Class. The claims of Plaintiffs and the Class are based on the same legal theories and arise from the same unlawful pattern and practice of mishandling claims for sexual harassment and assault.

276.    Each Plaintiff is a member of the Class she seeks to represent. Plaintiffs' claims are typical of the claims of the proposed Class. Plaintiffs possess and assert each of the claims they assert on behalf of the proposed Class. They pursue the same factual and legal theories and seek similar relief.

277.    Like members of the proposed Class, Plaintiffs are current and former female graduate or undergraduate students who were enrolled at Brown during the relevant period.

278.    The acts and omissions to which Brown subjected Plaintiffs and the Class applied universally to all members of the Class and were not unique to any Plaintiff or Class Member.

279.    Brown has failed to respond adequately or appropriately to complaints of sexual harassment and has created a campus-wide hostile environment and culture of silencing survivors.  Brown has failed to create adequate procedures to ensure its employees comply with anti-discrimination laws and has failed to adequately discipline its employees when they violate anti-discrimination laws.  Plaintiffs and Class Members have been affected in the same or similar ways by Brown's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination and a sexually hostile environment.

280.    The relief necessary to remedy the claims of Plaintiffs is the same as that necessary to remedy the claims of the proposed Class Members.  Plaintiffs seek the following relief for their individual claims and on behalf of the members of the proposed Class:  (i) a declaratory judgment that Brown's policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and Class Members under, *inter alia*, Title IX and the applicable Rhode Island state laws; (ii) a permanent injunction against Brown and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein; (iii) an Order requiring Defendant to initiate and implement programs and policies that (a) remedy the gender/sex discrimination, sexual harassment, and hostile environment at Brown; (b) ensure prompt remedial action regarding all claims of gender/sex discrimination, sexual harassment and hostile environment; and (c)

eliminate the continuing effects of the discriminatory and retaliatory practices described herein; (iv) an award of damages to Plaintiffs and the Class under Title IX and common law, including compensatory damages and enhanced compensatory damages and/or punitive damages to deter Brown from engaging in similar discriminatory practices in the future; and (v) an award of litigation costs and expenses, including reasonable attorneys' fees.

281.    There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect only individual Class Members within the meaning of Fed. R. Civ. P. 23(a)(2) and 23(b)(3).

### D.    ADEQUACY OF REPRESENTATION

282.    Plaintiffs are adequate representatives of the proposed Class.

283.    Plaintiffs' interests are coextensive with those of the members of the proposed Class that they seek to represent in this case.  Plaintiffs seek to remedy Brown's hostile environment so female students will not suffer differential treatment, depriving them of educational opportunities and resources.

284.    Plaintiffs are willing and able to represent the proposed Class fairly and vigorously.

285.    Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.  The combined interests, experience, and resources of Plaintiffs and their counsel to litigate the claims at issue in this case competently satisfy the adequacy of representation requirement of Rule 23(a)(4).

286.    Plaintiffs are unaware of any difficulty that will be encountered in the management of this litigation precluding its maintenance as a class action.

### E.     COMMON QUESTIONS OF LAW AND FACT

287.    Common questions of law and fact exist as to Plaintiffs and the Class Members,

as required by Rule 23(a)(2) of the Federal Rules of Civil Procedure, including:

(a)     Whether Brown had a pattern and practice of failing to investigate and/or report allegations of sexual misconduct;

(b)     Whether Brown has engaged in unlawful, systemic sex/gender discrimination and facilitated a hostile educational environment that violates Title IX;

(c)     Whether Brown has violated the Title IX and other legal rights of its female students by failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of discrimination in the educational environment;

(d)     Whether Brown has perpetuated a culture of silence of survivors through its failures and misconduct;

(e)     Whether Brown is liable for continuing systemic violations of Title IX;

(f)     Whether Brown acted with deliberate indifference to the notice of sexual assault or harassment;

(g)     Whether the harassment permitted and facilitated by Brown interfered with the work or educational opportunities normally available to students;

(h)     Whether an "appropriate person"  had knowledge of the sexual assault, sexual harassment, and hostile environment, including such knowledge of facts that would reasonably indicate substantial risk to any female students, and failed to adequately respond;

(i)     Whether Brown owed Plaintiffs and the proposed Class Members a fiduciary duty;

(j)     Whether Brown breached its fiduciary duty by tolerating, condoning, ratifying, and/or engaging in the hostile environment, sexual harassment, gender/sex discrimination, and/or retaliation, and failed to take remedial action;

(k)     Whether Brown knew or should have known that its breach of fiduciary duty resulted in the sex/gender-based harassment and hostile environment to which Plaintiffs and members of the proposed Class were subjected.

(l)     Whether Brown's conduct amounted to a violation of RICRA, § 42-112-1 *et seq.*; and

(m)    Whether Brown breached its duty to exercise reasonable care by failing to provide a process to address allegations of sexual assault, including rape, sexual harassment, and dating violence, for which Plaintiffs and Class Members, who are students, had a reasonable expectation would exist.

**F.    REQUIREMENTS OF RULE 23(B)(2)**

288.    Brown has acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class by facilitating sex/gender based discrimination and failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of sexual assault, hostile environment, sexual harassment, and retaliation.  Brown's systemic discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

289.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case.  Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of the University's systemic gender/sex discrimination.  In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by Plaintiffs and Class Members of monetary and non-monetary remedies for additional losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

**G.    REQUIREMENTS OF RULE 23(B)(3)**

290.    The common issues of fact and law affecting the claims of Plaintiffs and proposed Class Members—including, but not limited to, the common issues identified above— predominate over any issues affecting only individual claims.  The common issues include whether Brown has engaged in sex/gender based discrimination against female students by facilitating a hostile environment and failing to appropriately handle evidence and complaints of assault and harassment.

291.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of Plaintiffs and members of the proposed Class because:

(a)    the expense and burden of individual litigation make it economically unfeasible for Class Members to seek redress of their claims other than through the procedure of a class action;

(b)    Class Members may be too humiliated or isolated to seek individual redress of their claims in a public forum for fear of public embarrassment and retaliation, and a class action procedure allows redress without participation in extended and traumatizing litigation;

(c)    Class Members may suffer from severe mental health issues related to the sexual misconduct they experienced while at Brown and do not have the physical ability to withstand a deposition or trial to seek redress of their claims;

(d)    Plaintiffs are unaware of any other actions seeking the same relief that is sought through the class action procedure;

(e)    concentrating the claims against Brown would grant it finality in litigation as well as guidance through injunctive orders; and

(f)    absent a class action, Brown would likely continue such unlawful activities to the detriment of future Brown students.

292.    The hostile academic environment at Brown makes Plaintiffs and Class Members eligible for monetary remedies for losses caused by this systemic discrimination, including compensatory damages, and other relief.

293.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class Members.

## COUNT I
### Violation of Title IX
### Deliberate Indifference to Sex/Gender Discrimination
### 20 U.S.C. §§ 1681, *et seq*.

294.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

295.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Brown due to the deliberate indifference to sex/gender-based discrimination. Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

296.    Brown created and/or subjected Plaintiffs to a hostile educational environment in violation of Title IX because:

(a)    As female students seeking equal access to educational programs and activities at Brown, Plaintiffs were members of a protected class covered by Title IX;

(b)    Plaintiffs were subjected to sex/gender-based discrimination in the form of sexual assaults, sexual harassment, relationship violence, and/or stalking;

(c)    Plaintiffs were subjected to harassment based on their sex; and

(d)    Plaintiffs were subjected to a hostile educational environment created by Brown's lack of policies and procedures and failure to properly investigate, prevent, and/or address the sexual and physical assaults and harassment perpetrated on Plaintiffs.

297.    At all relevant times, Brown exercised substantial control over Plaintiffs' abusers who, at all relevant times, were (or remain currently) students enrolled at Brown or employees working at Brown.

298.    Brown had actual knowledge of the sex/gender-based discrimination, which was created and furthered by its repeated failure to protect Plaintiffs consistent with Brown's own policies and federal law and guidance.

299.    Brown acted with deliberate indifference to the acts of sex/gender-based discrimination by failing to take any action to prevent them, deter the students and/or employees responsible, and/or protect Plaintiffs from sexual misconduct.

300.    Brown also acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective remedial steps to resolve the Plaintiffs' allegations of sex/gender-based discrimination.

301.    Brown's repeated failure to promptly and appropriately respond to the sexual misconduct Plaintiffs experienced resulted in Plaintiffs, on the basis of their sex, being excluded from participation in, being denied the benefits of, and being subjected to discrimination in Brown's educational programs and activities in violation of Title IX.

302.    Brown acted intentionally and with deliberate indifference to the repeated denial of Plaintiffs' access to educational opportunities or benefits.  Brown's violation of its duty to Plaintiffs arises from its systemic failure to properly enforce Title IX.  Contrary to its own policies, Brown cultivated a culture of silence by failing to report complaints of sex/gender-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure victimized students had equal access to educational opportunities and benefits or grievance procedures.

303.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by Brown, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to Brown's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left Brown before completing their degrees.

304.    As a direct, natural, and proximate result of Brown's violation of Title IX due to its deliberate indifference to sex/gender-based discrimination, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income, loss of enjoyment of life,

economic damages associated with moving to flee their abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

305.    Plaintiffs are also entitled to a permanent injunction requiring Brown to take substantial steps to remedy its deliberate indifference to reports of Title IX violations and change the culture of silence at Brown by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex/gender-based discrimination; holding students and employees accountable for their acts of sexual misconduct and discrimination; and remedying any hostile environment that is created as a result of sex/gender-based discrimination, as damages alone are not an adequate remedy for ongoing violations of Title IX.

**COUNT II**
**Violation of Title IX**
**Hostile Environment**
**20 U.S.C. §§ 1681, *et seq*.**

306.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

307.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Brown due to the heightened risk of sex/gender-based discrimination on Brown's campus.  Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

308.    As female students seeking equal access to educational opportunities and benefits at Brown, Plaintiffs were members of a protected class covered by Title IX.

309.    The abuse described previously in this Amended Complaint, perpetuated by Brown employees and students, created an abusive and sexually hostile educational environment

on Brown's campus that impeded and effectively denied Plaintiffs' equal access to educational opportunities and benefits.

310.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to Brown's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left Brown before completing their degrees.

311.    Brown is liable for the abusive and hostile educational environment on campus because it had actual knowledge of Plaintiffs' abusers' acts of sex/gender-based discrimination against women students, but allowed them to continue to have unfettered access to female students, including Plaintiffs.

312.    Brown is also liable for its failure to remedy the hostile educational environment experienced by Plaintiffs by failing to offer Plaintiffs appropriate interim support measures and accommodations that could have provided Plaintiffs with equal access to educational opportunities and benefits.

313.    Brown is also liable for its failure to remedy the hostile educational environment by failing to initiate and conduct proper investigations into the Title IX violations Plaintiffs suffered, appropriately sanction the assailants, and provide appropriate follow-up support to Plaintiffs, thus ensuring they received equal access to educational opportunities and benefits.

314.    As a direct, natural, and proximate result of Brown's violation of Title IX by creating and perpetuating a sexually hostile environment, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health

treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income, expenses associated with fleeing their abusers, and other economic and non-economic damages, for which they are entitled to just compensation.

315.     Plaintiffs are also entitled to a permanent injunction requiring Brown to take substantial steps to remedy its sexually hostile environment by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex/gender discrimination; holding students and employees accountable for their acts of sexual misconduct and discrimination; and remedying any hostile environment that is created as a result of sex/gender-based discrimination, as damages alone are not an adequate remedy for ongoing violations of Title IX.

**COUNT III**
**Violation of Title IX**
**Heightened Risk**
**20 U.S.C. §§ 1681, *et seq*.**

316.     Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

317.     All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Brown due to the heightened risk of sex/gender-based discrimination on Brown's campus.  Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

318.     Despite sexual misconduct occurring frequently on campus, Brown failed to adequately train its employees on how to prevent and respond to reports of sex/gender-based discrimination and harassment.

319.    Contrary to Title IX and its own official policies, Brown cultivated a culture of silence by failing to report complaints of sex/gender-based discrimination, initiate and/or conduct adequate investigations and grievance procedures under Title IX, and ensure that victimized students had equal access to educational opportunities and benefits or grievance procedures.

320.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by Brown, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to Brown's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left Brown before completing their degrees.

321.    As a direct, natural, and proximate result of Brown's violation of Title IX and creation and perpetuation of an environment with heightened risk, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income, costs associated with fleeing abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

322.    Plaintiffs are also entitled to a permanent injunction requiring Brown to take substantial steps to lower the risk of sex/gender-based discrimination by providing appropriate training for its employees and students; conducting fair, equitable, unbiased, and thorough investigations into reports of sex/gender-based discrimination; holding students and employees accountable for their acts of sexual misconduct and discrimination; and remedying any hostile

environment that is created as a result of sex/gender discrimination, as damages alone are not an adequate remedy for ongoing violations of Title IX.

## COUNT IV
**Violation of Title IX**
**Erroneous Outcome**
**20 U.S.C. §§ 1681, *et seq*.**

323.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

324.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Brown due to the erroneous outcomes of investigations of sex/gender-based discrimination.  Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

325.    After disenfranchising Plaintiffs from the campus Title IX process, Brown failed to conduct a prompt, equitable, thorough, reliable, and impartial grievance process, as required under Title IX.  Instead, Brown gave Plaintiffs' assailants minimal discipline, or in some cases no discipline whatsoever, thus allowing them to avoid the consequences of their abuse against Plaintiffs.

326.    The ongoing sexual and physical assaults, harassment, abuse, and stalking the Plaintiffs experienced, and the subsequent Title IX failures by Brown, were so severe, pervasive, and objectively offensive that Plaintiffs were denied equal access to Brown's educational opportunities and benefits, as they lost their academic focus, changed their majors, stopped attending classes, saw their grades slip, quit campus jobs, lost scholarships, and/or left Brown before completing their degrees.

327.    As a direct and proximate result of Brown's violation of Title IX and erroneous outcomes in Title IX proceedings retaliation, Plaintiffs have sustained injuries and damages,

including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income and other economic or non-economic damages, for which they are entitled to just compensation.

328.    Plaintiffs are also entitled to a permanent injunction requiring Brown to ensure individuals who report sex/gender-based discrimination are provided with due process, take substantial steps to properly investigate reports of sex/gender-based discrimination at Brown, provide appropriate interim measures and reasonable accommodations to complainants, impose appropriate discipline and remedial measures in situations where a violation of the Title IX Policy is found to have occurred, as damages alone are not an adequate remedy for the ongoing violations of Title IX.

## COUNT V
### Violation of Title IX
### Retaliation by Withholding Protection Otherwise Conferred by Title IX
### 20 U.S.C. §§ 1681, *et seq.*

329.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

330.    All Plaintiffs, individually and on behalf of Class Members, allege violations of Title IX against Brown due to retaliation.  Brown receives federal funds and is thus covered by Title IX's prohibition on sex/gender-based discrimination.

331.    Title IX and its interpretive regulations prohibit retaliation against any person who complains about what they reasonably believe to be a Title IX violation, advocates on behalf of Title IX rights and enforcement, or cooperates in any investigation of a Title IX violation.

332.    Plaintiffs engaged in protected activity by reporting incidents of sex/gender-based discrimination perpetrated on them by Brown students to Brown staff.  Plaintiffs' actions were protected by the anti-retaliation provision of Title IX.

333.    Brown engaged in materially adverse actions against Plaintiffs where staff failed to report Plaintiffs' disclosures of sexual misconduct, where Brown's Title IX Office failed to properly investigate Plaintiffs' claims of sex/gender discrimination, where Brown's Title IX Office failed to initiate appropriate interim measures to ensure their safety and ongoing equal access to educational opportunities and benefits, and where Brown's Title IX Office failed to implement appropriate sanctions and responsive measures to remedy the sexually hostile environment and prevent its recurrence.

334.    There was a causal connection between Plaintiffs' decisions to exercise their rights under Title IX by reporting sex/gender-based discrimination and Brown's decisions to engage in adverse actions against them.

335.    As a direct and proximate result of Brown's Title IX retaliation, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income and other economic or non-economic damages, for which they are entitled to just compensation.

336.    Plaintiffs are also entitled to a permanent injunction requiring Brown to ensure individuals who report sex/gender-based discrimination are provided with due process, take substantial steps to properly investigate reports of sex/gender-based discrimination at Brown, provide appropriate interim measures and reasonable accommodations to complainants, impose

appropriate discipline and remedial measures in situations where a violation of the Title IX Policy is found to have occurred, cease all retaliatory action against students who report sex/gender-based discrimination, and impose appropriate discipline and remedial measures where retaliation is found to have occurred, as damages alone are not an adequate remedy for the ongoing retaliation in violation of Title IX.

## COUNT VI
### Negligence

337.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

338.    Plaintiffs, individually and on behalf of Class Members, allege negligence by Brown in its response to reports of sexual misconduct suffered by Plaintiffs.

339.    At all relevant times, Brown owed Plaintiffs a duty of reasonable care to ensure their safety and freedom from sex/gender-based assault, harassment, and abuse by, among other things, conducting an investigation into their claims of sex/gender-based assault, sexual misconduct, and abuse and enforcing the Title IX Policy.

340.    Brown was aware that Plaintiffs had been subject to sexual misconduct and took no reasonable protective measures to protect Plaintiffs nor took action to prevent its recurrence or remedy its effects.

341.    Brown's failure to follow its own policies in reviewing, investigating, and resolving complaints of sexual assault and harassment constitutes a breach of its duty of care to Plaintiffs.

342.    As a direct and proximate result of Brown's negligence, Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault,

anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefits including scholarships, loss of income and other economic or non-economic damages, for which they are entitled to just compensation.

343.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from Brown, as damages alone are not an adequate remedy for the Brown's ongoing negligence.  Brown is also vicariously liable for the damages caused by its employees.

**COUNT VII**
**Negligent Supervision**

344.    Plaintiffs adopt and incorporate by reference previously plead paragraphs as if fully plead herein.

345.    Plaintiffs, individually and on behalf of Class Members, allege negligent supervision by Brown in its response to reports of sexual misconduct.  Brown had a duty to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies, but they failed to do so and therefore breached the duties of care owed to Plaintiffs as alleged herein.

346.    Brown's failure to timely report and investigate the physical violence and sexual misconduct perpetrated against Plaintiffs, or to monitor the Title IX investigation and response process at Brown, is a breach of its duty to supervise.

347.    As a direct and proximate cause of Brown's conduct, actions, and/or inactions Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss

of income and other economic and non-economic damages, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter, for which they are entitled to just compensation.

348.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from Brown, as damages alone are not an adequate remedy for the Brown's ongoing negligence.  Brown is also vicariously liable for the damages caused by its employees.

## COUNT VIII
### Breach of Fiduciary Duty

349.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

350.    Plaintiffs and Class Members are or were enrolled at Brown as undergraduate and/or graduate students during the liability period.

351.    Brown, a Rhode Island post-secondary educational institution, has a fiduciary relationship with the Plaintiffs and Class Members.  Plaintiffs and Class Members were or are dependent on Brown for their education, and Brown owed them a duty to act in good faith and with due regard for their interests.  Brown thus owed Plaintiffs and Class Members a fiduciary duty to create an environment in which they could pursue their education free from gender/sex discrimination.

352.    Brown breached the fiduciary duty it owed to Plaintiffs and Class Members by tolerating, condoning, ratifying, and/or engaging in the hostile environment, sexual harassment, gender/sex discrimination, and/or retaliation, and by failing to take remedial action.  Brown failed to adopt and enforce practices and grievance procedures to effectively respond to misconduct that would minimize the danger that Plaintiffs and Class Members would be exposed

to gender/sex discrimination.  Brown failed to act in good faith and with due regard for the interests of Plaintiffs and Class Members, who entrusted Brown with their confidence.

353.    Brown's conduct was wanton, malicious, outrageous, and conducted with full knowledge of the law.  Brown exhibited reckless indifference to the foreseeable risks of harm.

354.    Because of Brown's breach of its fiduciary duty owed to Plaintiffs and Class Members, Plaintiffs and Class Members have suffered and will continue to suffer harm, including but not limited to loss of future educational and employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

355.    Plaintiffs and Class Members have suffered and continue to suffer damages and injuries for which Brown is liable under state law.

### COUNT IX
### Intentional Infliction of Emotional Distress

356.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

357.    Plaintiffs, individually and on behalf of Class Members, allege intentional infliction of emotional distress by Brown in its response to reports of sexual misconduct.

358.    By dismissing Plaintiffs' allegations of sexual misconduct, failing to properly investigate such claims or protect Plaintiffs from their assailants, justifying the behavior of the assailants, failing to properly discipline the assailants, openly mocking and spreading rumors about Plaintiffs, isolating and alienating Plaintiffs, and improperly disciplining and retaliating against Plaintiffs, Brown engaged in extreme and outrageous conduct and specifically intended for its conduct to cause Plaintiffs to suffer emotional distress so severe that it would silence any additional disclosures.

359.    As a result of Brown's extreme and outrageous conduct, Plaintiffs suffered severe emotional distress, including, but not limited to, headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, depression, anxiety, post-traumatic stress disorder, obsessive compulsive disorder, eating disorders, substance dependency, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter. Brown is aware of such emotional distress suffered by Plaintiffs.

360.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from Brown, as damages alone are not an adequate remedy for the Brown's conduct. Brown is also vicariously liable for the damages caused by its employees.

## COUNT X
### Negligent Failure to Warn, Train or Educate

361.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

362.    Plaintiffs, individually and on behalf of Class Members, allege negligent failure to warn, train, or educate by Brown in its response to reports of sexual misconduct.

363.    Brown owed Plaintiffs and the Class Members a duty to take reasonable protective measures to protect them from the risks of sex/gender-based discrimination, sexual assault, including rape, sexual harassment, and dating violence by properly warning, training or educating Plaintiffs and the Class Members on how to avoid such risks on its campus or as Brown students.

364.    Brown breached its duty to take reasonable protective measures to protect Plaintiffs and the Class Members from the risks of sex/gender-based discrimination, sexual assault, including rape, sexual harassment and dating violence by failing to properly warn, train

or educate Plaintiffs and the Class Members on how to avoid such risks on its campus, with other students or with Brown employees.

365.    Brown breached its duty to take reasonable protective measures to protect Plaintiffs and the Class Members from the risks of sex/gender-based discrimination, sexual assault, including rape, sexual harassment and dating violence by failing to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies.

366.    As a direct and proximate cause of Brown's conduct, actions, and/or inactions Plaintiffs have sustained injuries and damages, including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, embarrassment, humiliation, physical assault, anxiety, emotional pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income and other economic and non-economic damages, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter, for which they are entitled to just compensation.

367.    Plaintiffs are entitled to monetary compensation for past damages and injunctive relief from Brown, as damages alone are not an adequate remedy for the Brown's ongoing negligence.  Brown is also vicariously liable for the damages caused by its employees.

### COUNT XI
**Violation of Rhode Island Civil Rights Act (RICRA)**
**R.I. Gen. Laws. § 42-112-1, *et seq*.**

368.    Plaintiffs hereby incorporate by reference the allegations set forth in the above paragraphs as if fully set forth herein.

369.    Plaintiffs, individually and on behalf of Class Members, allege violation of the Rhode Island Civil Rights Act, § 42-112-1, *et seq.*

370.    Brown, by and through its agents, servants, employees and/or those for whose conduct it was responsible, interfered with the personal, contractual, and property rights of Plaintiffs and the Class Members and with their right to the full and equal benefit of all laws and proceedings for the security of persons.

371.    Brown's deliberate failure to enforce compliance with the requirements set forth under the RICRA violated the rights of Plaintiffs and the Class Members to equal protection of the law, created a hostile education environment, and substantially interfered with access to educational opportunities or benefits.

372.    Brown's discriminatory actions or inactions were motivated by the sex/gender of Plaintiffs and the Class Members, and amounted to reckless or callous indifference to the protected rights of Plaintiffs and the Class Members.

373.    As a direct, natural, and proximate result of Brown's violation of the RICRA, Plaintiffs have suffered actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving to flee their abusers, and other economic or non-economic damages, for which they are entitled to just compensation.

## **PRAYER FOR RELIEF**

For all the foregoing reasons, Plaintiffs, on behalf of themselves and the putative Class, pray for judgment against Brown as follows:

A.    Certification of this action as a class action, pursuant to Fed. R. Civ. P. 23, appointment of Plaintiffs as representatives of the Class, and appointment of Plaintiffs' counsel as Class Counsel;

B.    A declaratory judgment that Brown's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and Class Members under, *inter alia*, Title IX and the applicable Rhode Island state laws;

C.    A permanent injunction against Brown and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

D.    An Order requiring Brown to initiate and implement programs and policies that (i) remedy the gender/sex discrimination and hostile environment at Brown; (ii) ensure prompt remedial action regarding all claims of gender/sex discrimination and hostile environment; and (iii) eliminate the continuing effects of the discriminatory and retaliatory practices described herein;

E.    An award of damages to Plaintiffs and the Class Members under Title IX of the Education Amendments of 1972 and common law, including compensatory damages and punitive damages;

F.    An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

G.    For interest based on damages, as well as pre-judgment and post-judgment interest as allowed by law; and

H.    All such additional and/or further relief as this Court deems just and equitable under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Respectfully submitted,

Dated: January 28, 2022

*/s/ Kimberly A. Evans*

**GRANT & EISENHOFER P.A.**
Kimberly A. Evans (*Pro Hac Vice*)
Samuel Mukiibi (*Pro Hac Vice*)
Carla Agbiro (*Pro Hac Vice*)
123 Justison Street
Wilmington, DE 19801
Tel:  (302) 622-7000
kevans@gelaw.com
smukiibi@gelaw.com
cagbiro@gelaw.com

**GRANT & EISENHOFER P.A.**
M. Elizabeth Graham (*Pro Hac Vice*)
101 California Street, Suite 2710
San Francisco, CA 94111
Tel:  (415) 365-9585
egraham@gelaw.com

**GRANT & EISENHOFER P.A.**
Karin Fisch (*Pro Hac Vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  (646) 722-8512
kfisch@gelaw.com

**SALTZ MONGELUZZI AND BENDESKY**
Elizabeth A. Bailey (*Pro Hac Vice Forthcoming*)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: 215-575-3859
ebailey@smbb.com

**LAW OFFICES OF PATRICIA E. ANDREWS**
Patricia E. Andrews
38 N. Court Street
Providence, RI 02903
Tel:  (401) 421-0966
peandrews@verizon.net

*ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS*

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of PLAINTIFFS' FIRST AMENDED CLASS

ACTION COMPLAINT AND JURY DEMAND was filed and served electronically through the

Court's CM/ECF system on the following counsel of record:

Steven M. Richard (4403)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI  02903
srichard@nixonpeabody.com

*Counsel for Defendant, Brown University*

By:  */s/ Kimberly A. Evans*
Kimberly A. Evans

Dated: January 28, 2022