UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KATIANA SOENEN, TAJA HIRATA-EPSTEIN,
CHLOE BURNS, EMMA DENNIS-KNIERIEM,
JANE DOES 1-2, individually and
on behalf of all others similarly situated,

               Plaintiffs,

v.                                       C.A. NO.: 21-325-JJM-PAS

BROWN UNIVERSITY,

               Defendant.

**DEFENDANT BROWN UNIVERSITY'S MEMORANDUM
IN SUPPORT OF ITS MOTION TO DISMISS
EACH PLAINTIFF'S INDIVIDUAL CLAIMS,
STRIKE THE CLASS ACTION ALLEGATIONS,
AND/OR SEVER CLAIMS**

**(RESPONDING TO PLAINTIFFS' FIRST AMENDED
CLASS ACTION COMPLAINT AND JURY DEMAND)**

Steven M. Richard (#4403)
Caitlyn Smith (#10361)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1020
Fax: 401-454-1030
srichard@nixonpeabody.com
cxsmith@nixonpeabody.com

# **TABLE OF CONTENTS**

**Page**

**INTRODUCTION**.................................................................................................................1

**SECTION I: OVERVIEW OF TITLE IX AND BROWN'S POLICIES** ...............................7

    A. Title IX's Statutory Language, Administrative Oversight, and Implied Cause
       of Action ...........................................................................................................7

    B. The Department of Education's Title IX Sexual Harassment Regulations
       Effective August 14, 2020 ....................................................................................11

    C. Brown's Sexual Misconduct Policies from the 2015-16 Academic Year to the
       Present ..............................................................................................................15

**SECTION II: THE CLAIMS OF THREE PLAINTIFFS ARE SUBSTANTIALLY TIME-
BARRED, AND THEY LACK STANDING TO SEEK DECLARATORY AND
INJUNCTIVE RELIEF** ................................................................................................19

    A. Taja, Chloe, and Emma cannot litigate claims that accrued before August 6,
       2018...................................................................................................................19

        1. Taja .......................................................................................................20
        2. Chloe ....................................................................................................21
        3. Emma ...................................................................................................23

    B. Chloe, Taja, and Emma lack standing to seek declaratory and injunctive relief
       against Brown. ....................................................................................................23

**SECTION III: BROWN'S ARGUMENTS FOR THE RULE 12(B)(6) DISMISSAL OF
EACH PLAINTIFF'S INDIVIDUAL CLAIMS** ...............................................................25

    A. Plaintiffs' Title IX counts and RICRA count fail to state claims upon which
       relief can be granted............................................................................................25

        1. Counts I-III: Each Plaintiff's "Pre-Assault" or "Heightened Risk" claim
           fails as a matter of law. ...........................................................................26

           a. The "pre-assault" claims of Taja, Chloe, and Emma are time-barred. ...........27
           b. Katiana and Jane 2 improperly seek to hold Brown liable for alleged off-
              campus conduct in third-party owned buildings............................................28
           c. Jane 1…………… ..............................................................................29

        2. Counts I-III: Each Plaintiff's "post-reporting" Title IX claim fails as a
           matter of law. .........................................................................................30

            a. Chloe's claim is time-barred................................................................30
           b. No Plaintiff has met the high bar to show deliberate indifference. .................31

        3. Count IV: No Plaintiff has pled a plausible Title IX erroneous outcome
           claim...................................................................................................33

            a. Katiana, Taja, and Jane 1 ...................................................................35
           b. Chloe …………… ..............................................................................36

i

Table of Contents (continued)

Page

    c.  Emma ............... ................................................................37
    d.  Jane 2 ............... ............................................................37

4.  Count V:  No Plaintiff has pled actionable Title IX retaliation. ...........................38

    a.  Four of the Plaintiffs – Katiana, Taja, Jane 1, and Jane 2 – were not
       subjected to any alleged adverse action to support a Title IX retaliation
       claim. ............... ..........................................................39
    b.  Chloe ............... ...........................................................39
    c.  Emma ............... ..........................................................40

B.  Counts VI, VII, and X:  Plaintiffs' negligence claims fail as a matter of law. ...........41

1.  Title IX's deliberate indifference standard cannot be circumvented by
    invoking negligence theories. .........................................................42
2.  Plaintiffs cannot premise a negligence duty based upon their contractual
    relationship with Brown................................................................45
3.  Plaintiffs have not pled a special relationship to create any plausible basis
    to hold Brown responsible for the alleged tortious actions by third-parties. .........46
4.  Plaintiffs cannot recover on a claim of negligent infliction of emotional
    distress relating to Brown's response to their reporting of alleged sexual
    misconduct. ..............................................................................50
5.  Plaintiffs have not plausibly pled claims to hold Brown liable under
    negligent supervision or retention theories. .........................................51
6.  Plaintiffs' claim titled "Negligent Failure to Warn, Train, and Educate" is
    not recognized by Rhode Island law. ................................................52

C.  Count VIII: Rhode Island law has not recognized the existence of a university-
    student fiduciary relationship.............................................................53
D.  Count IX:  Plaintiffs have not pled extreme and outrageous conduct by Brown
    to support a claim for intentional infliction of emotional distress. ...........................54
E.  Plaintiffs' prayer for punitive damages fails as a matter of law. .................................56

1.  Punitive damages are not recoverable in a Title IX action. ...................................56
2.  Plaintiffs have not pled a legally sufficient claim for punitive damages
    under Rhode Island law. ...............................................................58

**SECTION IV: BROWN'S ARGUMENTS TO STRIKE PLAINTIFFS' CLASS ACTION
ALLEGATIONS** ..........................................................................................59

A.  A putative class action may be stricken on the pleadings.............................................59
B.  A federal class action must satisfy all four requirements of Rule 23(a) and
    meet at least one of the categories under Rule 23(b). ..................................................61
C.  Plaintiffs' allegations do not satisfy all four of Rule 23(a)'s requirements. ...............64

1.  Numerosity (Rule 23(a)(1)) .........................................................64
2.  Commonality (Rule 23(a)(2)) .......................................................64
3.  Typicality (Rule 23(a)(3))............................................................67
4.  Adequacy (Rule 23(a)(4)) ...........................................................70

Table of Contents (continued)

Page

    D. Plaintiffs do not satisfy the criteria for any of the allowable types of class actions under Rule 23(b)(1)-(b)(3)..................................................................72

       1. Plaintiffs have not shown the predominance required for a Rule 23(b)(3) class action.......................................................................................................72

       2. A single Rule 23(b)(2) injunction cannot be entered for all class members, and Plaintiffs' claims for monetary damages are not incidental to the requested injunctive relief........................................................................................77

**SECTION V: BROWN'S ARGUMENTS TO SEVER EACH PLAINTIFF'S CLAIMS** ....79

**CONCLUSION** ........................................................................................................83

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. Univ. of Haw.*,
  594 F.2d 202 (9th Cir. 1979) ..................................................20

*Acevedo v. Allsup's Convenience Stores, Inc.*,
  600 F.3d 516 (5th Cir. 2010) ..................................................82

*Adams v. Town of Burrillville*,
  249 F. Supp. 2d 151 (D.R.I. 2003)...........................................20

*Alvarardo-Morales v. Dig. Equip. Corp.*,
  843 F.2d 613 (1st Cir. 1988)....................................................60

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997)................................................................62

*Amgen Inc. v. Connecticut Ret. Plans & T. Funds*,
  568 U.S. 455 (2013)................................................................73

*In re Asacol Antitrust Litig.*,
  907 F.3d 43 (1st Cir. 2018)................................................73, 74

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
  12 F.4th 81 (1st Cir. 2021) (Barron, J. concurring) ................74

*Barnes v. Gorman*,
  536 U.S. 181 (2002)..........................................................56, 57

*Barrett v. Avco Fin. Servs. Mgmt. Co.*,
  292 B.R. 1 (D. Mass. 2003) ...............................................60, 61

*Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*,
  420 U.S. 128 (1975)................................................................24

*Bergholz v. John Marshall Law School*,
  C.A. No. 18-C-3, 2018 WL 5622052 (N.D. Ill. Oct. 30, 2018)...............56

*Bessette v. Avco Fin. Servs.*,
  279 B.R. 442 (D.R.I. 2002).....................................................61

*Boudreau v. Automatic Temperature Controls, Inc.*,
  212 A.3d 594 (R.I. 2019).........................................................20

*Brown v. State of Ariz.*,
    23 F.4th 1173 (9th Cir. 2022) ..................................................................................28

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979)..................................................................................................8

*Cash v. Lees-McRae Coll.*,
    No. 1:18CV52, 2018 WL 7297876..........................................................................45

*Champlin v. Wash. Tr. Co., of Westerly*,
    478 A.2d 985 (R.I. 1984) .........................................................................................54

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)...................................................................................................24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).............................................................................................72, 73

*Cruz v. Bristol-Myers Squibb Co., PR, Inc.*,
    699 F.3d 563 (1st Cir. 2012) ...................................................................................80

*Daniels v. Fluette*,
    64 A.3d 302 (R.I. 2013) ...........................................................................................41

*Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999)....................................................................................... *passim*

*Delaware St. Coll. v. Ricks*,
    449 U.S. 250 (1980).................................................................................................20

*DeLeón v. New York Univ.*,
    No. 21 Civ. 05005, 2022 WL 179812 (S.D.N.Y. Jan. 20, 2022)............................25

*Doe v. Columbia Coll. Chi.*,
    933 F.3d 849 (7th Cir. 2019) ...................................................................................41

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*,
    220 F.3d 380 (5th Cir. 2000) ...................................................................................10

*Doe v. Pawtucket Sch. Dept.*,
    969 F.3d 1 (1st Cir. 2020)........................................................................................30

*Doe v. Trs. of Bos. Coll.*
    892 F.3d 67 (1st Cir. 2018)................................................................................26, 33

*Doe v. Trs. of Bos. Coll.*,
    942 F.3d 527 (1st Cir. 2019) .....................................................................................6

*Doe v. Unified Sch. Dist. No. 259*,
    240 F.R.D. 673 (D. Kan. 20007)........................................................................63

*Doe v. Univ. of South*,
    No. 4:09-cv-62, 2011 WL 1258104, (E.D. Tenn. Mar. 31, 2011) ...........................................44

*Doe v. Vanderbilt Univ.*,
    No. 3:18-cv-00569, 2019 WL 4748310 (M.D. Tenn. Sept. 30. 2019) ....................................44

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011)........................................................................73

*Erie R. Co. v. Tomkins*,
    304 U.S. 64 (1938)..........................................................................6

*Faiaz v. Colgate Univ.*,
    64 F. Supp. 3d 336 (N.D.N.Y. 2014)........................................................................46

*Fitzgerald v. Barnstable Sch. Comm.*,
    504 F.3d 165 (1st Cir. 2007), *reversed on other grounds*, 555 U.S. 246 (2009)....................32

*Flores v. Starwood Hotels & Resorts Worldwide, Inc.*,
    No. SACV141093AGANX, 2015 WL 12912337 (C.D. Cal. Mar. 16, 2015)........................61

*Fowler v. Univ. of Phx., Inc.*,
    2019 WL 1746576 (S.D. Cal. Apr. 18, 2019).......................................................54

*Franklin v. Gwinnett Cty. Pub. Schs.*,
    503 U.S. 60 (1992)..........................................................................8

*Frazier v. Fairhaven Sch. Comm.*,
    276 F.3d 52 (1st Cir. 2002)........................................................................38

*Gaffney v. Riverboat Servs. of Ind., Inc.*,
    451 F.3d 424 (7th Cir. 2006) ........................................................................82

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)............................................................ *passim*

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)............................................................ *passim*

*Guckenberger v. Boston Univ.*,
    957 F. Supp. 306 (D. Mass. 1997) ........................................................................56

*Gushlaw v. Milner*,
    42 A.3d 1245 (R.I. 2012) ........................................................................41, 47

*Harris v. St. Joseph's Univ.*,
   No. CIV A. 13-3937, 2014 WL 1910242 (E.D. Pa. 2014) .....................................46

*Havlik v. Johnson & Wales Univ.*,
   509 F.3d 25 (1st Cir. 2007) .............................................................................45

*Hoffman v. Davenport-Metcalf*,
   851 A.2d 1083 (R.I. 2004) .......................................................................55, 56

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167, 171 (2005) ...............................................................................*38*

*Jane Doe v. Brown Univ.*,
   304 F. Supp. 3d 252 (D.R.I. 2018) ............................................................ *passim*

*Jane Doe v. Rhode Island School of Design*,
   432 F. Supp. 3d 35 (D.R.I. 2019) ............................................................. *passim*

*John Doe v. Brown Univ.*,
   166 F. Supp. 3d 177, 196 (D.R.I. 2016) ...........................................................46

*John Doe v. Brown Univ.*,
   210 F. Supp. 3d 310 (D.R.I. 2016) ....................................................15, 16, 66

*John Doe v. Brown Univ.*,
   327 F. Supp. 3d 397 (D.R.I. 2018) ..............................................19, 20, 26, 36

*John Doe v. Brown Univ.*,
   505 F. Supp. 3d 65 (D.R.I. 2020) .................................................................26, 55

*John Doe v. Michigan St. Univ.*,
   Case No. 1:18-cv-1413 (W.D. Mich.) ...............................................................78

*Johnson v. Johnson*,
   952 F.3d 376 (1st Cir. 2020) ...........................................................................6

*Jue v. Costco Wholesale Corp.*,
   No. 10-cv-000333-WHA, 2010 WL 889284 (N.D. Cal. Mar. 11, 2010) ..............61

*Karasek v. Regents of the Univ. of California*,
   956 F.3d 1093 (9th Cir. 2020) .........................................................................27

*Kiossovski v. Forest Labs, Inc.* (*In re Celexa & Lexapro Mtkg. & Sales Practices Litig.*),
   325 F.R.D. 529 (D. Mass. 2017) ......................................................................73

*Knelman v. Middlebury Coll.*,
   898 F. Supp. 2d 697 (D. Vt. 2012) ..................................................................53

*La Plante v. American Honda Motor Co., Inc.*,
  27 F.3d 731 (1st Cir. 1994) .................................................................................58

*Leader v. Harvard Univ. Bd. of Overseers*,
  No. 16-10254-DJC, 2017 WL 1064160 (D. Mass. Mar. 17, 2017) ...........................................9

*Lipian v. Univ. of Mich.*,
  453 F. Supp. 3d 937 (E.D. Mich. 2020) .................................................................34

*In re Loestrin 24 FE Antitrust Litig.*,
  No. 1:13-MD-2472, 2019 WL 3214257 (D.R.I. July 2, 2019) .............................................68

*Malodonado Cordeiro v. AT&T*,
  190 F.R.D. 26 (D.P.R. 1999) .............................................................................79

*Manning v. Boston Med. Ctr. Corp.*,
  725 F.3d 34 (1st Cir. 2013) ..........................................................................59, 60

*Manning v. Boston Med. Ctr. Corp.*,
  No. 09-11463-RWZ, 2012 WL 1355673 (D. Mass Apr. 18, 2012), *aff'd in
  part*, *vacated in part*, 725 F.3d 34 (1st Cir. 2013) .....................................................61

*Mellen v. Bunting*,
  327 F.3d 355 (4th Cir. 2003) ...........................................................................24

*Mercer v. Duke Univ.*,
  50 F. App'x 643 (4th Cir. 2002) ........................................................................56

*Monteferrante v. Williams-Sonoma, Inc.*,
  241 F. Supp. 3d 264 (D. Mass. 2017) ...................................................................60

*National Railroad Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ...................................................................................20

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) .............................................................................59

*North Carolina v. Rice*,
  404 U.S. 244 (1971) ...................................................................................24

*Palmisano v. Toth*,
  624 A.2d 314 (R.I. 1993) ...............................................................................58

*Patrick Collins, Inc. v. Does 1-38*,
  941 F. Supp. 2d 153 (D. Mass. 2013) ...................................................................79

*Pederson v. La. St. Univ.*,
  213 F.3d 858 (5th Cir. 2000) ...........................................................................24

*Pejovic v. State Univ. of N.Y. at Albany,*
    No. 1:17-cv-1092, 2018 WL 3614169 (N.D.N.Y. July 26, 2018) ........................................57

*Pilgrim v. Universal Health Card, LLC,*
    660 F.3d 943 (6th Cir. 2011) .............................................................................60

*Porto v. Town of Tewksbury,*
    488 F.3d 67 (1st Cir. 2007), .............................................................26, 30, 31, 74

*Puerto Rico v. M/V Emily S,*
    158 F.R.D. 9 (D.P.R. 1994) ...............................................................................68

*Regan v. Cherry Corp.,*
    706 F. Supp. 145 (D.R.I. 1989) ........................................................................58

*Reilly v. U.S.,*
    547 A.2d 894 (R.I. 1988) .................................................................................56

*Roe v. Hotchkiss Sch.,*
    385 F. Supp. 3d 165 (D. Conn. 2019) ..............................................................54

*Rohr v. Metro. Ins. & Cas. Co.,*
    No. CIV. A. 06-10511, 2007 WL 163037 (E.D. La. Jan. 17, 2007)...................82

*Roskin-Frazee v. Columbia Univ.,*
    No. 17 CIV. 2032 (GBD), 2018 WL 1166634 (S.D.N.Y. Feb. 21, 2018)..........27

*Ross v. Univ. of Tulsa,*
    No. 14-CV-484-TCK-PJC, 2015 WL 4064754 (N.D. Ok. July 2, 2015) ..........45

*S.E.C. v. Tambone,*
    597 F.3d 436 (1st Cir. 2010) ...........................................................................19

*Sadeghian v. Univ. of S. Ala.,*
    No. 18-0009-JB-B, 2018 WL 7106981 (S.D. Ala. Dec. 4, 2018).....................56

*Simpson v. University of Colorado at Boulder,*
    500 F.3d 1170, 1184-85 (10th Cir. 2007) ..................................................26, 27

*Smilow v. Sw. Bell Mobile Sys., Inc.,*
    323 F.3d 32 (1st Cir. 2003) .............................................................................59

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.,*
    No. CV 14-MD-02503, 2017 WL 462177 (D. Mass. Oct. 16, 2017) ................76

*Squeri v. Mount Ida College,*
    954 F. 3d 56, 67 (1st Cir. 2020)......................................................................53

*Sterman v. Brown University*,
513 F. Supp. 3d 243 (D.R.I. 2021)...................................................................................... *passim*

*Stotts v. Cmty. Sch. Dist. No. 1*,
230 F.3d 989 (7th Cir. 2000) ...................................................................................24

*Theidon v. Harvard Univ.*,
948 F.3d 477 (1st Cir. 2020)....................................................................................38

*Thomas R.W., By and Through Pamela R. v. Mass. Dept. of Educ.*,
130 F.3d 477 (1st Cir. 1997) ...................................................................................24

*Transamerica Life Ins. v. Caramadre*,
No. 09-470-S, 2017 WL 752145 (D.R.I. Feb. 17, 2017) ........................................51

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021)..............................................................................................24

*Tubbs v. Stony Brook Univ.*,
No. 15-cv-0517 (NSR), 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) ....................27

*Tyson Foods, Inc. v. Bouphakeo*,
577 U.S. 442 (2016)...........................................................................................72, 73

*Volpe v. Gallagher*,
821 A.2d 699 (R.I. 2003) ..........................................................................................41

*W. Reserve Life Assur. Co. of Ohio v. Caramadre*,
No. CV 09-470S, 2015 WL 13704429 (D.R.I. Nov. 16, 2015)................................79

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338, 348 (2011) ................................................................................. *passim*

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000) ....................................................................................73

*Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc.*,
474 A.2d 436 (R.I. 1984) ..........................................................................................51

*Wills v. Brown Univ.*,
184 F.3d 20 (1st Cir. 1999) .......................................................................................33

*Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*,
778 F. Supp. 101 (D.R.I. 1991) ................................................................................58

*Yu v. Vassar Coll.*,
97 F. Supp. 3d 448 (S.D.N.Y. 2015).........................................................................52

*Yusuf v. Vassar Coll.*,
   35 F.3d 709 (2d Cir. 1994)..............................................................................33, 37

*Z.J. v. Vanderbilt Univ.*,
   355 F. Supp. 3d 646 (M.D. Tenn. 2018)...........................................................45

**Statutes**

20 U.S.C. § 1232g............................................................................................70

20 U.S.C. §§ 1681-88 .......................................................................................1

20 U.S.C. § 1681(a) .............................................................................7, 28, 29

20 U.S.C. § 1682....................................................................................*passim*

20 U.S.C. 1687...................................................................................................7

R.I.G.L. § 9-1-14(b)..................................................................................19, 55

R.I.G.L. § 42-112-1 et seq. ...............................................................19, 20, 25, 26

**Other Authorities**

34 C.F.R. § 99.3...............................................................................................70

34 C.F.R. § 99.31.............................................................................................71

34 C.F.R. Part 106....................................................................................11, 15

34 C.F.R. § 106.8(b).........................................................................................44

34 CFR § 106.2(h)............................................................................................13

34 CFR § 106.30.........................................................................................12, 13

34 CFR §§ 106.44.............................................................................................13

34 CFR § 106.45...............................................................................................14

83 Fed. Reg. at 61,462 ....................................................................................11

85 Fed. Reg. at 30,026 ....................................................................................12

85 Fed. Reg. at 30,037 ....................................................................................13

85 Fed. Reg. 30,061 ........................................................................................12

**Federal Rules of Civil Procedure**

Federal Rule of Civil Procedure 8 ........................................................................................61

Federal Rule of Civil Procedure 12(b)(1) ...........................................................................24

Federal Rule of Civil Procedure 12(b)(6) ................................................................. *passim*

Federal Rule of Civil Procedure 12(f) ................................................................................60

Federal Rule of Civil Procedure 20 ........................................................................79, 80, 81

Federal Rule of Civil Procedure 21 ...........................................................................79, 82

Federal Rule of Civil Procedure 23 .......................................................................... *passim*

# <u>INTRODUCTION</u>

Consistent with Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681-88, Brown University ("Brown" or the "University") has acted proactively to prevent sexual assault and harassment within its education programs or activities. Brown has adopted and applied detailed sexual misconduct policies and procedures to ensure the safety and protection of its community. Over the past several years, Title IX's administrative requirements have evolved and changed through guidance documents and regulatory amendments (with proposed further amendments to the Department of Education's Title IX regulations expected to be issued for public comment by April 2022). In compliance with Title IX, Brown has continuously implemented prompt and equitable responses to sexual misconduct allegations and complaints, which have included appropriate supportive measures and fully respected the respective rights of complainants and respondents.

Plaintiffs have sought to generate highly-slanted publicity for their lawsuit, while their allegations in their pleading raise implausible claims. Brown will present its strong arguments only in the courtroom and will let them speak for themselves under the law. Now eight months after filing this action, Plaintiffs have received a full opportunity to try to fix the fatal flaws in their initial Complaint, but they have failed to do so in their First Amended Complaint for the reasons explained below.[1]

This putative class action lawsuit should end at its beginning for many reasons. First, three Plaintiffs raise claims beyond the applicable three-year statute of limitations period and lack standing to request declaratory or injunctive relief. Second, for the Rule 12(b)(6) analysis, each

---

[1]    Brown cites to Plaintiffs' First Amended Complaint with the abbreviation "FAC" and the number(s) of corresponding pled paragraph(s).

Plaintiff must stand on the plausibility of her allegations and claims, not blend them into what the other five Plaintiffs plead.  When properly analyzed on an individual basis, none of the six Plaintiffs has stated any claims upon which relief can be granted.  Third, even if any claim of any Plaintiff is allowed to proceed beyond the Rule 12(b)(6) stage, this litigation cannot possibly satisfy the rigorous analysis mandated under Federal Rule of Civil Procedure 23 and United States Supreme Court precedent to certify a class action, so their class allegations must be stricken now. As is evident from the pleading, the individual issues alleged across this case (as to each current or former student's particular liability and damages claims) will devolve into many mini-trials, such that the class action procedure is no better than separate individual lawsuits.  Finally, if any claims go forward, each Plaintiff should stand and litigate on her own in a separate lawsuit and should not be allowed to litigate collectively with the others, given the highly individualized, strongly disputed liability and damages questions that would exist going forward.

To provide the Court with a roadmap, Brown summarizes the structure of its memorandum:

- In **<u>Section I</u>**, Brown overviews (1) Title IX's legal framework as codified by Congress under the United States Constitution's Spending Clause, implemented administratively by the Department of Education, and interpreted by the Supreme Court in private causes of action and (2) the University's sexual misconduct policies as they have been adopted and amended since the 2015-16 academic year to comply with Title IX's still evolving requirements.  This overview puts the issues in this lawsuit in their proper perspective and exposes the fundamental flaws of Plaintiffs' Title IX analysis and pleading, as well as frames the Title IX legal paradigm as structured by the statute, administrative regulations, and Supreme Court precedent.  *See* pp. 7-18.

- In **<u>Section II</u>**, Brown addresses two restrictions that limit the claims across the First Amended Complaint.  First, all of Plaintiffs' Title IX and state law claims (with the exception of their breach of fiduciary duty claim, which is not recognized under Rhode Island law) are subject to a three-year limitations period (meaning that only claims accruing on or after August 6, 2018 are timely pled).  Yet, Plaintiffs Taja Hirata-Epstein, Chloe Burns, and Emma Dennis-Knieriem seek to litigate alleged Title IX and state law claims that accrued before August 6, 2018.  They cannot resurrect their clearly time-barred claims by bundling them into other Plaintiffs' allegations after that date.  Second, because these three Plaintiffs graduated from Brown and have not pled any allegations suggesting that they still participate or intend to participate in any of Brown's education programs or activities (e.g., as a graduate student), they lack standing against their alma mater to seek the expansive and unprecedented declaratory and mandatory injunctive relief requested in the First Amended Complaint.  *See* pp. 19-25.

- In **<u>Section III</u>**, addressing each of the eleven counts pled in the First Amended Complaint, Brown argues why each Plaintiff's implausibly pled Title IX and state law claims fail as a matter of law.  When the allegations are analyzed individually, each Plaintiff cannot withstand a Federal Rule of Civil Procedure 12(b)(6) dismissal of her claims.  *See* pp. 25-59.

- In **<u>Section IV</u>**, to the extent that any of Plaintiffs' claims may survive, Brown analyzes step-by-step the four prerequisites to certify a class under Rule 23(a), and proceed with a class action under either Rule 23(b)(2) or (b)(3).  The common thread through all of the Rule 23 requirements is that the class action mechanism depends on the existence

3

and predominance of central common factual and legal issues over individualized inquiries. Whether denominated as commonality, typicality, adequacy of representation, or predominance, the determinative factor in the viability of a class action is the degree to which the case involves common issues of common proof, as opposed to individual issues requiring distinct proof among each of the six Plaintiffs and across all of the class members. As permitted by the First Circuit, Plaintiffs' implausible and impractical class action allegations must be stricken now in the interests of judicial economy and basic fairness to Brown. *See* pp. 59-79.

- In **<u>Section V</u>**, Brown shows that there is no justification to allow any of the six Plaintiffs to litigate collectively in a single lawsuit. For example, as noted above, three Plaintiffs bring substantially time-barred claims and lack standing to seek declaratory and injunctive relief. Among the six Plaintiffs, there is no "common transaction or occurrence" across the individualized claims supporting a permissive joinder. Each Plaintiff's claims will entail highly individualized examinations of her specific and unique liability and damages claims. *See* pp. 79-82.

At the outset, Brown must stress an overriding and paramount concern to the University, as well as to all of Rhode Island's higher education institutions. Under Rhode Island law, Plaintiffs have not pled any plausible common law duty-based claims against Brown, so a Rule 12(b)(6) dismissal is proper on all of their negligence and fiduciary duty counts. Plaintiffs want to rewrite established Rhode Island common law to redefine substantially the legal boundaries of the university-student relationship. Also, to proceed with a plausibly pled class action lawsuit, Plaintiffs must show that a singular, across-the-board duty applied under Rhode Island law and was breached under the fact-specific circumstances of each of their six sets of allegations, as well

as under the individual circumstances of each of the purported hundreds of current or former Brown students in the putative class. Plaintiffs cannot possibly proceed with a class action if the duty analysis (as well as the analysis of proximate causation and damages) must apply a fact-specific review to each student's allegations and her relationships with Brown, which is what Rhode Island law requires. Instead, Plaintiffs seek to impose negligence and fiduciary relationship liability upon Brown under the general premise of the risk of sexual assault and sexual harassment among adult university students, as they interact, socialize, and live not only on campus but also anywhere off campus (including within off-campus residences that are not owned, controlled, or maintained by Brown).

As the Court has held, neither the Rhode Island General Assembly nor the Rhode Island Supreme Court has ever recognized such a broad duty under the university-student relationship, nor universally held universities liable for the tortious conduct of its adult students. *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d 252, 261 (D.R.I. 2018) (declining to create a special relationship and recognizing that "courts across the country have determined . . . that the general foreseeability of sexual assault on campus is insufficient to warrant negligence liability [against colleges and universities].") (citations omitted); *Jane Doe v. Rhode Island School of Design*, 432 F. Supp. 3d 35, 43 (D.R.I. 2019) (acknowledging vexing public policy considerations arising under the university-student relationship, including (1) the very limited circumstances under which a university may have a special relationship duty to a student and (2) the disappearing doctrine of *in loco parentis* "in the face of the realities of modern college life") (citations omitted).

Similarly, as this Court held recently in *Sterman v. Brown University*, 513 F. Supp. 3d 243, 255 (D.R.I. 2021), Rhode Island law has never recognized a fiduciary duty between a higher education institution and its students. Yet, Plaintiffs insist that Brown owed a fiduciary duty to all

of them, as well as to the purported "hundreds" of current or former Brown students in the alleged putative class, as an erroneous foundational premise for their demanded class action. (FAC ¶ 287(i)-(k) (alleging that "[c]ommon questions of law and exist as to Plaintiffs and the Class Members" as to a purported fiduciary duty owed to all of them)).

As is clear in their First Amended Complaint, Plaintiffs want to redefine the university-student relationship under Rhode Island law, with serious and immediate implications for every Rhode Island college and university. A federal court is not the proper forum to create new state law. *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d at 260-62. *See also Erie R. Co. v. Tomkins*, 304 U.S. 64, 78 (1938) (a federal court must apply the state law as "declared by its Legislature in a statute or by its highest court in a decision."); *Johnson v. Johnson*, 952 F.3d 376, 377 (1st Cir. 2020) (noting the First Circuit's practice to present certified questions to the Rhode Island Supreme Court regarding unsettled questions of Rhode Island law); *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019) ("Federal courts are not free to extend the reach of state law.") (applying *Erie*).

As argued below, Brown submits that all of Plaintiffs' claims – under Title IX and state law - fail as a matter of law. Particularly as to the state law claims, if the Court is not inclined to dismiss Plaintiffs' negligence and fiduciary duty counts on the pleadings, it should stay this litigation before any discovery commences and should promptly certify appropriate questions to the Rhode Island Supreme Court in accordance with Article I, Rule 6 of the Rhode Island Supreme Court Rules of Appellate Procedure. The Rhode Island Supreme Court, not a federal court, should address the unprecedented theories of liability that Plaintiffs seek to create and impose upon higher education institutions under Rhode Island law.

## SECTION I:
## OVERVIEW OF TITLE IX AND BROWN'S POLICIES

### A. Title IX's Statutory Language, Administrative Oversight, and Implied Cause of Action

Title IX prohibits discrimination "on the basis of sex" of any person in an education program or activity receiving federal funding. 20 U.S.C. § 1681(a). Specifically, Title IX prescribes that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." *Id*.

Under the Constitution's Spending Clause at Article I, Section 8, Clause 1, Congress enacted Title IX to mandate nondiscrimination as a condition to receive federal funding in an education program or activity. *Id*. Title IX applies to federally-funded schools at all levels of education, including elementary schools, secondary schools, and higher education institutions. When any part of an institution or a school district receives federal funding, all of the recipient's operations are covered by Title IX. *Id*. at § 1687. Brown is subject to Title IX.

Title IX directs federal agencies, such as the Department of Education, to establish requirements to effectuate the nondiscrimination mandate and allows the agencies to enforce their funding requirements, including ultimately the right to suspend or terminate the funding. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287-88 (1998). Title IX administrative enforcement encompasses the oversight of the funding recipient's policies and their implementation. Federal agencies may issue regulations and orders to enforce their Title IX compliance requirements. 20 U.S.C. § 1682. In a judicial lawsuit, liability cannot be based on a funding recipient's "failure to promulgate and publicize an effective policy and grievance procedure for sexual harassment

claims." *Gebser*, 524 U.S. at 291.  As *Gebser* makes clear, Title IX policy compliance is ordinarily the subject of federal administrative oversight, review, and enforcement.

Title IX does not expressly provide for a private right of action.  The Supreme Court has recognized a limited implied right of action under Title IX, which allows for the recovery of monetary damages.  *Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979).  Because Congress enacted Title IX under the Spending Clause, "private damages actions are available only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue."  *Davis as Next Friend of La Shonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

A law, such as Title IX, that relies on Congress's spending power essentially offers a deal to federal funding recipients.  The federal government provides funding, and the recipient agrees to prescribed conditions.  For such a funding agreement to be knowing and voluntary, the recipient must have fair notice of its assumed obligations and potential liabilities.

As the Supreme Court held in *Davis*, "a recipient of federal funds may be liable in damages under Title IX only for its own misconduct.  The recipient itself must 'exclud[e] [persons] from participation in, . . . den[y] [persons] the benefits of, or . . . subject[t] [persons] to discrimination under its program[s] or activit[ies] in order' to be liable under Title IX.  The Government's enforcement power may only be exercised against the funding recipient, see § 1682, and [the Supreme Court has] not extended damages liability under Title IX to parties outside the scope of this power."  *Id*. at 640-41 (citations omitted).

Under Title IX, a funding recipient may be held civilly liable only upon proof of its own intentional gender discriminatory conduct.  *Id*. at 642.  The Supreme Court rejected the application of agency or constructive notice principles to impute Title IX liability to a funding recipient and

declined to impose the equivalent of a negligence standard.  *Id.* (citing *Gebser*, 524 U.S. at 283).  In a private Title IX cause of action, the recoverable injury is the deprivation of an *educational opportunity in the funding recipient's programs or activities*.  *Id.* at 650 (identifying injury as harassment that "can be said to deprive the victims of *access to the educational opportunities or benefits provided by the school*.") (emphasis added).

      *Gebser* and *Davis* prescribe the requirements to hold an educational funding recipient liable under Title IX for damages arising from actionable sexual harassment in its programs or activities.  *Gebser* prescribes the standards applicable to a funding recipient's response to reported faculty-on-student sexual harassment, and *Davis* prescribes the standards applicable to the recipient's response to reported student-on-student sexual harassment.  Liability attaches if a funding recipient acts with "deliberate indifference" upon its "actual notice" of the sexual harassment.  *Gebser*, 524 U.S. at 290-91; *Davis*, 526 U.S. at 642.  "Deliberate indifference" sets a high bar for plaintiffs to recover under Title IX.  *Davis*, 526 U.S. at 643.  The standard "has been purposely set high to eliminate any risk that the [Title IX funding] recipient would be liable in damages not for its own official decision but instead for a [third party's] independent actions."  *Leader v. Harvard Univ. Bd. of Overseers*, No. 16-10254-DJC, 2017 WL 1064160, at * 4 (D. Mass. Mar. 17, 2017) (quoting *Davis*, 526 U.S. at 643) (internal quotation marks omitted).

      The "deliberate indifference standard" does not dictate that funding recipients "can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action."  *Davis*, 526 U.S. at 648.  Rather, a funding recipient's response to harassment will amount to deliberate indifference only where its "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances."  *Id.*

Because *Gebser* and *Davis* require that Title IX liability must be based only upon the recipient's "own failure to act" in response to actually (not constructively) known sexual misconduct within its educational programs or activities, a school is not held liable for the sexual misconduct itself.  Thus, an institution will not be liable absent a showing of deliberate indifference, even when the underlying alleged sexual misconduct could easily be characterized as extreme and egregious.  *See*, *e.g.*, *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 381-82, 384, 388 (5th Cir. 2000) (finding no Title IX liability on the part of a school district for a third-grade teacher's sexual molestation of several students over a four-year period, explaining that under the Supreme Court's "high" standard for liability, a federal funding recipient is liable for damages under Title IX only when a plaintiff can show the funding recipient acted with deliberate indifference in response upon its actual notice of the alleged abuse).

Additionally, the funding recipient's deliberate indifference must cause the deprivation of educational opportunities and benefits.  *Davis* 526 U.S. at 660.  Liability arises where the funding recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.  *Id.* at 645.  Only then can the recipient be said to expose its students to harassment or cause them to undergo it in education programs or activities.  *Id.*

Contrary to what Plaintiffs suggest through their expansive allegations and prayers for relief, they cannot pursue in a Title IX private lawsuit much of what they seek to litigate.  The Supreme Court made clear in *Gebser*, in addressing the roles of the Department of Education and judiciary in the Title IX enforcement paradigm, that a funding recipient's alleged failure to comply with Department of Education regulatory requirements "does not establish the requisite actual notice and deliberate indifference."  *Gebser*, 524 U.S. at 292 (reviewing the Department's Title IX administrative regulatory oversight under 20 U.S.C. § 1682).  Moreover, the Supreme Court has

"never held, [], that the implied right of action under Title IX allows recovery in damages for violation of [Department of Education] administrative requirements." *Id*.

**B. The Department of Education's Title IX Sexual Harassment Regulations Effective August 14, 2020**

On November 16, 2018 (which falls within the time period pled in Plaintiffs' First Amended Complaint), the United States Department of Education published a *Notice of Proposed Rulemaking on Title IX*. The Department of Education sought public comments to its proposed significant regulatory amendments designed for the first time to specifically address Title IX sexual harassment. This rulemaking constituted the Department's most significant Title IX regulatory amendment process, since it first issued in 1975 its Title IX regulations codified at 34 C.F.R. Part 106.[2]

On May 19, 2020, after a year-and-a-half public comment period, generating the submission of nearly 125,000 comments, the Department of Education's Office for Civil Rights ("OCR") issued the long-awaited final regulations governing sexual harassment under Title IX, **effective on August 14, 2020**. The final regulations specify how federal funding recipients must address and respond to sexual harassment, as defined by Title IX, consistent with the statute's prohibition against sex discrimination.

Significantly, for purposes of this litigation, OCR made clear in its lengthy preamble to the final regulations (spanning over 500 printed pages in the Federal Register) and subsequent Title IX guidance documents that "**the Department will not enforce these regulations retroactively**."

---

[2]   *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Assistance*, 83 Fed. Reg. 61,462 (proposed November 29, 2018) (to be codified at 34 C.F.R. pt. 106).

85 Fed. Reg. 30,061 (May 19, 2020) (emphasis added).[3]  *See also* OCR's *Questions and Answers on the Title IX Regulations on Sexual Harassment (July 2021)*, at p. 10 ("The 2020 amendments took effect on August 14, 2020 and are not retroactive.  This means a school must follow the requirements of the Title IX statute and the regulations that were in effect at the time of the alleged incident .  .  . This is true even if the school's response was on or after that date.").[4]

Under the 2020 Title IX regulations, the definition of sexual harassment, which specifies the conduct that triggers the application of Title IX, mirrors *Davis'* standards and is narrower than the definitions previously stated in OCR guidance documents issued during the Obama Administration.  Under the new Title IX regulations effective August 14, 2020, sexual harassment subject to Title IX's requirements is defined as either (1) a *quid pro quo* by a school employee for unwanted sexual conduct, (2) "unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," or (3) sexual assault as defined in the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (known as the "Clery Act") and domestic violence, dating violence, and stalking as defined in the Violence Against Women Act."  34 CFR § 106.30 (definition of Title IX "sexual harassment").

Where and under what circumstances an incident will invoke Title IX obligations present vexing issues for colleges and universities, given the number of students who live off-campus and the fact that schools often offer programming and activities in a wide range of settings such as

---

[3]     *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (final Title IX rule published on 5/19/20 to take effect on 8/14/20).

[4]     *See* https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf. (OCR's July 2021 Q&A Document).

study abroad programs.   Under the Department of Education's administrative definition of "education program or activity" at 34 CFR § 106.44(a), a federal funding recipient's obligations will apply to Title IX "sexual harassment" occurring off-campus within the United States, only if one of three conditions applies:

- The off-campus incident occurs as part of the recipient's "operations" as that term is defined by 20 U.S.C. 1687 and 34 CFR § 106.2(h);

- The recipient exercised substantial control over the respondent and the context of the alleged sexual harassment that occurred off-campus; or

- The incident of sexual harassment occurs at an off-campus building owned or controlled by a student organization recognized by a postsecondary institution.

The Title IX regulations **do not** apply when sexual misconduct **does not** meet the definition of "sexual harassment," under 34 CFR § 106.30, and/or **has not** occurred within the recipient's "education program or activity," as defined under 34 CFR § 106.44(a).  In its lengthy preamble to the 2020 regulations, OCR has made clear that regarding prohibited conduct that does not meet Title IX's definition of sexual harassment or jurisdictional boundaries within the education program or activity, a school may still elect to address and adjudicate such conduct through its other codes of conduct or non-Title IX policies.  *See*, *e.g*, 85 Fed. Reg. at 30,037 (noting that when conduct does not meet the definition of Title IX "sexual harassment," a federal funding recipient may "address[]the alleged misconduct under other provisions of the recipient's own code of conduct.").

In addition to the definitional and jurisdictional provisions, the Title IX regulations prescribe a funding recipient's responsive actions upon the reporting of alleged Title IX sexual misconduct (such as the provision of interim supporting measures) and the required grievance process triggered by the filing of a written, formal complaint, during the investigation, at a live hearing (with cross-examination of witnesses), and through an appeal.   34 CFR §§ 106.44

(Recipient's response to sexual harassment) and 106.45 (Grievance process for formal complaints of sexual harassment).

Of current significance, the Biden Administration will soon issue for public comment further amendments to the Department of Education's Title IX regulations.  In May 2021, the Executive Branch's Office of Management and Budget announced:

> The Department [of Education] plans to propose to amend its regulations implementing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et. seq., consistent with the priorities of the Biden-Harris Administration, including those of set forth in the Executive Order on Preventing and Combatting Discrimination on the Basis of Gender Identity or Sexual Orientation and the Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation and Gender Identity (EO 14021).

On February 18, 2022, the Department of Education announced that it has sent its proposed amendments to the Title IX regulations to the Office of Information and Regulatory Affairs, the part of the Office of Management and Budget responsible for coordinating the review of all Executive Branch regulations. The Department of Education anticipates that it will publicly issue a Notice of Intended Rulemaking by April 2022, seeking public comments responding to proposed amendments to the Title IX regulations.  Which provisions of the 2020 Title IX regulatory amendments will stay in effect remains to be seen, and the regulatory Title IX landscape will soon change once again.[5]

Obviously, as has been widely publicized and debated, Title IX's administrative landscape has evolved significantly during the past decade, since the issuance on April 4, 2011 of the Obama Administration's Dear Colleague Letter and additional guidance documents thereafter, through the Trump Administration's rescission of those guidance documents and ultimate issuance of the Title

---

[5]   Copies of the Department of Education's recent notices of its upcoming issuance of proposed Title IX regulatory amendments are attached as Exhibit A.

IX regulations on sexual harassment that took effect on August 14, 2020, and now with the Biden Administration's intention to issue this year further amendments to the Title IX regulations.[6]  Title IX's regulatory requirements are changing again as this litigation proceeds.

Plaintiffs seek to rewrite Title IX law and impose substantial judicial oversight over Brown's Title IX compliance.  Plaintiffs' demand for a mandatory and permanent injunction "requiring [the University's] compliance with Title IX and recurring external audits of Brown's Title IX compliance" would result in the Court encroaching substantially upon the Department of Education's Title IX regulatory oversight under 20 U.S.C. § 1682 and 34 CFR Part 106.

### C.  Brown's Sexual Misconduct Policies from the 2015-16 Academic Year to the Present

For historical background regarding the University's Title IX policies and procedures, Brown refers back to its 2014-15 academic year.  As the Court has addressed in prior cases, during the fall 2014 semester, Brown convened a Task Force on Sexual Assault, comprised of members of Brown's administration, faculty, and student body, to review its sexual misconduct policies and procedures. *See John Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 315-16 (D.R.I. 2016).[7]

As a result of the Task Force's year-long engagement with Brown's campus and diverse external experts, at the start of the 2015-16 academic year, Brown adopted a new *Sexual and Gender-Based Harassment, Sexual Violence, Relationship, and Interpersonal Violence and Stalking Policy*. *Id*.  Brown represents to the Court, and does not believe that Plaintiffs will

---

[6]   On September 22, 2017, the Department of Education rescinded the Obama Administration's April 4, 2011 Dear Colleague Letter and its April 29, 2014 Questions and Answers of Title IX and Sexual Violence. *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

[7]   Brown recognizes that many of the citations within this brief refer to several cases brought in this Court by "John Doe" and "Jane Doe" plaintiffs.  Because each "Doe" case involved distinct claims, timelines, facts, and results, Brown has attempted to be as detailed as possible when referring to the "Doe" citations in order to distinguish one case from the several others.

dispute, that this sexual misconduct policy remained in effect, as amended over time, between academic years 2015-16 through 2019-20 (until the 2020 amendments to the Title IX regulations took effect in August 2020).  The policy addressed prohibited sexual misconduct that occurred on Brown's premises, in the context of a Brown employment, education or research program or activity (including study abroad programs), and conduct that occurred outside of Brown's program or activity that had continuing effects on Brown's campus or within its programs or occurred in close proximity to Brown's campus and was connected to hostile conduct on campus.  Also, as a result of the Task Force's extensive year-long work and at the start of the 2015-16 academic year, Brown implemented a new *Complaint Process*, which delineated the procedures for the receipt, investigation, and informal and formal resolution of complaints involving alleged sexual misconduct.  *John Doe v. Brown Univ.*, 210 F. Supp. 3d at 316.

In August 2020, in response to the Department of Education's Title IX regulations effective on August 14, 2020 and effective starting the 2020-21 academic year, Brown adopted the *Sexual and Gender-Based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy* (to address sexual misconduct falling within the Department's definition of Title IX sexual harassment), as well as the *Sexual and Gender-based Misconduct Policy* (to address sexual misconduct falling outside of the Department's definition of Title IX sexual harassment).  Brown also issued the *Title IX Grievance Procedure* (delineating its processes in response to reported Title IX sexual harassment) and the *Sexual and Gender-based Complaint Process* (delineating its processes in response to sexual misconduct falling outside of the Department's definition of Title IX sexual harassment).

16

As published on Brown's website, its *Sexual and Gender-Based Harassment, Sexual Assault, Intimate Partner Violence, and Stalking Policy* states the following regarding its applicability in compliance with the jurisdictional scope of the Title IX regulations:

**To Whom the Policy Applies**

This policy applies broadly to the entire Brown University ("Brown" or "the University") community including applicants, employees, invitees, students, and contractors collectively together known as Covered Persons. This policy pertains to acts of Prohibited Conduct committed by or against Covered Persons when:

i.) the conduct that occurs, in the United States, on property owned, leased or controlled by Brown University; and/or

ii.) the conduct occurs off-campus, in the United States, in the context of a program, activity, or location in which Brown exercises substantial control over both the Respondent and the context in which the alleged Prohibited Conduct occurred, including but not limited to off-campus research, internships, mentorships, summer sessions, clerkships, graduate student fellowships, or other affiliated programs.

As also published on the its website, Brown's *Sexual and Gender-based Misconduct Policy*, which addresses sexual misconduct falling <u>outside</u> of Title IX that is prohibited conduct under Brown's community standards, states the following regarding its applicability:

**To Whom the Policy Applies**

This policy applies broadly to employees and students collectively known as "Covered Persons." This policy pertains to acts of Prohibited Conduct committed by or against Covered Persons when:

1) the conduct occurs on property owned, leased, used or controlled by Brown University,

2) the conduct that occurs in University programs or activities abroad; and/or

3) the conduct occurs off-campus, in the United States, outside of the context of a program, activity, or location of Brown when Brown exercises substantial control over both Complainant and the Respondent, and the effects of the Prohibited Conduct have a continuing discriminatory effect at Brown.

**Note:** *Complaints involving student Respondents who are participants in Summer@Brown or Pre-College Programs should refer to the policies and procedures governing students enrolled in those programs.*

As shown in the above-stated chronology, Brown's sexual misconduct policies and procedures have evolved to ensure the fullest protection of its community members and adapt to changing Title IX administrative guidance documents and regulations.  As should be clear (but what Plaintiffs omit to address in their pleading), Plaintiffs reported their individualized allegations to Brown at different times, during different academic years, and when different sexual misconduct policies (or versions thereof) were in effect.

Only Plaintiffs Katiana Soenen and Jane Doe 1 allege that they were subjected to sexual misconduct during the 2020-21 academic year and <u>after</u> the Title IX regulations took effect on August 14, 2020.  To comply with the new regulations and ensure that its policies addressed both Title IX and non-Title IX sexual misconduct, Brown issued two sexual misconduct policies and procedures effective for the 2020-21 academic year.  By contrast, the other four Plaintiffs reported allegations to Brown during earlier academic years under Brown's prior *Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy*, which initially took effect at the start of the 2015-16 academic year and was amended over time through the 2019-20 academic year.  Accordingly, no single Brown policy or complaint procedure is at issue among the six Plaintiffs' claims, nor would be at issue within the putative class dating back to 2018, so there cannot possibly be class action commonality and predominance, as discussed in more detail *infra*.

## SECTION II:
## THE CLAIMS OF THREE PLAINTIFFS ARE SUBSTANTIALLY TIME-BARRED, AND THEY LACK STANDING TO SEEK DECLARATORY AND INJUNCTIVE RELIEF

While Brown strongly disagrees with and categorically denies substantially all of Plaintiffs' allegations, the University recognizes that the Court must accept the truth of any well-pled factual allegations at this stage of the legal proceedings. *S.E.C. v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010). Within Section III below stating Brown's Rule 12(b)(6) arguments for the dismissal of each count, the University analyzes individually the allegations of each Plaintiff: Katiana Soenen ("Katiana"), Taja Hirata-Epstein ("Taja"), Chloe Burns ("Chloe"), Emma Dennis-Knieriem ("Emma"), "Jane Doe 1" ("Jane 1"), and "Jane Doe 2" ("Jane 2"). Before doing so, Brown must first address two overriding limitations. First, Taja's, Chloe's, and Emma's claims predating August 6, 2018 (three-years prior to the filing of this litigation) are time-barred. Second, as Brown alumni, these three Plaintiffs lack standing to seek any declaratory and injunctive relief against their alma mater, even if some of their claims survive past a Rule 12(b)(6) dismissal.

**A. Taja, Chloe, and Emma cannot litigate claims that accrued before August 6, 2018.**

Except for the breach of fiduciary duty claim (Count VIII),[8] all claims in the First Amended Complaint (Counts I-VII and IX-XI) are subject to a three-year limitations period. *John Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 407, n.7 (D.R.I. 2018) (Title IX borrows the Rhode Island's personal injury limitations period), R.I.G.L. § 42-112-2 (Rhode Island Civil Rights Act ("RICRA") limitation period); R.I.G.L § 9-1-14 (b) (personal injury limitation statute). A claim accrues when the plaintiff becomes aware of both the fact and injury and its causal connection to the defendant.

---

[8]   Under R.I.G.L. § 9-1-13, a breach of fiduciary duty claim must be filed within ten years of its accrual, but Rhode Island law has not recognized a fiduciary relationship between a university and its students. *Sterman v. Brown Univ.*, 513 F. Supp. 3d at 255.

*Delaware St. Coll. v. Ricks*, 449 U.S. 250, 258 (1980). "The proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the act become most painful." *Id*. (*Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (9th Cir. 1979)). *See also Adams v. Town of Burrillville*, 249 F. Supp. 2d 151, 155 (D.R.I. 2003).

Plaintiffs filed this action on August 6, 2021, so all of their claims must have accrued on or after August 6, 2018. Three Plaintiffs – Taja, Chloe, and Emma – plead claims that accrued before that date. They fail to plead any plausible basis to apply the "continuing violations doctrine" to save their time-barred claims.[9] As Brown addresses *infra* the futility of each count pled in the First Amended Complaint, it does so incorporating its arguments that Taja, Chloe, and Emma's allegations and claims are substantially time-barred.

### 1. Taja

Taja, who graduated from Brown in 2020, alleges that she was involved in an abusive relationship with a Brown male student, which allegedly involved sexual assaults and abuse "on various occasions" perpetrated by that student "[f]rom 2017 to 2018." (FAC ¶¶ 108-09). Taja first reported the alleged abuse to her fraternity in September 2018 and then to a Brown dean in October 2018. (*Id*. ¶ 112, 116). Regarding events that occurred after the August 6, 2018 cut-off date, Plaintiffs specify Taja's allegations by month or date. Yet, when alluding to her allegations

---

[9]   The Court has held that the "continuing violation doctrine," as defined in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), may apply a Title IX hostile environment claim. *John Doe v. Brown Univ.*, 327 F. Supp. 3d at 408-10. The doctrine does not apply to a Title IX erroneous outcome claim. *Id*. at 410. Under Rhode Island law, RICRA contains no language that the doctrine can extend its limitations period. "Rhode Island has not fully recognized the continuing violation doctrine in the tort context." *Adams*, 249 F. Supp. 2d at 155 (citing *Nicolo v. Phillip Morris, Inc.*, 201 F.3d 29, 39 (1st Cir. 2000)). *See also Boudreau v. Automatic Temperature Controls, Inc.*, 212 A.3d 594, 602 (R.I. 2019) (noting that "[a] review of [Rhode Island Supreme Court caselaw] reveals that [the Court] ha[s] only applied the continuing tort doctrine only once, in the context of claims for conversion and unjust enrichment") (citing *Narragansett Elec. Co. v. Carbone*, 898 A.2d 87, 101 (R.I. 2006)).

preceding that date, they do not do so, noting only generally that the alleged abusive relationship ended in "2018" (apparently before August 6, 2018).  This appears to be intentionally designed pleading seeking to shield that the preclusive effect of the three-year limitations period upon Taja's claims.  To the extent that Taja seeks to hold Brown responsible for alleged abuse or sexual assault pre-dating August 6, 2018, her claims are time-barred.

### 2. Chloe

Chloe's causes of action substantially accrued before August 6, 2018.  Chloe graduated from Brown in 2019 (FAC ¶ 148), and she seeks to litigate alleged events extending back to at least April 14, 2016 and possibly even further back.

Chloe alleges that she was sexually assaulted by a Brown male student in her on-campus sorority house on April 14, 2016.  (*Id.* ¶¶ 150-51).  Any causes of action that Chloe may have had against Brown relating to the alleged sexual assault accrued on April 14, 2016, and she did not bring any claim against Brown within three years thereafter.

Four months after the alleged sexual assault, in December 2016, Chloe contacted Brown's Office of Student Conduct to seek the entry of a no-contact order against the accused male student, whom she claims was repeatedly trying to contact her, which Brown provided to her.  (*Id.* ¶ 152).  She claims that the male student failed to honor the no-contact order.  (*Id.* ¶ 153).

In May 2017, over a year after the alleged April 14, 2016 sexual assault, Chloe filed a formal complaint with Brown's Title IX Office against the male student, who filed a cross-complaint against Chloe alleging that she sexually assaulted him.  (*Id.* ¶ 154).  As pled in the First Amended Complaint, Brown's internal processes addressed and determined the cross-complaints through processes that concluded on December 19, 2017 (eight months before the August 6, 2018 accrual cut-off date in the limitations analysis).  Brown determined that neither student was responsible for the sexual assault allegations in the cross-complaints.  (*Id.* ¶¶ 154-170).  Chloe did

not file any claims relating to Brown's determinations of the cross-complaints within three years thereafter.

Chloe pleads allegations relating to a second and distinct internal proceeding between the two students that commenced on December 4, 2017 and closed on August 15, 2018.  (*Id*. ¶¶ 157-80).  In November 2017, Chloe spoke to a student newspaper and protested the male student's selection as a mid-year graduation ceremony speaker.  (*Id*. ¶ 163).  The male student retained legal counsel, who notified Chloe of the student's contentions that she had publicly defamed him in the published interview.  (*Id*. ¶ 165).

On December 4, 2017, the male student filed with Brown's Title IX Office a retaliation complaint against Chloe.  (*Id*. ¶ 169).  Chloe pleads an alleged chronology regarding Brown's process to determine the male student's retaliation complaint against her, which resulted in a finding on August 6, 2018 of her responsibility for retaliation and imposed a written reprimand.  (*Id*. ¶¶ 169-78).  Chloe was granted an extension to appeal the finding, but she did not submit an appeal by the extended deadline. (*Id*. ¶¶ 179-80).   Consequently, Brown's Title IX Office closed the proceeding on August 15, 2018.  (*Id*. ¶ 180).

To the extent that Chloe has any claims against Brown that accrued on or after August 6, 2018, she may only litigate the second proceeding regarding the male student's retaliation complaint against her.  Chloe has not pled any timely claims against Brown regarding either the alleged April 16, 2016 sexual assault or Brown's process to determine the students' cross-complaints accusing each other of sexual assault, which was completed by December 19, 2017.

### 3.  Emma

Emma also seeks to litigate untimely raised claims that accrued before August 6, 2018. Emma, who graduated from Brown in 2021, apparently seeks to hold Brown responsible for alleged sexual misconduct that occurred during her alleged sexually-abusive relationship with a male student between October 2017 to May 2018.  (FAC ¶¶ 184-92).

The First Amended Complaint is silent regarding any events pertaining to Emma over the next six-month period between May 2018 (the end of the relationship) and November 2018 (when Emma filed a formal complaint against the male student).  During this interval, the operative date here for statute of litigation purposes (August 6, 2018) ensued.

The allegations resume, as of November 2018, when Emma filed with Brown a formal complaint against the male student, who subsequently filed a cross-complaint against Emma in April 2019.  (FAC ¶¶ 193-208).  Brown's processes to address the cross-complaints completed in in September 2019, concluding that the male student was not responsible for the allegations in Emma's complaint and that Emma was responsible for the allegations in the cross-complaint (imposing a probation).  (*Id*. ¶¶ 207-08).

In sum, Emma has not raised any timely claim against Brown to hold it responsible for any claims relating to the "abusive relationship" that spanned from October 2017 through May 2018. Her claims are limited only to Brown's internal processes to address the cross-complaints between her and the male student, which spanned from November 2018 through September 2019.   Brown will address *infra* why these claims by Emma should be dismissed.

### B.  Chloe, Taja, and Emma lack standing to seek declaratory and injunctive relief against Brown.

Plaintiffs seek a declaratory judgment that Brown's policies, practices and procedures violate Title IX and state law.  (FAC, Prayer B).  They also seek prospective injunctive relief to

prevent Brown from "engaging in any further unlawful practices, policies, customs, and usages" and "requiring Brown to initiate and implement programs and policies." (FAC, Prayers C & D).

Chloe, Taja, and Emma graduated in 2019, 2020, and 2021 respectively.  (FAC ¶¶ 108, 148, 184).  As Brown alumni, they have not pled any real or immediate threat of injury to give them standing to pursue any such non-monetary relief against the University.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (a party seeking injunctive relief must show that "there is a real and immediate threat of repeated injury.").  Consequently, these three alumna lack standing to seek a prospective mandatory injunction or a declaratory judgment against their alma mater.[10]

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject matter jurisdiction as a defense to suit.  Fed. R. Civ. P. 12(b)(1).  "[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  *North Carolina v. Rice*, 404 U.S. 244, 246 (1971).  "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

Taja, Chloe, and Emma cannot act as plaintiff representatives in a Rule 23(b)(2) class, when they lack individual standing to seek injunctive or declaratory relief.  A plaintiff

---

[10]  *See*, *e.g.*, *Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129 (1975) (per curium) ("[Once] all of the named plaintiffs in the action [have] graduated . . . a case or controversy no longer exists."); *Mellen v. Bunting*, 327 F.3d 355, 364 (4th Cir. 2003) ("[Students'] claims for declaratory and injunctive relief generally become moot when they graduate."); *Stotts v. Cmty. Sch. Dist. No. 1*, 230 F.3d 989, 991 (7th Cir. 2000) (holding that "case lacks a live controversy [because the plaintiff] has graduated"); *Pederson v. La. St. Univ.*, 213 F.3d 858, 874-75 (5th Cir. 2000) (finding Title IX injunctive relief claims mooted by student's graduation); *Thomas R.W., By and Through Pamela R. v. Mass. Dept. of Educ.*, 130 F.3d 477, 479 (1st Cir. 1997) (holding that a student's graduation from private school and matriculation into public high school rendered student's claims for injunctive and declaratory relief moot).

representative must demonstrate the prospect of future injury to herself in order to seek injunctive or declaratory relief on behalf of the putative class. *DeLeón v. New York Univ.*, No. 21 Civ. 05005 (CM), 2022 WL 179812, at *6 (S.D.N.Y. Jan. 20, 2022) ("past injuries do not confer standing upon Plaintiff [as a named class representative] unless she is likely to be harmed again in a similar way, which she is not, because she graduated at the end of the spring 2020 semester.").

Even if Taja, Chloe, and Emma try to respond by arguing that their graduation is not dispositive (which it is) to the standing analysis, none has pled any facts indicating or even implying any individual plans or intentions to participate in Brown's education programs or activities (e.g., as a graduate student). Therefore, they clearly face no real or immediate threat of any repeated injury to allow them to seek non-monetary relief. Accordingly, Chloe, Taja, and Emma's prayers for declaratory and injunctive relief must be dismissed, as a matter of law, due to their lack of standing. As is also discussed *infra*, Plaintiffs seek to litigate a Rule 23(b)(2) class action demanding a mandatary prospective class-wide injunction against Brown, but the "former students" in the proffered class have no standing to request or receive such relief.

## SECTION III:
## BROWN'S ARGUMENTS FOR THE RULE 12(B)(6)
## DISMISSAL OF EACH PLAINTIFF'S INDIVIDUAL CLAIMS

**A. Plaintiffs' Title IX counts and RICRA count fail to state claims upon which relief can be granted.**

Plaintiffs have pled five Title IX counts and a RICRA count:

- <u>Count I</u>:     Title IX - Deliberate Indifference to Sex/Gender Discrimination;
- <u>Count II</u>:    Title IX - Hostile Environment;
- <u>Count III</u>:   Title IX - Heightened Risk;
- <u>Count IV</u>:   Title IX - Erroneous Outcome;
- <u>Count V</u>:    Retaliation by Withholding Protection Otherwise Conferred by Title IX;

- Count XI:      Violation of RICRA[11]

As this Court has held, "[c]ourts generally recognize two lines of Title IX claims against universities, (1) where schools exhibit 'deliberate indifference' to 'severe, pervasive, and objectively offensive' sexual harassment, *Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007), and (2) where university disciplinary proceedings result in either an 'erroneous outcome' or 'selective enforcement' of codes of conduct or disciplinary procedures[.] *Doe v. Trs. of Bos. Coll.* 892 F.3d 67, 90 (1st Cir. 2018) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 716 (2d Cir. 1994))." *John Doe v. Brown Univ.*, 505 F. Supp. 3d 65, 75 (D.R.I. 2020), *on appeal*, No. 20-2023 (1st. Cir.) (argued Nov. 1, 2021).

Brown addresses Counts I-III collectively, which seek to impose (under various titles in each count) "pre-assault" and "post-reporting" theories of Title IX institutional liability.   Next, Brown addresses separately Count IV, alleging a Title IX claim that Brown's processes reached an erroneous outcome as to each Plaintiff.  Lastly, Brown addresses Count V, which is a distinct theory of Title IX liability focused on alleged retaliation for engaging in a protected activity.

1. **Counts I-III:  Each Plaintiff's "Pre-Assault" or "Heightened Risk" claim fails as a matter of law.**

The "heightened risk theory" is often called the "pre-assault theory" of Title IX liability, which the First Circuit has yet to adopt.  While some courts have recognized a pre-assault theory under Title IX, they have only done so in markedly different circumstances from those alleged by each Plaintiff here.  In *Simpson v. University of Colorado at Boulder*, for example, the Tenth Circuit held that an officially sanctioned but unsupervised football recruiting program in which

---

[11]   The RICRA claim "rises and falls with [the] Title IX claims." *John Doe v. Brown Univ.*, 327 F. Supp. 3d at 413.  Plaintiffs wrongly plead that their RICRA claim should be analyzed under a "reckless or callous indifference" standard (FAC ¶ 372), which is not stated in RICRA and is not an applicable standard under Title IX.

high school recruits were paired with female "ambassadors" for the purpose of being shown a "good time" created a significantly heightened risk of sexual assault within that athletic program, of which the university knew.  500 F.3d 1170, 1184-85 (10th Cir. 2007).  There, the university had actual knowledge of sexual assaults that had previously occurred within the football program and warnings from law enforcement.  *Id.* at 1184.  The risk of sexual misconduct inherent in such a program was so "obvious" that a jury could reasonably find that the university's continuation of the program amounted to deliberate indifference.  *Id.* at 1184-85.

In "pre-assault" cases, universities may be held responsible where "they have 'actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators.'"  *Roskin-Frazee v. Columbia Univ.,* No. 17 CIV. 2032 (GBD), 2018 WL 1166634, at *5 (S.D.N.Y. Feb. 21, 2018) (emphasis in original) (quoting *Tubbs v. Stony Brook Univ.*, No. 15-cv-0517 (NSR), 2016 WL 8650463, at * 9 (S.D.N.Y. Mar. 4, 2016)).  In other words, "something more than general knowledge of assaults campus-wide (i.e. some greater specificity) is required to satisfy the actual knowledge requirement [for Title IX liability]."  *Tubbs*, 2016 WL 8650463, at * 9 (collecting cases); *see also Karasek v. Regents of the Univ. of California*, 956 F.3d 1093, 1113-14 (9th Cir. 2020) (While the court would "not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus," it acknowledged that doing so would be "difficult" and made clear that "Title IX does not require [a university] to purge its campus of sexual misconduct to avoid liability.") (citing *Davis*, 526 U.S. at 648).

### a.  The "pre-assault" claims of Taja, Chloe, and Emma are time-barred.

All Title IX claims asserted by Plaintiffs are subject to a three-year limitations period, meaning that each of their causes of action must have accrued on or after August 6, 2018.  Yet,

Taja, Chloe, and Emma seek to litigate pre-assault claims that are long time-barred.  Chloe tries to

reach back the furthest, seeking to hold Brown liable for an alleged sexual assault on that occurred

on April 14, 2016, while Taja seeks to raise alleged sexual abuse and assault that occurred during

a relationship "from 2017 to 2018," and Emma seeks liability for alleged sexual abuse and assault

that occurred in a relationship from October 2017 to May 2018.  (FAC ¶¶ 109, 150, 185).  All of

these untimely "pre-assault" claims must be dismissed as a matter of law.

**b. Katiana and Jane 2 improperly seek to hold Brown liable for alleged off-campus conduct in third-party owned buildings.**

To the extent that Plaintiffs may proceed at all with any pre-assault or heightened risk

claims, both *Gebser* and *Davis* support imposing Title IX liability only when a school's alleged

official policy is one of deliberate indifference to sexual harassment in a context subject to the

school's control.  *See Brown v. State of Ariz.*, 23 F.4th 1173, 1182 (9th Cir. 2022) ("To be faithful

to Title IX and *Davis*, there must be something beyond student-focused disciplinary authority that

renders *the context* where the challenged harassment occurred part of the school's 'operations.'

To conclude otherwise eviscerates Congress's express requirement that conduct is actionable only

if it occurs 'under an[] education program or activity receiving Federal financial assistance.'  20

U.S.C. § 1681(a).") (emphasis in original) (citation to *Davis*, 526 U.S. at 645, omitted).

Katiana and Jane 2 seek to hold Brown responsible for alleged sexual assaults that occurred

in off-campus, privately owned buildings in Providence.  Katiana alleges that she was sexually

assaulted in May 2021 while attending an off-campus party at a student's apartment and that she

was sexually assaulted on June 12, 2021 in an "off-campus unsanctioned frat house."  (FAC ¶¶ 71,

85).  She has failed to plead that Brown had any ownership interest, control, or management over

either off-campus building.

28

Jane 2, who is Doctor of Philosophy (Ph. D) student in the Religious Studies Department, alleges that she attended an off-campus party hosted by a fellow Brown student in her academic department in March 2019.  (*Id*. ¶¶ 241-42).  While attending the off-campus private party, she was allegedly assaulted by "an older doctoral student who groped her breasts as he was leaving the party."  (*Id*. at ¶ 243).  Jane 2 has not pled that Brown had any ownership interest, control, or management over the off-campus residence where the party was held.[12]

Both Katiana and Jane 2 wrongly seek to hold Brown liable, under their "pre-assault" or "heightened risk" claims for alleged sexual misconduct that occurred outside of Brown's campus and not within one of the University's education programs or activities.  Title IX, as codified at 20 U.S.C. § 1681(a) and interpreted by *Gebser* and *Davis*, do not allow either Plaintiff to hold Brown liable under Title IX for the alleged off-campus sexual misconduct that occurred in third-party owned residences as a matter of law.

### c.   Jane 1

Jane 1 alleges that, while interacting with a professor during Zoom conferences held in the Fall 2021 semester, the professor "had issues with boundaries" in discussions and spoke in a sexually inappropriate manner during an October 2021 session.  (FAC ¶¶ 212-15).  While *Davis'* requirement to show "severe, pervasive, and objectively offensive" conduct (applicable to student-on-student harassment cases) has not been applied to faculty-on-student allegations, the First Circuit has held that "some degree of severity or pervasiveness must be present in order for

---

[12]   As another basis to dismiss all of Jane 2's Title IX allegations, the alleged single instance of student-on-student sexual harassment at an off-campus residence does not sufficiently meet the severity or pervasiveness standards under *Davis* to form the basis of Title IX liability. *Davis*, 526 U.S. at 651-52 ("[I]n the contexts of student-on-student harassment, damages are available only when the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to prevent").

harassment to result in 'exclusion' under Title IX." *Doe v. Pawtucket Sch. Dept.*, 969 F.3d 1, 10 (1st Cir. 2020). What Jane 1 has pled about a single inappropriate conversation does not meet this standard of actionable sexual harassment. Also, Jane 1 has not pled any sufficient facts showing pre-incident notice to support a "pre-assault" or "heightened risk" based theory of Title IX liability.

2.   **Counts I-III**: Each Plaintiff's "post-reporting" Title IX claim fails as a matter of law.

Under Title IX, a federal funding recipient can be liable when it is deliberately indifferent to known acts of sexual harassment by a teacher. *Gebser*, 524 U.S. at 287-88. Such liability can also occur when the funding recipient is deliberately indifferent to known acts of harassment in its programs or activities, including the severe and pervasive acts of harassment perpetuated by fellow students in circumstances under the recipient's substantial control. *Davis*, 526 U.S. at 644-46 (finding liability "where [the school] is deliberately indifferent to sexual harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."). Applying the Supreme Court's Title IX precedent, the First Circuit has made clear that the deliberate indifference standard "is not one of effectiveness by hindsight." *Porto*, 488 F.3d at 74.

a.   **Chloe's claim is time-barred.**

An "appropriate person," who is "an official of the recipient entity with authority to take corrective action to end the discrimination," must have actual knowledge of the alleged sexual misconduct. *Gebser*, 524 U.S. 290. Chloe reported to Brown in May 2017 that she had allegedly been sexually assaulted by another student on April 14, 2016.[13] After the other student filed a cross-complaint against Chloe, Brown's responsive processes addressing the complaints

---

[13]   Unlike Chloe, the other five Plaintiffs allege that they reported the alleged sexual assault or harassment to Brown on dates after August 6, 2018.

concluded on December 19, 2017, upon the determination of the male student's appeal of the hearing board's findings.  At the conclusion of its responsive process, Brown determined that neither Chloe nor the male student was responsible for the allegations in the cross-complaints. Chloe waited more than three years to bring any claims in litigation seeking to impose Title IX liability concerning Brown's post-incident responses to her reporting of the April 16, 2016 incident and the University's investigation and determination of the cross-complaints that the students filed against each other.  Therefore, Chloe's post-assault Title IX deliberate indifference claim is time-barred as a matter of law.

### b.  No Plaintiff has met the high bar to show deliberate indifference.

To establish a deliberate indifference claim, a plaintiff must set forth sufficient plausible facts that would show that (1) she was subject to "severe, pervasive, and objectively offensive" sexual harassment; (2) the harassment caused her to be deprived of educational opportunities or benefits; (3) Brown was aware of this harassment in (4) its programs and activities and (5) its response, or lack thereof, to the harassment was "clearly unreasonable."  *Porto*, 488 F. 3d at 72-73.  As Brown addresses in its Title IX summary at the outset of this brief, the bar to impose institutional liability is very high.   Each Plaintiff must establish that once Brown had actual knowledge of the alleged sexual misconduct, the University's actions amounted to "'an official decision . . . not to remedy'" the discrimination.  *Gebser*, 524 U.S. at 290.  The alleged deliberate indifference must have also "cause[d the plaintiff] to undergo harassment or ma[d]e [the plaintiff] liable or vulnerable to it."  *Davis*, 526 U.S. at 645 (internal quotations omitted).

When applying the "deliberate indifference" standard, courts must remain cognizant that the Supreme Court emphasized that it does not mean "that administrators must engage in particular disciplinary actions" to avoid Title IX liability.  *Davis*, 526 U.S. at 648.   Nor does it mean that

complainants reporting sexual harassment are entitled to make particular remedial demands – in fact the Supreme Court further emphasized that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id*. (citation omitted).   Yet, that is precisely what each Plaintiff (including Chloe in her time-barred claims) is asking the Court to do.

As the First Circuit has noted, "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by [complainants].  The test is objective – whether the institution's response, evaluated in light of known circumstances, is so deficient to be clearly unreasonable."  *Fitzgerald v. Barnstable School Comm.*, 504 F.3d 165, 174 (1st Cir. 2007), *reversed on other grounds*, 55 U.S. 246 (2009).  "Title IX was not intended to wither pretermit thoughtful consideration of students' rights or to demand a gadarene rush to judgment."  *Id*.  "After all, in situations involving charges of peer-on-peer harassment, [a school] has obligations not only to the accuser but also to the accused."  *Id*.  As *Fitzgerald* noted, "investigations involve judgment calls," and "[t]hat is vitally important because, in the last analysis, courts have no roving writ to second-guess an educational institution's choices from within a universe of plausible investigative procedures."  *Id*. at 175.

Two Plaintiffs – Emma and Jane 2 – base their deliberate indifference claims upon their disagreements with Brown's determinations holding the respondents as not responsible for the alleged charges, which is an insufficient basis to support a deliberate indifference claim.  Taja likewise complains that she disagrees with Brown's responsive actions after she reported her first abusive relationship and further claims that Brown was somehow deliberately indifferent when she did not report her allegations regarding her second abusive relationship until after the accused student had graduated from the University.  Brown responded to both of Katiana's reports of off-campus sexual assaults, by appropriately telling her that the alleged conduct falls outside of Title

IX in accordance with the 2020 Title IX regulations and that it would need her to identify the student whom she claimed sexually assaulted her.

Jane 1 alleges a single instance when a professor made inappropriate comments to her and that she thereafter requested and received academic accommodations within her educational program to limit her interactions with the professor.   Simply put, this was not deliberate indifference.  *See Wills v. Brown Univ.*, 184 F.3d 20, 27 (1st Cir. 1999) (rejecting claims that a professor's presence on campus and interactions with a student supported a deliberate indifference claim).

### 3.   Count IV:  No Plaintiff has pled a plausible Title IX erroneous outcome claim.

A Title IX claim challenging a disciplinary procedure as an "erroneous outcome" requires that a plaintiff must offer evidence "'cast[ing] some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and indicating that 'gender bias was a motivating factor.'" *Trs. of Bos. Coll.*, 892 F.3d at 90 (quoting *Yusuf*, 35 F.3d at 715).  To plead a plausible erroneous outcome claim, a student may meet the first part of the analysis by alleging, for example, an evidentiary weakness at the hearing level, such as "a motive to lie on the part of *a complainant* or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge."  *Yusuf*, 35 F.3d at 715 (emphasis added).[14]  "However, allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss."  *Id*.  Rather, a plaintiff must allege particularized facts that support a "causal connection between the flawed outcome and gender bias."   *Id*.   "A plaintiff must thus also allege particular

---

[14]    *Yusuf's* reference to a showing that *the complainant* had a motive to lie further evidences that that an erroneous outcome claim is brought by the respondent in a disciplinary matter.

circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.* "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

As this Court knows from its docket, the erroneous outcome cases, which it has adjudicated, were filed by respondents who sought to challenge a finding of responsibility and/or the imposed sanction. At least one federal court has doubted that a complainant may file a Title IX erroneous outcome lawsuit to contend that a respondent should have been found responsible for sexual misconduct charges or sanctioned more severely:

> Defendant[] notes that Plaintiff's pleadings seem to proceed under theories of erroneous or selective enforcement, and that this cause of action is typically reserved for students accused of misconduct challenging a disciplinary proceeding. Indeed, all the relevant cases cited by Plaintiff involve respondents who alleged that they were discriminated against in their disciplinary proceedings . . . Plaintiff seems to be asking the Court to find a novel cause of action for complainants in school disciplinary proceedings to sue for gender discrimination.

*Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937, 965 (E.D. Mich. 2020) (citations omitted).

Regarding Plaintiffs' erroneous outcome allegations, Brown first responds to their citation to the University's Annual Outcome Reports published by its Title IX Office. (FAC ¶ 66). As the reported statistics show, cases in which formal complaints were filed and adjudicated under Brown's policies have resulted in determinations of both responsibility and non-responsibility. While Plaintiffs subjectively believe that the number of responsible findings should have been higher, that does not objectively show any gender bias in Brown's implementation of its processes. Further, as the Court also knows from its docket over the past decade, several male respondents who were found responsible under Brown's processes have brought lawsuits alleging the exact opposite of what Plaintiffs contend here. All of this shows that Brown implements its processes

fairly and in a gender neutral manner, by investigating and adjudicating each case on its facts and not based upon any gender bias.

In the ensuing sections, Brown addresses the many flaws in Plaintiffs' class action allegations, particularly the lack of commonality, typicality, and predominance. As a preview, Brown notes that the undisputed fact that some sexual misconduct disciplinary cases have resulted in findings of responsibility, while others have not, exemplifies a simple and clear reason why a class action is totally implausible. Understandably, complainants who were involved in disciplinary cases where the respondents were not held responsible may believe that the results were caused by deliberate indifference or were erroneous. However, the broadly pled putative class stated in paragraph 266 of the First Amended Complaint would certainly include cases in which the respondents were held responsible for sexual misconduct policy violations – Would those complainants too be claiming that the determined outcome was erroneous, and how and why would they do so? This is yet another factual distinction that Plaintiffs have overlooked completely when pleading a putative class action so boldly. Each sexual misconduct determination involves a myriad of underlying individualized factual issues with many nuances distinguishing it from other sexual misconduct cases.

Having provided this preview of the absence of a plausible class action, Brown next addresses why each of the six Plaintiffs has not pled a plausible erroneous outcome claim, even if such a cause of action may be brought by a complainant.

### a. Katiana, Taja, and Jane 1

Beginning with the simplest to address, Katiana, Taja, and Jane 1 have not pled any allegations that they were ever a party in any Brown disciplinary case. (FAC ¶¶ 70-107, 108-47,

211-40).  Consequently, these three Plaintiffs have not pled any plausible basis to support an erroneous outcome claim.

### b.  Chloe

Chloe alleges that she was sexually assaulted by a male Brown student on April 14, 2016. (FAC ¶ 150).  Thirteen months later, in May 2017, she filed a formal complaint against the male student, who filed a cross-complaint against her alleging that she sexually assaulted him.  (*Id*. ¶ 154).  After a hearing held on October 30, 2017, Brown found the male student responsible for the charges and found Chloe not responsible on his cross-complaint.  (*Id*. ¶ 155). The male student appealed the finding against him.  (*Id*. ¶ 156).  On December 19, 2017, Brown's appellate body granted the appeal and reversed the finding of responsibility.  (*Id*. ¶ 170).

As a fatal flaw, Chloe's erroneous outcome claim, seeking to challenge Brown's determination of the cross-complaints, is time-barred.  As expressly pled in the First Amended Complaint, Brown's process regarding the cross-complaints closed on December 19, 2017 – eight months before August 6, 2018.  (FAC ¶ 170).  *See John Doe v Brown Univ.*, 327 F. Supp. 3d at 410 (continuing violations doctrine cannot be applied to extend the three-year limitations period controlling a Title IX erroneous outcome claim).  Therefore, Chloe may not pursue an erroneous outcome claim regarding Brown's determination of the cross-complaints as a matter of law.

Chloe also raises a second and separate Brown process to address the male student's complaint against her filed on December 4, 2017.  Specifically, the male student alleged that Chloe engaged in retaliation against him by speaking to a student newspaper, while his appeal in the cross-complaint proceeding was pending.   (FAC ¶ 169).  On August 6, 2018, Chloe was notified that she was found responsible for retaliatory conduct and received a written reprimand.  (*Id*. ¶ 178).  While disagreeing with the result, Chloe has pled nothing to suggest that there were any

procedural irregularities during the separate process conducted by Brown, nor does she allege any particular circumstances suggesting that gender bias was a motivating factor behind what she contends to be an erroneous finding.  Consequently, Chloe's erroneous outcome challenge fails to state a plausible claim as a matter of law.  *Yusuf*, 35 F.3d at 715.

### c.   Emma

Emma and a male Brown student filed cross-complaints, each alleging sexual misconduct by the other during the course of their prior dating relationship.  Emma filed her complaint first with Brown on November 14, 2018, and the male student filed his cross-complaint on April 30, 2019.  (FAC ¶¶ 193, 203).  Brown heard and decided Emma's complaint first on May 1, 2019 and found the respondent non-responsible on May 7, 2020.  (*Id*. ¶¶ 204, 207).  The University held a separate hearing on the cross-complaint and found Emma responsible and imposed a probationary period as the result.  (*Id*. ¶ 208).  Emma's erroneous outcome claim fails for that same reasons as Chloe's does (as discussed above), she has cited no procedural irregularities nor has she plausibly suggested that gender bias motivated the results in Brown's determination of the cross-complaint.

### d.   Jane 2

Jane 2 seeks to challenge Brown's January 17, 2020 determination in a disciplinary case, which addressed her September 18, 2019 formal complaint against another Brown student.  (FAC ¶¶ 248-60).   She has not pled that she ever appealed Brown's determination, which was her right under the University's process.  She was not subject to a cross-complaint in the case, so there was no disciplinary determination against her.

Because Jane 2 was not a respondent in the case, she cannot proceed with an erroneous outcome claim.  She cannot litigate an erroneous outcome case simply because she disagrees with the determination that the respondent was not-responsible for the allegations.

4.  <u>**Count V**</u>**:  No Plaintiff has pled actionable Title IX retaliation.**

In *Jackson v. Birmingham Bd. of Educ.*, the United States Supreme Court held that the private cause of action implied by Title IX encompasses claims "where the funding recipient retaliates against an individual because he [or she] has complained about sex discrimination."  544 U.S. 167, 171 (2005).  The Court reasoned that the funding recipient's "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action[,]" because "[r]etaliation is, by definition, an intentional act."  *Id.* at 173-74.

Citing to analogous law under Title VII of the Civil Rights Act of 1964, the First Circuit has delineated the elements of a Title IX retaliation claim.  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002).  A plaintiff may establish a *prima facie* case of Title IX retaliation by alleging facts sufficient to show that "she engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action."  *Id.*  The First Circuit has also required that a plaintiff must show that a university's "desire to retaliate was the but-for cause of the challenged [adverse] action." *Theidon v. Harvard Univ.*, 948 F.3d 477, 505 (1st Cir. 2020).

Brown first addresses the unique manner in which Plaintiffs caption their retaliation claim in Count V, calling it "Retaliation by Withholding Protection Otherwise Conferred by Title IX." They plead the following as the crux of their misapplied retaliation theory:

> Brown engaged in materially adverse actions against Plaintiffs where staff failed to report Plaintiffs' disclosures of sexual misconduct, where Brown's Title IX Office failed to properly investigate Plaintiffs' claims of sex/gender discrimination, where Brown's Title IX Office failed to initiate appropriate interim measures to ensure their safety and ongoing equal access to educational opportunities and benefits, and where Brown's Title IX Office failed to implement appropriate sanctions and

38

responsive measures to remedy the sexually hostile environment and prevent its recurrence.

(FAC ¶ 333).

Plaintiffs conflate a Title IX deliberate indifference claim into a Title IX retaliation claim. The Court should reject this clear misapplication of Title IX law, which itself justifies its Rule 12(b)(6) dismissal.  If dismissal is not granted on that ground, then once applying *Jackson* and *Frazier's* Title IX retaliation framework, this Court should determine that each Plaintiff has failed to plead a plausible Title IX retaliation claim.

### a. Four of the Plaintiffs – Katiana, Taja, Jane 1, and Jane 2 – were not subjected to any alleged adverse action to support a Title IX retaliation claim.

First, Taja's allegations must be limited to the time period of August 6, 2018 and after, under the three-year limitations period, which significantly limits the scope of her pled allegations that can even be considered for this claim.  Second, Taja, Katiana, Jane 1, and Jane 2 do not raise any allegations that Brown ever undertook any disciplinary process against them nor ever imposed any adverse educational actions against any of them.  They simply raise allegations about the individual disagreements about the timing and manner in which Brown responded to and addressed their sexual misconduct allegations against the respondent male students, which is insufficient to support a Title IX retaliation claim.  With no adverse action, there is no retaliation claim as a matter of law.

### b. Chloe

The three-year limitations period limits significantly the scope of what may be analyzed for purposes of Chloe's Title IX retaliation claim.  Brown's determination of the cross-complaints between her and a male student was completed by December 19, 2017 – eight months before the August 6, 2018 cut-off date for a timely-pled claim.  (FAC ¶ 170).

Chloe alleges that, on August 6, 2018 (the date exactly three years before she and others filed this lawsuit), Brown informed her that she was found to be responsible for the separate retaliation complaint that the male student filed against her after she went to a student newspaper to express her disagreement about his selection as a mid-year graduation speaker.  (FAC ¶¶ 149, 163-180).  She received only a written reprimand as a result of the finding.  (*Id.* ¶ 178).  Chloe has not pled any plausible inference that Brown reached its determination in this second proceeding, because she had earlier filed a formal complaint against the male student (who filed a cross-claim against Chloe, for which she was found not responsible).  (*Id.* ¶ 155).

### c.  **Emma**

Emma alleges that she was involved in an abusive relationship from October 2017 to May 2018 with a male Brown student (FAC ¶ 185), which she did not report to Brown until November 2018 (*id.* ¶ 193).  On November 14, 2018, she filed a formal complaint against the Student with Brown's Title IX Office.  (*Id.* ¶ 194).

On the eve of Brown's hearing to address Emma's complaint, the male student filed a cross-complaint against her on April 30, 2019.  (*Id.* ¶ 203).  Brown held two separate hearings on the respective complaints – hearing Emma's complaint on May 1, 2019 and the male student's cross-complaint on August 30, 2019.  (*Id.* ¶¶ 204, 208).  Following the hearing on Emma's complaint, on May 7, 2019, Brown's Title IX hearing board found the respondent not responsible due to insufficient evidence to support Emma's allegations against him.  (*Id.* ¶ 207).  Following the later hearing on the cross-complaint, on September 10, 2019, Brown's hearing panel found Emma responsible for engaging in nonconsensual sexual misconduct and imposed a probation sanction.  (*Id.* ¶ 208).  While disagreeing with Brown's determinations of the cross-complaints, Emma has not pled anything plausibly suggesting that Brown's finding on the cross-complaint

against her was because of her initial complaint against the respondent. *See, e.g., Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019) (affirming Rule 12(b)(6) dismissal of Title IX retaliation claim, where the plaintiff argued that college retaliated against him for defending himself in disciplinary proceeding, but no alleged facts plausibly suggested that the hearing panel reached its conclusion because he had done so).

**B.  <u>Counts VI, VII, and X</u>:  Plaintiffs' negligence claims fail as a matter of law.**

Counts VI, VIII and X asserting negligence claims seek to hold Brown responsible with respect to (1) its alleged actions both <u>before</u> the alleged sexual misconduct (seeking to hold Brown responsible for the allegedly tortious actions of a third-party student or faculty member) and (2) its alleged responsive actions <u>after</u> each Plaintiff's reporting of her allegations to the University. As discussed below, Plaintiffs individually (as well as collectively) cannot succeed on any negligence claims against Brown under Rhode Island law for several legal reasons (including again the statute of limitations restrictions preventing Taja, Chloe, and Emma from litigating any accrued claims predating August 6, 2018).

To prove negligence under Rhode Island law, Plaintiffs must establish that (1) Brown owed each of them a legally cognizable duty; (2) there was a breach of that duty; (3) there was proximate causation between the alleged conduct and the resulting injury; and (4) an actual loss or damages resulted. *Daniels v. Fluette*, 64 A.3d 302, 304-05 (R.I. 2013).  The existence of a legal duty is question of law that the Court is solely authorized to determine. *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I. 2003).  No "clear-cut formula" exists under Rhode Island law for making this determination. *Gushlaw v. Milner*, 42 A.3d 1245, 1256-57 (R.I. 2012).  The Court must instead employ an *ad hoc* approach to determining whether a duty exists considering five factors:

> (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered an injury, (3) the closeness of connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the

41

burden to the defendant and the consequences to the community for imposing a duty to exercise care with resulting liability for breach.

*Id.* (citing *Ferreira v. Strack*, 652 A.2d 965, 967-68 (R.I. 1995)).

Before addressing the legal futility of Plaintiffs' three negligence counts, Brown proffers an overriding point. As pled with a broad collective brush, Plaintiff's negligence claims seek to redefine the university-student relationship under Rhode Island common law. Their alleged duties, which they contend apply universally in the university-student relationship, are amorphous. As pled, their negligence claims would effectively turn all of our state's higher education institutions into insurers against the general risk of sexual assault or harassment, whenever students may be interacting with one another and wherever alleged sexual misconduct may occur.

Seeking to litigate collectively as a group of six plaintiffs and alleging a putative class action (with purportedly several hundred class members), Plaintiffs insist upon an "across-the-board" duty analysis, rather than the *ad hoc*, individualized duty assessment required under Rhode Island law. Because there are no guideposts for what Plaintiffs propose under Rhode Island law, their negligence claims fail as a matter of law for this basic reason, as well as the additional failings stated below.

**1.  Title IX's deliberate indifference standard cannot be circumvented by invoking negligence theories.**

Plaintiffs proffer three negligence claims (Count VI – Negligence, Count VII – Negligent Supervision, and Count X – Negligent Failure to Warn, Train or Educate). All three negligence theories are purely an attempted end-run to try to impose negligence liability upon Brown premised upon an alleged failure to comply with Title IX:

- In Count VI (Negligence), Plaintiffs individually and on behalf of Class Members allege negligence in its response to sexual misconduct suffered by Plaintiffs. (FAC ¶ 338). They further allege that Brown did not respond to the reports of sexual misconduct with proper investigations and failed to protect them from its reoccurrence. (*Id.* ¶¶ 339-40). Particularly, they allege that "[a]t

42

all relevant times, Brown owed Plaintiffs a duty of reasonable care to ensure their safety and freedom from sex/gender based-assault, harassment, and abuse by, among other things, conducting an investigation into their claims of sex/gender-based assault, sexual misconduct, and abuse and enforcing the Title IX Policy." (*Id.* ¶ 339).

- Similarly, in Count VII (Negligent Supervision), Plaintiffs allege "negligent supervision by Brown in its response to reports of sexual misconduct. Brown had a duty to properly supervise, train, and monitor its employees and students and to ensure those employees' and students' compliance with all applicable statutes, laws, regulations, and institutional policies . . . ." (*Id.* ¶ 345). By applicable statutes, laws, regulations, and institutional policies, Plaintiffs are surely referring to Title IX, the Department of Education's Title IX regulations, and Brown's sexual misconduct policies to ensure its Title IX compliance. They also claim that negligence liability may be imposed for failing to investigate alleged sexual assault and monitor the investigative and response processes in accordance with Title IX. (*Id.* ¶ 346).

- Further, in Count X (Negligent Failure to Warn, Train or Educate), Plaintiffs make totally conclusory claims alleging "negligent failure to warn, train, or educate Brown in its response to reports of sexual misconduct." (*Id.* ¶ 362). They make a boilerplate amorphous assertion that Brown "owed Plaintiffs and the Class Members a duty to take reasonable protective measures to protect them from the risks of sex/gender-based discrimination, sexual assault, including rape, sexual harassment, and dating violence by properly warning and training or educating Plaintiffs and the Class Members on how to avoid such risks on its campus or as Brown students." (*Id.* ¶ 363). Cutting though the conclusory pleading, Plaintiffs seek to make the University an insurer against all sexual misconduct.

*Davis* and *Gebser* prescribe that more than negligence is required to hold an educational institution liable under Title IX. Before liability can attach under Title IX, there must be proof that Brown acted with deliberate indifference to sexual harassment of which it had actual knowledge, i.e., that it made an official decision not to remedy the violation. *Davis*, 526 U.S. at 642 (discussing *Gebser*, 524 U.S. at 290-91). Yet, Plaintiffs seek to create a backdoor by suggesting that Brown's Title IX compliance and responses to its actual knowledge of alleged sexual misconduct should instead be evaluated under state law negligence standards.

In doing so, without explicitly labeling their counts as negligence per se, Plaintiffs premise their negligence claims upon assertions that Brown has negligently failed to adhere to and implement Title IX's statutory and administrative requirements. *Doe v. University of the South* supplies cogent reasoning why Plaintiffs' negligence causes of action fail as a matter of law. No. 4:09-cv-62, 2011 WL 1258104, at *14 (E.D. Tenn. Mar. 31, 2011). In that case, the plaintiffs premised a negligence duty citing to 34 C.F.R. § 106.8(b) (requiring a school receiving Title IX funds to establish "procedures providing for prompt and equitable resolution of student complaints' relating to all forms of sexual harassment, including sexual assault") and the OCR's guidance (requiring a school's procedures to "accord[] due process to both parties involved"). *Id*.

> Plaintiffs' arguments fail on several grounds, but most importantly, their arguments would vitiate the Supreme Court's ruling in *Gebser* []. In that case, the Court, interpreting precisely the same regulation at issue here, 34 C.F.R. § 106.8(b), said that "the failure to promulgate a grievance procedure does not itself constitute 'discrimination' under Title IX. Of course, the Department of Education could enforce the requirement administratively . . . [but] we have never held, however, that the implied right of action under Title IX allows recovery in damages for those sorts of administrative requirements. [*Gebser*, 524 U.S. at 292]. If the Court were to allow a regulation used in administering a federally-created right to create a state negligence per se claim, it would effectively eviscerate the *Gebser* rule.

*Id*.

Accordingly, Plaintiffs cannot advance their broadly alleged, but legally erroneous, claims of negligent administration of Brown's Title IX processes. *Davis*, 526 U.S. at 649 ("This is not a mere 'reasonableness' standard . . . ."). Applying *Davis*, courts have rejected plaintiffs' strategies seeking to effectuate "an end run around [Title IX] principles by asserting state-law negligence-based claims and relying on Title IX regulations and OCR guidance to establish the duty element of those claims." *Univ. of South,* 2011 WL 1258104, at *14.[15]

---

[15]    *See also Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 WL 4748310, at * 18 (M.D. Tenn. Sept. 30. 2019) ("it would be illogical for negligence per se liability premised on Title IX to

Plaintiffs' allegations that Brown breached duties imposed by Title IX (not to discriminate, to provide equal treatment and opportunities, to prevent harassment on the basis of sex, and to hire employees and train its community consistent with Title IX's requirements) do not support a negligence claim, as made clear by Supreme Court precedent and well-established national case law applying *Gebser* and *Davis*.   The Court must reject Plaintiffs' impermissible effort to recast their Title IX claims and recover under a negligence standard for actions premised upon Brown's Title IX compliance.

### 2. Plaintiffs cannot premise a negligence duty based upon their contractual relationship with Brown.

Under Rhode Island law, "[a] student's relationship to [her] university is based in contract." *Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (citing *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998)).   "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." *Id*.

Plaintiffs initially pled a separate breach of contract claim, which they have now abandoned in their First Amended Compliant.   They want instead to proceed with negligence claims premised upon their contractual relationship with the University.   Specifically, in paragraph 341 of Count VI (Negligence), they allege "Brown's failure to follow its own policies in reviewing,

---

exceed or circumvent the requirements of Title IX liability under federal law."); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 702 (M.D. Tenn. 2018) ("[t]he negligence per se doctrine is not a magic transformational formula that automatically creates a private cause of action for the violation of every statute") (citation omitted); *Cash v. Lees-McRae Coll.*, No. 1:18CV52, 2018 WL 7297876, at *14 (granting motion to dismiss in Title IX action and rejecting argument that "Title IX supplies a duty actionable in negligence"), *R&R adopted by*, 2019 WL 276842 (W.D.N.C. Jan. 22, 2018), *aff'd*., 811 Fed. Appx. 190 (Mem.) (4th Cir. 2020); *Ross v. Univ. of Tulsa*, No. 14-CV-484-TCK-PJC, 2015 WL 4064754, at *3-4 (N.D. Ok. July 2, 2015) (dismissing negligence claim "premised upon [university's] alleged violation of Title IX and its implementing regulations.").

investigating, and resolving complaints of sexual assault and harassment constitutes a breach of its duty of care to Plaintiffs."

In *John Doe v. Brown University*, the Court (by Judge Smith) held that "[i]f a contract claim and a tort claim are based upon the same duty, the plaintiff cannot maintain the tort claim." 166 F. Supp. 3d 177, 196 (D.R.I. 2016) (quoting *Ciccone v. Pitassi*, C.A. No. PB 97-4180, 2004 R.I. Super. LEXIS 150, at *23 (R.I. Super. Aug. 13, 2004) (Silverstein, J.)).  By analogy in the context of sexual misconduct claims, this Court cited with approval the Northern District of New York's ruling in *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) ("[T]he facts alleged in support of the plaintiff's negligence claim are similar to those alleged in connection with his contract claim – that the University breached its duty (contract) with plaintiff to follow its own rules regarding student discipline.  [S]imply alleging a duty of care does not transform a breach of contract [claim] into a tort claim." (internal quotation marks and citation omitted)).  *Id.*

Simply put, Plaintiffs cannot create negligence based upon their contractual relationship with Brown and alleged failures to follow policies and procedures under applicable University policies.  Any such claim must be raised under the parties' educational contract, which Plaintiffs have purposefully abandoned and not pled in their First Amended Complaint.  They do not get to repackage a contract claim into negligence theories.  *See Harris v. St. Joseph's Univ.*, No. CIV A. 13-3937, 2014 WL 1910242, at *6 (E.D. Pa. 2014) (dismissing negligence claim under the "gist of the action" doctrine where student-university relationship is contractual in nature).

### 3.  Plaintiffs have not pled a special relationship to create any plausible basis to hold Brown responsible for the alleged tortious actions by third-parties.

To the extent that Plaintiffs claim that Brown should be held liable in negligence for alleged sexual harassment or assault by other students (in the case of five of the Plaintiffs – Katiana, Chloe, Taja, Emma, and Jane 2) or by a faculty member (in the case of Jane 1), the focus

of each Plaintiff's claim concerns Brown's alleged acts *before* the alleged sexual misconduct and whether a special relationship between Brown and each Plaintiff existed such that the University can be held responsible for a third-party's alleged actions.  Rhode Island adheres to the general common law negligence rule that in the absence of a special relationship between the defendant and the injured party, or the defendant and third party who commits the assault, there is no duty to protect another from the harm caused by the acts of another.  *Gushlaw*, 42 A.3d at 1255.

This Court has recently analyzed the special relationship doctrine in the university-student context, reaching differing conclusions based upon the particular facts of each case – *Jane Doe v. Brown University*, 304 F. Supp. 3d 252 (D.R.I. 2018), and *Jane Doe v. Rhode Island School of Design*, 432 F. Supp. 3d 35 (D.R.I. 2019).  The *Brown* and *RISD* cases demonstrate that, under Rhode Island law, the question of whether a special relationship exists must be made on an individualized manner in the *ad hoc* duty analysis.  There cannot be an "across the board" special relationship determination, as Plaintiffs seemingly contend, that applies to all six of them collectively as a group (without an individualized assessment of each of their allegations), and certainly not to a proposed class of purportedly hundreds of students (raising hundreds of distinct allegations involving particular circumstances, individuals, locations, relationships, and time periods).

In *Brown University*, the Court dismissed the plaintiff's negligence claims against Brown because there was no special relationship recognized under Rhode Island law between the University and the plaintiff under the alleged facts.   304 F. Supp. 3d at 260-62.  The plaintiff alleged that she and her friend, both of whom were Brown students, attended a party hosted in a fraternity's on-campus, residential house owned by the University.  *Id.* at 256.  During the prior

four years, the University had charged the fraternity with five disciplinary infractions involving unregistered parties and serving alcohol to minors. *Id*. at 262.

At the party, the plaintiff's friend was served an alcoholic beverage by a fraternity member acting as a bartender. *Id.* at 256. The plaintiff and her friend shared the beverage and promptly suffered a loss of motor functions, cognitive awareness, and memory. *Id*. The plaintiff and her friend separated due to their disorientation. *Id*. The plaintiff interacted with another Brown undergraduate student and left the party with him. *Id*. The student escorted the plaintiff to her campus residence hall where they engaged in sexual intercourse. *Id*. The next day, the plaintiff reported that she was allegedly drugged at the fraternity house and sexually assaulted in her residence hall. *Id*. at 256-57.

The plaintiff alleged that the University should be held liable for the drugging and sexual assault because of its supervision of the fraternity. *Id*. at 261. The Court carefully examined the parameters of the special relationship doctrine under Rhode Island law. *Id*. In doing so, the Court cited with approval to rulings "across the country . . . that the general foreseeability of sexual assault on campus is insufficient to warrant liability [against universities]." *Id*. (quoting *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 619 (W.D. Tex. 2017)).

As the Court has acknowledged, the Rhode Island Supreme Court has noted the "serious implications" resulting from judicial expansions of negligence liability under the special relationship doctrine. *Id*. (citing *Ferreira v. Strack*, 652 A.2d 965, 967-68 (R.I. 1995)). This Court has held "that similarly serious implications would attend [to] holding universities . . . liable for the torts of their students. Therefore, discretion dictates dismissing this claim; any change in this area of third-party liability law must come from the legislature." *Id*.

While this Court later recognized a special relationship in the *RISD* case, it did so solely because of the case's unique circumstances, which involved a study abroad program in Ireland and the school's provision of mandatory housing for the program's participants. 432 F. Supp. 3d at 42-44. The plaintiff was sexually assaulted in the mandated housing by another student during the first evening of program. *Id*. at 37. The Court held that "[i]n organizing the Ireland Program, RISD undertook to provide housing to Ms. Doe in a foreign country and Ms. Doe reasonably relied on RISD to act with due care." *Id*. at 42. "This undertaking and reliance altered the relationship between RISD and Ms. Doe to one that [went] beyond the university and adult student relationship that led courts to abandon the doctrine of *in loco parentis*." *Id*. at 42 (citations omitted). The Court cautioned that "summarily holding universities liable for the torts of their students would cause serious implications that would be better dealt with by the legislature," but it "did not see such concerns" under the unique facts of the *RISD* case. *Id*.

Individually, each Plaintiff has not pled any comparable circumstances to the *RISD* case to prompt the recognition of a special relationship duty regarding her allegations. Again, starting with the simplest to dismiss, to the extent that Taja seeks to litigate the events "[f]rom 2017 to 2018" in an alleged "sexually-abusive relationship," Chloe seeks to hold the University liable for the alleged sexual assault by a male student that occurred on April 14, 2016 and Emma seeks to hold Brown liable for the events during her alleged "abusive relationship" with a male student between October 2017 and May 2018, all such claims are clearly time-barred beyond the three-year limitation period, having accrued well before August 6, 2018. Even if they were timely pled (which they clearly are not), these allegations do not raise any plausible support to conclude that Brown owed a special relationship duty to any of these Plaintiffs.

49

Two Plaintiffs, Katiana and Jane 2, allege that they were sexually assaulted in off-campus residences that were not owned or controlled by the University.  (FAC ¶¶ 71-72, 85 (Katiana), ¶¶ 242-43 (Jane 2)).  Consequently, neither has pled any plausible factual basis to conclude a special relationship existed, such that either Plaintiff can seek to impose negligence liability upon Brown for an alleged off-campus sexual assault.  Taja alleges that she was involved in a second abusive relationship with a Brown student sometime during or after the spring of 2019, but this alone is insufficient to impose a special relationship duty.  (*Id.* ¶¶ 136-37).

All of the above-alleged student-on-student matters fall short of the justification for the Court's imposition of a special relationship in the *RISD* case, and fall on the side compelling the federal judicial restraint invoked in the *Brown University* case.  Holding Brown responsible under negligence law for the alleged tortious student conduct would invoke the "serious implications" of expanded liability in the university-student context, which should be first addressed and established under Rhode Island law by either the state's legislature or its highest court, not the federal judiciary.

Finally, Jane 1 alleges that a professor spoke to her in a sexually suggestive manner, which caused her emotional distress.  (FAC ¶ 215).  Even accepting the truth of Jane 1's allegations, they hardly come close to meeting the extraordinary circumstances necessary to impose a special relationship duty upon a university.

### 4. Plaintiffs cannot recover on a claim of negligent infliction of emotional distress relating to Brown's response to their reporting of alleged sexual misconduct.

Although not specifically denominated as such, Plaintiffs' negligence allegations relating to Brown's responses to their reporting of alleged sexual misconduct constitute in all material respects a claim for negligent infliction of emotional distress.  As the Court has held, "Rhode Island common law is clear that only two groups of plaintiffs are able to seek recovery under a theory of

50

negligent infliction of emotional distress: those within the zone of danger who are physically endangered by the acts of a negligent defendant, and bystanders related to a victim whom they witness being injured. *Transamerica Life Ins. v. Caramadre*, No. 09-470-S, 2017 WL 752145, at *7 (D.R.I. Feb. 17, 2017) (citations and internal quotation marks omitted).

Judge Smith's ruling in *Brown University*, *supra*, is instructive to show why Plaintiff's claim fails as a matter of law.  In that case, among her several negligence theories (all of which the court rejected), the plaintiff sought to recover in negligence based upon Brown's response to her reporting of an alleged sexual assault, particularly how the University collected, maintained, and tested samples that were provided during Brown's investigation of an alleged drugging and subsequent sexual assault. *Brown Univ.*, 304 F. Supp. 3d at 261.  Judge Smith held that the plaintiff was seeking to proceed with negligent infliction of emotional distress claim, which did not meet one of the two allowable limited categories under which such a claim may proceed. *Id.*  Similarly, Plaintiffs cannot recover on a negligence-based theory challenging Brown's responses to their reporting of alleged sexual misconduct, which is actually a claim for negligent infliction of emotional distress that does not fall within the limited parameters allowed by Rhode Island law.

**5. Plaintiffs have not plausibly pled claims to hold Brown liable under negligent supervision or retention theories.**

In *Welsh Mfg., Div. of Textron, Inc. v. Pinkerton's Inc.*, the Rhode Island Supreme Court recognized the viability of a cause of action against an employer when a third party is injured by the acts of unfit or incompetent employees.  474 A.2d 436 (R.I. 1984).  The Court held that an employer has a duty "to exercise reasonable care in selecting [and retaining] an employee who, as far as could be reasonably known, [is] competent and fit for the [employment]." *Id.* at 440.

Plaintiffs' conclusory allegations fail to specify how Brown may have breached any specific supervision duty.  Also, they have not specified which alleged offending employees were

improperly supervised or how any such employees may have actually harmed each of them individually.  Further, Plaintiffs have not pled how Brown failed to meet the standards of care for universities in training, educating, and supervising employees, nor that such a standard extends to how employees handle reports of sexual assault.  Therefore, Count VII alleging negligent supervision should be dismissed as a total contortion of Rhode Island law.[16]

### 6. Plaintiffs' claim titled "Negligent Failure to Warn, Train, and Educate" is not recognized by Rhode Island law.

As another example of their excessive pleading, Plaintiffs seek to invent a new negligence claim against Brown for an alleged failure to "warn, train, and educate" students on "how to avoid risks on its campus or as to Brown students."  (FAC ¶ 363).  Rhode Island law has not imposed such a duty upon colleges and universities under negligence law.

Further, Plaintiffs' apparent factual basis for this novel and unrecognized claim under Rhode Island is found in paragraph 56 of the First Amended Compliant, stating that Brown has provided training for students and employees that Plaintiffs allege "falls far short" of the administrative standards of the Department of Education's Office for Civil Rights.  Again, Plaintiffs are conflating Title IX's administrative and judicial paradigm in the enforcement of Title IX.  Also, as addressed above, they are simply trying to backdoor negligence standards into a private lawsuit concerning Title IX compliance, which the Supreme Court has made clear is an impermissible basis under *Gebser* and *Davis* to impose institutional liability.

---

[16]  Elsewhere, courts have not recognized a common law duty of reasonable care in the investigation of sexual misconduct allegations.  *See Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 484 (S.D.N.Y. 2015).

**C.** <u>**Count VIII**</u>**: Rhode Island law has not recognized the existence of a university-student fiduciary relationship.**

In Count VIII, Plaintiffs have abandoned their initially pled breach of contract claim and replaced it with a breach of fiduciary duty claim. In a single conclusory paragraph, they allege that "Brown, a Rhode Island post-secondary educational institution, has a fiduciary relationship with the Plaintiffs and Class Members. Plaintiffs and Class Members were or are dependent on Brown for their education, and Brown owed them a duty to act in good faith and with due regard for their interests." (FAC ¶ 351). Rhode Island law has never recognized such a fiduciary duty.

Like Plaintiffs' negligence theories, their unchartered breach of fiduciary duty claim should be dismissed for its failure to state a claim upon which relief can be granted under Rhode Island common law. Particularly, in *Sterman v. Brown University*, this Court expressly declined to recognize or create such a university-student fiduciary relationship under Rhode Island law. 513 F. Supp. 3d at 255.

Similarly, the First Circuit, applying Massachusetts law, has also declined to do so. In *Squeri v. Mount Ida College*, the First Circuit held:

> [] Mount Ida itself did not owe a fiduciary duty to the students, and we reject the plaintiffs' assertions that this court should "expand the law" and establish a fiduciary duty between a college and its students. "Federal courts are not free to expand the reach of state law." *Doe v. Trs. of Bost. Coll.*, 942 F.3d 527, 535 (1st Cir. 2019), at least not where there are Massachusetts law and precedent suggesting the contrary, *see Mu v. Omni Hotels Mgmt. Corp.*, 882 F.3d 1, 9 (1st Cir.), *review denied*, 885 F.3d 52 (1st Cir. 2018).

954 F. 3d 56, 67 (1st Cir. 2020).

Nationally, courts have routinely declined to recognize a university-student fiduciary relationship. *See, e.g.*, *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 719 (D. Vt. 2012) (finding no fiduciary relationship between student-athlete and college under Vermont law, and noting that "[c]ourts in the Second Circuit have held that a fiduciary relationship generally does

not exist in the school context" and "[c]ourts in other jurisdictions have reached the same conclusion") (collecting cases); *Roe v. Hotchkiss Sch.*, 385 F. Supp. 3d 165, 172-73 (D. Conn. 2019) (noting that cases "involv[ing] adults (college students)" reject the existence of a school-student fiduciary relationship); *Fowler v. Univ. of Phx., Inc.*, 2019 WL 1746576 at *14 (S.D. Cal. Apr. 18, 2019) ("[t]he normal relationship between a student and the university and its agents is contractual," and "[t]he mere placing of a trust in another person does not create a fiduciary relationship") (citations omitted).

Simply put, Plaintiffs' single-paragraph conclusory proclamation that there should be a fiduciary relationship between Brown and its students does not create one under Rhode Island law. Consequently, just as it did in *Sterman* and the First Circuit did in *Mount Ida*, this Court should decline to recognize such new state law relationship.

Alternatively, if this Court is not inclined to dismiss, the questions of whether and under what circumstances a university could be deemed to have a fiduciary relationship with its adult students should be certified to the Rhode Island Supreme Court, given the profound impacts upon Rhode Island's colleges and universities if such a fiduciary relationship were recognized for the first time under Rhode Island law.

**D. <u>Count IX</u>: Plaintiffs have not pled extreme and outrageous conduct by Brown to support a claim for intentional infliction of emotional distress.**

To state a claim for intentional infliction of emotional distress, Plaintiffs must individually show "(1) that the conduct [was] intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct [was] extreme and outrageous, (3) there [was] a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question [was] severe." *Champlin v. Wash. Tr. Co., of Westerly*, 478 A.2d 985, 989 (R.I. 1984). The conduct required to state an intentional infliction of emotional distress claim under Rhode

Island law must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman v. Davenport-Metcalf*, 851 A.2d 1083, 1090 (R.I. 2004) (emphasis deleted) (quoting *Jalowy v. Friendly Home, Inc.*, 818 A.2d 698, 707 (R.I. 2003)).  This is a "very high standard." *Id*. at 1089.  Also, once again, Chloe's and Emma's claims are limited by the three-year limitations period of R.I.G.L. § 9-1-14(b), so their claims cannot reach back beyond August 6, 2018.

> As the Court has held, intentional infliction of emotional distress claims must be cautiously applied in matters involving sexual misconduct complaints and investigations:

> > Student disciplinary investigations and the face-to-face meetings no doubt could cause a wide range of emotional distress.  Universities must strike a balance between taking allegations of sexual assault seriously, investigating those fully and in accordance with school policies, and ensuring that the student accused is treated with fairness and dignity.  Courts must be "chary about interfering with the academic and disciplinary decisions made by private colleges and universities." *Schaer v. Brandeis University*, 432 Mass. 474, 478, 735 N.E. 2d 373 (2000) (quotations and citations omitted).

*John Doe v. Brown Univ.*, 505 F. Supp. 3d at 82.

None of the six Plaintiffs has pled any facts meeting this "very high standard" to state a claim for intentional infliction of emotional distress.  Each Plaintiff pleads generalized details about their interactions with administrators and deans and their frustrations with the alleged responses.  Even if any one of the Plaintiff's interactions with Brown officials may have been unreasonable or unfair (which Brown categorically denies), and a violation of any express or implied contractual obligations (which Plaintiffs have now abandoned as a claim), the bar for asserting an intentional infliction of emotion distress claim is considerably higher.

Nothing that Plaintiffs have pled shows conduct by anyone at Brown "so outrageous in character, and so extreme in degree, as to go beyond all possible grounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." *Hoffman*, 851 A.2d at 1090. The facts alleged in the First Amended Complaint, even assuming that they are true, do not constitute the type of targeted, deliberate, and malicious conduct that is required for an intentional infliction of emotional distress claim. *Id*. Even the "fact that the defendants' conduct may turn out to be violative of the plaintiffs' civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress." *Guckenberger v. Boston Univ.*, 957 F. Supp. 306, 319 (D. Mass. 1997) (citing *Marques v. Fitzgerald*, 99 F.3d 1, 6-7 (1st Cir. 1996)).

Finally, this claim requires a showing of physical symptomatology resulting from the alleged improper conduct. *Reilly v. U.S.*, 547 A.2d 894, 898 (R.I. 1988). Count IX merely provides a single-paragraph list of conditions that all "Plaintiffs" allegedly suffered collectively. (FAC ¶ 359). Each Plaintiff must sufficiently plead and support her own claim through facts specific to her, not aggregate her claim with others. None of the six Plaintiffs has specified any physical symptomatology suffered by her associated with any alleged emotional injuries. (FAC ¶ 104 (Katiana), ¶ 146 (Taja), ¶ 183 (Chloe), ¶ 192 (Emma), ¶¶ 238-39 (Jane 1), ¶ 262 (Jane 2)).

**E. Plaintiffs' prayer for punitive damages fails as a matter of law.**

**1. Punitive damages are not recoverable in a Title IX action.**

As explained above, each Plaintiff's Title IX claims fail individually as a matter of law. Even if some or all of the Plaintiffs survive past the Rule 12(b)(6) pleading stage, Plaintiffs cannot recover punitive damages in a Title IX claim as a matter of law. (FAC, Prayer E). Overwhelming authority across federal courts nationally demonstrates that such damages are not available in an action under Title IX.[17] The analysis in these cases rests upon *Barnes v. Gorman*, 536 U.S. 181

---

[17] *See*, *e.g.*, *Mercer v. Duke Univ.*, 50 F. App'x 643, 644 (4th Cir. 2002); *Sadeghian v. Univ. of S. Ala.*, C.A. No. 18-0009-JB-B, 2018 WL 7106981, at *20 (S.D. Ala. Dec. 4, 2018); *Bergholz*

(2002).  In *Barnes*, the Supreme Court held that punitive damages are unavailable under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act because the remedies under those statutes are "coextensive" with the remedies under Title VI of the Civil Rights Act of 1964 – and punitive damages are not allowed under Title VI.  *Id*. at 185.  In reaching this conclusion, the court relied extensively on cases analyzing Title IX, which was modeled after Title VI.  *Id*. ("[T]he Court has interpreted Title IX consistently with Title VI[.]").  The Court explained that both Title VI and Title IX were adopted pursuant to Congress' authority under the Spending Clause.  *Id*. at 185-86.  When Congress enacts legislation pursuant to its spending power, the legislation is "much in the nature of a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions."  *Id*. at 186 (emphasis in original, citation omitted).  Because a punitive damages award could result in indeterminate and "disproportionate exposure" and could be "disastrous" to a funding recipient, the Supreme Court found that it was "doubtful" that schools "would even *accepted the funding* if punitive damages liability was a required condition."  *Id*. at 188 (emphasis in original).

Because the foundation of a Title IX claim is contract and punitive damages are not recoverable in a contract action, the Supreme Court observed that "Title IX's contractual nature has implications for our construction of the scope of available remedies" and "*punitive damages unlike compensatory damages and injunction are generally not available for breach of contract*." *Id*. at 187 (internal quotation marks and citations omitted) (emphasis added).  As established by *Barnes*, and confirmed by numerous lower court opinions, the proper framework for analyzing Plaintiffs' potential remedies is contract law, not tort law.  As a matter of law, Plaintiffs' demand

---

*v. John Marshall Law School*, C.A. No. 18-C-3, 2018 WL 5622052, at *4-5(N.D. Ill. Oct. 30, 2018); *Pejovic v. State Univ. of N.Y. at Albany*, No. 1:17-cv-1092, 2018 WL 3614169, at * 7 (N.D.N.Y. July 26, 2018).

for punitive damages cannot stand because such damages are not legally recoverable in a Title IX lawsuit. Accordingly, Plaintiffs' claims for such damages should be stricken.

### 2. Plaintiffs have not pled a legally sufficient claim for punitive damages under Rhode Island law.

In the previous sections, Brown explained that Plaintiffs largely proffer theories under Rhode Island law that have never been recognized, and they seek to have Rhode Island law substantially rewritten in a manner that would dramatically alter the legal boundaries of the university-student relationship. Even if any of Plaintiffs' state law claims survive (which they should not), the First Amended Complaint offers no plausible justification to seek punitive damages under Rhode Island law. This Court has held that allegations to support claims for punitive damages must be more than conclusory assertions. *Wilson Auto Enterprises, Inc. v. Mobil Oil Corp.*, 778 F. Supp. 101, 107 (D.R.I. 1991).

Under Rhode Island law, punitive damages are considered an "extraordinary sanction," which courts will permit only where a defendant's conduct requires punishment and deterrence beyond that which can be imposed by compensatory damages alone. *Palmisano v. Toth*, 624 A.2d 314, 318 (R.I. 1993). The party seeking punitive damages has the burden of producing "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished." *La Plante v. American Honda Motor Co., Inc.*, 27 F.3d 731, 745 (1st Cir. 1994) (quoting *Soares v. Ann & Hope, Inc.*, 637 A.3d 339, 351 (R.I. 1994)). This Court has construed Rhode Island law to mean that one must allege that the other party acted "with an intention to cause harm." *Wilson*, 778 F. Supp. at 107. Alleged mere reckless conduct that is not malicious, wanton, or willful is insufficient to support a claim for punitive damages. *Regan v. Cherry Corp.*, 706 F. Supp. 145,

153 (D.R.I. 1989).  Nothing that Plaintiff has pled comes close to alleging any facts which, even if proven, could support a claim for punitive damages.

## SECTION IV:
## BROWN'S ARGUMENTS TO STRIKE
## PLAINTIFFS' CLASS ACTION ALLEGATIONS

### A.  A putative class action may be stricken on the pleadings.

If any of Plaintiffs' individual claims survive Rule 12(b)(6) dismissal, then the Court should review now and strike their class action allegations.  As detailed below, even at the pleadings stage, it is evident that this case cannot come close to meeting the rigorous requirements to certify a class action under Federal Rule of Civil Procedure 23 and United States Supreme Court precedent.

Rule 23(c)(1) directs courts to make certification decisions "[a]t an early practicable time." The Supreme Court has recognized that "[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim[.]"  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

When class allegations are challenged on the pleadings, the "dispositive question . . . is whether the complaint pleads the existence of a group of putative class members whose claims are susceptible of resolution on a classwide basis."  *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 59 (1st Cir. 2013).  The First Circuit has instructed that "[a] district court must conduct a rigorous analysis" of Rule 23's prerequisites.  *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003); *see also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 25 (1st Cir. 2008) ("noting that the common presumption at early stages of litigation that 'the complaint's allegations are necessarily controlling' does not apply in class certification situations because 'class action machinery is expensive and in our view a court has the power to test disputed

premises early on if and when the class action would be proper on one premise but not another'"

(quoting *Tardif v. Knox Cty.*, 365 F.3d 1, 4-5 (1st Cir. 2004)).

Rule 12(f) allows a district court to "strike from a pleading an insufficient defense or any

redundant, immaterial, impertinent, or scandalous matter," which includes insufficient allegations

concerning a putative class action. *See Monteferrante v. Williams-Sonoma, Inc.*, 241 F. Supp. 3d

264, 273 (D. Mass. 2017). Relatedly, Rule 23(d)(1)(D) allows a district court to issue an order

"requir[ing] that the pleadings be amended to eliminate allegations about representation of absent

persons and that the action proceed accordingly . . . ." Under appropriate circumstances such as

here, courts have not hesitated to grant motions to strike class allegations from putative class action

complaints. *See Monteferrante*, 241 F. Supp. 3d at 273; *Barrett v. Avco Fin. Servs. Mgmt. Co.*,

292 B.R. 1, 2 (D. Mass. 2003).

While the First Circuit has instructed district courts to "exercise caution when striking class

action allegations based solely on the pleadings," *Manning*, 725 F.3d at 59, district courts retain

"considerable discretion" to strike material under Rule 12(f), *Alvarardo-Morales v. Dig. Equip.

Corp.*, 843 F.2d 613, 618 (1st Cir. 1988). When "it is obvious from the pleadings that the

proceeding cannot possibly move forward on a classwide basis, district courts use their authority

under Federal Rule of Civil Procedure 12(f) to delete the complaint's class allegations." *Manning*,

725 F.3d at 59; *see also Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 949 (6th Cir. 2011)

(noting "[t]hat the motion to strike came before the plaintiffs had filed a motion to certify the class

does not by itself make the court's decision reversibly premature" and affirming the district court's

grant because it "cannot see how discovery or for that matter time would have helped [the

plaintiffs]"). When a defendant files a pre-discovery challenge to class certification on the basis

of the allegations in the complaint, trial courts in the First Circuit have generally applied the same

standard as a motion to dismiss for failure to state a claim. *Manning v. Boston Med. Ctr. Corp.*, No. 09-11463-RWZ, 2012 WL 1355673, at * 1 (D. Mass Apr. 18, 2012), *aff'd in part*, *vacated in part*, 725 F.3d 34 (1st Cir. 2013); *Barrett.*, 292 B.R. at 2; *Bessette v. Avco Fin. Servs.*, 279 B.R. 442, 450 (D.R.I. 2002).

Finally, the mere pleading of a class action should not be designed as a discovery vehicle. This is especially important because "if a class action complaint could survive a motion to dismiss based merely on the need for class discovery, then many, if not all, class action complaints would have expansive class allegations and definitions to permit a fishing expedition during discovery." *Flores v. Starwood Hotels & Resorts Worldwide, Inc.*, No. SACV141093AGANX, 2015 WL 12912337, at * 4 (C.D. Cal. Mar. 16, 2015); *see also Jue v. Costco Wholesale Corp*., No. 10-cv-000333-WHA, 2010 WL 889284, at * 6 (N.D. Cal. Mar. 11, 2010) ("[C]lass certification discovery is not a substitute to the pleading requirements of Rule 8 and *Twombly*. Class allegations must [be] supported by sufficient factual allegations demonstrating that the class device is appropriate and discovery on class certification is warranted.").

## B. A federal class action must satisfy all four requirements of Rule 23(a) and meet at least one of the categories under Rule 23(b).

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court reaffirmed the proposition that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual names parties only.'" 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). Class representatives must "'possess the same interest and suffer the same injury' as the class members." *Id*. at 348-49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

Rule 23 mandates a two-step process to determine whether an action may be maintained as a class action. First, the Court must determine that the proposed class meets all of Rule 23(a)'s

four prerequisites – numerosity, commonality, typicality, and adequacy of representation.  A putative class may be certified only if "the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."  *Falcon*, 457 U.S. at 161.  The Rule's four requirements "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.'" *Wal-Mart*, 564 U.S. at 349 (quoting *Falcon*, 457 U.S. at 156).  "[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable." *Falcon*, 457 U.S. at 160.

 Second, if Rule 23(a)'s four prerequisites are satisfied, then the Court must determine whether the proposed class falls within one of the categories of Rule 23(b) – here a class action under either Rule 23(b)(2) or (b)(3).

As addressed below, under Rule 23(b)(2), Plaintiffs must establish that Brown's alleged actions involve common conduct and injury such that injunctive relief is appropriately directed toward the class as a whole (including former students who lack standing to seek such relief).  Rule 23(b)(3) permits broader relief, including damages, but requires substantially greater proof of common questions.  Common questions of law or fact must predominate over any questions affecting only individual members, which is more demanding than the commonality requirement of Rule 23(a).  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  On the face of the pleading, Plaintiffs' First Amended Complaint falls far below the plausibility threshold to allow a putative class action case to proceed forward.

In paragraph 266 of the First Amended Complaint, Plaintiffs allege to represent a class defined as the following:

> All current or former female students who attended Brown University's Providence, Rhode Island campus from 2018 to present, who experienced sexual assault, harassment, or other forms of sexual misconduct and were deprived of

educational opportunities or otherwise harmed by Defendant's systematic mishandling of the reporting or investigation of complaints of such misconduct.[18]

Throughout their pleading, Plaintiffs have tried futilely to escape the inherently individualized nature of their sexual misconduct claims by focusing on alleged common practices of ignoring complaints of harassment; however, courts have declined to gloss over the highly individualized nature of the proof that is typically at issue in cognizable sexual misconduct claims. *See*, *e.g.*, *Doe v. Unified Sch. Dist. No. 259*, 240 F.R.D. 673 (D. Kan. 20007) (refusing to certify class in Title IX case despite plaintiffs' allegation that defendants failed to respond to more than 300 complaints of harassment).

Brown analyzes below the fatal shortcomings of Plaintiffs' class allegations applying Rule 23(a) and (b) step-by-step. Before doing so, Brown notes that, just like Chloe and Emma individually, many members of this putative class would face statute of limitation constraints. It is not the attendance or graduation dates of each student that would control the limitations analysis; it is the underline accrual date of each class member's cause of action that matters. For example, a former or current student, who was enrolled at Brown in 2018, may still lack timely claims that accrued well before August 6, 2018.[19]

---

[18]  The putative class proceeds on an erroneous assumption that only female students are complainants who allege sexual misconduct.

[19]  As pled, the class seeks to include current and former students who were enrolled at Brown during the spring term of the 2017-18 academic year, which entirely predates the August 6, 2018 accrual cut-off date that is determinative in the statute of limitations analysis. This is just another example of Plaintiffs pleading very boldly and broadly, but not carefully examining the nuances of what they have pled.

**C. Plaintiffs' allegations do not satisfy all four of Rule 23(a)'s requirements.**

**1. Numerosity (Rule 23(a)(1))**

Plaintiffs purport that the putative class consists of "hundreds" of current and former Brown students.  Brown strongly disputes that the putative class would total anywhere near the speculative number pled by Plaintiffs.  For the sole purposes of this motion only and with Brown reserving all rights, Brown will assume, *arguendo*, that Plaintiffs can satisfy the numerosity requirement.  Regardless, Plaintiffs' class allegations still fall short for reasons discussed below.

**2. Commonality (Rule 23(a)(2))**

The requirement of commonality is satisfied if "there are questions of law and fact common to the class."  Fed. R. Civ. P. 23(a)(2).  However, "[t]hat language is easy to misread, since any competently crafted class complaint literally raises common 'questions.'"  *Wal-Mart*, 564 U.S. at 349 (internal citations and quotations omitted).  "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" *id*. at 349-50 (quoting *Falcon*, 457 U.S. at 157), which takes more than "merely . . .  hav[ing] all suffered a violation of the same provision of law," *id.*

The test for commonality has become more demanding since the Supreme Court's decision in *Wal-Mart*.  As noted above, *Wal-Mart* repeats a standard first articulated by the Court in *Falcon* in 1982, requiring that a trial court may only certify a class if it determines, "after a rigorous analysis, the prerequisites of Rule 23(a) have been satisfied."  *Id*. at 350-51 (citing *Falcon*, 457 U.S. at 160.  "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped."  *Id*. at 351.

The proponent of certification must identify a "common contention . . . of such a nature that it is capable of classwide resolution."  *Id*. at 350.  It is not enough to show a common question or multiple common questions, "even in droves."  *Id*.  Rather, the plaintiff must show "the capacity

of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  *Id*. (quoting Nagareda, *Class Action Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  In short, a common contention is one that "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id*.

As this Court knows well from its adjudication over the past decade in several lawsuits raising alleged sexual misconduct involving college and university students (filed by both complainants and respondents), each case has presented a particularized application of a factually specific record to the law.  The discovery record in a single lawsuit is typically voluminous with thousands of pages, comprised of the school's relevant files, the investigative report, email communications, witness statements, text messages, social media postings, academic records, and counseling records.

Each of these lawsuits, as presented to the Court, has posed relationships and circumstances unique to the parties and their interactions, the context particular to the incident at issue and location (*e.g.*, off-campus vs. on-campus), the manner in which the incident was reported and to whom (e.g., whether the reporting was made to a confidential resource who was not obligated to disclose the reporting or an "appropriate person" who was obligated to forward the reporting to the Title IX office), and the school's responsive actions (e.g., determining appropriate interim measures pending adjudication, determining the proper scope of the investigation, determining whether an informal resolution was desired or appropriate, and/or determining appropriate sanctions upon a finding of responsibility).

A single sexual misconduct case typically requires at least a week-long trial, as it did in one lawsuit before the Court during 2016 (C.A. No. 16-17-WES), resulting in an eighty-four-page

slip opinion by Judge Smith detailing the findings of fact and conclusions of law.  That trial focused predominantly on liability issues with a request for an equitable remedy (reinstatement), and it would have certainly spanned longer if monetary damages were at issue.  *John Doe v. Brown Univ.*, C.A. No. 16-17-WES (Doc No. 62 dated 9/28/16) (reported at 210 F. Supp. 310 (D.R.I. 2016)).[20]

Here, before even considering a putative class of purportedly hundreds of current and former Brown student, individualized issues abound among the six Plaintiffs' allegations, as is evident from just a few examples of the many distinctions among their claims:

- Varying Brown policies are at issue depending on the academic year, because as detailed in Section I above, Brown has adopted and amended its policies over time to comply with the evolving Title IX requirements.

- Taja, Chloe, and Emma present claims that are substantially time-barred.

- Taja, Chloe, and Emma have graduated from Brown and lack standing to seek injunctive or declaratory relief.

- Some of the alleged matters pre-date the August 14, 2020 effective date of the Department of Education's amended Title IX regulations, while others post-date the effective date of the significant regulatory amendments.

- Chloe and Emma raise allegations that they were subject to a cross-complaint filed by the respondents accusing them of sexual misconduct.

- Katiana and Jane 2 allege sexual misconduct that occurred off-campus at premises that were not owned of controlled by Brown, while the others allege varying on-campus events.

- Differing academic years are at issue pertaining to each Plaintiff's interactions with different administrators.

- Taja and Emma raise allegations relating to dating relationships, which pose distinct issues compared to what is alleged by the other four Plaintiffs.

---

[20]  Similarly, in *Jane Doe v. Rhode Island School of Design*, C.A. No. 18-10-JJM, the Court required a several day bench trial to address the individualized liability and damages issues posed in that case, involving negligence claims relating to a special relationship between the school and the plaintiff recognized under the specific facts in that litigation.  A multi-day trial was necessary, even with the parties coordinating a streamlined and significantly stipulated presentation of evidence for purposes of a virtual Zoom trial held during the pandemic.

- Jane 1's allegations pertain to a faculty member (not a student-on-student matter), raising issues distinct to her educational program and the specific academic accommodations that she sought within it.

- The individual respondents in each matter are distinct as is the nature of the alleged misconduct in each instance.

In short, neither discovery nor factual development will alter the lack of commonality among the six Plaintiffs themselves (never mind a purported class of "hundreds" of current and former Brown female students). Stopping at this Rule 23(a)(2) stage of the analysis, Plaintiffs' putative class action allegations are fatally flawed and should be stricken. But, the allegations fare no better in the rest of the Rule 23(a) analysis as well as the additional criteria to pursue any of the three categories of class actions under Rule 23(b).

### 3. Typicality (Rule 23(a)(3))

In *Wal-Mart*, the Supreme Court stated:

We have previously stated in this context that "[t]he commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest. [*Falcon*, 457 U.S. at 157-58, n. 13]. In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied their typicality and adequate-representation requirements of Rule 23(a).

564 U.S. at 349, n. 5.

Further, this Court has stated:

Courts have noted some uncertainty as to the independent significance of Rule 23's typicality requirement. *See* 7A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1764 (rev. 4th ed. 2018). "[M]any courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Id.* (citations omitted). Other courts have used Rule 23(a)(3) "to screen out class actions in

> which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law and fact are present." *Id.* (citations omitted).

*In re Loestrin 24 FE Antitrust Litig.*, No. 1:13-MD-2472, 2019 WL 3214257, at *11 (D.R.I. July 2, 2019).

Brown submits that this is such a case that compels the Court to screen out this putative class action on the pleading, because Plaintiffs' First Amended Complaint is so deficiently unable to satisfy Rule 23(a)(3)'s typicality requirement. A class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Falcon*, 457 U.S. at 156. Plaintiffs have not shown that each of them possesses the "same interest" and has suffered the "same injury" as all other alleged sexual misconduct victims they purport to represent. For example, some students, by their own personal choice, may have preferred to have had their reporting resolved through an informal resolution with the accused, rather than a formal grievance process requiring a hearing. Some of the sexual misconduct cases resulted in findings of responsibility of the respondents. The wide array of scenarios and results in the purported hundreds of sexual misconduct cases are expansive.

Nor can damages be readily ascertainable on a class-wide basis. "This is even more clearly the case when one considers the alleged class claim for emotional distress, which is intractably individual in character." *Puerto Rico v. M/V Emily S*, 158 F.R.D. 9, 16 (D.P.R. 1994) (citations omitted). Plaintiffs plead that class members "suffered severe emotional distress, including, but not limited to, headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, depression, anxiety, post-traumatic stress disorder, obsessive compulsive disorder, eating disorders, substance dependency, and other such injuries and physical manifestations as may appear during the course of discovery and trial in this matter." (FAC ¶ 359). How can one named plaintiff alone, or the six named plaintiffs together, possibly claim that there is any typicality

68

regarding these alleged emotional and physical conditions across the board – whether in the existence of some or all of these conditions, duration, or degree - among the "hundreds" that they purport to represent?

As damages, Plaintiff allege that they have suffered "actual damages including, but not limited to, medical expenses associated with mental and physical health treatment, inconvenience, insult, mental distress, humiliation, physical assault, anxiety, emotional and physical pain and suffering, a denial of access to educational benefit, loss of educational benefit including scholarship opportunities, loss of income, loss of enjoyment of life, economic damages associated with moving to flee their abusers []."  (FAC ¶ 373).  Even making the gigantic leap to assume that each putative class member has suffered all thirteen of these categories of economic and emotional damages, as well as the broad catch-all of "other economic or non-economic damages," each damages claim would still not be the same or even substantially similar among each Plaintiff and class member.  What Plaintiffs propose would require an examination of at least tens of thousands and likely hundreds of thousands of pages of academic, medical, psychological, and financial records collectively to address the many individualized nuances and distinctions regarding each Plaintiff's and class member's particular alleged injuries.  This would hardly meet the typicality requirement.

As a paramount concern, the Court must consider Brown's Seventh Amendment due process rights and ability to defend itself fully.  Plaintiffs claim that they should be allowed to proceed on behalf of absent "[c]lass members [who] may suffer from severe mental health issues related to sexual misconduct they experienced while at Brown and do not have the physical ability to withstand a deposition or trial to seek redress of their claims."  (FAC ¶ 291(c)).  What Plaintiffs propose would substantially prejudice Brown.  The University must have the right to depose and

cross-examine at trial – both on liability and damages issues – all individuals who seek to recover

relief in this action.  Plaintiffs' suggestion that the alleged typicality of their claims (which actually

does not exist) should forego the need for depositions of many class members would absolutely

destroy Brown's due process right to mount a defense to each class member's claims.

### 4.  Adequacy (Rule 23(a)(4))

The adequacy analysis has two elements: (1) adequacy of the named plaintiff(s) and (2)

adequacy of counsel.  Brown incorporates its above-stated and interrelated commonality and

typicality arguments into its contention that Plaintiffs cannot not meet the adequacy requirement.

Of particular importance to the analysis, the privacy protections and requirements of the

Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, demonstrate

the total unmanageability of what Plaintiffs propose and show how neither they nor their counsel

are adequate representatives for the unnamed putative class members.   Subject to certain

exceptions, FERPA enables university students to control the disclosure of their "education

records" to others.  Moreover, the FERPA rights continue to exist after the student's graduation

and expire only upon either the destruction of the relevant records or the student's death.

All of FERPA's protections revolve around the central term "educational records," which

is defined in the implementing regulations as follows:

"Education records" . . . means those records that are:

1) Directly related to a student; and
2) Maintained by an educational agency or institution or by a party acting for the agency
   or institution.

34 C.F.R. § 99.3.  Given the vast breath of this definition, an "education record" includes standard

"academic" records such as student transcripts, papers, and exams, as well as virtually any records

or communications (including email communications) directly relating to a student "maintained"

by Brown.  Certainly, Brown's records relating to student reporting of alleged sexual misconduct

70

and any resulting disciplinary proceedings fall within FERPA's confidentiality and non-disclosure requirements.

Disclosure of education records under FERPA typically requires a student's written consent.  Otherwise, Brown must first redact all "personally identifiable information" from the records or one of sixteen exceptions must apply.  34 C.F.R. § 99.31(a)-(b).  The exception most relevant to litigation is a disclosure made to "comply with a judicial order or lawfully issued subpoena." 34 C.F.R. § 99.31(a)(9)(i).  Before complying with such a judicial order or subpoena, Brown must first make a "reasonable effort to notify the . . . student of the order or the subpoena in advance of compliance, so that the . . . student may seek protective action."  34 C.F.R. § 99.31(a)(9)(ii).

Under FERPA, neither Plaintiffs nor their counsel have any right to receive any education records pertaining to any class members, unless they obtain and provide Brown with a proper written consent from each student, or serve upon Brown an order from the Court or a subpoena, which would require Brown to provide all such class members with the opportunity to appear before the Court and object to the production of their education records.

FERPA issues will arise pertaining to the six Plaintiffs,[21] all of the members of the putative class, all accused respondent students, and all student witnesses who participated in Brown's investigations of sexual misconduct complaints.  The unmanageability of Plaintiffs' proposed class action would quickly devolve into an unwieldly monstrosity, with easily several hundred and possibly thousands of students who must be advised in writing and afforded reasonable notice of their FERPA rights to object to the production of any of their education records to Plaintiffs and

---

[21]    As to the six Plaintiffs, FERPA allows for disclosure to a court in the context of a lawsuit that the student brought against the institution.  34 C.F.R. § 99.31(a)(9)(iii).

71

their counsel, which would foreseeably result in immediate and prolonged motion practice. Alternatively, Brown could be compelled to incur the substantial time and expense to review line-by-line hundreds of thousands of pages of education records and redact all personally identifiable information before any production could occur to Plaintiffs and their counsel. Plaintiffs claim that they "are unaware of any difficulty that will be encountered in the management of this litigation precluding its maintenance as a class action." (FAC ¶ 286). Clearly, they fail to appreciate fully FERPA's requirements.

**D. Plaintiffs do not satisfy the criteria for any of the allowable types of class actions under Rule 23(b)(1)-(b)(3).**

**1. Plaintiffs have not shown the predominance required for a Rule 23(b)(3) class action.**

Although Plaintiffs claim that they wish to proceed with a class action in accordance with Rules 23(b)(2) and/or (b)(3), the bulk of their class allegations pertain to an intention to proceed with damages claims under a Rule 23(b)(3) class for monetary damages (especially when three named Plaintiffs lack standing to seek injunctive or declaratory relief). Rule 23(b)(3)'s predominance requirement is a foremost factor in whether a class can be certified where the sought remedy is monetary damages.

The relevant inquiry for the predominance requirement addresses whether "the questions of law and fact common to class members predominate over any questions affecting only individual members," and whether a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3)'s predominance requirement is "even more demanding than Rule 23(a)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).

The Courts must inquire "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouphakeo*, 577 U.S. 442, 453 (2016)

(quoting *Amchem Prods., Inc.*, 521 U.S. at 623).  Cohesiveness should be addressed by examining

the relation between common and individual questions in a case.  "An individual question is one

where 'members of a proposed class will need to present evidence that varies from member to

member.'"  *Tyson Foods*, 577 U.S. at 454 (quoting 2 W. Rubenstein, *Newberg on Class Actions*

§4:50, pp. 196-97 (5th ed. 2012)).

> Further, as the First Circuit has held:

> The aim of the predominance inquiry is to test whether any dissimilarity among the
> claims of class members can be dealt with in a manner that is not "inefficient or
> unfair."  [*Amgen Inc. v. Connecticut Ret. Plans & T. Funds*, 568 U.S. 455, 469
> (2013)] (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate
> Proof*, 84 N.Y.U. L. Rev. 97, 107 (2009)).  Inefficiency can be pictured as a line of
> thousands of class members waiting their turn to offer testimony and evidence on
> individual issues.  Unfairness is equally well pictured as an attempt to eliminate
> inefficiency by presuming to do away with the rights a party would customarily
> have to raise plausible individual challenges on those issues.

*In re Asacol Antitrust Litig.*, 907 F.3d 43, 51-52 (1st Cir. 2018).

Analysis of predominance under Rule 23(b)(3) "begins . . . with the elements of the

underlying cause of action."  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809

(2011).  The Court must consider the "probable course of the litigation" to "formulate some

prediction as to how specific issues will play out in order to determine whether common or

individual issues predominate."  *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st

Cir. 2000).

Under Rule 23(b)(3), courts should deny certification of a class seeking damages where

individualized issues of fact predominate over common questions.  *See*, *e.g.*, *Kiossovski v. Forest*

*Labs, Inc.* (*In re Celexa & Lexapro Mtkg. & Sales Practices Litig.*), 325 F.R.D. 529, 538-40 (D.

Mass. 2017).  In *Comcast*, the Supreme Court made clear that the named plaintiffs must show that

"damages are capable of measurement on a classwide basis," warning that "[q]uestions of

individual damages calculations will inevitably overwhelm questions common to the class."  569

U.S. at 34.  As detailed above, there is no conceivable way that the vast damage claims pled in the First Amended Complaint could avoid a student-by-student damages assessment.  On this ground alone, the Court should strike the claim for a Rule 23(b)(3) class.

Regarding the liability issues pled in this action, the claims by their very nature require an individualized assessment of each student's claims.  Simply put, Brown would be subjected to a stream of "mini-trials" on the other side of certification.  *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 99 (1st Cir. 2021) (Barron, J. concurring).  What Plaintiffs propose through a mass class action adjudication of highly individualized claims would be entirely inefficient and totally unfair to Brown.  *See In re Asacol Antitrust Litig.*, 907 F.3d at 51-52.

For example, the Title IX "deliberate indifference" analysis as applied to each student involves individualized questions, such as (1) whether the student was subjected to "severe, pervasive, and objectively offensive sexual harassment?;" (2) whether and to what extent such harassment may have caused the student to be deprived of educational opportunities?; (3) whether Brown had actual notice of such harassment through an appropriate official authorized to take corrective action?; and (4) whether Brown's responsive actions can meet the high standard of deliberate indifference to the harassment, such that the response was clearly unreasonable in light of the known circumstances? *See Porto*, 488 F.3d at 72.  No single across the board determinations could possibly answer all of these questions as to all six Plaintiffs, and especially not to a putative class of hundreds of members as a whole.

Significantly, as detailed above, Brown's policies have been amended over time to comply with evolving Department of Education's Title IX guidance documents and regulatory amendments, most recently in response to the Department's significant amendments to its Title IX regulations effective August 14, 2020.  Consequently, there would be wide divergence among the

named Plaintiffs and the class members regarding which substantive and procedural policies apply to each current or former student's claim.   Further, there would certainly be individualized questions in the interpretation and application of the controlling policies in each particular case.

Turning to the negligence claims, no "clear cut formula" exists under Rhode Island law for the determination of whether or not Brown may have owed a duty to an adult student and to what extent.   *RISD*, 432 F. Supp. 3d at 41 (D.R.I. 2019) (citing *Gushlaw*, 42 A.3d at 1256).   For each current or former student, the Court would have to employ a fact-specific, *ad hoc* review in the duty analysis.   *Id*.   Beyond the fact-specific duty analysis, questions of proximate causation, by their nature, pose inherently individualized factual issues that cannot be addressed on an aggregate basis.

Additionally, to the extent that some or all of the proposed class members claim that Brown owed them a "special relationship" and should be held responsible for the conduct of a student or third party, this Court has recognized that such an analysis raises "sweeping social implications." *Jane Doe v. Brown Univ.*, 304 F. Supp. 3d 252, 262 (D.R.I. 2018).   In doing so, the Court has declined to recognize a special relationship between a university and its adult students on an across-the-board basis.   *Compare Brown Univ.* (declining to find a special relationship concerning claims of an alleged drugging at an on-campus fraternity party resulting in a subsequent sexual assault in an on-campus dormitory room) and *RISD* (finding a special relationship arising from the unique facts of the school's provision of required lodging in a study abroad program, where a sexual assault occurred).

Similarly, even if Plaintiffs' invented breach of fiduciary duty claim has any possible plausibility, it would require a fact specific analysis of the context of each university-student interaction to determine whether there was "reliance by one party upon the other" and the

75

"readiness of one party to follow the other's guidance in complicated transactions." *Sterman*, 513 F. Supp. 3d at 255 (quoting *Simpson v. Dailey*, 496 A.2d 126, 129 (R.I. 1985)).  Further, to establish liability, each Plaintiff (as well as each putative class member) would have to show fact-specific proof that, during her interactions with the fiduciary's authorized agents, there was an alleged failure to disclose "all material facts" to the matter at issue in her particular matter.  Even assuming that such a cause of action existed under Rhode Island law in the university-student relationship (which it does not), each student's personal interactions with Brown administrators, counselors, or faculty members would have to be assessed individually to determine whether a fiduciary relationship existed, what facts were disclosed or not disclosed, and whether there was any breach of that fiduciary relationship.

As is abundantly clear from just a small sampling of the many individualized issues that will certainly arise by what Plaintiffs propose, they cannot ever meet Rule 23(b)(3)'s predominance requirement.  Certainly, this case would require hundreds of mini-trials.  Before it even reaches that stage, Brown should not be required to incur the substantial time and costs for a wide-ranging discovery fishing expedition by Plaintiffs (raising a myriad of FERPA concerns and anticipated objections by current and former students).  The Court must strike the class allegations now - in the interests of justice and judicial economy.[22]

---

[22]  Under Rule 23(b)(3), the Court must also consider whether a class action is a "superior" method of resolving the suit, taking into account the several factors outlined above.  Fed. R. Civ. P. 23(b).  The superiority requirement "ensures that litigation by class action will achieve the economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 462177, at * 21 (D. Mass. Oct. 16, 2017).  Brown incorporates all of its above-stated arguments to support its contention that Plaintiffs similarly fail to satisfy the "superiority" requirement.

2. **A single Rule 23(b)(2) injunction cannot be entered for all class members, and Plaintiffs' claims for monetary damages are not incidental to the requested injunctive relief.**

As detailed above, as a mandatory condition of its receipt of federal funding, Brown must adhere to Title IX (which it does) or otherwise run the serious risk of the administrative withdrawal of its federal funding.  Plaintiffs' boldly pled requested injunction would accomplish nothing other than what the law already requires, subject to the Department of Education's administrative oversight.  It is not the Court's role to enter the overbroad declaratory and mandatory injunctive relief demanded here.

Again as a fatal flaw and detailed above, three of the named Plaintiffs (Taja, Chloe, and Emma) have graduated from Brown, so they lack standing to seek declaratory and injunctive relief from their alma mater.  Their claims can only seek monetary relief.  Similarly, the putative class, which seeks to reach back to 2018, includes former students who have either since graduated or may have left Brown for other reasons, who likewise cannot seek non-monetary relief.

Under Rule 23(b)(2), class certification is proper only if resolution of a common question "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350 (reversing certification of a Rule 23(b)(2) class that sought injunctive and declaratory relief, punitive damages, and back-pay, where the plaintiffs failed to show commonality).  There is no ability for any class member to elect to opt of a Rule 23(b)(2) class action. *Id*. at 363.

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or none of them." *Id*. at 360 (citation omitted).  "In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class

member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

Again, as demonstrated above, Plaintiffs' proposed class members do not share a common question, the resolution of which will "resolve an issue that is central to the validity of the claims in one stroke." *Id.* at 350. Rule 23(b)(2) requires the injunctive relief must be final to "the class as a whole," a prospect totally at odds with the fact-intensive character of sexual misconduct claims. The putative class action is replete with numerous individualized issues spanning different academic years, scenarios, circumstances, locations, and applicable policies. A Rule 23(b)(2) injunction is impossible here because "[d]issimilarities within the proposed class . . . impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350.

Finally, Plaintiffs primarily seek substantial monetary damages. Under the advisory committee's note to Rule 23(b)(2), the committee states that "[Subdivision (b)(2)] does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Further, as the Supreme Court has held, Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages," which is precisely what is sought here. *Id.* at 360-61. In *Wal-Mart*, recognizing a defendant's due process rights, the Supreme Court determined that class claims for monetary relief required individualized determinations and therefore were not incidental to claims for injunctive or declaratory relief. *Id.* at 363. *Wal-Mart* compels the dismissal of Plaintiffs' request for a Rule 23(b)(2) certification in this litigation. *See also John Doe v. Michigan St. Univ.*, Case No. 1:18-cv-1413 (W.D. Mich.), Opin. and Order dated 9/1/20 (ECF No. 77) (striking class allegations on the pleadings in Title IX case, where the plaintiff proposed a Rule 23(b)(2) class of all university

students and/or former students who were subjected to disciplinary process without first being afforded a live hearing and opportunity to cross-examine witnesses).

## SECTION V:
## BROWN'S ARGUMENTS TO SEVER EACH PLAINTIFF'S CLAIMS

Misjoinder of parties is addressed under Rule 21 of the Federal Rules of Civil Procedure.[23] The rule does not define the grounds for misjoinder, but it is well-settled that parties are misjoined when the preconditions for permissive joinder in Rule 20(a) are not met. *Malodonado Cordeiro v. AT&T*, 190 F.R.D. 26, 28 (D.P.R. 1999).

Rule 20(a) allows for permissive joinder of plaintiffs when two requirements are met. First, the plaintiffs must "assert any right to relief, jointly, severally, or in the alternative with respect to or arising out of the same transaction or occurrence," and second, "any question of law or fact common to all plaintiffs" must "arise in the action." Fed. R. Civ. P. 20(a)(1). "[T]he Court must consider both equity and judicial economy; efficiency cannot prevail at the expense of justice." *W. Reserve Life Assur. Co. of Ohio v. Caramadre*, No. CV 09-470S, 2015 WL 13704429, at *3 (D.R.I. Nov. 16, 2015) (citation omitted). The Court must also examine whether a permissive joinder of plaintiffs comports with fundamental fairness and would not prejudice the defendant. *See Patrick Collins, Inc. v. Does 1-38*, 941 F. Supp. 2d 153, 164 (D. Mass. 2013).

> Multiple plaintiffs may join together in a single action if they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and any question of law or fact common to all plaintiffs will arise in the action. Fed.R.Civ.P. 20(a)(1)(A)–(B). If both elements of this test are not satisfied, 'a court, in its discretion, may sever the misjoined parties, so long as no substantial right will be prejudiced by the severance. In such a case, the court can generally dismiss all but

---

[23]   Federal Rule of Civil Procedure 21 states:

> Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against any party.

> the first named plaintiff without prejudice to the institution of new, separate
> lawsuits by the dropped plaintiffs . . . [.]

*Cruz v. Bristol-Myers Squibb Co., PR, Inc.*, 699 F.3d 563, 568–69 (1st Cir. 2012) (internal quotation marks and citation omitted).

Reviewing each of the six Plaintiffs' individual factual allegations (FAC ¶¶ 70-264), they are not asserting any right to relief "jointly and severally" (Rule 20(a)(1)(A)), so they must assert a right to relief "out of the same transaction, occurrence, or series of transactions or occurrences." (Rule 20(a)(1)(B)). Even accepting the truth of what each Plaintiff has pled individually and applying the "same transaction or occurrence" standard as liberally as possible, the six Plaintiffs' allegations do not come close to satisfying this mandatory requirement for a permissive joinder of individual claims collectively into a single lawsuit.

Plaintiffs do not allege that they suffered any assaultive conduct, harassment, or retaliation from common alleged perpetrators. They do not allege that their claims relate to the same educational programs and activities at Brown. They do not allege that the alleged harassment or retaliation occurred in temporally close time periods (or even during the same academic year). They do not allege any common locations, and, in fact, two of them (Katiana and Jane 2) allege sexual misconduct that occurred entirely off-campus in third-party owned buildings. The six Plaintiffs do not allege with any specificity that they interacted with the same or an overlapping set of Brown deans or administrators. Under Title IX, a global or consolidated adjudication of these diverse factual matters cannot be reached in one swoop under the "deliberate indifference analysis," which must review whether Brown's responses to each individual's reporting "was clearly unreasonable in light of known circumstances."

By way of a simple example showing why joinder is improper, looking at the enrollment periods of the six Plaintiffs at Brown, there is not even much overlap of their time together

collectively at the University.  For example, using Katiana's enrollment in September 2020 (the 2020-21 academic year) for comparative purposes, Chloe (who graduated in Brown's Class of 2019) and Taja (who graduated in Brown's Class of 2020) were never enrolled at Brown at the same time as Katiana.  Different Brown sexual misconduct policies applied over the course of the academic years spanning from Chloe's enrollment (2015-16) through the last academic year (2020-21) at issue in Plaintiffs' allegations, so their individual claims are subject to different applicable policies.  Only Katiana's and Jane 1's allegations involve alleged sexual misconduct post-dating the Department of Education's Title IX regulations effective as of August 14, 2020.

The analysis should stop at the Rule 20(a)(1)(A) step because Plaintiffs have not sufficiently pled facts to come close to satisfying the same transaction or occurrence standard.  And, they fare no better under the Rule 20(a)(1)(B) analysis, requiring that they show "any question of law or fact common to all plaintiffs will arise in the action."  Because of the clear disparities in the academic years at issue among the six Plaintiffs (as well as the statute of limitations problems that Chloe and Emma face), there is not commonality in the legal analysis (even though they have all pled the same eleven causes of action).

Beyond the many variations in the liability issues, the highly individualized nature and analysis of each Plaintiff's alleged damages are even more profound.  This is true not only as to any alleged physical or emotional injuries suffered by each Plaintiff, but also regarding any alleged deprivation of access to educational opportunities or purported economic losses.  The many differences in each Plaintiff's liability and damages issues cannot be easily reconciled, managed, and isolated during discovery.  The resulting case-management challenges would be substantially burdensome, and there is no judicial economy that would outweigh them.

Also, each case will involve unique respondents and third-party records, so the FERPA rights of each student respondent and third-party witnesses must be respected (especially to the extent that Plaintiffs seek to receive and share such FERPA-protected education records across a collective lawsuit). Looking ahead, the potential for juror confusion at a trial would be very real and very prejudicial to Brown because wholly distinct liability and damages claims would be blended together. *See Rohr v. Metro. Ins. & Cas. Co.*, No. CIV. A. 06-10511, 2007 WL 163037, at *3 (E.D. La. Jan. 17, 2007) (granting defendant's motion to sever, in part, because of the potential undue prejudice to defendant of defending multiple claims, with different factual scenarios, in one trial, and noting "[a] court may also consider whether jury confusion would result from the volume of evidence if the plaintiffs were joined.").

Applying Rule 21, severance is appropriate because one Plaintiff's claims are capable of full resolution regardless of the outcome of the other five Plaintiffs' claims. *See*, *e.g.*, *Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 442 (7th Cir. 2006) (severance under Rule 21 is proper if one claim is "capable of resolution despite the outcome of the other claim."). Because each Plaintiff pleads separate incidents of alleged sexual assault or harassment resulting in separate interactions with Brown administrators and separate responses in different time periods, each Plaintiff will substantially rely on different evidence to support her claims. *See Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 522 (5th Cir. 2010) (noting "district courts have considerable discretion to deny joinder [under Rule 21] when it would not facilitate judicial economy and when different witnesses and documentary proof would be required for plaintiffs."). The disposition of one Plaintiff's claims, to the extent that her individual claims may survive dismissal, is "discrete and separate" – Katiana's claims will have no bearing on the disposition of Taja's, Chloe's, Emma's, Jane 1's, or Jane 2's claims and vice versa.

## **CONCLUSION**

None of the six Plaintiffs has pled any plausible claims to hold Brown liable under Title

IX, RICRA, or Rhode Island common law.  If any Plaintiff has claims that survive past the Rule

12(b)(6) stage, then the Court should address now precisely how this litigation will proceed going

forward.

Simply put, this is not a class lawsuit strictly applying the Rule 23(a) and (b) analysis.

Plaintiffs' class action allegations should be stricken to avoid what would be a clearly futile pursuit

of trying to show that the asserted causes of action, with their highly individualized liability and

damages analyses, can somehow be combined into a large class action resulting in uniform

determinations.  Brown should not be forced to incur the substantial legal fees and costs and

administrative burdens of defeating class certification later, when Plaintiffs' stated justifications

for their putative class action are so obviously futile on the face of their pleading.

Additionally, the Court should not allow Plaintiffs to litigate together in one action (even

assuming that any of their individual claims may survive Rule 12(b)(6) dismissal).  For example,

if Taja, Chloe, and Emma can proceed at all, their claims would be substantially limited by the

three-year limitations period, and these three Plaintiffs have no standing to seek injunctive relief.

Among the group of six, each Plaintiff's allegations and claims present distinct underlying facts

that should be presented in individual cases.  This is the only fair way to proceed without

substantially prejudicing Brown's rights to defend itself.   Bundling six discrete lawsuits into one

does not aid any form of disposition.

Finally, if the Court is not inclined to dismiss Plaintiffs' negligence and fiduciary duty

theories contending that a university may be held liable under Rhode Island law for the general

risk of student-on-student sexual misconduct (both on-campus and anywhere off-campus) and the

tortious acts of third-parties (under a special relationship theory), then appropriate questions regarding such highly precedential issues (impacting every Rhode Island higher education institution) should be certified to the Rhode Island Supreme Court.

BROWN UNIVERSITY

By Its Attorneys,

/s/ Steven M. Richard
Steven M. Richard (#4403)
Caitlyn Smith (#10361)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: 401-454-1000
Fax: 401-454-1030
srichard@nixonpeabody.com
cxsmith@nixonpeabody.com

## CERTIFICATE OF SERVICE

I certify that, on this 4th day of March 2022, this supporting memorandum was filed and served through the Court's CM/ECF system.

/s/ Steven M. Richard