# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KATIANA SOENEN, TAJA HIRATA-EPSTEIN, CHLOE BURNS, EMMA DENNIS-KNIERIEM, JANE DOES 1-2, individually and on behalf of all others similarly situated, | CLASS ACTION |
| | C.A. No. 1:21-cv-00325-JJM-PAS |
| *Plaintiffs,* | |
| v. | Jury Trial Demanded |
| BROWN UNIVERSITY, | |
| *Defendant.* | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS EACH PLAINTIFF'S INDIVIDUAL CLAIMS, STRIKE THE <u>CLASS ACTION ALLEGATIONS, AND/OR SEVER CLAIMS</u>**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

SUMMARY OF THE FACTS ......................................................................... 4

I.      STANDARD FOR DISMISSAL ............................................................ 13

II.      PLAINTIFFS' CLAIMS ARE TIMELY .................................................. 14

     A.      ALL PLAINTIFFS' CLAIMS ARE TIMELY BEFORE THE COURT ................................ 14

     B.      THE CONTINUING VIOLATION DOCTRINE FURTHER TOLLS THE STATUTE OF LIMITATIONS .................................................................................. 17

     C.      IN THE ALTERNATIVE, PLAINTIFFS' CLAIMS DID NOT ACCRUE UNTIL JUNE 2020 ........................................................................................ 21

III.      PLAINTIFFS SEEK INJUNCTIVE RELIEF AND HAVE STANDING TO DO SO .......................................................................................... 23

IV.      PLAINTIFFS HAVE PROPERLY PLED EACH OF THEIR INDIVIDUAL CLAIMS ...................................................................................... 27

     A.      COUNTS I-III: PLAINTIFFS HAVE SUFFICIENTLY ALLEGED TITLE IX CLAIMS ....... 27

         1.      Plaintiffs' Post-Assault Title IX Claims Are Sufficiently Pled ............... 27

         2.      Plaintiffs Have Sufficiently Pleaded Pre-Assault Title IX Claims .......... 33

     B.      COUNT IV: PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A CLAIM FOR TITLE IX ERRONEOUS OUTCOME ......................................................................... 46

     C.      COUNT V: PLAINTIFFS HAVE SUFFICIENTLY PLED FACTS TO SUPPORT A CLAIM FOR TITLE IX RETALIATION .................................................................. 49

     D.      COUNT XI: PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A CLAIM UNDER RICRA ....................................................................................... 53

V.      COUNTS VI, VII, AND X: PLAINTIFFS SUFFICIENTLY PLED NEGLIGENCE CLAIMS ...................................................................... 53

     A.      THE FAC SUFFICIENTLY ALLEGES NEGLIGENCE ....................................... 53

     B.      DEFENDANT CONFLATES THE PLEADING STANDARD FOR NEGLIGENCE AND TITLE IX CLAIMS ........................................................................... 56

     C.      PLAINTIFFS DO NOT ALLEGE NEGLIGENCE BASED ON ANY CONTRACTUAL DUTY ......................................................................................... 58

     D.      THE CLAIMS IN THE FAC ARE FOCUSED ON BROWN'S ACTIONS AND FAILURES, NOT THE ACTIONS OF STUDENTS OR OTHER THIRD PARTIES .............................. 59

     E.      PLAINTIFFS DO NOT ASSERT A CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS ...................................................................... 60

i

F. THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR NEGLIGENT SUPERVISION (COUNT VII) ......................................................................................... 61

G. THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR NEGLIGENT FAILURE TO WARN, TRAIN, AND EDUCATE (COUNT X) ......................................................... 63

H. THE FAC SUFFICIENTLY ALLEGES A BREACH OF FIDUCIARY DUTY CLAIM (COUNT VIII) ...................................................................................... 64

I. THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT IX) ...................................................... 68

J. PLAINTIFFS MAY RECOVER PUNITIVE DAMAGES FOR THEIR STATE LAW CLAIMS .............................................................................................. 70

    1. Plaintiffs Have Sufficiently Pled Their Claims For Punitive Damages Under Rhode Island Law ....................................................... 70

    2. Plaintiffs' May Also Recover Damages for Emotional Distress ............. 71

VI. DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS IS PREMATURE AND SUBSTANTIVELY WRONG ............................................................... 74

A. MOTIONS TO STRIKE CLASS ALLEGATIONS ARE ROUTINELY FOUND TO BE PREMATURE ........................................................................................ 74

B. PLAINTIFFS' CLASS ALLEGATIONS ARE PROPERLY PLED ...................................... 79

    1. Plaintiffs Have Properly Pled All Elements of Rule 23(a) ...................... 80

    2. Plaintiffs Have Properly Pled Common Questions of Law and Fact........ 80

    3. Plaintiffs Have Properly Pled Typicality .................................................. 83

    4. Plaintiffs Have Properly Pled Adequacy .................................................. 85

C. PLAINTIFFS HAVE PROPERLY PLED THE RELEVANT ELEMENTS OF RULE 23(B)..... 86

    1. Rule 23(b)(2).............................................................................................. 86

    2. Rule 23(b)(3).............................................................................................. 88

VII. PLAINTIFFS' CLAIMS SHOULD NOT BE SEVERED ................................................. 92

VIII. CONCLUSION ................................................................................................. 94

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo v. Allsup's Convenience Stores, Inc.*,
  600 F.3d 516 (5th Cir. 2010) ................................................................93

*AMTRAK v. Morgan*,
  536 U.S. 101 (2002)...............................................................................17, 18

*Applegate v. Formed Fiber Techs, LLC*,
  2:10-CV-00473-CZS, 2012 WL 3065542 (D. Me. July 12, 2012)....................81, 89

*Barnes v. Gorman*,
  536 U.S. 181 (2002)...............................................................................71

*Barrett v. Avco Fin. Servs. Mgmt. Co.*,
  292 B.R. 1 (D. Mass. 2013) ....................................................................77

*Blagman v. Apple, Inc.*,
  No. 12-CIV-5453-ALC-JCF, 2013 WL 2181709 (S.D.N.Y. May 20, 2013)..........75

*Bourbonnais v. Ameriprise Fin. Servs., Inc.*,
  No. 14-C-966, 2015 WL 12991000 (E.D. Wis. Aug. 20, 2015)...........................79

*Brodeur v. Claremont Sch. Dist.*,
  626 F. Supp. 2d 195 (D.N.H. 2009)...........................................................28

*Brown v. Arizona*,
  23 F.4th 1173 (U.S. 9th Cir. 2022) ..........................................................43, 44

*Brown v. Cook Cty.*,
  No 17 C 8085, 2019 WL 3776150 (N.D. Ill. Aug. 12, 2019)................................86

*Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*,
  504 F. Supp. 3d 39 (D.R.I. 2020) .............................................................27

*Burlington N. & Santa Fe Ry. v. White*,
  548 U.S. 53 (2006)................................................................................49

*Canady v. Bridgecrest Acceptance Corp.*,
  No. 19-CV-04738-PHX-DWL, 2022 WL 279576 (D. Ariz. Jan. 31, 2022) ...................74, 76

*Cash v. Lees-McRae Coll., Inc.*,
  No. 18-cv-52, 2018 WL 7297876 (W.D.N.C. Aug. 13, 2018) ................................57

*Castellucci v. Battista*,
   847 A.2d 243 (R.I. 2004) ................................................................................70

*Cavalier v. Catholic Univ. of Am.*,
   306 F. Supp. 3d 9 (D.D.C. 2018) .........................................................32, 33, 49

*Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv., Inc.*,
   No. CIV.A. PB 01-3522, 2004 WL 877599 (R.I. Super. Apr. 21, 2004) ...............64

*Chen–Oster v. Goldman, Sachs & Co.*,
   877 F. Supp. 2d 113 (S.D.N.Y. 2012)................................................................75

*Chenensky v. N.Y. Life Ins. Co.*,
   No. 07-CV-11504-WHP, 2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011) .........74-75

*Chhun v. Mortg. Elec. Registration Sys., Inc.*,
   84 A.3d 419 (R.I. 2014) ................................................................................69

*Ciccone v. Pitassi*,
   No. Civ. A. PB 97-4180, 2004 WL 2075120 (R.I. Super. Aug. 13, 2004)............58

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
   142 S. Ct. 1562 (2022).................................................................71, 72, 73, 74

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999)................................................................................ *passim*

*Dawn L. v. Greater Johnstown Sch. Dist.*,
   586 F. Supp. 2d 332 (W.D. Pa. 2008)..............................................................72

*De Leon v. New York Univ.*,
   No 21 Civ 05005 (CM), 2022 WL 179812 (S.D.N.Y. Jan. 20 2022)....................26

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ........................................................................81

*In re Dial Complete Marketing and Sales Practices Litig.*,
   312 F.R.D. 36 (D.N.H. 2015) ........................................................................81

*Dibbern v. Univ. of Michigan*,
   No. 12-15632, 2013 WL 6068808 (E.D. Mich. Nov. 18, 2013).......................18, 49

*Dionne v. Bouley*,
   757 F.2d 1344 (1st Cir. 1985).........................................................................86

*In re District of Columbia*,
   792 F.3d 96 (D.C. Cir. 2015) ........................................................................86

*Doe 1 v. Howard Univ.*,
    396 F. Supp. 3d 126 (D.D.C. 2019) ...................................................................52

*Doe v. Baylor Univ.*,
    240 F. Supp. 3d 646 (W.D. Tex. 2017)......................................................... *passim*

*Doe v. Brown Univ.*,
    166 F. Supp. 3d 177 (D.R.I. 2016).................................................28, 46, 48, 58

*Doe v. Brown Univ.*,
    304 F. Supp. 3d 252 (D.R.I. 2018)...............................................................49, 59

*Doe v. Brown Univ.*,
    327 F. Supp. 3d 397 (D.R.I. 2018) ............................................................ *passim*

*Doe v. Johnson & Wales Univ.*,
    425 F. Supp. 3d 108 (D.R.I. 2019)...................................................................46

*Doe v. McKenna*,
    No. C.A. 94-7084, 1998 WL 269228 (R.I. Super. May 8, 1998) ...........................61

*Doe v. Rhode Island Sch. of Design*,
    432 F. Supp. 3d 35 (D.R.I. 2019) ...............................................54, 59, 60, 77, 82

*Doe v. Sarah Lawrence College*,
    453 F. Supp. 3d 653 (S.D.N.Y. 2020).......................................................54, 56, 60

*Doe v. Trustees of Boston College*,
    892 F.3d 67 (1st Cir. 2018)...............................................................................46

*Doe v. Unified Sch. Dist. 259*,
    240 F.R.D. 673 (D. Kan. 2007)..........................................................................82

*Doe v. Univ. of the South*,
    No. 09-cv-62, 2011 WL 1258104 (E.D. Tenn. Mar. 31, 2011) .......................28, 57

*Doe v. Univ. of Tenn.*,
    186 F. Supp. 3d 788 (M.D. Tenn. 2016).......................................................24, 50

*Doe v. Vanderbilt Univ.*,
    No. 18-cv-00569, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019)......................57

*Duke v. Community Health Connections, Inc.*,
    355 F.Supp. 3d 49 (D. Mass. 2019) .................................................................14

*Dzung Duy Nguyen v. Mass. Inst. of Tech.*,
    479 Mass. 436 (2018) ......................................................................................64

*Faiaz v. Colgate Univ.*,
    64 F. Supp. 3d 336 (N.D.N.Y. 2014) .........................................................................58

*Farmer v. Kansas State Univ.*,
    918 F.3d 1094 (10th Cir. 2019) ..................................................... *passim*

*Fitzgerald v. Barnstable Sch. Comm.*,
    504 F.3d 165 (1st Cir. 2007), *rev'd on other grounds*, 555 U.S. 246 (2009) ...................27, 33

*Flores v. City of New York*,
    19CV5763KAMRLM, 2021 WL 663977 (E.D.N.Y. Feb. 19. 2021) ...............................25, 78

*Frazier v. Fairhaven Sch. Cmm.*,
    276 F.3d 52 (2002)......................................................................................50

*Garcia v. E.J. Amusements of New Hampshire. Inc.*,
    98 F. Supp. 3d 277 (D. Mass. 2015) ........................................................89

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)..............................................................................34, 39, 57

*Grajales v. P.R. Ports Auth.*,
    682 F.3d 40 (1st Cir. 2012) .....................................................................69

*Gushlaw v. Milner*,
    42 A.3d 1245 (R.I. 2012) ........................................................54, 59, 61

*Haidak v. Univ. Of Massachusetts-Amherst*,
    933 F.3d 56 (1st Cir. 2019) .....................................................................46

*Hamm v. Carpenter*,
    937 F.2d 86 (1st Cir. 2019) ..................................................................... 47-48

*Harris v. St. Joseph's Univ.*,
    No. 13-3937, 2014 WL 1910242 (E.D. Pa. May 13, 2014)...................................58

*Hernandez v. Baylor Univ.*,
    274 F.Supp.3d 602 (W.D. Tex. 2017).......................................................29, 55, 56

*I.L. v. Houston Indep. Sch. Dist.*,
    776 F. App'x 839 (5th Cir. 2019) ............................................................28

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005)................................................................................49

*Jefferson v. Moran*,
    479 A.2d 734 (R.I. 1984) .........................................................................3

*Jenkins v. McKeithen*,
395 U.S. 411 (1969)..................................................................................13

*Jennings v. Univ. of N.C.*,
444 F.3d 255 (4th Cir. 2006) ..................................................................45

*John Doe v. Michigan St. Univ.*,
Case No. 1:18-cv-1413 (W.D. Mich.)......................................................87

*Jones v. Ill. Dep't. of Rehab. Servs.*,
689 F.2d 724 (7th Cir. 1982) ..................................................................24

*Joyce v. Wright State Univ.*,
3:17-CV-387, 2018 WL 3009105 (S.D. Ohio June 15, 2018)..........................40-41

*Jue v. Costco Wholesale Corp.*,
2020 WL 889284 (N.D. Cal. Mar. 11, 2010)............................................78

*K. v. Chi. Bd. of Educ.*,
551 F. Supp. 1107 (N.D. Ill. 1982) .........................................................25

*Karasek v. Regents of Univ. of Cal.*,
500 F. Supp. 3d 967 (N.D. Cal. 2020) ........................................... *passim*

*Karasek v. Regents of Univ. of California*,
956 F.3d 1093 (9th Cir. 2020) ..............................................33, 34, 35, 37

*Kassman v. KPMG LLP*,
925 F. Supp. 2d 453 (S.D.N.Y. 2013)......................................................75

*Kelly v. Yale Univ.*,
CIV.A. 3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003) ......................29, 41, 45

*Kirby v. Cullinet Software, Inc.*
116 F.R.D. 303 (D. Mass. 1987).......................................................80, 85

*Knelman v. Middlebury Coll.*,
898 F. Supp. 2d 697 (D.Vt. 2012)......................................................66, 67

*LaChapelle v. Berkshire Life Ins. Co.*,
142 F.3d 507 (1st Cir. 1998)....................................................................17

*Lamphere v. Brown Univ.*,
71 F.R.D. 641 (D.R.I. 1976) ....................................................................86

*Leader v. Harvard Univ. Bd. of Overseers*,
CV 16-10254-DJC, 2017 WL 1064160 (D. Mass. Mar. 17, 2017) .........................28

*Lecenat v. Perlitz*,
   No. 3:13-CV-01132, 2019 WL 3451571 (D. Conn. Feb. 11, 2019) .......................................87

*LeGoff v. Trustees of Bos. Univ.*,
   23 F. Supp. 2d 120 (D. Mass. 1998) ..................................................................................14

*Logiodice v. Trustees of Maine Cent. Institute*,
   135 F. Supp. 2d 199 (D. Me. 2001) ...................................................................................65

*Lopez v. Metro. Gov't.*,
   646 F. Supp. 2d 891 (M.D. Tenn. 2009) ............................................................................45

*Lopez v. Regents of Univ. of California*,
   5 F. Supp. 3d 1106 (N.D. Cal. 2013) .................................................................................72

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ...........................................................................................................25

*Maldonado-Cátala v. Municipality of Naranjito*,
   876 F.3d 1 (1st Cir. 2017) ................................................................................................18

*Mandsager v. Univ. of N. Carolina at Greensboro*,
   269 F. Supp. 2d 662 (M.D.N.C. 2003) .......................................................................... 49-50

*Manning v. Boston Med. Ctr. Corp.*,
   No 09-CIV-11463-RWZ, 2012 WL 1355673 (D. Mass Apr. 18, 2012), *aff'd in
   part, vacated in part*, 725 F.3d 34 (1st Cir. 2013) .................................................................77

*Mark v. Congregation Mishkon Tefiloh*,
   745 A.2d 777 (R.I. 2000) ..................................................................................................70

*Martin v. Marciano*,
   871 A.2d 911 (R.I. 2005) ..................................................................................................63

*Mayale-Eke v. Merrill Lynch*,
   754 F. Supp. 2d 372 (D.R.I. 2010).....................................................................................13

*McGinnis v. Muncie Cmty. Sch. Corp.*,
   No. 1:11-CV-1125-WTL-TAB, 2013 WL 2456067 (S.D. Ind. June 5, 2013) .......................45

*McLaughlin v. Liberty Mut. Ins. Co.*,
   224 F.R.D. 304 (D. Mass. 2004)................................................................................ 83, 84-85

*Monteferrante v. Williams-Sonoma, Inc*,
   241 F. Supp. 3d 264 (D. Mass. 2017) ................................................................................77

*Moody v. Boston and Maine Corp.*,
   921 F.2d 1 (1st Cir. 1990)..................................................................................................57

*Mullins v. Pine Manor Coll.*,
389 Mass. 47 (1983) ...........................................................................................64, 67

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006)...............................................................................90

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015).......................................................................84, 88, 89

*Ollier v. Sweetwater Union High Sch. Dist.*,
768 F.3d 843 (9th Cir. 2014) ....................................................................24, 49, 50

*Ouadani v. Dynamex Operations E., LLC*,
405 F. Supp. 3d. 149 (D. Mass. 2019) .................................................................83

*Ouch v. Khea*,
963 A.2d 630 (R.I. 2009) .....................................................................................63

*Palmisano v. Toth*,
624 A.2d 314 (R.I. 1993) .....................................................................................70

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ...............................................................................81

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010) ...............................................................................90

*Pennington v. City of Huntsville*,
261 F.3d 1262 (11th Cir. 2001) ...........................................................................52

*Perez v. Town of N. Providence*,
256 F. Supp. 3d 139 (D.R.I. 2017) (JJM) ...........................................................19

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) ...............................................................................14

*Posso v. Niagara Univ.*,
518 F. Supp. 3d 688 (W.D.N.Y. 2021) ........................................................... 33-34

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*,
501 F.3d 592 (6th Cir. 2007) ...............................................................................81

*R.I. Indus.-Recreational Bldg. Auth. v. Capco Endurance, LLC*,
203 A.3d 494 (R.I. 2019)......................................................................................53

*Regents of Univ. of California v. Superior Ct.*,
413 P.3d 656 (Cal. 2018)......................................................................................54

*Rodriguez v. Nat'l City Bank*,
     726 F.3d 372 (3d Cir. 2013)................................................................................81

*Rodriguez-Reyes v. Molina-Rodriquez*,
     711 F.3d 49 (1st Cir. 2013)........................................................................69, 70

*Roohbakhsh v. Bd. of Trustees of Nebraska State Colleges*,
     409 F. Supp. 3d 719 (D. Neb. 2019).....................................................................72

*Roskin-Frazee v. Columba University*,
     2018 WL 1166634 (S.D.N.Y. Feb. 21, 2018)..................................................36, 37

*Ross v. Univ. of Tulsa*,
     No. 14-cv-484-TCK-PJC, 2015 WL 4064754 (N.D. Okl. July 2, 2015)...............57

*Ryan v. Yost*,
     CV 15-229-ML, 2017 WL 1232421 (D.R.I. Apr. 3, 2017)...................................68

*S.C. v. Metro. Gov't of Nashville & Davidson Cnty.*,
     Tennessee, No. 3:17-CV-01098, 2022 WL 127978 (M.D. Tenn. Jan. 12, 2022)..................72

*Schneider v. Plymouth State Coll.*,
     144 N.H. 458 (1999) ...........................................................................................65

*Sealock v. Covance, Inc.*,
     No. 17-cv-5857-JMF, 2018 WL 2290698 (S.D.N.Y May 18, 2018) ....................75

*Selwyn v. Ward*,
     879 A.2d 882 (R.I. 2005)......................................................................................54

*Shank v. Carleton Coll.*,
     993 F.3d 567 (8th Cir. 2021) ................................................................................27

*Sheely v. MRI Radiology Network, P.A.*,
     505 F.3d 1173 (11th Cir. 2007) ............................................................................72

*Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc.*,
     540 F. Supp. 3d 182 (D.R.I. 2021).........................................................................84

*Shibetti v. Z Restaurant, Diner and Lounge, Inc.*,
     No. 18-CV-856-ERK-ST, 2019 WL 11624313 (E.D.N.Y Aug. 30, 2019) .....74, 75

*Simpson v. Dailey*,
     496 A.2d 126 (R.I. 1985).....................................................................................64

*Simpson v. University of Colorado at Bounder*,
     500 F.3d 1170 (10th Cir. 2007) ..............................................................29, 34, 36

*Smilow v. Sw. Bell Mobile Sys.*,
  323 F.3d 32 (1st Cir. 2003) ..................................................................................88, 90

*Soper v. Hoben*,
  195 F.3d 845 (6th Cir. 1999) ....................................................................................45

*Soseeah v. Sentry Ins.*,
  No. CIV 12-01091 ......................................................................................................81

*Spencer v. Univ. of New Mexico Bd. of Regents*,
  No. 15-CV-141 ............................................................................................................45

*Splendorio v. Bilray Demolition Co.*,
  682 A.2d 461 (R.I. 1996) ..........................................................................................63

*Squeri v. Mount Ida Coll.*,
  954 F.3d 56 (1st Cir. 2020) .................................................................................. 66-67

*Stanley v. Trs. Of the Cal. State Univ.*,
  433 F.3d 1129 (9th Cir. 2006) ..................................................................................23

*Sterman v. Brown Univ.*,
  513 F. Supp. 3d 243 (D.R.I. 2021) ................................................................65, 66, 67

*Takla v. Regents of the Univ. of California*,
  No. 215CV04418CASSHX, 2015 WL 6755190 (C.D. Cal. Nov. 2, 2015) ...........32

*Theidon v. Harvard Univ.*,
  948 F. 3d 477 (1st Cir. 2020) .............................................................................. 52-53

*Thomas v. Bd. of Regents of the Uni. of Neb.*,
  Case No. 4:20-cv-03081, Doc. 47 (D. Neb. June 11, 2021) ...................................34

*TransUnion LLC v. Ramirez*,
  __ U.S. __, 141 S. Ct. 2190 (2021) ..........................................................................26

*Tubbs v. Stony Brook Univ.*,
  15 CIV. 0517 (NSR), 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) ......................34, 36, 37, 39

*United States v. Frost*,
  125 F.3d 346 (6th Cir. 1997) ....................................................................................26

*Vance v. Spencer Cnty. Pub. Sch. Dist.*,
  231 F.3d 253 (6th Cir. 2000) ....................................................................................28

*Vartanian v. Monsanto Co.*,
  14 F.3d 697 (1st Cir. 1994) ................................................................................56, 65

*Connor B. ex rel Vigurs v. Patrick*,
  272 F.R.D. 288 (D. Mass. 2011) ...................................................................81, 84

*Volpe v. Gallagher*,
  821 A.2d 699 (R.I. 2003) .........................................................................................63

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ...................................................................................80, 81, 88

*Weinstein v. Bradford*,
  423 U.S. 147 (1975) ................................................................................................25

*Wells v. Smith*,
  102 A.3d 650 (R.I. 2014) ........................................................................................61

*Welsh Mfg. v. Pinkerton's, Inc.*,
  474 A.2d 436 (R.I. 1984) ..................................................................................61, 62

*Williams v. Bd. of Regents of Univ. Sys. of Ga.*,
  477 F.3d 1282 (11 Cir. 2007) ..........................................................................36-37

*Wills v. Brown Univ.*,
  184 F.3d 20 (1st Cir. 1999) (Lipez, dissenting) ...................................................45

*Yang Chen v. Hiko Energy, LLC*,
  No. 14-CV-1771 VB, 2014 WL 7389011 (S.D.N.Y. Dec. 29, 2014) ..............74-75

*Yates v. Collier*,
  868 F.3d 354 (5th Cir. 2017) .................................................................................86

*Yu v. Vassar College*,
  97 F. Supp. 3d 448 (S.D.N.Y. 2015) .....................................................................62

*Z.J. v. Vanderbilt Univ.*,
  355 F. Supp. 3d 646 (M.D. Tenn. 2018) ...............................................................57

## Statutes and Other Authorities

Fed. R. Civ. P. 8(a) ..........................................................................................................61

Fed. R. Civ. P. 12(b)(6) ...................................................................................................13

Fed. R. Civ. P. 12(f) ............................................................................................76, 77, 83

Fed. R. Civ. P. 21 .............................................................................................................93

Fed. R. Civ. P. 23 .................................................................................................. *passim*

## PRELIMINARY STATEMENT

Plaintiffs, Katiana Soenen ("Katiana"), Taja Hirata-Epstein ("Taja"), Chloe Burns ("Chloe"), Emma Dennis-Knieriem ("Emma"), and Jane Does 1-2 ("Jane 1" and "Jane 2," respectively) (collectively, "Plaintiffs" and each a "Plaintiff"), on behalf of themselves and the class defined herein (the "Class"), submit this Memorandum of Law in Opposition to Defendant Brown University's ("Brown" or "Defendant") Motion to Dismiss Each Plaintiff's Individual Claims, Strike the Class Action Allegations, and/or Sever Claims (Doc. 20) (the "Motion").

This case arises out of Defendant's systemic failure to respond to widespread sexual misconduct on its campus. The sexual misconduct response program at Brown has been in a state of neglect and dysfunction for many years. Despite public efforts to engage Brown on change to end and prevent sexual violence on campus, including by student-led activism on the Voices of Brown ("VOB") and End Sexual Violence at Brown ("ESV") Instagram accounts, an open letter to Brown, and numerous protests and email-campaigns mobilized by ESV, Brown continues to bury its head in the sand and refuses to make any effort to address or prevent sexual misconduct on campus. Brown further continues to ratify the system that it has put in place, dissuading and thwarting survivors from reporting sexual misconduct and failing to provide survivors with adequate resources, resulting in the re-traumatization of survivors by the University itself.

Defendant simply ignores the allegations regarding its own conduct throughout its 84-page memorandum in support of its Motion, and, at times, manufactures and then responds to allegations that simply do not exist in Plaintiffs' First Amended Complaint ("FAC").[1] Indeed, instead of

---

[1] Defendant Brown University's Memorandum in Support of its Motion to Dismiss Each Plaintiff's Individual Claims, Strike the Class Action Allegations, and/or Sever Claims will be referred to as the "Memorandum" in the Opposition, and citations to the Memorandum will be referred to as "Memo. at __."

acknowledging the endemic issues raised by Plaintiffs, Brown instead employs a strategy of distraction, going to great lengths to redefine and mischaracterize Plaintiffs' well-pled claims in a manner that bears no resemblance to the plain assertions of the FAC.  For example, foundational to Defendant's arguments is the idea that Plaintiffs are seeking to litigate each of their respective sexual assaults and that this lawsuit seeks to impose some mountainous burden on Brown to patrol the actions of every Brown student and to hold Brown liable for the torts of its students, whether on or off campus.  Not so.  As discussed at length herein, Plaintiffs' claims challenge ***Brown's*** conduct, ***Brown's*** failure to comply with the mandates of Title IX of the Educational Amendments of 1972 ("Title IX"), and the toxic and hostile educational environment created ***by Brown***, all which deprived Plaintiffs and the proposed Class of the educational opportunities and benefits that they are entitled to by law.  Plaintiffs' primary goal is to create systemwide change to Brown's currently inadequate policies and procedures for handling Title IX complaints and to implement best practices for the prevention and response to sexual misconduct.

Plaintiffs allege that Brown violated the terms of its own policies by, among other things, failing to train its employees, failing to appoint a dedicated Title IX investigator at an institution with approximately 10,000 students and employees, relying on a mere two investigators borrowed from other departments with other duties, and otherwise failing to ensure that the relevant provisions of its own policies were complied with.  As a result of these failures, data suggests that campus sexual and gender-based harassment and violence was and continues to be a widespread and serious issue at Brown, affecting primarily female students.  The relief Plaintiffs seek will ensure that Brown examines and responds to known complaints regarding its Title IX response program by, among other things, properly training its employees, appointing dedicated Title IX

investigators, and taking all steps necessary to ensure that its policies are not only compliant with Title IX, but are also enforced.

Absent from Brown's Motion is any argument seeking outright dismissal of any of Plaintiffs' class claims for injunctive relief.  Defendant makes a passing reference to the substantive injunctive relief sought (Memo. at 77), but fails to pinpoint any colorable basis for dismissal.  All of Brown's other arguments which focus on each Plaintiff's individual claims fail as a matter of law and fact.  *First*, Brown's efforts to dismiss certain of the named Plaintiffs' claims on statute of limitations grounds relies on a fundamental misreading of the allegations of the FAC and disingenuously seeks to segregate the underlying sexual assault of each Plaintiff, which is provided as context for Brown's systemic conduct, in an effort to create bite-sized chunks of time that they can point to as falling outside the applicable statute of limitations.  That is not how the statute of limitations analysis works in this—or any—Court.

*Second*, each count of the FAC is supported by sufficient factual allegations to survive a motion to dismiss.  Plaintiffs have sufficiently pled all of the required elements of their claims for: (i) Title IX violations (Counts I-V), (ii) Negligence, Negligent Supervision, and Negligent Failure to Warn, Train or Educate under Rhode Island state law (Counts VI, VII, and X), (iii) Breach of Fiduciary Duty under Rhode Island state law, (iv) Intentional Infliction of Emotional Distress under Rhode Island state law, and (v) violation of the Rhode Island Civil Rights Act ("RICRA") (Count XI).  Likewise, Defendant's curious request for the Court to *sua sponte* stay the action and "certify appropriate questions to the Rhode Island Supreme Court" ignores how the litigation process works.  *See Jefferson v. Moran*, 479 A.2d 734, 738 (R.I. 1984) ("The rule [regarding certification of questions from federal court] directs that [the Rhode Island Supreme Court] may

answer certified questions from the federal courts. It does not, however, require that [it] always honor such requests.").

*Third*, Brown's motion to strike Plaintiffs' class action allegations is unfounded and premature.  All of the challenges to Plaintiffs' class allegations are not ripe for determination at the pleading stage.  Rather, these arguments can properly be considered by the Court in the context of a motion for class certification with the benefit of a full evidentiary record.  Nonetheless, even if the Court were to consider the sufficiency of the class allegations on this Motion, Plaintiffs have satisfied all of the pleading requirements under Rule 23.  Proof of the primary issues in this case will not vary from plaintiff to plaintiff; rather, liability will hinge on proof of a common policy and course of conduct that uniformly affected Plaintiffs' personal and academic protections and rights, as well as the rights of students campus-wide.  Moreover, the injunctive relief sought will redound to the benefit of all class members and cannot be assessed on an individual basis.

*Finally*, Defendant's efforts to sever each Plaintiff's claims into separate, individual lawsuits also fail, as its arguments in support largely mirror the arguments made in support of its motion to strike the class allegations.  The inappropriateness of this request is compounded by Defendant's fundamental mischaracterization of the allegations of the FAC, premised on the faulty assumption that Plaintiffs seek to litigate their respective sexual assaults.  Moreover, both the law and notions of fairness and judicial economy support allowing the Plaintiffs to jointly litigate their claims, all of which involve the exact same challenges to Brown's conduct, before this Court.

In sum, Defendant's Motion should be rejected in its entirety.

## SUMMARY OF THE FACTS

Campus sex and gender-based harassment and violence was and continues to be a widespread and serious issue at Brown, affecting primarily female students.  FAC ¶¶ 63-64.  Yet,

4

the sexual misconduct response program at Brown has been in a state of neglect and dysfunction for many years. *Id.* at ¶ 1. For example, in 2019, a Campus Climate Survey on Sexual Assault and Misconduct (available on Brown's own website) reported that 24.5% of undergraduate women had reported experiencing nonconsensual sexual contact since arriving at Brown, and 22.1% of students believed that sexual misconduct was "very or extremely problematic" on Brown's campus. *Id.* at ¶¶ 63-64. Despite knowledge of these statistics, along with numerous protests, speeches, and repeated requests from student activists to open a dialogue between students and administrators, Brown has failed to take any meaningful steps to address or prevent sexual misconduct on its campus through its Title IX policies and practices. *Id.* at ¶¶ 6-13. Instead, Brown has adopted a policy of discouraging or preventing the proper reporting of sexual assault and has generally ignored its obligations under federal law. *Id.* at ¶¶ 14-17.

As a recipient of federal funds, Brown is required to comply with the mandates of Title IX. *Id.* at ¶¶ 307, 317, 330. Those mandates, in broad terms, prevent students at Brown from being discriminated against on the basis of sex or gender in a manner that would deny them the benefits of any education program or activity. *Id.* at ¶ 4. Brown claims that its own applicable policies from the 2015-2016 academic year to the present, comply with Title IX. *See* Memo. at 15-18. Whether Brown's policies were sufficient under Title IX is an issue for trial, and improperly raised on a motion to dismiss. The facts pled certainly suggest that Brown's policies and enforcement of those policies were deficient. Brown also devotes several pages of it memorandum to the Title IX changes that took effect on August 14, 2020 (the "Final Rule"). *See id.* at 11-15. Prior to 2020, administrative regulations generally set out requirements under Title IX, but did not include specific requirements related to sexual harassment. Instead, the Office of Civil Rights ("OCR") issued new guidance to assist educational institutions with their understanding of

how the OCR interpreted the Department's Title IX regulations for sexual harassment.  The 2020 amendments added specific, legally binding steps that schools must take in response to notice of alleged sexual harassment.  *See* 85 Fed. Reg. at 30, 63.

That said, the 2020 Final Rule changes are immaterial to Plaintiffs' claims and whether Brown met its obligations to Plaintiffs.  Educational institutions, such as Brown, have always had certain responsibilities related to allegations of sexual misconduct, such as the obligation to provide support and resources to survivors, like Plaintiffs.  That obligation has not changed over time in the manner Brown suggests.[2]

Brown also enacted its own Title IX policy (the "Brown Title IX Policy"), a Sexual and Gender-based Misconduct Policy (the "Sexual Misconduct Policy"), and a Title IX Grievance Procedure Policy (the "Grievance Policy").  FAC ¶¶ 41-54.  The Brown Title IX Policy expressly claims to be in accordance with Title IX, and the Sexual Misconduct Policy is proffered by Brown as a complement to the Brown Title IX Policy.  *Id.* at ¶ 42.  The Sexual Misconduct Policy includes provisions addressing prohibited conduct that occurs off-campus, specifically requiring Brown to provide support and resources relating to violations even if the complainant and/or respondent are no longer students or affiliated with the school.  *Id.* at ¶¶ 44-45, 47.  Likewise, University faculty and staff are required to report knowledge of any prohibited conduct under the policies to the Brown Title IX office.  *Id.* at ¶¶ 43, 46.  If a violation is reported, Brown's Title IX office is required to take appropriate action.  *Id.* at ¶¶ 43, 47.  Retaliation of any kind against those who report sexual misconduct is prohibited.  *Id.* at ¶¶ 49, 331.

---

[2] Furthermore, as Brown notes, only Katiana and Jane are subject to the Final Rule revisions to Title IX.  Memo. at 18.  Whether there are material differences between the prior rules and the Final Rule cannot be determined on the pleadings.

The Grievance Policy dictates how complaints for violations of the Brown Title IX Policy and the Sexual Misconduct Policy can be made, provides for both formal complaints and an informal resolution process, and specifically grants Brown's Title IX office discretion to proceed with a Title IX complaint using the informal resolution process. *Id.* at ¶¶ 50-52. Whereas a formal complaint requires an investigation into the underlying sexual assault, a collection of evidence, a hearing, a finding by Brown's Title IX committee, and an appropriate discipline, the informal resolution does not. Plaintiffs allege that Brown's Title IX office put its own interests ahead of those of its students by improperly favoring its informal resolution process, under which "a full [Title IX] investigation of the allegation is not conducted" and the matter is considered closed once resolved." *Id.* at ¶ 52.

Each Plaintiff, while attending Brown, was subjected to sexual misconduct. *Id.* at ¶¶ 71, 109, 150-151, 185, 214-215. 243. Each Plaintiff also reported the misconduct and sought assistance from the Brown Title IX office in connection with their respective experiences. *Id.* at ¶¶ 73-74, 94, 116, 154, 193, 224, 246. Moreover, each Plaintiff was deprived of aspects of their right to an education as a result of the way Brown responded to their Title IX complaints. *Id.* at ¶¶ 103-107, 145-146, 182-183, 209-210, 238-239, 261-263.

Katiana was a Public Health and International and Public Affairs student at Brown University.[3] *Id.* at ¶ 70. She began her education at Brown in 2020. *Id.* In May 2021, Katiana was sexually assaulted at an off-campus party hosted by student members of Brown's rugby team. *Id.* at ¶ 71. After the assault, Katiana reached out to a Brown SHARE advocate, who connected her with Brown's Title IX Office. *Id.* at ¶ 73. During her meeting with the Interim Title IX

---

[3] Plaintiffs' counsel learned the day before the instant filing that Plaintiff Katiana may not return to Brown. Counsel will update Defendant and the Court regarding this issue.

Program Officer and the Title IX Program Officer, Katiana was discouraged from filing a formal complaint about her assault. *Id.* at ¶¶ 74-78. Katiana was informed that her assaulter would not be found responsible because of the perceived lack of evidence to support her claim. *Id.* at ¶ 75. Despite knowing Katiana was assaulted, the Title IX office failed to provide her with any resources to help her process the assault through mental health support and failed to help Katiana maintain academic good standing. *Id.* at ¶¶ 79-80. Instead, she was told to either make an informal report or report the assault anonymously through Brown's anonymous reporting system. *Id.* at ¶ 76. In the end, there was no equitable investigation into Katiana's May 2021 assault.

On June 12, 2021, Katiana was raped by another student at an unsanctioned frat house, a frat house that had previously been suspended but which Brown knew was operating informally off-campus and had been the subject of prior complaints of sexual misconduct. *Id.* at ¶ 87, 94. Brown again failed to conduct any investigation into Katiana's rape or provide her with any resources. *Id.* at ¶¶ 95-97. As a result of her experience with the Title IX Office, Katiana took a leave of absence and left Brown's campus on June 2021 and has not rematriculated. *Id.* at ¶¶ 105-107. Katiana returned to Brown's campus at the end of Summer 2021 in order to complete a police report for the June 2021 rape. *Id.* at ¶ 106.

Taja was in a sexually-abusive relationship with a male Brown student from 2017-2018 while she was a student at Brown. *Id.* at ¶ 109. After reporting the sexually abusive relationship to both their co-ed fraternity and the Dean at Brown, the Dean reported the sexually abusive relationship to the Title IX Office. *Id.* at ¶ 116. The Dean had to submit the report to the Title IX Office **twice** before Taja even received a ***response*** about her reported concern. *Id.* at ¶ 118. When she was finally able to meet with the Title IX Office, she too (like Katiana) was pressured into the informal process and agreed to participate in the program based upon Brown's misleading

representations. *Id.* at ¶¶ 121-129. Brown failed to honor various reasonable requests that Taja made concerning her rapist, including that he stay away from the fraternity and go to peer counseling. *Id.* at ¶¶ 129-130, 134. Brown also denied Taja's request to move off-campus, exposing her to further contact with her rapist and his friends. *Id.* at ¶ 131. As result of Taja's experience with Brown's Title IX Office, Taja feared leaving her dorm room and stopped being an active participant in extracurricular activities on campus. *Id.* at ¶ 146. She missed class and received a "No Credit" grade which disqualified her for the Political Science Honors Society and caused her to take a reduced course load for the Fall 2018 and Spring 2019 semesters, and further was provided no Title IX support. *Id.* at ¶¶ 136, 144-145.

Chloe was sexually assaulted by another Brown student on April 14, 2016 when she was a Cognitive Neuroscience student. *Id.* at ¶¶ 148-150. In May 2017, Chloe filed a formal complaint with the Title IX Office against her assaulter. *Id.* at ¶ 154. Her assaulter then filed a cross-complaint alleging that Chloe had assaulted him. *Id.* After Brown's investigation, Chloe's attacker was found responsible for non-consensual sexual touching, sanctioned with an 18-month suspension from Brown, and mandated to complete consent counseling. *Id.* at ¶ 155. Chloe was found not responsible in connection with the cross-complaint. *Id.* However, when Chloe's assaulter appealed his finding of responsibility for her assault, Brown allowed him to remain on campus and attend classes during the pendency of his appeal. *Id.* at ¶ 156.

During the pendency of the appeal process, Brown selected Chloe's assaulter as an "honorary" mid-graduation speaker for Brown. *Id.* at ¶ 157. Appalled, Chloe contacted the Title IX Office and the Associate Dean to request that he not be permitted to serve as the graduation speaker, given the finding of responsibility against him. *Id.* at ¶ 160. On November 30, 2017, Chloe was informed by the Dean of College at Brown that her attacker would still be the mid-year

graduation speaker.  *Id.* at ¶ 161.  Distraught, Chloe contacted a college newspaper to highlight Brown's decision to allow her attacker to be the speaker at Brown's graduation ceremony.  *Id.* at ¶ 163.  When the college newspaper published the article, Brown and Chloe received a litigation notice concerning the newspaper article from a lawyer representing Chloe's attacker.  *Id.* at ¶ 165. After receipt of the litigation notice, Brown never contacted Chloe to check on her well-being, to provide her with resources or support measures, or to find out why she had contacted the newspaper.  Chloe perceived there was a clear shift in the way Brown was treating her.  *Id.* at ¶¶ 166-167.  Chloe's attacker then filed a retaliation claim against Chloe.  *Id.* at ¶¶ 165-169.  Chloe's subsequent request to Brown to obtain a No Trespass Order against her attacker was denied by the Brown Department of Public Safety.  *Id.* at ¶ 171.  On August 6, 2018, Chloe was found responsible for the retaliation claim.  *Id.* at ¶ 178.  Brown also granted the appeal filed by Chloe's assaulter and overturned the original finding of responsibility against him.  *Id.* at ¶ 170.  As a result of her interactions with Brown, Chloe was traumatized, her mental health deteriorated, and her education suffered.  Chloe received two incomplete grades for classes she was enrolled in at the time.  *Id.* at ¶¶ 180, 182-183.

Emma was in an abusive relationship with another Brown student from October 2017 to May 2018, during which time she was an Applied Mathematics student at Brown.  *Id.* at ¶ 193. On November 14, 2018, Emma made a formal complaint to the Title IX Office concerning her abusive relationship.  *Id.* at ¶ 193.  In response to the formal complaint, the Title IX office issued a No Contact Order between Emma and her abuser.  *Id.* at ¶ 194.  Despite this, the Title IX Office made little effort to ensure that Emma did not run into her abuser at the Title IX office.  *Id.* at ¶ 195.  The Title IX office also, without her knowledge or consent, altered a personal note that she wrote to her abuser and had asked Brown to deliver to her attacker.  *Id.* at ¶ 196.  In a breach of

trust, the Title IX office also shared a confidential email exchange between Brown and Emma with Emma's abuser. *Id.* at ¶ 197. After this complete breach of trust, Emma requested that the program officer responsible for sending the email be removed from her case. *Id.* at ¶ 198. On April 19, 2019, the Title IX office informed Emma that her attacker had instructed them to ask whether she would consider proceeding with the informal resolution process instead of a formal complaint. *Id.* at ¶ 201. While hesitant, Emma provided the Title IX Office with a list of conditions she would require her abuser to agree to in order to proceed with the informal process, but the Title IX office never responded. *Id.* at ¶ 202. Instead, Emma's abuser filed his own formal complaint against Emma with the Title IX office, ***exactly one day before*** the hearing on Emma's formal complaint, which Emma was not told about until one day after the hearing took place. *Id.* at ¶ 203. On May 7, 2019, nearly six months after her complaint was filed, Emma learned that her abuser was found not responsible. *Id.* at ¶ 207. Moreover, instead of recognizing the strategic filing of the complaint as another form of manipulation against her, Brown found Emma responsible for the allegations made by Emma's abuser. *Id.* at ¶¶ 205-207. Emma was provided with no resources or support from Brown throughout her entire ordeal. *Id.* at ¶210. As a result of Emma's abysmal experience with Brown's Title IX office, Emma developed a paranoia of being on campus and experienced emotional instability, traumatic flashbacks, and contemplated suicide, all of which affected her ability to concentrate on her studies. *Id.* at ¶ 209.

Jane 1 is a current student at Brown. *Id.* at ¶ 211. From Fall 2020 to Spring 2021, Jane 1 was a student in the Applied Music Program ("AMP"). *Id.* As part of her coursework, Jane 1 had one-on-one Zoom sessions with a professor in the department. *Id.* at ¶ 212. The professor made sexually-suggestive and offensive comments to Jane 1 that left her feeling uncomfortable. *Id.* at ¶¶ 213-215. In November 2020, Jane 1 emailed the Director of Choral Activities (the "Director")

to report the professor's conduct.  *Id.* at ¶ 216.  The Director failed to respond to Jane 1's email until ***January 18, 2021***.  *Id.* at ¶ 217.  Jane 1's attempts to discuss the harassment with other faculty members of the AMP were also futile.  *Id.* at ¶¶ 221-222.  As a result of the professor's conduct, Jane 1 stopped appearing for a month of lessons in the Fall 2020 semester, yet received an "A" in the class from the offending professor, and was later assigned a new voice professor for the Spring 2021 semester.  *Id.* at ¶¶ 219-220, 223.  On March 30, 2021, Jane 1 reached out to the Title IX office to file a formal complaint, which she filed on April 2, 2021.  *Id.* at ¶¶ 224, 226.  Despite this filing, the Title IX Office failed to investigate the offending professor or take any action in response to  her formal complaint.  *Id.* at ¶¶ 227-230.  Jane 1 asked for an accommodation to not have to perform her final performance in front of the offending professor, which was permitted in April 2021, but she was informed by Brown that it was a "one time thing" and that she would have a hard time continuing in the program if they were to continue giving her that accommodation.  *Id.* at ¶¶ 232-235.  As a result of this experience, Jane 1 felt forced to withdraw from the program.  *Id.* at ¶ 238.

Jane 2 is currently pursuing a doctorate of philosophy degree at Brown.  *Id.* at ¶ 241.  In March 2019, Jane 2 was assaulted by another doctoral student at an off-campus party.  *Id.* at ¶ 243.  Soon after, Jane 2 learned that other students had similar experiences with this same doctoral student.  *Id.* at ¶ 244.  Given this pattern of concerning behavior, Jane 2 reported her assault to a department director at Brown, who disclosed he was a mandatory reporter.  *Id.* at ¶ 245.  The Title IX office also tried to coerce Jane 2 into the informal resolution process once it became aware of Jane 2's allegations.  *Id.* at ¶ 247.  After several communications with the Title IX office, Jane 2 was finally able to file a formal complaint with the Title IX office on September 18, 2019.  *Id.* at ¶ 248.  Throughout the investigation process, Jane 2 received instructions from the Title IX office

regarding the length and content of her statement with which she complied. *Id.* at ¶¶ 251-255. Her attacker was not given the same limitations. *Id.* at ¶ 256. Ultimately, the Title IX office found Jane 2's attacker not responsible. *Id.* at ¶ 260. As a result of Jane 2's experience with Brown Title IX Office, Jane 2 was traumatized, humiliated, and ultimately took a leave of absence for the Spring 2020 semester due to her trauma. Having received no support or guidance from Brown, she continues to limit her presence on Brown's campus, despite being a current graduate student.. *Id.* at ¶¶ 256, 261-264.

The experience of each of these six women is illustrative of the effect that Brown's failure to respond adequately or appropriately to complaints of sexual misconduct has had on campus, and evidences the existence of both a campus-wide hostile environment and a culture of silencing survivors. *Id.* at ¶¶ 2, 14, 16, 18, 67-68, 312. Plaintiffs and all members of the Class they seek to represent have been affected in the same or similar ways by Brown's failure to implement adequate procedures to detect, monitor, and correct this pattern and practice of discrimination and a sexually hostile environment. *Id.* at ¶ 279. Plaintiffs seek to remedy these wrongs, primarily through equitable and injunctive relief, in a manner that serves to better protect students and fosters a campus culture that does not tolerate sexual violence. *Id.* at ¶¶ 270-271, 280.

## I.    STANDARD FOR DISMISSAL

"For the purpose of a motion to dismiss, the material allegations of the complaint are taken as admitted. And, the complaint is to be liberally construed in favor of plaintiff." *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). A plaintiff must plead "more than a sheer possibility that a defendant has acted unlawfully." *Mayale-Eke v. Merrill Lynch*, 754 F. Supp. 2d 372, 381 (D.R.I. 2010). "[T]he question is not whether a plaintiff is likely to prevail, but whether . . . Plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 678-80. Although a plaintiff can survive a Rule 12(b)(6)

motion if "recovery is very remote and unlikely," the complaint's factual assertions "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555–56 (quotation marks omitted).  The well-pleaded allegations of the FAC satisfy this standard.

## II.     PLAINTIFFS' CLAIMS ARE TIMELY

### A.     ALL PLAINTIFFS' CLAIMS ARE TIMELY BEFORE THE COURT

The primary error in Brown's statute of limitations argument is that it ignores the ongoing misconduct that underlies Plaintiffs' pursuit of changes in policy and enforcement, among other declaratory or injunctive relief.  Plaintiffs expressly allege that, to date, Brown has ignored its students' attempts to push for reform.  FAC ¶¶ 6-12.  In response to numerous red flags raised by students, Brown only begrudgingly agreed to meet with ESV members in 2021, but the meeting resulted in no material changes to Brown's policies or conduct.  *Id.* at ¶¶ 13-14.  There is therefore no question that the SOL with respect to any claim for injunctive relief, tailored to remedy a continuing wrong, has not run.

With respect to each Plaintiff's individual experiences, although Title IX borrows the forum state's personal injury statute of limitations, accrual is determined according to federal law. *LeGoff v. Trustees of Bos. Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass. 1998) ("A cause of action under federal law normally begins to accrue when the plaintiff 'knows or has reason to know of the injury on which the action is based.'") (quoting *Rivera-Muriente v. Agosto-Alicea*, 959 F.2d 349, 353 (1st Cir. 1992)).  A plaintiff's awareness of injury encompasses two elements:  "(1) [t]he existence of the injury; and (2) causation, that is, the connection between the injury and the defendant's actions."  *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001) (internal quotations omitted); *see also Legoff*, 23 F.Supp.2d at 127.  "[W]hen accrual actually occurred in a particular case is a question of fact to be resolved by the fact-finder."  *Duke v. Community Health Connections, Inc.*, 355 F.Supp. 3d 49, 55-56 (D. Mass. 2019).

Defendant does not challenge the timeliness of the claims of Plaintiffs Katiana, Jane 1, or Jane 2, nor does it contend that any claims arising on or after August 6, 2018 are time-barred. Memo. at 19.  Rather, the crux of its statute of limitations arguments relate to Plaintiffs Taja, Chloe, and Emma, for whom Brown asserts all claims except Count VIII are barred by a three-year statute of limitations.  *Id.*  In doing so, Defendant inappropriately parses out the allegations of the FAC and ignores the substance of those allegations and the claims themselves.

Specifically, Brown incorrectly attempts to tie the running of the relevant statute of limitations to the date of each Plaintiff's incident of sexual assault/harassment.  Memo. at 19-23. This is improper and does not reflect the facts underlying Plaintiffs' actual claims.  The individual facts describing each Plaintiff's allegations of sexual misconduct are provided to give context to the claims Plaintiffs assert ***against Brown***—namely, each Plaintiff's claim ***concerning Brown's inadequate response*** to their reporting of those assaults.  To be clear, the FAC does not assert claims against Plaintiffs' assaulters; rather, the claims alleged relate to ***Brown's*** Title IX liability resulting from the institution's "own misconduct."  *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (holding universities violate Title IX "when they remain deliberately indifferent" to "known acts of . . . discrimination").  That the respective incidents of sexual misconduct of each Plaintiff may have occurred prior to August 6, 2018 is irrelevant, as all of the allegations concerning ***Brown's inadequate response*** to each Plaintiffs' reports of those assaults all culminated within the applicable limitations period.  Indeed, the injunctive relief that Plaintiffs seek focuses on ongoing conduct that continues to this day.  *See* Section III, *infra*.

Regarding Taja, the conduct at issue in the FAC is Brown's response to her report of a sexually abusive relationship.  Taja reported her first sexually abusive relationship to her fraternity

15

in September 2018 and to a Dean at Brown in October 2018. FAC ¶¶ 112, 116. The Dean then reported the sexually abusive relationship to the Title IX Office. *Id.* at ¶ 116. All of the actions taken by Brown in response to Taja's complaint occurred after August 6, 2018.[4] Similarly, in 2019, Taja again communicated with the Brown Title IX office "to request that her rapist be barred from entering her new dorm[,]" and was "pushed into an informal resolution process" by Brown's Title IX Office. *Id.* at ¶¶ 128, 134. Thereafter, Taja never received any response from Brown's Title IX Office to requests she made during the informal resolution process and was later subjected to further abuse from a romantic partner. *Id.* at ¶¶ 129-131, 136. Thus, all of Brown's conduct related to its response to Taja's report of abuse occurred within the statute of limitations period.

Regarding Chloe, Brown agrees that she may litigate Brown's "proceeding regarding the male student's retaliation complaint" against her (Memo. at 22), but this retaliation finding on August 6, 2018 is a key part of the exact issue before the Court. Contrary to Defendant's assertions, Chloe is not alleging a claim against Brown for either the April 16, 2016 sexual assault or Brown's December 19, 2017 determination that her assaulter was responsible. These underlying facts simply provide the factual predicate for Chloe's claims against Brown arising from its conduct in connection with the retaliation claim and are relevant to her claims of a hostile educational environment. The entirety of Defendant's actions, including inviting Chloe's assaulter to speak at the mid-year graduation ceremony after he was found responsible for sexual assaulting Chloe (FAC ¶ 157), the change in Brown's treatment of Chloe after it received a litigation hold notice from counsel representing her assaulter (*id.* at ¶ 166), and "the failure to provide Chloe with any resources or support measures, leaving [her] no choice but to go outside the University for

---

[4] Defendant's argument that Plaintiffs purposely do not specify an exact date for Taja's assault (Memo. at 20-21), wholly misses the point. As discussed herein, the date of the actual assault is substantively irrelevant to the claims asserted against Brown.

guidance and support [and retain] SurvJustice, a legal organization that provides services to survivors of sexual violence" (*Id.* at ¶ 168), are relevant to the creation of a hostile environment which arose from Brown's conduct.[5]  Therefore, Chloe's claims are timely.

Finally, Plaintiff Emma made a verbal complaint to Brown University's Title IX Office on November 14, 2018 concerning a sexually abusive relationship.  *Id.* at ¶ 193.  The FAC does not allege that Brown is liable for the abuse itself; rather, Emma's claims arise from Brown's ***response to*** her complaint, including putting Emma in the position of seeing her abuser at the Title IX office, altering a message she wrote to her abuser, and sharing her confidential information.  *Id.* at ¶¶ 195-197.  All of ***Brown's conduct*** giving rise to Emma's claims took place after August 6, 2018 and, therefore, her claims are timely.

Thus, Brown's statute of limitations argument is without merit and should be rejected.  *LaChapelle v. Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998) (when a defendant raises a statute of limitations defense in its motion to dismiss, dismissal is not appropriate unless "the pleader's allegations leave no doubt that an asserted claim is time-barred.").

## B.    THE CONTINUING VIOLATION DOCTRINE FURTHER TOLLS THE STATUTE OF LIMITATIONS

Defendant argues that the continuing violation doctrine does not apply (Memo. at 20), but that is wrong.  As the Supreme Court has made clear, when there is a hostile environment, as alleged here, an unlawful practice "cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act … may not be actionable on its own."  *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002).  Thus, "[i]t does not

---

[5] Brown does not assert that only the ultimate August 6, 2018 decision is properly brought before this Court.  Rather, Brown agrees that Chloe may timely bring the entire retaliation complaint proceeding, which took place between December 4, 2017 and August 15, 2018.  Memo. at 22.

matter, for purposes of the statute [of limitations], that some of the component acts … fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered . . . ."  *Id.* at 117; *see Maldonado-Cátala v. Municipality of Naranjito*, 876 F.3d 1, 9 (1st Cir. 2017) (the continuing violation doctrine allows a hostile environment claim "to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought.") (quoting *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008)).  Indeed, this Court has already held (in another case against Brown) that the continuing violation doctrine applies in cases alleging Title IX claims.  *See Doe v. Brown Univ.*, 327 F. Supp. 3d 397, 409 (D.R.I. 2018) (the "Court believes that the facts, as pleaded, tell the tale of a singular ongoing and evolving interaction between [Plaintiff] and Brown, motivated by discriminatory animus, which gives rise to certain of his claims");[6] *see also Dibbern v. Univ. of Michigan*, No. 12-15632, 2013 WL 6068808, at *8 (E.D. Mich. Nov. 18, 2013) ("in determining whether Plaintiff has plead a plausible Title IX hostile environment claim, the continued deliberate indifference of the University within the limitations period permits this Court to consider events that, although they took place outside the limitations period, are helpful in establishing liability.").

For the continuing violation doctrine to apply, a plaintiff must allege that:  (1) there is "anchoring conduct" within the statute of limitations period; and (2) that the time-barred and non-

---

[6] *Doe v. Brown* does not dictate that the continuing violation doctrine can never apply to a claim for erroneous outcome, as Brown incorrectly contends.  Memo at 20, n.9.  The court in *Brown* simply held that it did not apply given the facts of that particular individual case.  *See Doe*, 327 F.Supp.3d at 410.  Here, Plaintiffs' erroneous outcome claim arises from an ongoing pattern of procedural irregularities in decision-making that continues unabated to this day.  *See* discussion at Section IV(B), *infra*.  The cases cited in that same footnote 9 also do not stand for the proposition that the continuing violation doctrine cannot apply to a RICRA claim when that claim hinges on allegations of an ongoing pattern of discrimination and not on a single incident.

time-barred conduct are related.  *See generally Perez v. Town of N. Providence*, 256 F. Supp. 3d 139, 150 (D.R.I. 2017) (JJM) (holding that "[i]n order for the continuing violation doctrine to apply, the time-barred acts must relate to the anchoring conduct ....") (citing *Ayala v. Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015).  The FAC satisfies each of these requirements.

First, as set forth in Section IV, the FAC sufficiently pleads a Title IX hostile environment claim for Taja, Chloe, and Emma.  Second, to the extent time-barred acts are alleged for each of these Plaintiffs, they all are anchored by, and relate to, acts that fall within the statute of limitations period.  For example, with respect to Chloe, the FAC describes conduct that took place as far back as November 2017, including that, after her assaulter had been (1) found responsible for non-consensual sexual touching, (2) sanctioned with an 18-month suspension from Brown, and (3) mandated to complete consent counseling, he was nonetheless selected to be the mid-year graduation speaker for Brown because the Associate Dean had not been made aware of the responsibility finding, contrary to Brown's Title IX Grievance Procedure requiring that appropriate campus officials be notified of the outcome and determination of any formal complaint where there is a finding of responsibility, and Brown refused to reverse the decision.  FAC ¶¶ 155-162.  As a result of Brown's decision, Chloe contacted the college newspaper, which resulted in publication of a story that, among other things, culminated in a retaliation claim being filed against Chloe by her assaulter, which was not fully adjudicated and closed until August 15, 2018, at which point Chloe felt completely hopeless in the pursuit of an appeal as a result of Brown's actions.  FAC ¶¶ 163-180.  All of these facts were inextricably intertwined with and anchored in the determination of the retaliation claim in August 2018.

With respect to Taja, the FAC alleges facts beginning in 2017, when Taja was in a sexually abusive relationship with another male Brown student.  *Id.* at ¶¶ 109-111.  The "anchoring event"

19

relevant to Plaintiffs' claims against Brown begins at earliest in September 2018, but more appropriately in October 2018, when Taja disclosed the sexually abusive relationship and that she had been raped to a Dean at Brown who subsequently reported those allegations to Brown's Title IX Office. *Id.* at ¶¶ 112-116. Regardless of which date is used, both fall within the applicable statutory period. From there forward, Taja's contacts with Brown's Title IX Office continued through at least July 2020, which contacts form the basis of Plaintiffs' allegations against Brown. *Id.* at ¶¶ 117-142. The historical details of Taja's sexually abusive relationship with another Brown student provide the basis for Taja's interactions with Brown's Title IX Office, and are inextricably intertwined with and anchored in Brown's conduct in response to her complaint through at least July 2020.

Likewise, with respect to Emma, the FAC alleges facts that reach back to October of 2017, the commencement of Emma's abusive relationship with a Brown student in his junior year. *Id.* at ¶¶ 185-192. That prior conduct is directly related to the "anchoring conduct" relevant to Plaintiffs' allegations against Brown, which commenced with Emma's verbal complaint to Brown's Title IX Office on November 14, 2018, a date well within the statutory period. *Id.* at ¶ 193. Thereafter, Emma continued to have relevant interactions with Brown's Title IX Office through late Fall of 2019, including the September 10, 2019 responsibility determination by Brown's Title IX Committee against Emma (stemming from further harassing and retaliatory conduct by Emma's abuser). *Id.* at ¶¶ 193-210. Thus, as with Taja and Chloe, all of Emma's allegations concerning the time period from October 2017 through November 13, 2018, are inextricably intertwined with and anchored in her experience with Brown's Title IX Office through September 2019.

Thus, Taja, Chloe, and Emma have each alleged facts from which it can reasonably be inferred that Brown's violation of Title IX was continuing for purposes of the relevant statutory period.  Plaintiffs' claims are therefore timely.

### C.  IN THE ALTERNATIVE, PLAINTIFFS' CLAIMS DID NOT ACCRUE UNTIL JUNE 2020

In the alternative, even if this Court were to find that claims asserted by Plaintiffs Taja, Chloe, and Emma are not tolled or anchored to conduct within the statutory period, this Court may still find that such claims are timely as they did not accrue until June 2020 when the VOB Instagram made each Plaintiff collectively aware of the university-wide, systemic issues with Brown's Title IX policy and procedures, which no single Plaintiff alone would have discerned from each Plaintiff's independent experience with Brown's Title IX Office.  A pre-assault Title IX claim based on a policy of indifference to sexual misconduct accrues when a plaintiff knows or has reason to know of the policy deficiencies that led to a heightened risk for sexual misconduct. *Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 663-64 (W.D. Tex. 2017).  In *Baylor University*, the plaintiffs alleged a pre-assault claim under Title IX based on the university's underreporting of sexual misconduct on campus, failure to adequately investigate complaints of sexual misconduct, and failing to inform survivors of their rights under Title IX.  240 F. Supp. 3d at 662.  The plaintiffs also alleged that they were unaware of these actions taken by Baylor until the spring of 2016, when a media report exposed Baylor's school-wide failures with respect to addressing sexual misconduct on campus.  *Id.* at 663.  Applying the federal rule of accrual, the Court held that the plaintiffs' pre-assault Title IX claims did not accrue until the spring of 2016 because they did not have "a reason to further look into whether Baylor had a policy of intentionally discriminating against women who reported sexual assault" until the media report was published.  *Id.*

Like in *Baylor University*, Plaintiffs here had no reason to investigate whether Brown had a policy of discrimination against women who reported sexual misconduct at any time prior to or even immediately following their respective assaults. Just as the plaintiffs in *Baylor University* could not have reasonably known about Baylor's school-wide misconduct until it was reported publicly in the media, Plaintiffs could not have reasonably known of Brown's school-wide systemic indifference to sexual misconduct until the VOB movement publicly brought these issues to light.

Specifically, the FAC alleges that in June 2020 the VOB Instagram account was created, allowing "sexual assault survivors at Brown to discuss anonymously instances of sexual assault on campus and their experiences in reporting those assaults to Brown." FAC ¶ 7. "VOB quickly amassed strong student support and a large online presence [and] the account was followed by ***over half of the student population*** at Brown." *Id.* (emphasis added). "For the ***first time***, Brown students were made aware of Brown's systemic failures on campus in preventing sexual violence and responding to Title IX complaints." *Id.* (emphasis added). Likewise, the FAC alleges that, in February 2021, "in the wake of over 100 survivor reports to VOB, and silence from Brown, the Instagram account End Sexual Violence at Brown ("ESV") was created." *Id.* at ¶ 8. "In April 2021, ESV posted an open letter on Instagram denouncing the Brown administration and recounting a decades-long history of institutional survivor-silencing and suppression of student activism." *Id.* at ¶ 9. The letter went viral, garnering attention both online and by the media." *Id.* "ESV also organized an in-person . . . protest on April 7, 2021," and "on April 15, 2021, ESV published demands for Brown's administration through an organized email campaign; hundreds of Brown students emailed Brown with demands for reform." *Id.* at ¶¶ 11-12. It was only after this public outcry that Brown's widespread failures become known.

22

Indeed, to the extent Brown argues that Plaintiffs had reason to know of their claims when they experienced their respective individual sexual assaults, that argument is misplaced. The crux of a pre-assault Title IX claim is the discriminatory action taken by an institution that creates a heightened risk for sexual misconduct to occur. Thus, even though Plaintiffs each unquestionably knew of their own respective individual assaults, they did not know, nor reasonably could have known until the VOB movement in June 2020, that Brown maintained a systemic, school-wide policy of indifference which created a heightened risk for other sexual misconduct to occur. *See Stanley v. Trs. Of the Cal. State Univ.,* 433 F.3d 1129, 1136 (9th Cir. 2006) (acknowledging that with respect to accrual of a Title IX claim, "[t]he proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful") (internal quotations omitted).

## III.    PLAINTIFFS SEEK INJUNCTIVE RELIEF AND HAVE STANDING TO DO SO

According to a survey available on Brown's own website, in 2019, 24.5% percent of undergraduate women reported experiencing nonconsensual sexual contact since arrive at Brown. *Id.* at ¶ 63. That is almost one-quarter of all women on campus. In light of this statistic and their own experiences with the Title IX office, Plaintiffs are pursuing "remedies to eliminate the adverse effects of such discrimination in their own lives and working conditions, and the working conditions of the Class members, and to prevent continue sex/gender discrimination." *Id.* at ¶ 270. Plaintiffs specifically allege that their injuries are "redressable through systemic relief, such as equitable and injunctive relief. *Id.* at ¶ 271. Plaintiffs detail the nature of the relief they seek including the implementation of policies and programs to remedy the specific wrongs about which they complain. *Id.* at ¶ 280. Brown's only argument regarding the underlying substance of Plaintiffs' pursuit of injunctive relief is that the injunctive relief sought would "accomplish nothing other than what the law already requires." Memo. at 77. This argument is curious as Plaintiffs'

primary complaint is that Brown's policies and enforcement do not in fact comply with Title IX and Plaintiffs seek institutional change to ensure that they do. Brown cites no case for its proposition that the Court does not have the authority to issue an injunction requiring Brown to remedy its ongoing violations of Title IX. FAC ¶¶ 305, 315, 322, 328, 336.

Defendant challenges Plaintiffs' standing to seek injunctive relief. Brown does not challenge the standing of Plaintiffs Katiana, Jane 1, and Jane 2, as all three were current students enrolled at Brown at the time the FAC was filed. *Id.* at ¶¶ 70, 211, 241. A request for injunctive relief can proceed past the pleading stage "so long as just one of the plaintiffs has standing to bring such a claim[.]" *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016). Likewise, in a class action, standing is satisfied if at least one named plaintiff meets the requirements. *See, e.g.*, *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 865 (9th Cir. 2014). Because there is no dispute that at least three Plaintiffs have standing as current Brown students (which Brown concedes), Defendant's argument fails.

Defendant also asserts that Plaintiffs Chloe, Taja, and Emma do not have standing to seek injunctive or declaratory relief or to serve as a class representative because each has already graduated from Brown. Memo. at 23-25. Defendant is incorrect in several respects. First, the fact that Taja, Emma, and Chloe are no longer students at Brown does not preclude their claims for declaratory and injunctive relief. All three Plaintiffs still have standing because this case alleges a prime example of a wrong that is "capable of repetition, yet evading review." Courts in comparable circumstances have permitted cases like this to proceed where a wrong can continue to the detriment of other similarly-situated students. *See, e.g., Jones v. Ill. Dep't. of Rehab. Servs.*, 689 F.2d 724, 727-28 (7th Cir. 1982) (denying motion to dismiss where allegations of failure to provide interpreters in violation of Rehabilitation Act by a deaf student was deemed capable of

24

repetition by the school, such that other deaf students could be affected by the same misconduct); *K. v. Chi. Bd. of Educ.*, 551 F. Supp. 1107, 1112-13 (N.D. Ill. 1982) (certifying a class of handicapped children where the challenged issue would "linger" to the detriment of future members of class).[7]

Under Defendant's theory, any plaintiff would have to (i) experience an underlying assault or harassment, (ii) complain to the Title IX office, (iii) wait for a response from the Title IX office, (iv) engage and participate in an investigation of the complaint, (v) wait for an adjudication of the complaint, and, if applicable, (vi) file and wait for an adjudication of an appeal—all within a less than 4-year period between matriculation and graduation.  Each of these processes standing alone can be time-consuming.  In other words, accepting Defendant's argument would result in Brown being able to evade liability for pervasive Title IX violations simply due to the passage of time.  Moreover, such a rubric would yield the absurd result of incentivizing a university to inappropriately drag out the Title IX process in order to evade liability.  This is not the intent and purpose of Title IX.

Third, Defendant argues that Taja, Chloe, and Emma have not alleged that they wish to return to Brown and, therefore, the declaratory relief sought could not possibly redound to their benefit.  Wrong.  There is at least "a reasonable probability" that each of these women could be in the same position in the future.  *See, e.g., Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)

---

[7] In *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), relied upon by Brown, the Court refused to accept the plaintiff's argument that he would likely, in the future, be stopped for a traffic hold and subjected to a chokehold without provocation.  Memo. at 24.  The Court held that plaintiff's claims were too speculative and hypothetical, especially as plaintiff-therein had not alleged any pattern of misconduct or ongoing relationship—facts which are in stark contrast to the allegations of Plaintiffs' FAC here, which clearly alleges a pattern and ongoing nature of harmful conduct.  Moreover, *Lyons* is distinguishable from class cases, as is pled here, where a class member is likely to be subjected to the alleged wrongdoing in the future.  *See, e.g.*, *Flores v. City of New York*, 19CV5763KAMRLM, 2021 WL 663977, at *3 (E.D.N.Y. Feb. 19. 2021).

(requiring "reasonable expectation" or "demonstrated probability" the plaintiff could be in the same position in the future).  Here, these three Plaintiffs, and those similarly situated, may continue to have ongoing contacts with the school that are materially similar to those of current students, thereby placing graduates (or those who left Brown as a result of their experiences with the Title IX office) in the same shoes (for purposes of this action) as those students currently enrolled.  For example, since filing this action, Taja, through counsel, has been in contact with the Title IX office to inquire about whether her alleged assaulter is planning to attend her graduation ceremony, which was delayed due to COVID-19.  *See* FAC ¶ 140.[8]

The same issue arises with alumni who often return or wish to return to the school's premises, whether to pursue graduate studies or attend alumni events, but are forced to choose whether to forego those continued studies or important networking events or other ties to the school community because of their fear of further harm.  Moreover, graduates of Brown also have standing insofar as they have a direct reputational and economic interest in their alma mater.  Indeed, the value of a degree from Brown, or any academic institution, is in part dependent upon the reputation of the institution.  *See United States v. Frost*, 125 F.3d 346, 367 (6th Cir. 1997) (noting that damage to a university's reputation decreases value of degree in general).  Importantly, actual reputational harm or the fear of a risk of monetary or reputational harm (which can cause future emotional and/or psychological harm) is sufficient to establish standing.  *TransUnion LLC v. Ramirez*, __ U.S. __, 141 S. Ct. 2190, 2197-98 (2021).

---

[8] *De Leon v. New York Univ.*, No 21 Civ 05005 (CM), 2022 WL 179812 (S.D.N.Y. Jan. 20 2022), involved New York University's response to COVID-19.  Specifically, a class of students sought a tuition reimbursement given the change to remote learning.  *Id*. at *1-2.   Under the unique circumstance involving a pandemic, the court found that there was no possibility that the graduate would be in the same position in the future.  *Id*.  There were no allegations of a continuing pattern in that case, and no possibility of repetition of the alleged misconduct.

Here, Chloe, Emma, and Taja all have Brown degrees as a part of their academic credentialing necessary to their future professional prospects and reputation, and all Plaintiffs further derive significant benefits from their ongoing association with Brown and the Brown community. Accordingly, Brown's reputation as an academic institution is directly tied to Chloe, Emma, and Taja's professional reputation and economic outcome. Brown's failure to adequately address sexual misconduct on campus has already led to widely publicized media coverage of these failures. These inherently factual issues can be explored in class and merits discovery and are inappropriate for resolution on a motion to dismiss. *See Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 60 (D.R.I. 2020) (". . .  this contention involves factual issues that must be resolved at summary judgment or trial."). For the foregoing reasons, Defendant's challenges to the standing of Plaintiffs' Chloe, Emma, and Taja should be rejected.

## IV.   PLAINTIFFS HAVE PROPERLY PLED EACH OF THEIR INDIVIDUAL CLAIMS

### A.    COUNTS I-III:  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED TITLE IX CLAIMS

#### 1.    Plaintiffs' Post-Assault Title IX Claims Are Sufficiently Pled

Post-assault claims, like the one in *Davis*, focus on how a recipient of federal funds responded after it received actual notice of a plaintiff's sexual harassment. Courts consistently have applied *Davis*'s three-part framework to post-assault claims. *See, e.g., Shank v. Carleton Coll.*, 993 F.3d 567, 573-76 (8th Cir. 2021) (applying *Davis*'s three-part framework to a post-assault claim); *Fitzgerald v. Barnstable Sch. Comm.*, 504 F.3d 165, 171-73 (1st Cir. 2007) (same), *rev'd on other grounds*, 555 U.S. 246 (2009); *Farmer*, Case No. 16-CV-2256-JAR-GEB, 2017 WL 3674964, at *4 (D. Kan. Aug. 24, 2017) (same), *aff'd*, 918 F.3d 1094 (10th Cir. 2019); *see Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 658-659 (W.D. Tex. 2017) (referring to plaintiffs' post-assault claims as "post-reporting" claims that use *Davis*'s "traditional" framework).

27

Under this framework, a plaintiff must allege actual knowledge by the federal funding recipient of sexual misconduct "that is so severe, pervasive, and objectively offensive that it effectively bars the [plaintiff]'s access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Moreover, a plaintiff must allege that the funding recipient responded to this knowledge with deliberate indifference. *Id.* Deliberate indifference in post-assault claims asks whether the school's "response to harassment or lack thereof is clearly unreasonable in light of the known circumstances" and applies to cases "where a school has ignored a victim's complaint of sexual harassment or assault." *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 190-91 (D.R.I. 2016) (citing *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009)) (quoting *Patterson v. Hudson Area Schs.*, 551 F.3d 438, 446 (6th Cir. 2009)). Deliberate indifference may be shown by a clearly unreasonable response or lack of response by the school. *I.L. v. Houston Indep. Sch. Dist.*, 776 F. App'x 839, 842 (5th Cir. 2019).

Furthermore, a "minimalist response," such as "merely investigating and absolutely nothing more[,] … is not within the contemplation of a reasonable response." *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000). Nor may a school hide behind limited, ineffective actions to suggest it is not deliberately indifferent. *See Leader v. Harvard Univ. Bd. of Overseers*, CV 16-10254-DJC, 2017 WL 1064160, at *4 (D. Mass. Mar. 17, 2017) ("[Our] precedent does not appear to suggest that as long as a university acts in some way in response to reported sexual harassment, it has satisfied its burden under the deliberate indifference standard."); *Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195, 210 (D.N.H. 2009) (holding that some aspects of a response could be "so lax, so misdirected, or so poorly executed" as to amount to deliberate indifference). A recipient can also be found to have acted with deliberate indifference

by failing to provide reasonable accommodations after a report of severe sexual harassment. *Kelly*, 2003 WL 1563424, at *3-4.

The Tenth Circuit's decision in *Farmer* is also instructive. 918 F.3d 1094. On interlocutory appeal after the district court's denial of defendant-university's motion to dismiss, the Tenth Circuit, relying in large part on *Davis*, held that a plaintiff only needs to allege that the university's deliberate indifference to reports of sexual misconduct made plaintiff "'vulnerable to' [future] sexual harassment" by allowing their student-assailants—unchecked and without the school investigating—to continue attending [the university] along with [p]laintiffs." *Id.* at 1102-1104 (collecting cases). As explained in *Farmer*, plaintiff therein pled allegations specific enough to support the conclusion that they were "vulnerable to" sexual misconduct in violation of Title IX as the plaintiffs had alleged that the "fear of running into their student-rapists caused them, among other things, to struggle in school, lose a scholarship, withdraw from activities [the university] offers its students, and avoid going anywhere on campus without being accompanied by friends or sorority sisters." *Id.* at 1105 (citing *Hernandez v. Baylor Univ.*, 274 F.Supp.3d 602, 613 (W.D. Tex. 2017)). The sexual misconduct alleged in *Farmer* is similar to the allegations of the FAC, as similarly here, Plaintiff Katiana was raped off-campus. *Id.* at 1099-1100; FAC at ¶ 85.[9]

Here, Defendant's arguments illustrate a fundamental misunderstanding of the deliberate indifference analysis, as well as the allegations in the FAC. Memo. at 32-33. The FAC contains detailed allegations regarding Brown's unreasonable responses to Plaintiffs' reports of harassment

---

[9] The case Defendant points to suggesting pre-assault claims have been recognized in "markedly different circumstances" than those here, *Simpson v. University of Colorado at Bounder*, 500 F.3d 1170 (10th Cir. 2007), involved an action appealed to the Tenth Circuit following a dismissal **on summary judgment**. Memo. at 26-27. So, indeed, *Simpson* was a markedly different case as it was decided on a full factual record in the context of a motion for summary judgment; unlike this case which is still at the pleadings stage.

and assault. *Id.* at ¶¶ 75-81, 102, 117-121, 128-131, 160, 195-197, 217. The FAC goes on to specify how their experiences led Plaintiffs to, among other things, miss a multitude of classes, fail courses, and even unenroll from educational programs. *See, e.g., id.* at ¶¶ 103-107, 145-146, 182-183, 209-210, 238-239, 261-263. Plaintiffs have also sufficiently alleged Brown's failure to remedy the hostile educational environment experienced by Plaintiffs by failing to offer appropriate interim measures and accommodations that could have provided equal access to educational opportunities and benefits and failing to remedy known sexually hostile environments. *Id.* at ¶¶ 80, 114-117, 131-136, 168, 225-240. These facts are sufficient to plead a claim for a post-assault Title IX violation. Plaintiffs do not contend that Brown's failure to take any specific remedial, disciplinary, or investigatory action alone constitutes deliberate indifference. Rather, Plaintiffs maintain that Brown's collective failures in responding to each of their reports of sexual assault were clearly unreasonable in light of the circumstances and denied them access to their education.

Moreover, each Plaintiff has specific factual averments supporting their claims:

- Taja alleges that Brown failed to honor various reasonable requests Taja made concerning her rapist, repeatedly denied her reasonable requests to move off-campus, exposing her to future harm and traumatization, and resulted in her falling into a second abusive relationship because she feared leaving her door room. *Id.* at ¶¶ 129-130, 134, 146. Taja's concerns about further encounters with her rapist prevented her from accessing her education and were a direct result of Brown's conduct. *Id.* at ¶¶ 145-146.

- Emma alleges that despite Brown's Title IX Office's knowledge of her No-Contact Order against her assailant, the office scheduled a meeting with Emma when her

abuser was also physically present at that office, altered her personal note to her assailant and delivered that note to him without informing her of those changes, shared a confidential email exchange between Emma and the office with her abuser, did not respond to a list of conditions for her abuser if she were to continue in the informal process, which she provided upon the office's request, failed to time inform her that her abuser filed a cross-complaint against her (material information that she did not have knowledge of during her own complaint hearing), and failed to recognize the strategic use of that cross-complaint as an extension of the manipulation and abuse of her abuser, that the Title IX Office failed to provide her with resources and support, and as a result of the foregoing, she has developed a paranoia of being on campus and experienced emotional instability, traumatic flashbacks, and thoughts of self-harm and suicide, all of which affected her ability to concentrate on her studies. *Id.* at ¶¶ 195-197, 201-204, 206-207, 209-210.

- Jane 2 alleges that Brown's Title IX office tried to coerce her into using the informal resolution process, placed restrictions on the content and length of her formal complaint that were not similarly imposed on her abuser, was further traumatized upon receipt of her abuser's statement which was permitted to be lengthier and did not have the same limitations as imposed on her which allowed him to attack her character and sexual history, when she complained about same the office informed her that it could not limit the content of her abuser's statement, and her abuser's statement was subsequently relied upon by the Title IX committee in its ultimate determination that the abuser was not responsible. *Id.* at ¶¶ 247, 251-255, 256-257, 259-260.

31

- Katiana's allegations, discussed in in Section IV(A)(2)(d), *infra*, are sufficient to state a post-assault Title IX claim.  Even if no formal complaint is filed, schools are still required to comply with various mandatory response obligations, which include offering and informing the survivor of supportive measures and following the appropriate grievance process prior to imposing discipline against a respondent. Katiana alleges Brown failed in this regard.  *Id.* at ¶¶ 83, 96, 99, 103, 104.

- Choe's allegations concerning her post-assault claims are sufficient and not time-barred for the reasons set forth in Section II, *supra*.

- Jane 1's allegations concerning her post-assault claims are also sufficient for the reasons discussed in Section IV(A)(2)(e), *infra*.

Moreover, at the motion to dismiss stage, "the Court need not, and should not, separately assess each of the alleged actions or failures to act identified in [Plaintiffs'] complaint to determine whether each discrete episode might, standing alone, support a claim of deliberate indifference to student-on-student harassment."  *Cavalier v. Catholic Univ. of Am.,* 306 F. Supp. 3d 9, 27 (D.D.C. 2018); *see also Takla v. Regents of the Univ. of California*, No. 215CV04418CASSHX, 2015 WL 6755190, at *6 (C.D. Cal. Nov. 2, 2015) ("The [complaint] contains a number of allegations that, taken together, makes a plausible claim that [the school's] response to [the student's] report of sexual harassment was deficient and not reasonably expected to remedy the violation" even though "taken individually, may not constitute deliberate indifference.").  At this stage, the Court's responsibility "is limited to deciding whether the complaint contains any factual allegations

sufficient to support 'the reasonable inference that the [University] is liable for the misconduct alleged.'" *Cavalier*, 306 F. Supp. 3d at 27 (quoting *Iqbal*, 556 U.S. at 678).[10]

### 2.   Plaintiffs Have Sufficiently Pleaded Pre-Assault Title IX Claims

#### (a)   Pre-Assault Claims Have Been Recognized By The Ninth Circuit, Tenth Circuit, and District Courts of Various Circuits

Since the U.S. Supreme Court's decision in *Davis Next Friend LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629, 640 (1999), which established that a university's deliberate indifference to known misconduct violates Title IX, Courts have recognized "pre-assault" claims as a separate theory of liability under Title IX. *Id.* at 643; *see, e.g.*, *Karasek v. Regents of Univ. of Cal.*, 500 F. Supp. 3d 967, 970 (N.D. Cal. 2020) (explaining that a "post-assault claim" is premised on "a school's response to a [plaintiff's] complaint of sexual misconduct" after the assault); *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1099 (9th Cir. 2020) (explaining that a "pre-assault claim" "relies on events that occurred before [the plaintiffs'] assaults"). While the First Circuit has not had the opportunity to address a "pre-assault" or "heightened risk" Title IX claim or the "official policy" theory of liability, these claims have been recognized in the Ninth and Tenth Circuits, as well as in various district courts, including within the First Circuit.[11]

---

[10] *Brown University*, 184 F.3d 20, relied upon by Defendant (*see* Memo. at 33), was decided after trial on a full evidentiary record, and hinged on specific facts in that record. *Id.* at 27-28. Further, the court's dismissal was primarily premised on the fact that the plaintiff's continuing harassment theory was not properly before the court. *Id.* Notably, the First Circuit deemed Brown's response to a professor's harassment of students to be "remarkably inept." *Id.* at 28. *Fitzgerald v. Barnstable Sch. Comm.*, also relied upon by Brown (*see* Memo. at 32) was decided on summary judgment and hinged on a detailed assessment of the fact adduced in discovery with respect to the school's response *Id.* at 168-70. Defendant's attempt to have the Court determine at the pleading stage that Brown's responses were reasonable is improper.

[11] *See Karasek*, 956 F.3d at 1099; *Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019); *Posso v. Niagara Univ.*, 518 F. Supp. 688, 703 (W.D.N.Y. 2021) (allowing pre-and post-assault claims of deliberate indifference under Title IX to proceed); *Doe v. Baylor Univ.*, 240 F. Supp. 3d

For example, in *Karasek*, the Ninth Circuit concluded that "*Gebser* [*v. Lago Vista Independent School District*, 524 U.S. 274 (1998)] and *Davis*[ ] support[ ] imposing Title IX liability when a school's *official policy* is one of deliberate indifference to sexual harassment in any context subject to the school's control." *Karasek*, 956 F.3d at 1113 (emphasis added). The Ninth Circuit further held that institutional liability need not be limited to knowledge of risk within a specific context by a particular group of persons, like an athletic team, but could apply "in any context subject to the school's control." *Id*. The Court would "not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus." *Id*.[12]

Here, the facts pled in the FAC are similar to *Karasek*, where the Ninth Circuit vacated the district court's dismissal of the pre-assault claim. *See Karasek*, 956 F.3d at 1111-14. Like *Karasek*, the Annual Outcome Reports produced by Brown's Title IX Office found that only a fraction of the sexual misconduct incidents reported to the Title IX Office resulted in a formal complaint. *Compare e.g.* FAC at ¶ 66 (comparing number of reported incidents to Brown's Title IX Office with minimal number of formal complaints actually filed) *with Karasek*, 956 F.3d at 1113 (over a five-year period, the university resolved 76 percent of Title IX complaints using the early resolution process). Brown also failed to adequately inform its students of what to expect as

---

646 (W.D. Tex. 2017); *Tubbs v. Stony Brook Univ.*, 15 CIV. 0517 (NSR), 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016); *see also Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (holding that a "funding recipient can be said to have 'intentionally acted in clear violation of Title IX,' . . . when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.").

[12] Indeed, even the United States, in a Statement of Interest filed in an effort to explain the legal standards governing peer sexual harassment and retaliation claims under Title IX, recognized pre-assault and post-assault theories. *Thomas v. Bd. of Regents of the Uni. of Neb.*, Case No. 4:20-cv-03081, Doc. 47 (D. Neb. June 11, 2021).

they underwent the Title IX investigation process. *Compare* FAC at ¶¶ 15-16 ("Reports to the University's Title IX Office were useless because Brown employees . . . discouraged or even overtly prevented the proper reporting of sexual assault and abuse allegations and failed to provide students with resources and support as required by law.") *with Karasek*, 956 F.3d at 1113 (university could not "demonstrate that [it] consistently informed students of what to expect as the university investigated their complaints.") (internal quotations omitted, alteration in original). Brown also failed to adequately educate its employees and students on preventing sexual misconduct. *Compare* FAC at ¶ 14 ("Brown has failed and continues to fail at taking steps to address or prevent sexual misconduct from occurring at its institution."); *Id.* at ¶ 56 (Brown failed to properly train its students and employees regarding, *inter alia*, its investigation and reporting procedures) *with Karasek*, 956 F.3d at 1113 (university did not sufficiently educate its employees and students about preventing sexual harassment, which led to the mishandling of sexual-misconduct complaints and put the safety of its students at risk); *see also* at FAC at ¶ 63 (48.2% of students were subjected to at least one type of sexually offensive or inappropriate behavior while at Brown). Lastly, similar to *Karasek*, the FAC alleges that Brown benefitted from discouraging survivors from filing formal complaints. *Compare* FAC at ¶ 65 (alleging Brown "purposefully buried or diverted [Title IX complaints]" and this "concealment of Title IX complaints benefits Brown both financially and reputationally") *with Karasek*, 956 F.3d at 1113 (plaintiffs allege that the university's choice of resolving sexual-misconduct complaints through an early resolution process allows the university to escape statutory disclosure requirements).

The FAC further alleges that Brown violated Title IX by making Plaintiffs (and the similarly-situated Class) more "vulnerable to" sexual misconduct at Brown. *See Farmer v. Kansas State Univ.*, 918 F.3d 1094, 1109 (holding university was "deliberately indifferent in responding

to Plaintiffs' rape reports by failing to take any reasonable action to address and remedy those

matters.") (discussed further below at Section IV(A)(2)(b); *see, e.g.*, FAC at ¶ 14 ("Brown has

failed and continues to fail at taking steps to address or prevent sexual misconduct from occurring

at its institution.  In fact, Brown set up a system that dissuades and actively thwarts reporting of

sexual assault and misconduct despite its knowledge of a pervasive and ongoing problem."); *Id.* at

¶ 16 ("Those complaints that were filed with the Title IX Office were ignored and inadequately

investigated or addressed, *effectively ratifying the abusive acts committed against Plaintiffs and

the Class* and creating a hostile educational environment.") (emphasis added).[13]

    None of the cases Defendant cites warrants dismissal of Plaintiffs' pre-assault claims as

alleged.  Defendant cites *Roskin-Frazee v. Columba University*, 2018 WL 1166634 (S.D.N.Y. Feb.

21, 2018) and *Tubbs v. Stony Brook University*, 2016 WL 8650463 (S.D.N.Y. 2016), two out-of-

circuit unpublished decisions, to support their allegation that universities cannot be held liable in

pre-assault cases if they only have general knowledge of campus-wide assaults.  Memo. at 27.

Defendant mischaracterize the holdings in these cases.  *Roskin-Frazee* and *Tubbs* were premised

on the fact that, at the time of the decision, no other court had recognized pre-assault liability where

a university had a general policy of indifference to sexual misconduct on campus.  *See Roskin-

Frazee*, 2018 WL 1166634 at *5 ("plaintiff's allegations involve a very different set of

circumstances [than *Simpson* and *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282

---

[13] *Simpson v. University of Colorado at Boulder*, 500 F.3d 1170 (10th Cir. 2007), relied upon by
Defendant (Memo. at 26-27), involved an action appealed to the Tenth Circuit following a
dismissal **on summary judgment**, after development of a full factual record.  Although the facts
of *Simpson* relate to a football recruiting program, nowhere does *Simpson* hold that a finding of
deliberate indifference can never be warranted under different factual scenarios.  *Id.*  Moreover, at
the pleading stage, without the benefit of discovery, this Court is not able to assess whether the
facts alleged in the FAC are sufficient to create a heightened risk of a general policy of indifference
by Brown.  *Id.* at 1184-85 (holding "in light of the summary-judgment standard" and concluding
a "reasonable jury [could] return a verdict for [Plaintiff.]").

(11 Cir. 2007)]—circumstances that courts have not recognized as a basis for pre-assault liability"); *Tubbs*, 2016 WL 8650463 at *8 ("…courts generally have not expanded on the circumstances in which an 'official policy' will be sufficient to impose Title IX liability").  Since *Roskin-Frazee* and *Tubbs*, numerous courts, including courts in the Second Circuit, have permitted pre-assault Title IX claims to proceed where a plaintiff alleges that the university has a policy of deliberate indifference to sexual misconduct on its campus.  *See, e.g.*, *Karasek*, 956 F.3d at 1113 ("But we will not foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus.").

### (b)    Plaintiffs' Pre-Assault Claims are Sufficiently Pled

As the Ninth Circuit explained in *Karasek*, a pre-assault claim requires plausible allegations that:  "(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious, (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered" severe and pervasive harassment.  956 F.3d at 1112 (quoting *Davis*, 526 U.S. at 650).  In such cases, the school has "intentionally violate[d] the statute."  *Davis*, 526 U.S. at 642.  "Where the official policy is one of deliberate indifference to a known overall risk of sexual harassment, notice of a particular harassment situation and an opportunity to cure it are not predicates for liability."  *Karasek*, 956 F.3d at 1112-14 (quoting *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967) (9th Circ. 2010)).  The FAC pleads facts which, taken as true, satisfy all of the above.

First, the FAC sufficiently alleges that Brown maintained a consistent policy of deliberate indifference to reports of sexual assault and harassment.  Specifically, Plaintiffs allege Brown and its staff repeatedly misinformed survivors of sexual assault of their rights under Title IX, FAC ¶ 15; failed to investigate reported sexual assaults (*id.* at ¶ 16); discouraged those who reported

sexual assaults from filing a formal complaint and instead pushed survivors into an informal resolution process or from otherwise coming forward, (*id.* at ¶¶ 14, 15); and acted with deliberate indifference to acts of sexual misconduct by failing to take immediate, effective remedial steps to resolve the Plaintiffs' allegations of sex-based discrimination. *Id.* at ¶ 56. The FAC further alleges that Brown's Title IX Office "purposely buried" or "never properly investigated" complaints of sexual misconduct. *Id.* at ¶ 65. The FAC also contains statistics supporting these allegations of a policy of deliberate indifference. *Id.* at ¶¶ 64-67.

Second, Brown's "official policy" of deliberate indifference created a heightened risk of sexual harassment that was known or obvious in a context subject to Brown's control. *Id.* at ¶ 68 ("Brown's insufficient response to Plaintiffs' reports of Title IX violations subjected Plaintiffs and other similarly-situated students to further harassment and created a sexually hostile and toxic environment on campus."). By way of example, following Taja's initial sexually abusive relationship with another Brown student which she reported to and was mishandled by Brown's Title IX Office (*see id.* at ¶¶ 109-134), Taja's entered into a subsequent romantic relationship with another Brown student that also devolved into a sexually abusive relationship. *Id.* at ¶¶ 136-137. However, the prior mishandling of Taja's initial complaint related by Brown's Title IX Office (*i.e.*, "[b]ecause she never heard back from the Title IX Office and she was unsure about whether or not her abuser could still enter her building"), Taja was "scared to leave her dorm room[]" and was therefore was "trapped" in her second sexually abusive relationship as she was "forced to rely on her new [sexually-abusive] romantic partner for basic necessities and escorts to class." *Id.* at ¶¶ 136-137.

Finally, the FAC sufficiently alleges that, as a result of Brown's official policy, Plaintiffs suffered severe and pervasive harassment. Specifically, Plaintiffs allege that as a result of Brown's

inadequate policies and enforcement, students suffered assaults and harassment severe enough to be deprived of access to the educational opportunities or benefits provided by the school. *Id.* at ¶¶ 1-55.

In addition, the Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault. *See Gebser*, 524 U.S. at 290 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis*, 526 U.S. at 642 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation . . . is not a bar to liability where a funding recipient intentionally violates the statute"). Accordingly, Courts that have addressed pre-assault Title IX claims at the pleading stage have departed from the traditional *Davis* deliberate indifference standard. For example, in *Baylor Univ*ersity, the plaintiffs, among other things, alleged that Baylor and its staff repeatedly misinformed survivors of sexual assault as to their rights under Title IX, failed to investigate reported sexual assaults, and discouraged those who reported sexual assaults from naming their assailants or otherwise coming forward. 240 F. Supp. at 662. The Court held that, "[t]hese alleged facts, if construed as true, could allow a jury to infer that Baylor's policy or custom of inadequately handling and even discouraging reports of peer sexual assault created a heightened risk of sexual assault, thereby inflicting the injury of which Plaintiffs complain." *Id.*; *see Tubbs*, 2016 WL 8650463, at *9 (denying motion to dismiss a pre-assault Title IX claim because knowledge of an increase in sexual misconduct on campus, coupled with notice that the institution's policies were deficient and that the school failed to remedy them, was sufficient to

39

state a claim at the pleading stage). Here, Brown's Motion does not address the collective policy allegations against it in the FAC and instead seeks to disqualify each Plaintiffs' pre-assault claims on an individual basis.

> **(c)      Taja, Chloe, and Emma's Pre-Assault Claims Are Timely**

Brown challenges the pre-assault claims of Taja, Chloe, and Emma as untimely. Memo. at 28. For the reasons discussed in Section II, *supra*, Plaintiffs' pre-assault claims for Taja, Chloe, and Emma are timely.

> **(d)      Katiana and Jane 2 Have Sufficiently Alleged A Nexus Between Off-Campus Conduct And An On-Campus Effect**

Brown claims that Katiana and Jane 2 cannot hold Brown liable for alleged off-campus conduct. Memo. at 28. Not only is this position wrong, but, yet again, Brown seeks to rewrite Plaintiffs' claims into ones targeting Plaintiffs' underlying assaults and not about Brown's inadequate response to Plaintiffs' complaints to Brown's Title IX office, as actually alleged in the FAC. Under Title IX, schools have a responsibility to address the on-campus hostile environment that results from off-campus conduct. *See generally Farmer*, 918 F.3d 1094.

"Plaintiffs can state a viable Title IX claim by alleging alternatively <u>either</u> that [the school's] deliberate indifference to their reports of rape caused Plaintiffs 'to undergo' harassment <u>or</u> 'ma[d]e them liable or vulnerable' to it." *Id.* at 1103 (quoting *Davis*, 526 U.S. at 645) (emphasis in original). In *Farmer v. Kansas State University*, 918 F.3d 1094 (10th Cir. 2019), the court found that the plaintiffs, who alleged off-campus sexual assaults, had adequately pled that KSU made them vulnerable to harassment "by alleging that the fear of running into their student-rapists caused them, among other things, to struggle in school, lose a scholarship, withdraw from activities KSU offers its students, and avoid going anywhere on campus without being accompanied by friends or sorority sisters." *Id.* at 1105. In reaching its decision, *Farmer* relied on *Joyce v. Wright State*

*Univ.*, 3:17-CV-387, 2018 WL 3009105 (S.D. Ohio June 15, 2018), which declined to dismiss plaintiff's Title IX claim based on the university's failure to enforce a restraining order prohibiting an assailant from being on campus because "it could be said that the [university's] alleged failure to enforce the expulsion order made [plaintiff] 'vulnerable' to additional incidents of sexual assault and sexual harassment by [the perpetrator], even though plaintiff never actually encountered her assailant on campus." *Id.* at *7-8. *Farmer* also relied on *Kelly v. Yale Univ.*, CIV.A. 3:01-CV-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003), which held that a Title IX plaintiff had sufficiently pled that the university was deliberately indifferent to her reported rape, as the university ignored her "requested academic and residential accommodations after the assault" and her reported "discomfort and fear that she would feel if she encountered" the alleged assailant, which the court held made plaintiff-therein "liable or vulnerable" to her assailant's harassment. *Id.* at *4.

Brown's own Sexual Misconduct Policy applies to off-campus conduct. *See* FAC at ¶¶ 44-45. In addition to this fact, the FAC adequately pleads a nexus between Plaintiffs' off-campus assaults and the on-campus hostile environment that Brown created. As to Jane 2, there is a sufficient nexus between the off-campus conduct and the on-campus effect. Jane 2's off-campus sexual assault had a dramatic effect on her life on-campus, within the confines of an environment that Brown controlled, including her experience with the Title IX Office, as delineated in the FAC and as summarized herein. *Id.* at ¶¶ 250, 256, 260. The effects of the Title IX panel's decision and her experience with Brown's own-campus Title IX Office on Jane 2 were severe, and they ultimately led to her taking a leave of absence from Brown and missing the Spring 2020 semester.

*Id.* at ¶ 260.  To this day, Jane 2 limits her presence on Brown's campus to only her teaching

responsibilities, as her assaulter remains on-campus and within her course of study.  *Id.* at ¶ 260.[14]

Similarly, Katiana's off-campus rapes and sexual assaults directly affected her ability to

continue her education on-campus.  The FAC alleges that Katiana was in her freshman year when

she was sexually assaulted by a male Brown student athlete at a party hosted by Brown student

athletes.  *See id.* at ¶ 71.  Katiana alleges that the Title IX Office coerced her into the informal

resolution process, preventing her from filing a formal complaint, and failed to provide her with

any clarity or guidance regarding how to formulate terms and conditions that would likely be

accepted by her assailant as part of that process.  *Id.* at ¶¶ 76-79.  Katiana further alleges that there

was no equitable investigation with respect to this assault and when she finally made her informal

report, Brown's Title IX Office blindly accepted her assaulter's version of events and forwarded

Katiana an apology written by the assaulter downplaying the assault, which Brown's Title IX

administrator characterized as "affirming and appropriate."  *Id.* at ¶¶ 82-83.  Thereafter, Katiana

was subsequently raped at an unsanctioned Sigma Chi fraternity house adjacent to Brown's

campus, which fraternity Brown had previously suspended (in late 2019) from operating on

campus for five years, after Brown's own investigation found the fraternity guilty of hazing and

alcohol violations, misrepresenting information, and violating University operational rules.  *Id.* at

¶ 87.  Katiana alleges that Brown's Office of Student Conduct ("OSC") was aware that the

---

[14] Without any analysis, Defendant makes a bare contention in a footnote that Jane 2's Title IX allegations can also be dismissed as they allegedly do not "sufficiently meet the severity or pervasiveness standards under *Davis* to form the basis of Title IX liability."  Memo. at 28, n.12. Plaintiffs address, *infra*, how a single instance of harassment sufficiently meets the severity and pervasiveness standard.  *See infra*, Section IV(A)(2)(e).  Certainly, with respect to Jane 2, her underlying assault was sufficiently severe enough to warrant the filing of a formal complaint, a subsequent investigation thereof, and a hearing before the Title IX committee.  *See* FAC at ¶¶ 246-260.

fraternity was operating informally on campus and hosting parties at the Sigma Chi fraternity house. *Id.* at ¶ 89. Katiana alleges that, at the time of her rape, a majority of the male students that resided at the unsanctioned Sigma Chi fraternity house were members of Brown's men's water polo team (*id.* at ¶ 91), and that the Title IX Office advised her that it could treat this June 2021 rape as on-campus conduct because of the proximity of the Sigma Chi fraternity to Brown's Campus. *Id.* at ¶ 94. Katiana further alleges that her experience with the Title IX Office had detrimental effects on her mental health and ability to continue her education. *Id.* at ¶ 103. Katiana alleges that as a result of her experience with the Title IX Office, she did not want to be on campus anymore. *Id.* at ¶ 104. Katiana started the Summer 2021 semester taking five courses but withdrew from one as a result of her experience with Brown's handling of her Title IX complaints (*id.* at ¶ 105), and later received an "incomplete" for two additional courses, thus completing only two classes that semester. *Id.*

In support of its position which focuses yet again on the underlying assaults and not **Brown's** own conduct, Defendant cites *Brown v. Arizona*, 23 F.4th 1173 (U.S. 9th Cir. 2022) (hereinafter "*University of Arizona*"), a Ninth Circuit decision reviewing a district court's grant of summary judgment, to suggest that, here, Brown cannot be held liable for sexual misconduct that occurred off-campus under any circumstances. *See* Memo. at 28. As a threshold matter, *University of Arizona* concerned the review of a grant of summary judgment, and not a motion to dismiss. 23 F.4th at 1178. The court's analysis is also extremely fact-specific (*id*. at 1176-77), and does not involve allegations about the educational institution's systemic mishandling of Title IX complaints (as alleged in the FAC here). *See generally id.* The plaintiff in *University of Arizona* took no issue with the university's response to her own complaint to the Title IX office. Rather the plaintiff sought to hold the university liable for her actual assault under Title IX because the institution had

failed to respond to prior reports regarding her specific abuser. *Id.* at 1178 ("[Plaintiff] sued the University alleging, among other things, that it violated Title IX by failing to appropriately respond to reports that [assailant-student] physically abused [two prior female students before abusing plaintiff]."). It was under these specific circumstances that the Court found the University of Arizona could not be held responsible for an underlying assault that occurred off campus. *Id.*

Given the foregoing, and as set forth in the FAC, Katiana and Jane 2 have sufficiently alleged a nexus between off-campus conduct and an on-campus effect.

### (e)   Jane 1 Sufficiently Alleges A Pre-Assault Title IX Claim Against Brown

Brown argues that "a single inappropriate conversation" between a student and a professor does not amount to harassment. Memo. at 29-30. Again, Brown misses the point. In this action, Jane 1 is not pursuing a sexual harassment claim against the offending professor. Rather, the FAC challenges ***Brown's own conduct***—*i.e.*, Brown's inadequate response to Jane 1's complaint to the Title IX office that ultimately resulted in Jane 1's withdrawal from the music program at Brown in which she was enrolled—Brown's Applied Music Program ("AMP").

Specifically, the FAC alleges that Jane 1 reported her sexual assault to the Director of Choral Activities on November 1, 2020, FAC ¶ 216, who did not respond until January 18, 2021, and later apologized for having missed the email. *Id.* at ¶ 217. On January 20, 2021, Jane 1 asked the Chair of the Music Department for an investigation into the offending professor. *Id.* at ¶ 222. The Chair was defensive of the offending professor and dismissive of Jane 1's complaint, stating that nothing in the offending professor's history showed any similar conduct. *See id.* Even after Jane 1 reported to the Title IX Office, it took no action on her request for a formal complaint, failed to investigate, never asked Jane 1 to submit anything in writing regarding her experience with the offending professor, and never advised Jane 1 that any action was taken in response to Jane 1's

44

formal complaint. *Id.* at ¶¶ 227-230. A new professor told Jane 1 that AMP would "make it hard for her" to continue in the program and the accommodation of not performing before the offending professor was a "one-time thing." *Id.* at ¶ 234. Jane 1 left the AMP after the Spring 2021 semester because she was made to feel unsafe by Brown's actions. *Id.* at ¶ 238.

Moreover, underscoring Brown's "victim-blaming" mentality, Defendant's argument that Jane 1's harassment by the offending professor was "not pervasive enough" is also wrong. As Defendant concedes, Memo. at 29, the *Davis* requirement to show "severe, pervasive, and objectively offensive" conduct has not been applied to faculty-on-student allegations. That said, even a single episode of harassment (whether peer-to-peer or not) is actionable Title IX harassment. *See Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists); [15] *see also Wills v. Brown Univ.*, 184 F.3d 20, 37 (1st Cir. 1999) ("The effect of such abusive conduct on a victim does not necessarily end with a cessation of the abusive conduct, ***particularly if the victim and the abuser retain the same or similar roles in an educational institution.***") (emphasis added) (Lipez, dissenting).[16]

---

[15] *See Soper v. Hoben*, 195 F.3d 845, 855-56 (6th Cir. 1999); *Lopez v. Metro. Gov't.*, 646 F. Supp. 2d 891, 913 (M.D. Tenn. 2009); *Spencer v. Univ. of New Mexico Bd. of Regents*, No. 15-CV-141 MCA/SCY, 2016 WL 10592223, at *3 (D.N.M. Jan. 11, 2016); *McGinnis v. Muncie Cmty. Sch. Corp.*, No. 1:11-CV-1125-WTL-TAB, 2013 WL 2456067, at *12 (S.D. Ind. June 5, 2013); *Kelly,* 2003 WL 1563424, at *1.

[16] Defendant cites to *Doe v. Pawtucket School Department* (Memo. at 30) for the general proposition that a harassment must be "sufficiently severe and pervasive" to give rise to Title IX liability. 969 F.3d 1 (1st Cir. 2020). *Doe* specifically recognized that the severity or pervasiveness of harassment can hinge on details developed in discovery, especially where the abuser is in a position of authority. *Id.*

**B.      COUNT IV:  PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A CLAIM FOR TITLE IX ERRONEOUS OUTCOME**

To state a claim under the "erroneous outcome" theory, a plaintiff must allege facts to (1) cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome and (2) demonstrate a particularized causal connection between the flawed outcome and sex discrimination.  *Doe v. Trustees of Boston College*, 892 F.3d 67, 89-90 (1st Cir. 2018); *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 185 (D.R.I. 2016).  With respect to the second prong, a showing of a ***pattern of decision making*** in a school's disciplinary cases can establish the requisite connection between the outcome and the alleged bias.  *Brown Univ.*, 166 F. Supp. 3d at 185 (finding that an erroneous outcome can be plead based upon facts suggesting "patterns of decision-making").

The analysis of both prongs is intensely fact-driven, making it unsuitable for resolution at the motion to dismiss stage, and the determination of bias often hinges on expert testimony and the development of a full evidentiary record.  *See, e.g.*, *Boston College*, 892 F.3d at 90-92 (determination of erroneous outcome claim hinged on evidentiary record at the summary judgment stage); *Haidak v. Univ. Of Massachusetts-Amherst*, 933 F.3d 56, 73-74 (1st Cir. 2019) (same); *Doe v. Johnson & Wales Univ.*, 425 F. Supp. 3d 108, 115-16 (D.R.I. 2019) (summary judgment ruling hinged on statistical evidence in the evidentiary record).  In *Doe v. Brown*, this Court engaged in a detailed analysis of what is required at the pleading stage and concluded that factual allegations documenting procedural flaws in Title IX proceedings are enough at the pleading stage to create a plausible claim for erroneous outcome.[17]

---

[17] Defendant implicitly acknowledges that the Court's analysis will hinge on evidence and statistical analysis.  Brown goes so far as to ask the Court to apply its own knowledge of "its docket over the past decade" to assess Plaintiffs' claims—a patently inappropriate request and argument.  Memo. at 34.  Defendant's own unsupported assessment of the statistics to which Plaintiffs cite– namely, its bald assertion that "Brown implements its processes fairly and in a gender neutral

The FAC pleads all of the required elements of a claim for erroneous outcome on a motion to dismiss.  FAC ¶¶ 324-327.  Plaintiffs have not merely parroted the legal standard.  Rather, the FAC sets out detailed facts suggesting that "Brown failed to conduct a prompt, equitable, thorough, reliable, and impartial grievance process" and that Brown failed to adequately discipline Plaintiffs' assailants, if they were disciplined at all."  *Id*. at 325.  Facts that are pled supporting that claim are legion and include the following:

- Brown discouraged women from filing formal complaints.  *Id*. at ¶¶ 75, 125-126.

- Brown encouraged women to pursue informal resolutions.  *Id*. at ¶¶ 76-78, 121-122, 247.[18]

- Brown failed to provide proper guidance to female complainants.  *Id*. at ¶¶ 79-80, 96, 101, 129-130, 226-230, 249, 252-254.

- Brown forwarded an email to a female complainant from her assaulter which reframed her rape as a non-event.  *Id*. at ¶¶ 82-83.

- Brown permitted previously suspended Brown fraternities to operate informally.  *Id*. at ¶¶ 87-89.

- Brown failed to contact female survivors after a rape was reported by a mandatory reporter.  *Id*. at ¶ 118.

- Brown denied a request from a female survivor to move off campus.  *Id*. at ¶ 117.

- Brown selected a male student originally found responsible for non-consensual sexual touching to be the mid-year graduation speaker.  *Id*. at ¶¶ 157-161.

- Brown allowed women to encounter their abusers in the Title IX office.  *Id*. at ¶ 195.

- Brown forwarded a confidential email from a complainant to her accuser.  *Id*. at ¶ 197.

---

manner"—is equally inappropriate.  *Id*. at 34-35.  Brown will have its chance to address those statistics and its "processes" after a full evidentiary record has been developed through discovery.

[18] Brown fails to explain why it believes an erroneous outcome case must hinge on a formal proceeding when Plaintiffs specifically allege that they were discouraged from filing formal complaints.  Memo. at 35-36.

- Brown delayed in scheduling hearings with respect to formal complaints filed. *Id.* at ¶ 200.

These types of "clear procedural irregularities" are sufficient to state a claim for erroneous outcome particularly where, as here, all inferences must be drawn in favor of the Plaintiffs. *Hamm v. Carpenter*, 937 F.2d 86, 88 (1st Cir. 2019) (all reasonable inferences must be drawn in the moving party's favor on a motion to dismiss); *Doe v. Brown*, 166 F. Supp. 3d at 189-90. In its Memorandum, Brown attempts to point out the purported flaws in each Plaintiff's specific factual allegations. But Brown mischaracterizes those facts. For example, Brown claims that Emma "has cited no procedural irregularities." Motion at 37. To the contrary, Emma alleges that (1) the Title IX office put her in a position where she would see her abuser in the Title IX office; (2) the Title IX office altered an email she had written to her abuser; (3) the Title IX office shared a confidential email with Emma's accuser that she had requested not be shared; and (4) that the hearing on Emma's complaint was not heard until 168 days after it was filed. *See* FAC ¶¶ 195-200. Brown's descriptions of the experiences of the other Plaintiffs is similarly skewed and incomplete. Moreover, Plaintiffs have provided statistics suggesting a pattern of decision-making that is specifically biased against female complainants and thus are relevant to the claims of all Plaintiffs. *Id.* at ¶ 66 (comparing number of incidents reported with number of formal complaints pursued and findings of responsibility).[19]

---

[19] In *Yusuf v. Vassar College*, cited by Brown (*see* Memo. at. 33, n.14), the Second Circuit expressly recognized that allegations of "patterns of decision-making" can tend to show the influence of gender. 35 F.3d 709, 715-16 (2d Cir. 1994). In fact, in *Yusuf*, the Court found the plaintiff's allegations that "males invariably lose" provided a sufficient causal connection at the pleading stage to support a claim for erroneous outcome. *Id.* at 716. The Court refused however to "pause at the pleading stage" to consider what statistical sample would be significant, leaving that for the appropriate stage in the future of the case. *Id.*

Finally, and despite Brown's allegations to the contrary, a complainant-survivor is not barred from pursuing a claim for erroneous outcome.  *See* Memo. at 34-35.  Brown attempts to support this incorrect assertion by citing to a case from the Eastern District of Michigan that does not stand for the proposition that Brown asserts.  *Id.* at 34 (citing *Lipian v. Univ. of Mich.*, 453 F. Supp. 3d 937 (E.D. Mich. 2020)).  In *Lipian v. University of Michigan*, the Court considered a plaintiff's erroneous outcome claim on summary judgment, after discovery including depositions, and held that the plaintiff therein, who was a complainant as opposed to the accused, had not established a genuine issue of material fact with respect to that cause of action.  *Id.* at 965-66. While noting that erroneous outcome claims are typically filed by an accused, the court in no way limited the rights of a complainant to assert that claim.  *Id.*

C.   **C**OUNT **V:  P**LAINTIFFS **H**AVE **S**UFFICIENTLY **P**LED **F**ACTS **T**O **S**UPPORT **A** **C**LAIM **F**OR **T**ITLE **IX R**ETALIATION

In order to state a claim for retaliation, a plaintiff must "'establish three elements:  that she made a charge or opposed a practice made unlawful by Title [IX], that the [university] took a materially adverse action against her, and that the [university] took the action because of her protected conduct."  *See Cavalier v. Catholic Univ. of Am.,* 306 F. Supp. 3d 9, 36 (D.D.C. 2018) (citing *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)); *Brown Univ.*, 304 F.Supp.3d at 260. An action is "materially adverse" if it "might have dissuaded a reasonable [student] from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, (2006); *Brown Univ.*, 304 F. Supp. 3d at 260.  As explained by the U.S. Supreme Court in *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005), a Title IX claim for "retaliation presents an even easier case than deliberate indifference."  *Id.* at 183.  To establish protected activity in retaliation cases, a plaintiff need only show that she had a reasonable belief that she opposed an unlawful practice.  *Id.* at 187, n.1 (Scalia, J. dissenting) (citing cases to support that "no Court of

Appeals requires a complainant to show more than that [s]he has a reasonable, good-faith belief that discrimination occurred to prevail on a retaliation claim."). For example, a student's report of sexual misconduct to school administrators constitutes a protected activity under Title IX. *See Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 867-68 (9th Cir. 2014); *Dibbern v. Univ. of Michigan*, 2013 WL 6068808, at *9 (E.D. Mich. Nov. 18, 2013); *Mandsager v. Univ. of N. Carolina at Greensboro*, 269 F. Supp. 2d 662, 674 (M.D.N.C. 2003). An individual is also engaging in protected activity when she participates in a process to assert her rights, such as filing a complaint with her school, *Ollier*, 768 F.3d at 867, and reporting allegations of retaliation in response to her initial complaint, *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 810 (M.D. Tenn. 2016).

Here, each Plaintiff has pled that she contacted the Title IX office with a complaint about sexual abuse or harassment. FAC ¶¶ 73-74, 94, 116, 154, 193, 224, 246. Thus, each sought assistance directly from the Title IX office who was then on notice of the complaint. The alleged adverse action in response need not be a cross-claim against the claimant; allegations that the "alleged retaliator subsequently undertook some action disadvantageous to the actor" suffices at the pleading stage. *Frazier v. Fairhaven Sch. Cmm.*, 276 F.3d 52, 67 (2002) (setting out standard but dismissing claim only because retaliator did not know about the underlying complaint); *see also Brown Univ.*, 304 F. Supp. at 260 (finding denial of an interview for medical school sufficient to be "adverse action" sufficient at the pleading stage).

Brown's primary argument appears to be that Katiana, Taja, Jane 1, and Jane 2 "were not subjected to any adverse action to support a Title IX retaliation claim." Memo. at 39-40. Brown cites no case for the proposition that an adverse action must be either a "disciplinary process" or an "adverse educational action." *Id.* at 39. As noted above, an adverse action can be any action

disadvantageous to the student that might dissuade that student from making or supporting her complaint.  Here, each Plaintiff has alleged that Brown took some action disadvantageous to her after the filing of her complaint in a manner that discouraged her or dissuaded her from pursuing her claim:

- Katiana alleges that Brown's Title IX Office: (i) discouraged her from filing a formal complaint, instead coercing her into an informal resolution process; (ii) forwarded her an apology from her accuser that it characterized as "affirming and appropriate;" (iii) made her reluctant to report a second incident due to her first complaint experience; (iv) failed to conduct any investigation of her second assault; (v) failed to explain any procedures to her, including the option to obtain a "no contact" order; and that those actions (vi) impeded her ability to pursue her claim. *See* FAC ¶¶ 74-78, 81, 95-97.

- Taja alleges that Brown's Title IX Office: (i) pressured her into an informal process; (ii) failed to honor reasonable requests she made of her rapist; (iii) denied her reasonable request to move off-campus without explanation, exposing her to further harm and traumatization; and (iv) intends to permit her abuser to attend her graduation after she and six other women reported him to Brown.  *Id.* at ¶¶ 121-130, 131, 134, 138.

- Chloe alleges that Brown's Title IX Office: (i) retaliated against her by selecting her alleged abuser to be a graduation speaker; (ii) refused to revisit that decision; (iii) reversed its finding of responsibility for her accuser once Chloe contacted the

college newspaper; and (iv) treated her differently once the university received a litigation notice from her abuser's counsel. *Id.* at ¶¶ 157-181.[20]

- Jane 1 alleges that Brown's Title IX Office: (i) failed to take her complaints seriously; (ii) defended the offending professor; (iii) made it difficult for her receive an accommodation with respect to her musical performance; and (iv) otherwise took steps to prevent her from pursuing her complaint. *Id.* at ¶¶ 217, 222, 225-235.

- Jane 2 alleges that Brown's Title IX Office: (i) discouraged her from pursing a formal complaint; (ii) dissuaded her from including details about her assaulter's pattern of conduct in that complaint; (iii) gave her strict parameters with respect to the content of her complaint which were not similarly imposed on her assaulter. *Id.* at ¶¶ 251-259.

Plaintiffs do not conflate a Title IX deliberate indifference claim into a Title IX retaliation claim, as Brown contends, simply because the two claims arise from the same set of underlying facts. Memo. at 38-39.  Given the broad sweep of Title IX's reach, "[t]he definition of an adverse action would be meaningless if plaintiffs were unable to use actions taken by schools to form the bases of both retaliation and deliberate indifference claims." *Doe 1 v. Howard Univ.*, 396 F. Supp. 3d 126, 147 (D.D.C. 2019).

Furthermore, a plaintiff need only clear a low hurdle to allege a causal link at the motion to dismiss stage. *Doe 1.*, 396 F. Supp. 3d at 144 (citing *Cavalier*, 306 F. Supp. 3d at 36); *see also Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) ("The causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative . . . action are not completely unrelated.").  Accordingly, Brown's reliance on *Theidon v.*

---

[20] Defendant's SOL arguments with respect to Taja and Chloe are addressed at Section II.

*Harvard Univ.*, 948 F. 3d 477, 505 (1st Cir. 2020) to suggest Plaintiffs must plead "but-for causation" is misplaced.  Memo. at 38.  Not only was *Theidon* an appeal to the First Circuit from the lower court's granting of the university's motion for summary judgment, but that case is distinguishable because it arose in an employment context and involved a professor's denial of tenure for allegedly commenting on the university's response to sexual assault complaints, where there was no showing that voting members of the university's tenure committee were aware of the professor's conduct during their deliberation.  *Id.*

### D.   COUNT XI: PLAINTIFFS HAVE SUFFICIENTLY ALLEGED A CLAIM UNDER RICRA

Brown does not independently address Plaintiffs' RICRA claim, instead positing that it stands or falls with Plaintiffs' Title IX claims.  Plaintiffs acknowledge that "the Court looks to federal law in construing analogous civil rights statutes in assessing discrimination claims under RICRA."  *See Brown Univ.*, 505 F. Supp. 3d at 81.  Accordingly, Count XI of the FAC, alleging gender discrimination under RICRA, states a valid cause of action for the same reasons as articulated at Section IV(A)-(C), *supra*.

## V.   COUNTS VI, VII, AND X:  PLAINTIFFS SUFFICIENTLY PLED NEGLIGENCE CLAIMS

### A.   THE FAC SUFFICIENTLY ALLEGES NEGLIGENCE[21]

To plead a negligence claim under Rhode Island law, the FAC must sufficiently allege that: (1) Brown owed a legally cognizable duty to Plaintiffs; (2) Brown breached that duty; (3) Brown's conduct proximately caused Plaintiffs' injuries; and (4) Plaintiffs suffered actual loss or damage.

---

[21] In making these arguments, Defendant reiterates its statute of limitations argument as to Plaintiffs Taja, Chloe, and Emma.  Memo. at 41.  As discussed in Section II, *supra*, these arguments fail as a matter of law and should be rejected.

*R.I. Indus.-Recreational Bldg. Auth. v. Capco Endurance, LLC*, 203 A.3d 494, 499 (R.I. 2019). Here, the FAC sufficiently pleads these elements. *See* FAC ¶¶ 337-348, 361-367.

First, the FAC sufficiently alleges that Brown had a duty of care to Plaintiffs to handle their allegations of sexual assault and misconduct adequately and appropriately. That duty of care, as alleged in the FAC includes Brown's duty to: (i) ensure that its students are safe and free from sex- and gender-based assault and harassment by conducting an adequate investigation into Plaintiffs' claims of assault, sexual assault and harassment, and enforcing the requirements of Title IX (*Id.* at ¶¶ 19, 41-52, 54, 339); (ii) take reasonable measures to protect Plaintiffs from the risks of sexual misconduct by properly warning, training, or educating them on how to avoid such risks as Brown's students (*Id.* at ¶¶ 23, 56, 58, and 363); and (iii) properly supervise, train, and monitor its employees and students to ensure that they comply with all required laws and policies (*Id.* at ¶¶ 22, 23, 56, 58, 279, and 345).[22]

In addition to these clearly alleged duties, the FAC further alleges that a special relationship in fact existed between Brown and its students who reported their sexual assault claims to Brown's Title IX Office. *See infra*, Section V(H). Courts have found that "a duty may be imposed upon a college when it has encouraged its students to participate in an activity and has taken affirmative

---

[22] Defendant incorrectly contends that "Plaintiffs insist upon an 'across-the-board' duty analysis, rather than the *ad hoc*, individualized duty assessment, required under Rhode Island law." Memo. at 42. This confuses the issue. *Gushlaw v. Milner*, 42 A.3d 1245, 1256-57 (R.I. 2012) (as relied upon by Defendant's themselves, *see* Memo. at 41-42) similarly focuses on the resulting ***harm*** experienced by Plaintiffs (which here is the ***same harm*** as to all Plaintiffs), and not the individualized facts of each Plaintiff's injury (as Brown improperly attempts to focus on). *See Selwyn v. Ward*, 879 A.2d 882, 887 (R.I. 2005) ("duty must ***be based on conduct*** 'sufficiently likely to result in the kind of harm' suffered by the plaintiff . . . .") (emphasis added). Brown's conduct, *i.e.*, the improper handling of Plaintiffs' Title IX complaints, is the same conduct as to each Plaintiff. *See* FAC ¶¶ 16-17, 69, 103-105, 145-147, 279. Thus, the five-factor analysis of duty, as articulated by *Gushlaw*, is the same for all Plaintiffs and is appropriately satisfied under a single analysis.

steps to supervise and control the activity." *Doe v. Sarah Lawrence College*, 453 F. Supp. 3d 653, 669 (S.D.N.Y. 2020) (negligence claim survived motion to dismiss where Court held a school's relationship with students changes once they engage the Title IX process). Courts have also held that a duty to protect students exists when a special relationship between university and its students is established. *See Doe v. Rhode Island Sch. of Design*, 432 F. Supp. 3d 35 (D.R.I. 2019); *Regents of Univ. of California v. Superior Ct.*, 413 P.3d 656 (Cal. 2018) (hereinafter, "*RISD*"). Whether a special relationship exists depends on the specific facts of each case. *Compare Hernández v. Baylor Univ.*, 274 F. Supp. 3d 602, 618-21 (W.D. Tex. 2017)[23] (holding that university owed female student a duty of reasonable care to protect her from sexual assault by a university football player if the university knew that the football player had previously been cited for sexual assault and knew that six other students at university had reported being sexually assaulted by the player, so that the risk and likelihood that the player would sexually assault another student was foreseeable) *with Doe v. Baylor Univ.*, 240 F. Supp. 3d 646, 667 (W.D. Tex. 2017) (finding that university had no special relationship with its students who were allegedly sexually assaulted on campus, as would give rise to duty to protect them from foreseeable criminal acts).

Second, the FAC sufficiently pleads that Brown breached its duty to Plaintiffs because Brown: (i) was aware that Plaintiffs were subject to sexual misconduct, yet took no protective action or measures to prevent its reoccurrence or remedy its effects (FAC ¶¶ 340, 363-364); (ii) failed to take reasonable protective measures to protect Plaintiffs from known risks of sexual misconduct on campus by failing to properly warn, train, or educate them on how to avoid those risks and failing to ensure that laws and policies relating to sexual misconduct were complied with

---

[23] Although Brown cites *Hernandez* in support of its position (Memo. at 48), the Court determined that a special relationship in fact existed between the university and plaintiff in circumstances analogous to the allegations pertaining to Plaintiff Taja. *See* FAC ¶¶ 108-147.

(*id.* at ¶¶ 23, 56, 58, 363-365); (iii) failed to follow its own policies in reviewing, investigating, and resolving complaints of sexual assault and harassment (*id.* at ¶¶ 41-69, 341); and (iv) failed to timely report and investigate the physical violence and sexual misconduct suffered by Plaintiffs or to adequately monitor and enforce the Title IX investigation and response process at Brown.  *Id.* at ¶¶ 1, 14-16, 24, 65, 97, 227, 288, 346.

Finally, the FAC alleges that Plaintiffs suffered damages from Brown's breach of its duty to Plaintiffs and that Brown's negligence proximately caused those damages.  *Id.* at ¶¶ 103, 147, 182, 209-210, 342-343, 347-348, 366-367.  Nothing more is required.  *Vartanian v. Monsanto Co.*, 14 F.3d 697, 700 (1st Cir. 1994) ("We must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss").

Defendant's contention that "Plaintiff's negligence claims seek to redefine the university-student relationship under Rhode Island common law[]" because "[a]s pled, [Plaintiffs'] negligence claims would effectively turn all of [Rhode Island's] higher education institutions into insurers against the general risk of sexual assault and sexual harassment[]" should also be rejected.  Memo. at 42.  To the contrary, Plaintiff's negligence counts establish a duty of care from Brown to all students as specifically related to ***Brown's handling*** of Title IX Complaints related to sexual misconduct, something that Brown, as an educational institution, is required to do, and in stark contrast to Defendant's incorrect assertion that this somehow broadly makes Defendant the insurer of ***any*** "risk of sexual assault and harassment."  Memo. at 42.

## B.   DEFENDANT CONFLATES THE PLEADING STANDARD FOR NEGLIGENCE AND TITLE IX CLAIMS

Without any legal support, Brown seems to argue that Plaintiffs are unable to simultaneously allege negligence and Title IX claims.  Memo. at 42-45.  Defendant is wrong.

Courts have allowed plaintiffs to simultaneously plead both negligence and deliberate indifference claims under Title IX.  *See, e.g.*, *Doe v. Sarah Lawrence College*, 453 F. Supp. 3d 653, 669 (S.D.N.Y. 2020) (Title IX and negligence claim both surviving a motion to dismiss); *see generally Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602 (W.D. Tex. 2017) (same); *Doe*, 453 F. Supp. 3d 653 (same).  Here, Plaintiffs' negligence claims flow from the breach of the duty Brown owed to Plaintiffs as vulnerable students at the University, and Brown's breach of that duty, as sufficiently pled in the FAC (as discussed *supra*, *see* Section V(A).  Thus, Plaintiffs do not, as Brown incorrectly contends, attempt to "create a backdoor" to Title IX liability through their independent negligence claims.  Memo. at 43.

Brown inappropriately characterizes Plaintiffs' common law negligence counts as a negligence *per se* claims.  Memo. at 44-45.  However, the FAC does not assert any negligence *per se* claim, and Brown's reliance on an out-of-circuit opinion in support of this point, *Doe v. Univ. of the South*, No. 09-cv-62, 2011 WL 1258104 (E.D. Tenn. Mar. 31, 2011), a case analyzing a ***motion for summary judgment***, is misplaced.  *See* Memo. at 44.  *Doe* involved a fully-developed factual record, as well as a specifically asserted claim for negligence *per se*, neither of which are asserted by the FAC here.[24]  This is further evidenced by the fact that the elements to establish a negligence *per se* claim differ from those of a general negligence claim, requiring: (1) the existence of a statute that prescribes certain actions or defines a standard of conduct; (2) the violation of such

---

[24] None of the other out-of-circuit authority cited by Brown (*see* Memo. at 44-45, n.15) are persuasive, nor do they address Rhode Island law.  *See Doe v. Vanderbilt Univ.*, No. 18-cv-00569, 2019 WL 4748310 (M.D. Tenn. Sept. 30, 2019) (finding the plaintiff's ***negligence per se*** claim based on Title IX); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018) (same); *Cash v. Lees-McRae Coll., Inc.*, No. 18-cv-52, 2018 WL 7297876 (W.D.N.C. Aug. 13, 2018) (same); *Ross v. Univ. of Tulsa*, No. 14-cv-484-TCK-PJC, 2015 WL 4064754 (N.D. Okl. July 2, 2015) (finding that a ***negligence per se*** claim based on a Title IX regulatory violation would be inconsistent with *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998)).

statute by defendant; (3) that plaintiffs were members of a class of persons sought to be protected by the statute; and (4) that plaintiffs suffered harm that the statute sought to prevent. *Moody v. Boston and Maine Corp.*, 921 F.2d 1, 4 (1st Cir. 1990). For the foregoing reasons, the FAC sufficiently pleads all of the Negligence Counts.

### C.   PLAINTIFFS DO NOT ALLEGE NEGLIGENCE BASED ON ANY CONTRACTUAL DUTY

Brown also incorrectly argues that Plaintiffs assert a tort-based negligence claim based on their contractual relationship with Brown. Memo. at 45-46. To the contrary, that is not what the FAC alleges. As Defendant acknowledges (Memo. at 45), Plaintiffs do not include any contract-based claims in the FAC, which only asserts tort claims. Nothing Defendant relies upon warrants a different conclusion.

The case law cited by Brown in support of this incorrect conclusion pertain to actions where the plaintiff-therein asserted independent contract-based claims in addition to tort-based claims. Memo. at 45-46. For example, in *Doe v. Brown Univ.*, 166 F. Supp. 3d 177 (D.R.I. 2016), the plaintiff brought both negligence and breach of contract claims. *Id.* at 196. It is only in that situation—where the complaint asserts independent tort and contract claims—that Courts in this Circuit have held that the tort claim cannot survive. *See Ciccone v. Pitassi*, No. Civ. A. PB 97-4180, 2004 WL 2075120, at *7 (R.I. Super. Aug. 13, 2004) ("[i]f the claims are based upon the same duty, the plaintiff cannot maintain the tort claim; however, if they are not, 'the tort claim is not barred.'") (internal citation omitted). All of the other cases relied upon by Brown similarly involve independent contract claims. *See Ciccone*, 2004 WL 2075120 at *7 (involving independent tort and breach of contract claims); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 362 (N.D.N.Y. 2014) (same); *Harris v. St. Joseph's Univ.*, No. 13-3937, 2014 WL 1910242 (E.D. Pa.

May 13, 2014) (same).  Since the FAC does not allege any contract-based claims, and only alleges tort-based claims, Brown's argument should be rejected.

### D.   THE CLAIMS IN THE FAC ARE FOCUSED ON BROWN'S ACTIONS AND FAILURES, NOT THE ACTIONS OF STUDENTS OR OTHER THIRD PARTIES

Brown's arguments again miss the point and incorrectly attempt to claim that Plaintiffs seek to hold Brown liable "for alleged sexual harassment or assault by other students."  Memo. at 46.  The FAC makes no such claim.[25]  Rather, Plaintiffs' allegations are focused on *Brown's* actions and failures in connection with *Brown's response* to Plaintiffs' Title IX reports of sexual misconduct and are rooted in the ineffective execution of Brown's Title IX program.  *See, e.g.* FAC ¶¶ 1, 14-24.  Of note, the allegations in the FAC concerning the specific sexual assaults and harassment experienced by each Plaintiff individually are provided to explain why each Plaintiff sought to participate in Brown's Title IX program.

None of the cases cited by Defendant in support of this argument warrant a different conclusion.  In *Doe v. Brown Univ.*, 304 F. Supp. 3d 252 (D.R.I. 2018), the negligence issues involved (1) a claim for negligent infliction of emotional distress based on Brown's negligence in the way it handled the physical evidence related to the plaintiff's case, and (2) a negligent supervision claim for Brown's failure to properly supervise a fraternity.  *Id.* at 260-61.  Here, Plaintiffs' negligence-based claims arise out of Brown's oversight and implementation of its Title IX program, *not the torts of its students*.  Defendant's attempt to distract from this fact by reciting all of the underlying factual allegations in *Doe v. Brown* (*see* Memo. at 47-50) ignores a plain

---

[25] Brown's reliance on *Gushlaw v. Milner*, 42 A.3d 1245 (R.I. 2012) involved a wrongful death case arising from a car accident and, thus, the negligence duty articulated in that case has no application to the claims at issue here.  *See* Memo. at 47.

reading of the FAC.[26]  *See* FAC ¶¶ 1-2.  In *RISD,* also cited by Defendant (*see* Memo. at 49), the Court held, on a motion for summary judgment, that a special relationship existed between Brown and its students participating in Brown's study abroad program because Brown coordinated the study abroad program and arranged for student housing.  432 F. Supp. 3d at 42.  Contrary to Defendant's contentions (Memo. at 49), *RISD* is akin to the allegations of the FAC, where a special relationship existed between Brown and Plaintiffs when each attempted to participate in Brown's Title IX program.[27]  FAC ¶¶ 73, 74, 116-119, 154, 193.  Brown breached its duty when it failed to adequate investigate or address their claims of sexual assault.  *Id.* at ¶¶ 16, 24, 73-74, 118-121, 154.

### E.   PLAINTIFFS DO NOT ASSERT A CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Brown cannot create its own causes of action in Plaintiffs' lawsuit.  Nowhere in the FAC does there appear a claim for negligent infliction of emotional distress, yet Brown spends a whole section of its brief discussing why Plaintiffs' "claim fails" and how they cannot recover on this theory.  Memo. at 50-51.  The FAC only pleads a claim for *intentional* infliction of emotional distress.  *See* FAC ¶¶ 356-360 (Count IX).[28]

---

[26] Brown's continued efforts to point to each Plaintiff's specific allegations describing their underlying assaults, with the associated argument that Plaintiffs seek to hold Brown liable for the assaults by its students (Memo. at 49), misconstrues and ignores the actual allegations of the FAC. Likewise, Brown's assertion that Plaintiffs have not "pled any comparable circumstances to the *RISD* case" (*id.* at 49) is just wrong.

[27] Moreover, no "individualized assessment" of the circumstances of each Plaintiff's sexual assault or harassment is necessary or required.  *See* Memo. at 47.  The fact that each Plaintiff sought to engage with Brown in their Title IX program (that Brown offered and controlled) is enough to establish this special relationship.  *Sarah Lawrence College*, 453 F. Supp. 3d at 669.

[28] Brown attempts to read its own claim of  negligent infliction of emotional distress into this case based on *Brown University*, 304 F. Supp. 3ds at 261.  Memo. at 51.  In that case, the Court characterized certain of the plaintiff's negligence claims as ones for negligent of infliction of emotional distress because there were no allegations of physical injury.  Here, as made clear in Plaintiffs' **intentional** infliction of emotional distress claim, the FAC specifically alleges that, due

**F.    THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR NEGLIGENT SUPERVISION (COUNT VII)**

Rhode Island "recognizes direct liability of an employer to third parties injured by acts of unfit or incompetent employees." *Wells v. Smith*, 102 A.3d 650, 653 (R.I. 2014). Under Rhode Island law, Brown has a duty to adequately train and supervise its employees for the position that they are hired. *See Welsh Mfg. v. Pinkerton's, Inc.*, 474 A.2d 436, 441 (R.I. 1984) (holding that evidence showing that the defendant did not properly train or supervise its employees was sufficient to submit plaintiff's training and supervision claim to a jury). "In an action for negligent supervision, the plaintiff must prove that the defendant failed to exercise such care in supervision as would protect against dangers reasonably foreseeable." *Doe v. McKenna*, No. C.A. 94-7084, 1998 WL 269228, at *2 (R.I. Super. May 8, 1998). "As it pertains to the determination of duty, the foreseeability inquiry considers generally whether 'the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party.'" *Gushlaw*, 42 A.3d at 1261. All that is required at the motion to dismiss stage is a short, plain statement with sufficient facts to support the inference that, when taken as true, the claim is plausible and the defendants are put on notice of such claim. *See* Fed. R. Civ. P. 8(a); *Iqbal*, 556 U.S. 678; *Twombly*, 550 U.S. at 545; *Gagliardi*, 513 F.3d at 305.

Here, Brown's failure to exercise reasonable care in the training and supervision of its employees creates a foreseeable risk to Plaintiffs that they will be harmed by Brown improperly

---

to Brown's conduct, Plaintiffs suffered emotional distress that manifested into physical symptoms, including headaches, nausea, dizziness, shortness of breath, racing heart rate, insomnia, and substance dependency. *See* FAC ¶ 359. Similarly, Brown's argument that "Plaintiffs cannot recover on a negligence-based theory challenging Brown's responses to their reporting or alleged sexual misconduct, which is actually a claim for negligent infliction of emotional distress that does not fall within the limited parameters allowed by Rhode Island law[,]" (Memo. at 51) has no basis in law or fact as discussed herein.

handling of their sexual assault complaints.  Plaintiffs allege that when they made complaints to Brown's Title IX Office, employees at the office either pressured them into forgoing the formal process (*see* FAC ¶¶ 15, 16, 76, 121, and 241), failed to provide them with accurate information about the process (*see id.* at ¶¶ 252-254), disregarded specific requests made (*see, e.g.*, FAC ¶¶ 129-131), or generally failed to investigate Plaintiffs' claims (*see, e.g.*, *id.* at ¶¶ 85-97 and 226-230).  Plaintiffs also allege that Brown was aware that students were dissatisfied with Brown's Title IX Program due to the VOB and ESV student movements, but Brown failed to take any affirmative measures to address students' concerns.  *See id.* at ¶¶ 7-14.  The harm Plaintiffs suffered would have been avoided if Brown properly had trained and supervised its employees on Title IX procedure.  *See id.* at ¶¶ 14-16, 23, 41-54, 56, 58-61.

The FAC alleges that Brown had a duty to adequately train and supervise its employees regarding Title IX law and procedures as well as other applicable laws and procedures related to allegations of sexual assault and harassment, and that Brown breached that duty.  *Id.* at ¶¶ 21, 22, 56, 58, 279, 318 (alleging Brown failed to adequately monitor and train its employees to ensure proper handling of Title IX complaints); *id.* at ¶¶ 15-16, 22, 56, 58 (alleging Brown breached this duty).  The FAC also alleges that the risk of harm to Plaintiffs from Brown's negligence was foreseeable.[29]  *Id.* at ¶¶ 7-14.  The FAC further alleges that Plaintiffs were in fact harmed Brown's negligence.  *Id.* at ¶¶ 103-107, 145-146, 182-183, 209-210, 238, 261, 347.[30]

---

[29] Brown's allegation that Plaintiffs have not specified which alleged offending employees were responsible for causing them harm is premature, as litigation has just commenced and discovery has not started in this action.  Upon a motion to dismiss, nothing more is required to sufficiently plead this claim.

[30] Defendant cites *Yu v. Vassar College*, 97 F. Supp. 3d 448, 484 (S.D.N.Y. 2015), an out of circuit case, in support of its proposition that other "courts have not recognized a common law duty of reasonable care in the investigation of sexual misconduct allegations."  Memo. at 52, n. 16.  *Yu* is inapplicable, and Defendant otherwise confuses that Plaintiffs here bring a claim for **negligent supervision and retention** of its employees.  In *Yu*, the Court determined that plaintiff could not

### G.   THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR NEGLIGENT FAILURE TO WARN, TRAIN, AND EDUCATE (COUNT X)

Without citing any authority in support, Brown criticizes Count X as an example of "excessive" pleading that Plaintiffs "invent[ed]." Memo. at 52. However, whether a duty exists is a question of law. *Volpe v. Gallagher*, 821 A.2d 699, 705 (R.I. 2003). While "there is no clear-cut formula to determine whether a duty exists in a specific case . . . the court will employ an *ad hoc* approach that 'turns on the particular facts and circumstances of a given case,' taking into consideration" "'all relevant factors, including the relationship between the parties, the scope and burden of the obligation to be imposed upon the defendant, public policy considerations,' and the 'foreseeability of harm to the plaintiff.'" *Ouch v. Khea*, 963 A.2d 630, 633 (R.I. 2009). The "linchpin in determining the existence of any duty" is the foreseeability of harm. *Splendorio v. Bilray Demolition Co.*, 682 A.2d 461, 466 (R.I. 1996).

A review of these factors based on the facts of this specific action, with particular focus on the foreseeability of the harm to Plaintiffs here, demonstrates that Brown had a duty to adequately prepare students regarding the risk of gender and sex-based violence and discrimination, including sexual assault and harassment and dating violence, that they would face while attending Brown. *See* FAC ¶¶ 23, 56, 58. The Rhode Island Supreme Court has held that the "requisite 'cause to anticipate'" harm "may arise from (1) actual or constructive knowledge of assailant's violent nature, or (2) actual or constructive knowledge ***that atmosphere of violence exists in [location of***

---

assert a negligence claim on the basis of a university's duty to exercise reasonable care in the investigation of allegations of rape and misconduct, as New York state law does not recognize a cause of action "in negligent prosecution or investigation." *Yu*, 97 F. Supp. 3d at 484. Here, Plaintiffs' claim is not for negligent prosecution and investigation, but alleges a failure to adequately train and supervise its employees in the handling of allegations of sexual assault and harassment. FAC ¶¶ 344-348. Moreover, a negligent supervision and retention claim is explicitly recognized by Rhode Island law. *See Welsh*, 474 A.2d at 441.

*the assault].*"  *Martin v. Marciano*, 871 A.2d 911, 917 (R.I. 2005) (emphasis added).  As alleged in the FAC, the risk of gender and sex-based violence to Plaintiffs was known by and foreseeable to Brown, which had notice of the frequency of sexual assault and harassment on its campus.  *See* FAC ¶¶ 62-64 (discussing the 2019 Campus Climate Survey on Sexual Assault and Misconduct); *see also id.* at ¶ 66 (citing Brown's Title IX Office Annual Outcome Reports which found that over 350 incidents were reported to Brown's Title IX Office between July 2016 to June 2020). Despite this knowledge, Brown failed to take effective measures to protect students on campus. *See id.* at ¶¶ 2, 23, 56, 58, 138, 141, 244.  The FAC also alleges that Plaintiffs were harmed by Brown's failure to warn and prepare students so that they could identify and guard against this known risk.  *See id.* at ¶¶ 69, 244, 103-107, 145-147, 209-210, 238-240, 262-264.  These allegations are sufficient to plead that Brown breached its duty of care to Plaintiffs to warn, train, and educate them about sex and gender-based violence and discrimination.[31]

### H.   THE FAC SUFFICIENTLY ALLEGES A BREACH OF FIDUCIARY DUTY CLAIM (COUNT VIII)

To plead a breach of fiduciary duty claim, a plaintiff must plead: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach."  *Chain Store Maint., Inc. v. Nat'l Glass & Gate Serv., Inc.*, No. CIV.A. PB 01-3522, 2004 WL 877599, at *13 (R.I. Super. Apr. 21, 2004) (internal citations omitted).  Under Rhode Island law, "a fiduciary

---

[31] The other factors can also be resolved in favor of Plaintiffs without issue.  While the relationship between students and universities is complex, at a minimum, universities should make every effort to ensure the safety of its students.  This does not frustrate any public policy considerations as "[p]arents, students, and the general community still have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be exercised to protect resident students from foreseeable harm."  *Mullins v. Pine Manor Coll.*, 389 Mass. 47, 52 (1983).  Further, the burden on Brown to carry out this duty is insignificant.  Other courts that have considered the issue have found that this duty can be satisfied if adequate warnings are conveyed to at-risk students.  *See Regents of Univ. of Cal.*, 4 Cal.5th 607, 619 (2018); *Dzung Duy Nguyen v. Mass. Inst. of Tech.*, 479 Mass. 436 (2018).  Here, Plaintiffs argue that Brown has failed to meet this minimal threshold.

duty may arise in a "'relationship of trust and confidence[,]' with relevant factors including "'the reliance of one party upon the other, the relationship of the parties prior to the incidents complained of, the relative business capacities or lack thereof between the parties, and the readiness of one party to follow the other's guidance in complicated transactions.'" *Simpson v. Dailey*, 496 A.2d 126, 129 (R.I. 1985).

Whether a fiduciary relationship exists between Brown and its students under the circumstances presented is an issue of first impression in Rhode Island.[32]  Moreover, novel legal questions are not amenable to resolution at the motion to dismiss stage, *see Logiodice v. Trustees of Maine Cent. Institute*, 135 F. Supp. 2d 199, 205 (D. Me. 2001), and the FAC sufficiently pleads facts to warrant discovery on this issue.  *See Vartarian*, 14 F. 3d at 700.  In fact, in *Sterman v. Brown Univ.*, 513 F. Supp. 3d 243 (D.R.I. 2021), a case both cited in the Motion (Memo. at 53) and in which Defendant was a party, Brown attempted to have this Court establish that no fiduciary relationship exists between universities and its students, and the Court declined to do so.  *See Sterman*, 513 F. Supp. 3d at 255.  Moreover, other district courts have found that a university has a fiduciary duty to its students to provide an environment free of sexual harassment, at least as it pertains to harassment perpetuated by faculty members.  *See, e.g.*, *Schneider v. Plymouth State Coll.*, 144 N.H. 458 (1999).

Here, the FAC alleges that Plaintiffs' fiduciary duty claim is based upon Plaintiffs' reliance on Brown for their education.  FAC ¶ 351.  As Brown students, Plaintiffs relied on Brown to adequately investigate or address their sexual assault complaints.  *Id.* at ¶¶ 16, 24, 73-74, 118-121,

---

[32] Brown incorrectly argues that Rhode Island law does not recognize a university-student fiduciary relationship.  Memo. at 53.  This is wrong.  Rhode Island courts have not yet addressed whether a fiduciary duty exists between a university and its students, which issue remains open for resolution.

154.  Plaintiffs also relied on Brown to take the adequate steps necessary to address or prevent sexual misconduct from occurring on campus.  *Id.* at ¶¶ 24, 68.  Further, the FAC alleges that Brown had a duty to create an environment free from gender and sex discrimination.  *Id.* at ¶¶ 1, 351.  The FAC also alleges that Plaintiffs relied on Brown to provide them with supportive services to help them cope and process as survivors of sexual assault.  *Id.* at ¶¶ 67, 136, 145, 168.  In short, the FAC alleges facts sufficient to show the relationship Plaintiffs had with Brown and the reliance they had on Brown to keep them safe from a unique and known harm to females of gender and sex-based discrimination on Brown's university campus.

The cases cited by Brown in its Motion are distinguishable.  *See* Memo. at 53-54.  *Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697 (D.Vt. 2012) and *Sterman*, 513 F. Supp. 3d 243 both considered whether a fiduciary relationship existed between a university and its student-athletes.  *Knelman*, 898 F. Supp. 2d at 697 (finding no fiduciary duty between student and university regarding student's status on extracurricular hockey team); *Sterman*, 513 F. Supp. 3d 243 (finding that the plaintiffs did not allege sufficient facts to allege that they had a fiduciary duty with Brown based on their reliance on Brown's representatives during the varsity squash recruitment process).  *Squeri v. Mount Ida Coll.*, 954 F.3d 56 (1st Cir. 2020) considered whether a fiduciary duty existed where a private college permanently closed after six weeks' notice.  Memo. at 53; *Squeri*, 954 F.3d 56 (finding no common-law fiduciary duty to student to disclose college's financial distress).  Thus, unlike the allegations in the instant action, none of the cases relied upon by Brown concern sex and gender-based discrimination based upon a university's knowledge of school-wide, systemic incidents of sexual misconduct.

Moreover, all cases cited by Brown concern a fiduciary duty that is distinguishable from the fiduciary duty Plaintiffs allege here.  *Compare* FAC ¶ 69 (alleging Brown owes a fiduciary

66

duty to its female students to provide an educational environment free of sex and gender based discrimination) *with Knelman*, 898 F. Supp. 2d at 697 (finding no fiduciary relationship between a student and a university regarding the student's right to play hockey); *Sterman*, 513 F. Supp. 3d 243 (finding that the university did not owe a fiduciary duty to inform recruited squash students about the possibility of the elimination of the varsity squash teams); *Squeri*, 954 F.3d 56 (finding that members of the college's board of trustees did not owe a fiduciary duty to students with respect to disclosure of college's financial distress).  Further, the fiduciary duty claim in *Knelman* was analyzed under a summary judgment standard, not on a motion to dismiss.  *See Knelman*, 898 F. Supp. 2d at 701.  The plaintiff in *Knelman* had the benefit of discovery, whereas Brown attempts to deprive Plaintiffs of this opportunity.  The instant action is brought in Rhode Island, and Rhode Island is not bound by the established law of another jurisdiction, especially where, as here, the fiduciary duty alleged arises in a different context.

In *Sterman*, this Court declined to find whether a fiduciary duty existed because the plaintiffs failed to allege sufficient facts to support their claim.  *See Sterman*, 513 F. Supp. 3d at 255.  To the contrary, here the FAC sufficiently alleges a breach of fiduciary duty.  The FAC contends that Brown failed to effectively execute various of its grievance policies for reporting sexual assault, which students relied on to get justice and support after surviving sex/gender-based discrimination and/or harassment.  *See* FAC ¶¶ 14-16, 19, 65, 67, 68, 75-76, 96, 121, 125-127, 167-168, 195-197.  Brown's system for reporting sex/gender-based discrimination and/or harassment on campus is the only recourse students have to address any incident of sexual harassment or assault on campus.  *Id.* at ¶¶ 41-50.  Plaintiffs are also dependent on Brown for their education, and, as previously mentioned, "[p]arents, students, and the general community still have a reasonable expectation, fostered in part by colleges themselves, that reasonable care will be

exercised to protect resident students from foreseeable harm." *Mullins*, 389 Mass. at 52. Thus, Brown owed Plaintiffs a fiduciary duty to create an environment in which they could pursue their education free from gender and sex discrimination. *See* FAC ¶ 351. As a result of Brown's conduct, Plaintiffs suffered mental and physical harm and were exposed to further harassment and an overall toxic campus environment. *See id.* at ¶¶ 16-17, 69, 103-105, 145-147. These allegations are sufficient to sufficiently plead a breach of fiduciary duty claim.

## I.   THE FAC SUFFICIENTLY ALLEGES A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT IX)

To establish a claim of intentional infliction of emotional distress, Plaintiff must allege that: (1) Brown's conduct was intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct was extreme and outrageous, (3) there is a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question is severe. *Ryan v. Yost*, CV 15-229-ML, 2017 WL 1232421, at *7 (D.R.I. Apr. 3, 2017). Brown's Motion contests only the third element of this claim, arguing that Brown's conduct did not meet the "very high standard" of "extreme and outrageous" conduct as required by the statute. Brown's position is unfounded. The FAC satisfies all of these elements.

The FAC alleges that Chloe's attacker was chosen as mid-graduation speaker at Brown after he was found responsible for sexual misconduct. FAC ¶¶ 157, 161. Then, Chloe was found responsible for retaliation for publicly speaking out about her assault. *Id.* at ¶ 150. As a result of Brown's conduct, Chloe experienced emotional instability, traumatic flashbacks, and even experienced thoughts of self-harm and suicide. *Id.* at ¶ 209. Taja was initially forced to continue to live in the dorm where she was sexually assaulted and subjected to harassment after the fact and was only permitted to move to another on-campus dormitory after multiple rejected requests to

move off campus.  *Id.* at ¶¶ 109-117; *see also id.* at ¶ 132.  As a result of Brown's failure to ensure

Taja's safety, Taja spent most of the semester confined to her dorm room.  *Id.* at ¶¶ 135, 146.

After Katiana was coerced by Brown into the informal resolution process after reporting

her May 2021 sexual assault, Brown found it appropriate to forward Katiana an email "apology"

written by her assaulter that contained language where he insinuated that he enjoyed assaulting

her.  *Id.* at ¶¶ 81-83.  After retraumatizing her with that email, Brown took no further action with

respect to her report.  *Id.* at ¶ 84.  To further add insult to injury, when Katiana was assaulted again

two months later, Brown completely dismissed Katiana and did not conduct any investigation into

her rape or provide her with any resources or assistance.  *Id.* at ¶¶ 95-96.  Brown's conduct had

such a severe effect on Katiana that Katiana essentially abandoned her pursuit for higher education

at Brown.  *Id.* at ¶¶ 104-107.  These allegations are plainly sufficient to survive a motion to

dismiss.[33]

Finally, Brown's unsupported argument that Plaintiffs have failed to sufficiently pled

physical symptomatology is also without merit.  A complaint "must contain sufficient factual

matter to state a claim to relief that is plausible on its face."  *Grajales v. P.R. Ports Auth.*, 682 F.3d

40, 44 (1st Cir. 2012).  All allegations must be taken as true, and any doubts must be resolved in

favor of the plaintiff.  *Chhun v. Mortg. Elec. Registration Sys., Inc.*, 84 A.3d 419, 421 (R.I. 2014).

It is not necessary to plead facts sufficient to establish a *prima facie* case at the pleading stage.  *See*

*Swierkiewicz v. Sorema*, N.A., 534 U.S. 506, 512 (2002).  "The prima facie standard is an

---

[33] *See also* FAC ¶¶ 7-8 (discussing the VOB Instagram account that was created by sexual assault survivors at Brown to anonymously discuss instances of sexual assault on campus and their experiences reporting those assaults to Brown, where over 100 students reported their stories to VOB and the account quickly amassed a support of over half of the student population at Brown).

evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Rodriguez-Reyes v. Molina-Rodriquez*, 711 F.3d 49, 54 (1st Cir. 2013).

Here, the FAC sufficiently outlines the physical symptoms Plaintiffs experienced after being subjected to Brown's Title IX process. FAC ¶ 359. Further, in contradiction of Brown's arguments (Memo. at 56), the FAC specifically alleges physical symptoms of mental anguish to specific Plaintiffs. *See* FAC ¶ 146 (Taja experienced panic attacks whenever she had to be on campus alone). These allegations are sufficient to state a plausible intentional infliction of emotional distress claim. Thus, Brown's Motion should be denied. *See Rodriguez-Reyes*, 711 F.3d at 53 (finding that defendants' laser-like focus on a prima facie case is misplaced at the pleading stage; that requirement should be reserved for summary judgment and trial).

### J.   PLAINTIFFS MAY RECOVER PUNITIVE DAMAGES FOR THEIR STATE LAW CLAIMS

#### 1.   Plaintiffs Have Sufficiently Pled Their Claims For Punitive Damages Under Rhode Island Law[34]

Brown contends that Plaintiffs are unable to recover punitive damages for their state law claims because Plaintiffs have failed to plead sufficient facts to justify their demand under the standards imposed by Rhode Island law. Memo. at 58-59. As Brown acknowledges in its Motion, Rhode Island reserves punitive damages for cases "where the defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." *Palmisano v. Toth*, 624 A.2d 314, 318 (R.I. 1993). To be sure, "[t]he standard in Rhode Island for imposing punitive damages is rigorous." *Mark v. Congregation Mishkon Tefiloh,* 745 A.2d 777, 779 (R.I. 2000). However, Plaintiffs need not meet that rigorous standard at the pleadings stage. To the contrary, as the Supreme Court of Rhode Island has explained:

---

[34] Plaintiffs' concede that punitive damages are not available under Title IX. *See* Memo. at 56-58.

> [a] plaintiff who is not seeking to delve into a defendant's financial net worth during the pretrial discovery stage does not have to bear the burden . . . necessary for imposing punitive damages, particularly in the early stages of litigation, simply because a claim for punitive damages has been included in the plaintiff's complaint[.]

*Castellucci v. Battista*, 847 A.2d 243, 247–48 (R.I. 2004).  The facts alleged by Plaintiffs in the FAC are properly pled, place Brown on notice of the claim and its bases, and thus are more than sufficient for Plaintiffs to pursue this state law based sanction against Brown.  *See, e.g.*, Section V(I) *supra* (providing examples of Brown's reckless conduct).  At the very least, Plaintiffs should be given the opportunity to that have their claims considered on its merits.

### 2.    Plaintiffs' May Also Recover Damages for Emotional Distress

On May 3, 2022, Defendant Brown submitted a Supplemental Memorandum of Law (the "Supplemental Memorandum") in support of its Motion, pushing its total briefing past 90-pages. In its Supplemental Memorandum, Defendant first rehashes the same argument made in its primary memorandum that Plaintiffs are not entitled to recover punitive damages for their Title IX claims. As previously discussed, Defendant's argument with respect to punitive damages premised upon *Barnes v. Gorman* is unavailing for a host of reasons, including that its applicability in this circuit is a novel issue not properly decided at the pleading stage.  *Barnes v. Gorman*, 536 U.S. 181 (2002).  *See supra* at Section V(J)(1).  Defendant makes a similar mistake in its attempt to broaden the scope of the Supreme Court's narrow holding in the recent decision of *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022) to make it applicable to this case.

The *Cummings* decision arose under the Rehabilitation Act of 1973 and the Patient Protection and Affordable Care Act.  *Cummings*, 142 S. Ct. at 1563 (2022).  In *Cummings*, a deaf plaintiff sought damages after she was denied disability accommodations while seeking services from a rehabilitation center that was subject to the aforementioned statutes.  *Id.* at 1568.  The

district court determined that the plaintiff's only compensable damages were emotional in nature. *Id*. Based upon these ***specific facts***, the Supreme Court considered whether emotional distress damages were available and held that prospective federal funding recipients in that matter, a small business rehabilitation center providing physical therapy to a deaf plaintiff, were not necessarily on notice that they could be subject to damages for emotional distress for failing to provide an American Sign Language interpreter if they accepted federal funds. As such, the Court determined that emotional distress damages are not available under the statutes considered in that case. *See id*. at 1572 ("[i]t follows that such damages are not recoverable under the Spending Clause statutes ***we consider here***[,]" specifically Title VI, not Title IX) (emphasis added).

Plaintiffs' claims here arise under Title IX, a statute that presents a host of different considerations, and Plaintiffs' claims for emotional distress damages are not directly foreclosed by *Cummings*. First, there is extensive federal case law from across the country, that expressly and specifically establish that emotional damages are available among the remedies under Title IX and that educational institutions have sufficient notice of that Title IX violations could lead to emotional distress damages. See, e.g., *Sheely v. MRI Radiology Network, P.A*., 505 F.3d 1173, 1204 (11th Cir. 2007); *Roohbakhsh v. Bd. of Trustees of Nebraska State Colleges*, 409 F. Supp. 3d 719, 735 (D. Neb. 2019); *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1116 (N.D. Cal. 2013); *S.C. v. Metro. Gov't of Nashville & Davidson Cnty*., Tennessee, No. 3:17-CV-01098, 2022 WL 127978, at *32 (M.D. Tenn. Jan. 12, 2022); *Dawn L. v. Greater Johnstown Sch. Dist*., 586 F. Supp. 2d 332, 384 (W.D. Pa. 2008). There is no discussion in *Cummings* of these cases nor any language in *Cummings* expressly finding them to be incorrect.

Moreover, given the newness of the *Cummings* decision, it is not surprising that no courts within the First Circuit, or any circuit, have expressly considered the extension of *Cummings* to

72

Title IX cases. Thus, as was the case with punitive damages, under *Franklin v. Gwinnett County Public Schools*, there is no "clear direction" that prohibits the recovery of emotional distress damages under Title IX. 503 U.S. 60, 70-71 (1992). To the extent that this Court wishes to explore this novel issue, the analysis would require far greater consideration than what Defendant set forth in its Supplemental Memorandum, which fails to delve into the differences between Title IX, which can encompass claims for sexual assault and harassment, and the two statutes at issue in any significant detail and fails to address whether a university accepting federal funds could be on notice that claims for emotional distress could flow from a breach of contract under that statute.

Finally, even if this Court were to find *Cummings* applicable to claims brought under Title IX, that finding would not bear on Plaintiffs' ability to recover damages for emotional distress under their common law claims, such as intentional infliction of emotional distress. Further, contrary to Defendant's efforts to spin the nature of the relief Plaintiffs seek,[35] Plaintiffs have sufficiently pled entitlement to economic damages separate and apart from emotional distress damages. By way of example:

- Following their experiences with the Title IX Office, both Katiana and Jane 2 took a leave of absence necessitated by their experiences with Brown's Title IX Office. FAC ¶¶ 107, 261.

---

[35] Defendant claims, for example, that Chloe, Taja, and Emma "pled only alleged emotional injuries" and no economic injury. Memo. at 5. This is simply untrue and Defendant's attempt to categorize Plaintiffs' damages claims is improper at the pleading stage. The FAC does allege that each suffered economic damage as a result of Brown's violations of Title IX. *See* FAC ¶¶ 168, 182-183 (Chloe); *Id.* at ¶¶ 132, 145-147 (Taja); *Id.* at ¶¶ 199, 209 (Emma); *Id.* at ¶¶ 219, 238 (Jane 1); ¶ 261 (Jane 2); *Id.* at ¶¶ 103, 105, 107 (Katiana). The FAC also alleges that all Plaintiffs suffered economic harm flowing from Brown's violation of Title IX. *Id.* at ¶¶ 304, 314, 321, 327, 335.

- Katiana and Taja had to take incomplete designations for courses in which they were enrolled. *Id.* at ¶¶ 105, 183.

- Taja also received a "No Credit" for a course she could not focus on due to the lack of support she received from Brown and had to take a reduced course load for two semesters. *Id.* at ¶ 145.

- Jane 1 left the program in which she was enrolled because she felt unsafe due to Brown's conduct. *Id.* at ¶ 238.

- All Plaintiffs allege that their academic experience and performance were negatively impacted by their inability to concentrate on their studies. *Id.* at ¶¶ 103, 105, 145, 209.

- Chloe and Emma both allege that they underwent therapy in order to process the traumatic experiences they were subjected to by Brown and its employees. *Id.* at ¶ 147.

These allegations give rise to claims for economic damages, in the form of lost tuition, lost dues or other campus costs, delay in graduation, out-of-pocket expenses, and other financial harm. *Cummings* does not address claims for these types of economic loss, which are recoverable under Title IX. *See Davis Next Friend LaShonda D.*, 526 U.S. 629 (holding that monetary damages are available in private suits for violations of Title IX); *Franklin*, 503 U.S. 60.

## VI.   DEFENDANT'S MOTION TO STRIKE CLASS ALLEGATIONS IS PREMATURE AND SUBSTANTIVELY WRONG

### A.   MOTIONS TO STRIKE CLASS ALLEGATIONS ARE ROUTINELY FOUND TO BE PREMATURE

A motion to strike class allegations is unusual and rarely successful. *See Shibetti v. Z Restaurant, Diner and Lounge, Inc.*, No. 18-CV-856-ERK-ST, 2019 WL 11624313, at *9

(E.D.N.Y Aug. 30, 2019) (noting that a motion to strike class claims is an "unusual vehicle"); *Chenensky v. N.Y. Life Ins. Co.*, No. 07-CV-11504-WHP, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) ("'Motions to strike are generally looked upon with disfavor.'"); *Canady v. Bridgecrest Acceptance Corp.*, No. 19-CV-04738-PHX-DWL, 2022 WL 279576, at *3 (D. Ariz. Jan. 31, 2022) (motions to strike "'viewed with disfavor'" and "'not frequently granted'").  "While such motions are generally looked upon with disfavor, they are 'even more disfavored' in the context of a class action because they seek 'to preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled.'"  *Yang Chen v. Hiko Energy, LLC*, No. 14-CV-1771 VB, 2014 WL 7389011, at *3 (S.D.N.Y. Dec. 29, 2014) (citing *Chenensky*, 2011 WL 1795305, at *1).

The threshold for a Court to even consider striking class allegations is whether the "issues raised are 'the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b).'"  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464 (S.D.N.Y. 2013) (quoting *Rahman v. Smith & Wollensky Rest. Grp., Inc.*, No. 06-CIV-6198-LAK-JCF, 2008 WL 161230, at *3 (S.D.N.Y. Jan. 16, 2008)).  Thus, unless a motion to strike class allegations "addresses issues separate and apart from the issues that will be decided on a class certification motion," the motion should be denied as premature.  *Chen–Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) (internal quotation marks omitted); *accord Blagman v. Apple, Inc.*, No. 12-CIV-5453-ALC-JCF, 2013 WL 2181709, at *2 (S.D.N.Y. May 20, 2013) (same); *Kassman*, 925 F. Supp. 2d 453 at 464–65 (same).

Here, simply reviewing the table of contents for Defendant's memorandum of law confirms that the issues presented by Defendant are literally identical to those that would be considered in

the context of Plaintiffs' eventual motion for class certification.   In the memorandum itself, Defendant first lays out the requirements of Rule 23(a) and 23(b).   Memo. at 61-63.   Next, Defendant discusses each requirement in turn.   *Id*. at 64-78 ("Plaintiffs' allegations do not satisfy all four of Rule 23(a)'s requirements.").   Defendant's motion to strike, therefore, presents ***exactly*** the type of "march through the . . . prongs of Rule 23" that courts routinely deem to be premature at this stage of the proceedings.   *Shibetti*, 2019 WL 11624313 at *9.   Under these circumstances, motions to strike should be "swiftly rejected."   *Sealock v. Covance, Inc.*, No. 17-cv-5857-JMF, 2018 WL 2290698 at *1 (S.D.N.Y May 18, 2018).

Recognizing that the law does not favor motions to strike, Defendant does not even reference Rule 12(f) in its notice of motion, seemingly trying to shoe-horn its 12(f) motion into its 12(b)(6) motion.   In fact, Defendant does not even reference Rule 12(f) until page 60 of its memorandum.   There, Defendant notes that a district court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."   F.R.C.P. 12(f).   Defendant ignores that courts have recognized that "these limited categories [dictated by Rule 12(f)] do not map neatly onto a class allegation.   Such an allegation is not a defense, is not redundant, is not impertinent, and is not scandalous.   At most, it might be said that a facially deficient class allegation is "immaterial," but even that is something of a stretch."   *Canady*, 2022 WL 279576, at *3 (citing Steven S. Gensler, *Federal Rules of Civil Procedure, Rules and Commentary, Rule 23*, at 632 (2020), which characterizes as 'problematic' the use of Rule 12(f) to strike class allegations).

The cases Brown cites stand for the general proposition that motions to strike have been considered using a threshold pleading standard, but they do not support Brown's arguments in any substantive way.   For example, in *Bessette v. Avco Fin. Serv., Inc.*, the court noted that "[i]t is not

appropriate to require plaintiff to establish that she can maintain a class action under Rule 23 before plaintiff even attempts to do so." 279 B.R. at 450 (D.R.I. 2002). The *Bessette* court denied the motion to strike, finding, among other things, that "Defendant's argument that plaintiff's claim is too individualized to warrant class certification is premature." *Id*. at 451. "Although defendant may ultimately be proven correct, at the initial stages of litigation, prior to discovery, defendant cannot prevail because it has a hunch or even a reasonable basis to believe that plaintiff will fail to meet Rule 23's requirements for class action." *Id*.

In *Manning v. Boston Medical Center Corp.*, also cited by Defendant, the District of Rhode Island did note that a motion to strike can be considered under a 12(b)(6) standard, but then went on to dismiss the underlying substantive claims on the merits, which necessarily disposed of the class allegation. *Manning v. Boston Med. Ctr. Corp.*, No 09-CIV-11463-RWZ, 2012 WL 1355673, at *1 (D. Mass Apr. 18, 2012), *aff'd in part, vacated in part*, 725 F.3d 34 (1st Cir. 2013). On appeal, the First Circuit ***vacated the Court's order striking the class and collective allegations from the complaint***, finding specifically that: (1) "courts should exercise caution when striking class action allegations based solely on the pleadings[;]" (2) 'such motions are narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion[;]'); and (3) 'striking a portion of a pleading is a drastic remedy.'" 725 F.3d at 59 (quoting *Boreri v. Fiat S.p.A.*, 763 F.2d 17, 23 (1st Cir. 1985) and 5C Charles Alan Wright, *et. al.*, *Federal Practice & Procedure* § 1380 (3d ed. 2011)). After further exposition on why the striking of class allegations is disfavored, the First Circuit concluded that "a court should typically await until the development

of a factual record before determining whether the case should move forward on a representative

basis." *Id*. at 59.[36]

Finally, in citing two cases from California for the proposition that a class action should

not be a vehicle for broad discovery (Memo. at 61), Brown fails to explain how the facts pled here

are at all comparable to those in the cases it cites and how the discovery sought by each individual

plaintiff with respect to Brown's common course of conduct would be any broader in a class versus

an individual or coordinated action.   Specifically, in *Flores v. Starwood Hotels & Resorts*

*Worldwide, Inc.*, the Court found that the plaintiffs "fail to allege even the most basic of facts

concerning their employment" and sought class discovery for the purpose of bolstering the

sufficiency of their underlying claims.   No. SACV-14-1093-AG-ANX, 2015 WL 12912337, at *3

(C.D. Cal. March 16, 2015).   In *Jue v. Costco Wholesale Corp.*, 2020 WL 889284 (N.D. Cal. Mar.

11, 2010), the Court concluded the exact opposite of what Defendant proffers, holding that, with

respect to the sufficiency of the class allegations in the complaint, "it is premature to evaluate the

sufficiency of the class allegation" given that the plaintiff's claims were dismissed and another

party was likely to become the new putative class representative.   *Id.* at *6.   That case also involved

a unique situation where the Court found there to be "questionable tactics" tainting the briefing

process and a concession by the plaintiff that the relief sought by the plaintiff was time-barred

(among other things).   *Id.* at *1.   Against this factually specific and strange backdrop, the Court

---

[36] Brown also cites *Monteferrante v. Williams-Sonoma, Inc*, 241 F. Supp. 3d 264, 273 (D. Mass. 2017) as an example of a Court's use of Rule 12(f) to strike class allegations.   Memo. at 60.   In that case, the Court invited the plaintiffs to amend the complaint to address the fact that the class definition, on its face, encompassed individuals who could not assert an unjust enrichment claim on statute of limitations grounds.   Here, there is no comparable allegation that is deficient on its face, nor does Defendant point to any.   Similarly, in *Barrett v. Avco Fin. Servs. Mgmt. Co*., 292 B.R. 1, 2 (D. Mass. 2013), the Court struck class allegations seeking to certify a nationwide class where the court lacked jurisdiction over bankruptcies that were discharged outside of the State of Massachusetts.   *See* Memo. at 60.

issued the warning Defendant cited in pure dicta.  No comparable situation exists here, and these two cases are inapposite.

Here, each Plaintiff has provided significant detail regarding the factual basis of their claims and is not seeking discovery to bolster their underlying claims for the purposes of pleading. *Jue v. Costco Wholesale Corp*. similarly was a fact-specific case where the court found there to be "questionable tactics" tainting the briefing process and a concession that the relief sought by the plaintiff was time-barred[,]" (among other things).  2010 WL 889284 at *1 (N.D. Cal. March 11, 2010).  Against this factually specific and strange backdrop, the court issued the warning to the plaintiff cited by Brown in pure dicta.  *Id*.  These cases do no not support Brown's effort to strike Plaintiffs' class allegations.

### B.    PLAINTIFFS' CLASS ALLEGATIONS ARE PROPERLY PLED

Because it is quite obvious that Defendant is seeking to litigate class certification at the pleading stage, and given that Defendant fails to even specify, let alone establish, what about Plaintiffs' class allegations is "redundant, immaterial, impertinent, or scandalous" as required, the Court's inquiry can and should stop there.  Defendant's Motion should be denied it its entirety as premature.  To the extent that the Court deems a review of Plaintiffs' class allegations to be appropriate (which it should not), those claims are well-pled and meet the "plausibility standard" under *Twombly* that Defendant itself espouses.  Memo. at 61.  It is more than plausible that Plaintiffs will be able to satisfy all requirements of Rule 23, especially after conducting the discovery to which they are entitled.  *Bourbonnais v. Ameriprise Fin. Servs., Inc.,* No. 14-C-966, 2015 WL 12991000, at *7 (E.D. Wis. Aug. 20, 2015).  The below discussion is the exact analysis the Court will engage in at the class certification stage and should be deferred until then.

To be clear, Plaintiffs are seeking to certify a class seeking injunctive relief under Rule 23(b)(2) and damages under 23(b)(3).  Defendants raise no real issue with a 23(b)(2) class other

than to claim that somehow the Court does not have power to grant the relief that Plaintiffs seek. *See* Section VI(C)(1), *infra*. Certainly, Brown provides no reason for class allegations regarding injunctive relief, which be definition will redound to the benefit of all, to be stricken from the pleading. To the extent that Plaintiffs also seek class wide damages, the issues are admittedly more complicated but, again, Brown provides no reason to strike claims that will be addressed in detail in the normal course of the litigation. With respect to damages, the proof of Brown's conduct lies at the heart of the proof of the claims of all members of the class. Further, it is axiomatic that individual questions of damages do not preclude class certification, so long as the source of the damages is common to the class. *See* Section VI(C)(2), *infra*.

### 1. Plaintiffs Have Properly Pled All Elements of Rule 23(a)

The requirements of Rule 23(a) are not in dispute. To obtain class certification, a plaintiff must ***establish*** the four elements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. F.R.C.P. 23(a). Defendant does not seriously dispute that Plaintiffs have properly pled numerosity.

### 2. Plaintiffs Have Properly Pled Common Questions of Law and Fact

Rule 23(a)(2) requires that common questions of law or fact be shared by the prospective class, but does not require that every question be common. *See Kirby v. Cullinet Software, Inc*. 116 F.R.D. 303, 306 (D. Mass. 1987). The commonality standard generally, let alone at the pleading stage, is not demanding, and the Supreme Court has held that "'[e]ven a single [common] question' will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).[37]

---

[37] Defendant strangely cites to the "rigorous" and often merits-driven analysis required by *Wal-Mart*, ignoring that Defendant has raised these issues ***at the pleading stage***. Memo. at 64.

The FAC details the issues of law and fact common to all members of the proposed class. FAC ¶ 287.  Even if this list were deemed merely "illustrative rather than exhaustive," the commonality prong would be satisfied.  *Kirby*, 116 F.R.D. at 306.  The claims of every class member will hinge on the answers to these common questions.  The FAC also specifies that "Plaintiffs' individual claims, as class representatives, require resolution of the common questions concerning whether Brown has subjected its female students to sex/gender-based discrimination[,]" and that Plaintiffs seek remedies to, among other things "prevent Brown's continued sex/gender discrimination. FAC ¶ 270.  The FAC goes on to specify that "Plaintiffs will first establish the existence of systemic gender discrimination as the premise for the relief they seek."  *Id.* at ¶ 272.  Thus, the answers to common questions will likely "drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350; *see also Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007); *In re Dial Complete Marketing and Sales Practices Litig.*, 312 F.R.D. 36, 53 (D.N.H. 2015).

The *Wal-Mart* Court specifically stated that commonality requires "the same" injury but explained that this means only that the "claims must depend upon a common contention."  *Wal-Mart*, 564 U.S. at 350.  The Court went on to give examples of what might satisfy the "same injury" test, describing one case that hinged on proof of "a companywide discriminatory pay and promotion policy."  *Id.* at 350, 359.  The examples chosen by the *Wal-Mart* Court all described injurious conduct by the defendant and not the type of damages suffered by class members.  After *Wal-Mart*, Courts have routinely held that "the same injury" test can be "satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects—the damages—are diverse."  *In re Deepwater Horizon*, 739 F.3d 790, 810-11 (5th Cir. 2014); *see also Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014); *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 383 (3d Cir.

2013); *Soseeah v. Sentry Ins.*, No. CIV 12-01091 RB/KK, 2016 WL 7435792, at *4 (D.N.M. Sept. 6, 2016).  "Where class members have different degrees of injury or even where defenses might exist only as to particular individuals, commonality has been found for class certification." *Applegate v. Formed Fiber Techs, LLC*, 2:10-CV-00473-CZS, 2012 WL 3065542, at *6 (D. Me. July 12, 2012); *Connor B. ex rel Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011) ("it is not uncommon for courts in this circuit to certify class actions in which alleged systemic deficiencies resulted in harms that manifested themselves differently among different segments of the plaintiff[s] class.").

Defendant's arguments regarding commonality are the exact arguments they will make, and that the Court will consider, at the class certification stage and are thus premature.  Defendant fails to even attempt to establish that a motion to strike is the appropriate place to assert these arguments.  Defendant's untimely argument against commonality is premised, as is a large part of its Motion, upon a self-serving and inaccurate description of Plaintiffs' claims.  Memo. at 65-67. Defendant knows full well that Plaintiffs are not seeking to litigate their individual sexual misconduct cases before this Court.[38]  The claims in this case stem primarily from the failings of the sexual misconduct response program at Brown and Brown's systemic failures to follow its own policies and procedures and to take effective preventative measures to protect the interest of the members of the class that Plaintiffs seek to represent.  FAC ¶¶ 55-56, 58-67, 302-306.  Thus, as

---

[38] Citations to individual cases asserting vastly different types of claims are not helpful to Brown. In *Doe v. Brown Univ.* (misdescribed as a "sexual misconduct case" and miscited by Brown at pages 65-66 of its memorandum), a student brought a breach of contract claim against Brown after he had been disciplined for sexual misconduct.  210 F. Supp. 3d 310 (D.R.I. 2016).  *Doe v. R.I. Sch. of Design*, 432 F. Supp. 3d 35 (D.R.I. 2019) was a case brought by a student who was assaulted while studying abroad and sued the school that organized the program for negligence and premises liability.  Neither asserted a Title IX claim on behalf of a class against a school premised upon a common policy.

discussed in detail above, Plaintiffs' claims hinge primarily on allegations of a failure of Brown's official policies as well as Brown's deliberate indifference in failing to address the risk of sexual assault on campus. *See* Section IV(A), *supra*. Under these circumstances, commonality can plausibly be established.[39]

Finally, it should be noted that Brown deems Plaintiffs allegations of commonality to be "fatally flawed" in a manner that can and will be addressed at the class certification stage. Memo. at 67. But nowhere does Brown assert that these allegations are "redundant, immaterial, impertinent, or scandalous," as Rule 12(f) requires.

### 3.   Plaintiffs Have Properly Pled Typicality

Under Rule 23(a)(3), the claims of proposed class representatives must be typical of the claims of the members of the proposed class. *See McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 309-10 (D. Mass. 2004). "'The central inquiry in determining whether a proposed class has 'typicality' [or] whether the class representatives' claims 'have the same essential characteristics as the claims of the other members of the class.'" *Id.* (quoting *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 491 (S.D. Fla. 2003); *see also Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d. 149, 162 (D. Mass. 2019). The "plaintiffs . . . need only show that their claims arise from the same course of conduct that gave rise to the claims of the absent class members." *McLaughlin*, 224 F.R.D. at 310 (quoting *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass 1988)).

---

[39] Brown accuses Plaintiffs of trying to "gloss over" the individual nature of their claims. Memo. at 63. This assertion, once again, is premised upon Brown's self-serving assessment of Plaintiffs' claims and ignores the bulk of the allegations of the FAC. Brown also cites to *Doe v. Unified Sch. Dist. 259*, 240 F.R.D. 673 (D. Kan. 2007) as an example of a case where class certification was denied. Memo. at 63. That case, however, was decided in the context of a class certification, not on a motion to strike.

The FAC pleads that the claims of Plaintiffs and the class they seek to represent stem from the "same legal theories and arise from the same unlawful pattern and practice of mishandling claims for sexual harassment and assault." FAC ¶ 275. The FAC further makes plain that the primary bases for Plaintiffs' claims are Brown's acts and omissions, Brown's failure to respond, Brown's creation of a hostile environment, Brown's failure to ensure a non-discriminatory environment, Brown's failure to provide supportive measures, Brown's failure to create adequate procedures or to follow its own procedures, Brown's failure to discipline, and other conduct unique to Brown. *Id.* at ¶¶ 278-79. The FAC goes on to state that the primary relief necessary to remedy the claims is the same as to Plaintiffs and the proposed class. *Id.* at ¶ 280. Thus, Plaintiffs' claims stem from a unitary course of conduct and are based on the same legal and remedial theories, as is required to establish typicality for purposes of a class certification motion. Here, of course, this case is at the pleading stage.

Defendant properly notes that the commonality and typicality analyses "tend to merge." Memo. at 67 (citing *Wal-Mart*, 564 U.S. at 349, n.5). Just as Brown's commonality arguments fail, so do its typicality arguments. Again, Brown fails to explain why its arguments should be addressed on the pleadings and fails to pinpoint what specifically is scandalous or impertinent about Plaintiffs' typicality allegations. Instead, Defendant again mischaracterizes Plaintiffs' claims as primarily seeking monetary damages and completely ignores that Plaintiffs' claims arise from Brown's own policies, practices, and procedures, all of which Plaintiffs allege violated Title IX. Memo. at 67-70. Defendants do not once mention the primary relief Plaintiffs seek, but instead focus on collateral allegations of monetary damages. *Id.* at 68-69. Even so, and as discussed above, it is well-settled that class treatment is not precluded in cases where issues of injury-in-fact or damages present individual questions. *In re Nexium Antitrust Litig.*, 777 F.3d 9,

21 (1st Cir. 2015); *see also Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 297 (D. Mass. 2011).  Differences in damages simply do not preclude class certification, and Brown certainly cannot so establish that on the pleadings.[40]

### 4.    Plaintiffs Have Properly Pled Adequacy

Rule 23(a)(4) requires a finding that Plaintiffs are adequate representatives of the class they seek to represent.  "Inquiries into the adequacy of representation should focus on the named plaintiffs' ability to prosecute the action vigorously through qualified counsel and their lack of conflicting interest with unnamed class members."  *McLaughlin*, 224 F.R.D. at 310 (quoting *Priest*, 118 F.R.D. at 556 (internal quotation marks omitted) and citing *Kirby*, 116 F.R.D. at 308-09 ("The two basic guidelines for meeting the adequacy of representation standard of Rule 23(a)(4) are:  (1) the absence of potential conflict between the named plaintiffs and the class members and (2) ... assurance of vigorous prosecution." (internal quotation marks omitted)).  Plaintiffs have alleged that they are willing and able to represent the proposed class fairly and adequately, and that they have retained qualified and experienced counsel.  FAC ¶¶ 284-85.  There is nothing scandalous or impertinent about these allegations, or even anything redundant or arguably immaterial.

Defendant's only argument regarding adequacy actually has nothing to do with adequacy, but rather hinges on an overblown and misguided reference to the "unwieldly [sic] monstrosity"

---

[40] Brown makes a passing reference to the Seventh Amendment with a single citation to authority purporting to support its position that it has the right to depose every member of the proposed class.  Memo. at 69.  There is no absolute right for Brown to depose and cross-examine absent class members in a case where the plaintiffs seek to establish class-wide impact through common proof.  There is also no precedent for striking class allegations for this reason at this stage.  *See Nexium*, 777 F.3d at 21; *Sheet Metal Workers Local No. 20 Welfare and Benefit Fund v. CVS Pharmacy, Inc*., 540 F. Supp. 3d 182, 219 (D.R.I. 2021) (rejecting similar Seventh Amendment-based argument at the "'class certification stage'").

that would be created by the requirements of FERPA.  Memo. at 71.  It is unclear why Defendant

deems this argument to be at all related to adequacy.  This strawman argument also is premised on

the mischaracterization of the FAC that pervades Brown's entire motion to strike.  Plaintiffs are

not seeking to prove an underlying sexual misconduct case on behalf of any member of the class

in a manner that would require release of a student's educational records.  Plaintiffs' claims will

be proven by reference to Brown's own policies and procedures and proof of Brown's deliberate

indifference.   The claims further will be proven through Brown's own documents and the

documents of the named Plaintiffs, as is the norm in class action litigation.  To the extent there is

ever a class wide claims-type process, it will be up to each class member to determine whether to

participate and to provide documentation if at all necessary.  And, again, Brown fails to establish

that this determination should be made on a motion to dismiss, rather than in the context of a fully

briefed motion for class certification.

### C.    PLAINTIFFS HAVE PROPERLY PLED THE RELEVANT ELEMENTS OF RULE 23(B)

Rule 23 requires that the proposed action fall into one of the three categories outlined in

Rule 23(b).  Plaintiffs allege that the current action satisfies the requirements of both 23(b)(2) and

23(b)(3).

### 1.    Rule 23(b)(2)

Rule 23(b)(2) states that an action may be maintained as a class action where "the party

opposing the class has acted or refused to act on the grounds generally applicable to the class,

thereby making final injunctive relief or corresponding declaratory relief with respect to the class

as a whole."  F.R.C.P. 23(b)(2).  If injunctive or declaratory relief is appropriate with respect to

the proposed class, then certification is proper.  *See Dionne v. Bouley*, 757 F.2d 1344, 1355 (1st

Cir. 1985).  Plaintiffs have alleged exactly what Rule 23(b)(2) requires; namely, that "Brown has

acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class by

facilitating sex/gender based discrimination and failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of sexual assault, hostile environment, sexual harassment and retaliation.  FAC ¶ 288.  Plaintiffs also have alleged that injunctive, declaratory and affirmative relief are "a predominant form of relief sought in this case."  *Id.* at ¶ 289.

Actions seeking injunctive relief are routinely certified as class actions under Rule 23(b)(2) in a wide range of contexts, especially where institutional policies and practices are challenged.  *See, e.g., Lamphere v. Brown Univ.*, 71 F.R.D. 641, 651 (D.R.I. 1976) (Title VII); *Yates v. Collier*, 868 F.3d 354, 371 (5th Cir. 2017) (affirming class certification where class of prisoner challenged excessive heating in prison); *In re District of Columbia*, 792 F.3d 96, 102 (D.C. Cir. 2015) (upholding certification where class of citizens challenged failure of municipality to provide required care under Medicaid); *Brown v. Cook Cty.*, No 17 C 8085, 2019 WL 3776150, at *233 (N.D. Ill. Aug. 12, 2019) (certifying a hostile work environment action based upon the defendants' policies where "each attack was different"); *Lecenat v. Perlitz*, No. 3:13-CV-01132, 2019 WL 3451571 (D. Conn. Feb. 11, 2019) (certifying a sex abuse class action where common liability issues predominated over individualized issues, such as details of the underlying abuse).

Defendant's attack on Plaintiffs' Rule 23(b)(2) allegations are scattershot and substantially duplicative of their other arguments, including their discussion of commonality.  Defendant repeats its incorrect assertion that Plaintiffs' claims are "primarily" for "substantial monetary damages," an assertion that wrong, wholly unsupported by any citation to the FAC, and, in fact, directly contradicted by the allegations of the FAC.  Memo. at 78.  Defendants do not elaborate on why Brown thinks that it is entitled to dictate what it is that Plaintiffs are seeking, without any citation

to the FAC, without any testimony from Plaintiffs, and without the analysis of the Court itself.[41]
In fact, Defendant fails to explain why any of its substantive arguments regarding the nature of the
relief sought, the composition of the class, the size of any monetary component of Plaintiffs'
claims, or any other assertion with respect to Rule 23(b)(2) are properly analyzed at the pleadings
stage.  Plaintiffs' engagement on these topics is in no way a concession that these issues should be
addressed in the context of a motion to strike.  Plaintiffs' motion for class certification, supported
by fact and potentially expert discovery, will address the nature of the injunctive relief sought and
to whose benefit any changes in practice or procedures at Brown necessarily will redound.[42]  To
the extent any of Brown's arguments are deemed to be well-founded, a class definition can be
modified at any point before trial.  Fed. R. Civ. P. 23(c)(1)(C) ("[a]n order that grants or denies
certification may be altered or amended before final judgement"); *see also, e.g., Dukes*, 509 F.3d
at 1176 (referencing the broad discretion of district courts to revisit class certification at any point).

### 2.      Rule 23(b)(3)

In analyzing the predominance and superiority requirements of Rule 23(b)(3), this Circuit
has instructed that the "class certification prerequisites should be construed in light of the
underlying objectives of class actions." *Smilow v. Southwestern Bell Mobile Sys*. Inc., 323 F.3d

---

[41] Brown relies on a factually distinguishable case where a male student alleged he was denied due
process when he was suspended from Michigan State "without first being afforded a live hearing
and opportunity for cross[-] examination of witnesses." *John Doe v. Michigan St. Univ.*, Case No.
1:18-cv-1413 (W.D. Mich.) (a case not reported or appended but cited, without a page reference,
by Brown (*see* Memo. at 78).  Plaintiff therein asserted that all class members shared a common
goal of challenging their "unconstitutional findings of guilt." *John Doe*, at 24.  Thus, by definition,
the proof of each class member's claim hinged upon an individual assessment of the due process
rights of each.  That is to say, the due process right at issue was not universally available.  *Id*. at
25-26.  Here, Plaintiffs challenge a university policy that is applicable and available to all.

[42] Brown's assertion that "[i]t is not the Court's role" to grant the declaratory and injunctive relief
sought is unsupported, undeveloped, and incorrect.  Memo. at 77.  Moreover, that assertion is
premised on Brown's  sweeping statement that Brown already adheres to Title IX – the contested
issue that lies at the heart of this case.  *Id.*

32, 41 (1st Cir. 2003).  For a Court to certify a class pursuant to Rule 23(b)(3), the rule "requires merely that common issues predominate, not that all issues be common to the class."  *Id*. at 39. "Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof.'  Rather the question is whether there is 'reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate."  *In re Nexium Antitrust Litig.*, 777 F.3d at 21 (quoting *Amgen*, 133 S. Ct. at 1196, and *Halliburton Co. v. Erica P. John Fund, Inc*., 573 U.S. 258, 134 S. Ct. 2398, 2412, 189 L. Ed. 2d 339 (2014)).

Here, Courts have long rejected the notion that because individual damages calculations might be necessary, the class is not properly certifiable.  This is true in the consumer context: "[W]here common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain."  *In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (ellipsis omitted). This is true in other class contexts as well.  *See also Garcia v. E.J. Amusements of New Hampshire. Inc.*, 98 F. Supp. 3d 277, 291 (D. Mass. 2015) ("Calculating the precise amount of damages owed to each class member may also require some individualized inquiry.  But this task also does not stand in the way of class certification."); *Applegate v. Formed Fiber Techs., LLC*, No. 2:10-CV-00473-GZS, 2012 WL 3065542, at *6 (D. Me. July 12, 2012) ("the fact that class members suffered different damages does not bar class certification.").  As stated by the *Nexium* Court, "the need for some individualized determinations at the liability and damages stage does not defeat class certification . . . the question is whether there is 'reason to think that [individualized] questions will overwhelm common ones and render class certification inappropriate.'"  *Id*. at 21.  Indeed, "[e]ven in cases where the 'issue of injury-in-fact[,] [not] just damages calculation[,] presents individual questions, . . . it does not necessarily

follow that they predominate over common ones and that class action treatment is therefore unwarranted.'" *Id.* (quoting *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108 (2d Cir. 2007)).

Defendant raises a variety of arguments with respect to the predominance and superiority requirements, all of which can be raised at the class certification stage and most of which are substantively incorrect.  First, to the extent Brown believes that any claim for damages would require an individualized assessment, as noted above, individual questions regarding damages do not preclude class certification.  Moreover, when considered at the appropriate stage, Plaintiffs and the Court have a variety of tools to enable any perceived predominance hurdles to be addressed.  For example, Rule 23(c)(4) permits a litigant to seek certification of a class with respect to a narrow set of issues.  Most often, the rule is used to bifurcate the issue of a defendant's liability from the issue of individual class members' damages, to the extent there are any.  Rule 23(c)(4) was originally intended to be interpreted broadly, and Courts allow common issues to be carved out for class treatment, even in circumstances where the claim as a whole may not satisfy Rule 23(b)(3)'s predominance requirement.  *See, e.g.*, *Smilow v. Sw. Bell Mobile Sys.*, 323 F.3d 32, 41 (1st Cir. 2003) (refusing to decertify TCPA class action, finding that even if individualized determinations were necessary to calculate damages, Rule 23(c)(4)(A) would still allow the court to maintain the class action with respect to other issues); *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) (holding that "a court may employ [Rule 23(c)(4)] to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement"); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation my require individualized

90

assessments."). These are just some of many cases certifying issues of liability where certain damages claims ultimately might require individual inquiries. The FAC specifically references Rule 23(c)(4) and the potential for the creation of subclasses. FAC ¶¶ 267, 293. The bottom line is simply that these issues will not preclude certification, and the striking of class allegations at the pleading stage is not warranted.

Second, proof of Plaintiffs' deliberate indifference claim will focus primarily on Brown's actions and its systemic failure to properly enforce Title IX by, among other things, failing to train, failing to investigate, and failing to remedy a hostile environment. *Id.* at ¶¶ 302-06. As discussed in Section IV(A)(1), *supra*, a deliberate indifference claim hinges on the conduct of the school in question and the effect of the school's collective indifference on the educational environment as a whole. This claim will be proven by reference to the common experiences of the six named Plaintiffs. To the extent Brown deems Plaintiffs' experiences to be different, for any reason, it is free to raise those defenses at the class certification stage, after discovery regarding Brown's common policies and procedures. The Court cannot make an evidentiary determination at the pleading stage that Brown's policies were amended in any material or substantive way, during the relevant period, in a manner that precludes a showing of predominance. And Brown cannot establish at the pleading stage that the purported amendments to those policies affected different plaintiffs, or groups of students, in different ways.

The same is true with respect to each of Plaintiffs' causes of action. For example, with respect to negligence, Plaintiffs will establish a duty to all members of the class based upon a common theory. *See* Section V(A), *supra*. This duty arises from the promulgation of Brown's

Title IX and Sexual and Gender-based Misconduct Policy.[43]   *Id.*   The same is true when considering Plaintiffs' claims for breach of fiduciary duty.  Whether or not a student-university fiduciary duty relationship exists is a common question, the resolution of which will hinge on allegations regarding Brown's duty, for example, to provide an educational environment free of sexual harassment.  *See* Section V(H), *supra*.  This, and other issues underlying the breach of fiduciary duty claim, are common to all members of the class and militate for certification, rather than against it.

## VII.   PLAINTIFFS' CLAIMS SHOULD NOT BE SEVERED

All of the preconditions for permissive joinder are met here:  (1) the claims of all Plaintiffs arise from the same course of conduct; and (2) Plaintiffs' claims present common questions.  *See* Section VI(B)(2)-(3), *supra*.[44]   Brown's argument that Plaintiffs' claims should be severed is premised upon the same inaccurate description of the nature of those claims and its biased and unsupported assessment of the primary relief that Plaintiffs seek through this litigation.  The facts relevant to all Plaintiffs and all similarly-situated students are set forth in detail at pages 9 through 17 of the FAC.  Those paragraphs describe the applicable policies, the specific provisions of those policies that are applicable, Brown's failure to train students and employees about these policies, the lack of a dedicated Title IX officer at Brown during the relevant time period, statistics regarding the prevalence of campus and gender-based harassment and violence at Brown, the outcomes of

---

[43] Brown ignores that the cases it cites with respect to negligence both presented situations where the plaintiffs were seeking to hold the University responsible under a premises liability theory. *See* Memo. at 75.

[44] Brown's arguments to sever are substantially duplicative of those in support of its motion to strike, challenging, for example, commonality, manageability, and superiority.  Plaintiffs' opposition to those arguments apply equally here.  Brown's arguments also continue to erroneously misrepresent that Plaintiffs are seeking recompense for their underlying assaults, rather than for Brown's own conduct.

Title IX complaints at Brown, and other facts common to the proposed class.  These facts form the crux of Plaintiffs' claims and discovery regarding these issues will be common as to all Plaintiffs. The reasons that the commonality prong of Rule 23 is satisfied apply equally here and militate against the severing of claims.

Plaintiffs are not seeking to litigate their sexual assault claims against their perpetrators, and Brown knows as much.  Individual assault claims are simply not at issue.  Rather, Plaintiffs seek primarily injunctive relief arising out of Brown's common course of conduct with respect to all Plaintiffs and similarly-situated students.  Each Plaintiff's case will hinge on proof of the same transaction or occurrence, namely Brown's own conduct, including its failure to take preventative measures to protect students, maintenance of a policy of indifference, systemic mishandling of complaints, systemic failure to train, failure to update policies, creation of a hostile educational environment, and general failure to comply with federal law, Rhode Island law, and its own policies.  FAC ¶¶ 55-56, 58-67, 302-306.  The proof of these failures will be common to each Plaintiff and judicial economy will be served by allowing these claims to be pursued jointly.  To the extent that Brown believes that Plaintiffs' claims are simply not manageable (Memo. at 81), those are issues properly raised at the class certification stage.

Similarly, Brown cannot seriously argue that each Plaintiff should seek the same injunctive relief through separate proceedings.  Rule 23 specifically provides for class certification where separate pursuit of claims creates a risk of inconsistent adjudications.  *See* Section VII(C)(1), *supra*.  The risk of conflicting adjudications is clear here were multiple individual actions to proceed separately.  To the extent that a remedy in this case is injunctive in nature, it will necessarily bear on the claims of all Plaintiffs.  To the extent that damages flow from proof of

Brown's violation of Title IX, among other systemic failures, proof of the underlying conduct by Brown will bear on the disposition of all claims.[45]

## VIII.   CONCLUSION

For the foregoing reasons, the FAC sufficiently pleads each of Plaintiffs' claims, Defendant's motion to strike Plaintiffs' class allegations is improper and premature, and Defendant's motion to sever fails.  Accordingly, Defendant's Motion to Dismiss must be denied. To the extent the Court determines any aspect of Plaintiffs' FAC to be deficient, Plaintiffs respectfully request leave to amend to address any such deficiencies.

Respectfully submitted,

Dated: May 24, 2022

**GRANT & EISENHOFER P.A.**

*/s/ Irene R. Lax*
Irene Lax (*Pro Hac Vice*)
Karin Fisch (*Pro Hac Vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  (646) 722-8512
kfisch@gelaw.com
ilax@gelaw.com

**GRANT & EISENHOFER P.A.**
Kimberly A. Evans (*Pro Hac Vice*)
Samuel Mukiibi (*Pro Hac Vice*)
Carla Agbiro (*Pro Hac Vice*)
123 Justison Street
Wilmington, DE 19801
Tel:  (302) 622-7000
smukiibi@gelaw.com

---

[45] Brown cites to cases for general propositions regarding Rule 21 severance without making any effort to analogize those cases to the case at hand.  Memo. at 82.  In *Gaffney v. Riverboat Servs. of Indiana, Inc.*, the Court severed claims after trial for appellate purposes only, given the distinct issues that remained with respect to two of ten merchant marine officers who brought the claims. 451 F.3d 424, 441-44 (7th Cir. 2006).  The case had been litigated jointly until post-trial.  In *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010), employees from 300 different stores asked to proceed in one lawsuit.  *Id.* at 518, 522.  The court was understandably concerned that the multitude of policies across 300 stores would result in different defenses.  *Id.* Here, six plaintiffs are challenging one policy at one school.

kevans@gelaw.com
cagbiro@gelaw.com

**GRANT & EISENHOFER P.A.**
M. Elizabeth Graham (*Pro Hac Vice*)
101 California Street, Suite 2710
San Francisco, CA 94111
Tel:  (415) 365-9585
egraham@gelaw.com

**SALTZ MONGELUZZI AND BENDESKY**
Elizabeth A. Bailey (*Pro Hac Vice Forthcoming*)
1650 Market Street, 52nd Floor
Philadelphia, PA 19103
Tel: 215-575-3859
ebailey@smbb.com

**LAW OFFICES OF PATRICIA E. ANDREWS**
Patricia E. Andrews
38 N. Court Street
Providence, RI 02903
Tel:  (401) 421-0966
peandrews@verizon.net

*ATTORNEYS FOR PLAINTIFFS AND THE
PROPOSED CLASS*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true and correct copy of **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS EACH PLAINTIFF'S INDIVIDUAL CLAIMS, STRIKE THE CLASS ACTION ALLEGATIONS, AND/OR SEVER CLAIMS** was filed and served electronically through the Court's CM/ECF system on the following counsel of record:

Steven M. Richard
Caitlyn Horbert
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI  02903
srichard@nixonpeabody.com
chorbert@nixonpeabody.com
*Counsel for Defendant, Brown University*

By:   */s/ Irene R. Lax*
       Irene Lax

Dated: May 24, 2022