2022 WL 5250294
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Jane DOE, et al., Plaintiff,
v.
TEXAS A&M UNIVERSITY, Defendant.

Civil Action No. H-21-3728
|
Signed October 6, 2022

**Attorneys and Law Firms**

Sarah Brown, Pro Hac Vice, Kansas City, MO, Holly G. Terrell, Law Office of Holly Terrell, PLLC, Pearland, TX, Martin Jay Cirkiel, Cirkiel Assoc, Round Rock, TX, for Plaintiffs John Doe, Jane Doe, A.T.

Landon Allen Wade, Office of the Attorney General, Austin, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

SIM LAKE, SENIOR UNITED STATES DISTRICT JUDGE

*1 Plaintiffs, Jane Doe, John Doe, and A.T., bring this action against defendant, Texas A&M University ("TAMU"), for violation of civil rights guaranteed by § 504 of the Rehabilitation Act of 1973 ("§ 504 of the RA"), 29 U.S.C. § 794; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 et seq.; Title IX of the Education Act of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq.; and the United States Constitution pursuant to 42 U.S.C. § 1983 ("§ 1983").[1] Plaintiffs seek damages,[2] equitable relief,[3] and "other relief that a Jury can give in law or in equity or both."[4] Pending before the court is Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Rules 12(B)(1) and 12(B)(6) ("Defendant's Motion to Dismiss") (Docket Entry No. 30). Also before the court are Plaintiffs' Response to Defendant's Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Rules 12(b)(1) and 12(b)(6) ("Plaintiffs' Response"), Docket Entry No. 33, and Defendant's Reply in Support of Its Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Rule 12(B)(1) and 12(B)(6) ("Defendant's Reply"), Docket Entry No. 34. After carefully considering the pleadings, the law, and the parties' arguments, Defendant's Motion to Dismiss will be granted in part and denied in part.

**I. Standard of Review**

Defendant TAMU seeks dismissal of Plaintiffs' Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Federal Rule of Civil Procedure 12(b)(1) governs challenges to the court's subject matter jurisdiction. "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." Home Builders Association of Mississippi, Inc. v. City of Madison, Mississippi, 143 F.3d 1006, 1010 (5th Cir. 1998). Because TAMU has not submitted evidence outside Plaintiffs' pleadings in support of its Rule 12(b)(1) motion, the motion is a facial attack; and the court's review is limited to whether the complaint sufficiently alleges jurisdiction. Plaintiffs, as the parties asserting federal jurisdiction, have the burden of showing that the jurisdictional requirement has been met. Alabama-Coushatta Tribe of Texas v. United States, 757 F.3d 484, 487 (5th Cir. 2014).

A Rule 12(b)(6) motion tests the formal sufficiency of the pleadings and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001), cert. denied sub nom Cloud v. United States, 122 S. Ct. 2665 (2002). The court must accept the factual allegations of the complaint as true, view them in a light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. Id. To defeat a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 127 S. Ct. at 1965).

**II. Factual Allegations**[5]

**\*2** Plaintiffs Jane and John Doe are parents of A.T., a young adult with Down Syndrome who was born in 2000. Down Syndrome is a genetic disorder caused by the presence of all or part of a third copy of chromosome 21. People with Down Syndrome commonly exhibit distinct physical characteristics, cognitive or intellectual disability ("ID"), and deficits in social skills. While A.T. has legal capacity to make her own decisions, A.T.'s ability to do so is "overtly" diminished, and her need for more supervision than her peers who do not have Down Syndrome is similarly overt. [6]

As a person with Down Syndrome, A.T. qualified for Special Education Services pursuant to the Individual with Disabilities Education Act for her pre-kindergarten through 12th grade school years. The Special Education Services that A.T. received were based on an Individual Education Plan, which included behavioral supports and "a watchful eye of staff" that allowed her to learn in a classroom environment with her non-disabled peers. Like many of her peers, A.T. wanted to attend college.

Defendant TAMU is a large, public, state university that receives federal funds. As a public university receiving federal funds, TAMU must follow the requisites of § 504 of the RA, the ADA, Title IX, and the United States Constitution. Accordingly, TAMU has a "Disability Resources" program. In addition to the usual accommodations a public entity must provide for persons with disabilities, § 504 of the RA requires TAMU to develop Accommodation Plans for eligible students with disabilities. TAMU also has a Title IX Officer tasked with overseeing TAMU's compliance with Title IX and investigating allegations of bullying and harassment based on sex and gender, including sexual assault.

Pursuant to the Higher Education Opportunity Act, 20 U.S.C. § 1140 et seq., TAMU offers "young adults with intellectual and developmental disabilities who have exited high school" the Aggie ACHIEVE (Academic Courses in Higher Inclusive Education and Vocational Experiences) Program. [7] The Aggie ACHIEVE Program is designed to provide four years of inclusive college education intended to equip students for employment in the community. Aggie ACHIEVE students reside in residence halls at TAMU's main campus in College Station, Texas, and have access to all campus-related activities. Those who graduate receive a Certificate in Interdisciplinary Studies.

In April of 2019, A.T. and her parents visited the TAMU campus and attended an Aggie ACHIEVE interview. While A.T. met separately with staff, her parents met with Dr. Carly Gibson, Founder and Faculty Director of the Aggie ACHIEVE program. During the meeting A.T.'s parents expressed concerns and raised issues related to the program generally and A.T. specifically about use of free time, supervision in and around the dormitories, and campus safety.

In August of 2019, A.T. and her parents met Dr. Olivia Hester, the Aggie ACHIEVE Program Director. At this meeting, A.T.'s parents asked how Aggie ACHIEVE students in general, and A.T. in particular, would be provided accommodations to benefit from the college experience. They expressed particular concerns that planned supports and supervision were insufficient for A.T. and other students in the dormitories. A.T.'s parents were told that A.T. and others in the Aggie ACHIEVE Program were adults and would be so treated. In the fall of 2019 A.T. entered the Aggie ACHIEVE Program without an individualized § 504 Accommodation Plan.

**\*3** While residing at the White Creek Dormitory, the situation between A.T. and some of her dormitory mates, particularly C.O., deteriorated. [8] C.O. was much larger than A.T., less cognitively impaired, more verbal, and more socially skilled. On at least one occasion, C.O. yelled at A.T. and shoved her, increasing A.T.'s anxiety. A.T. became fearful of C.O. A.T. and her mother expressed those fears to Dr. Hester, who did nothing. A.T. did not understand that she could file a formal complaint against C.O. A.T. became anxious, depressed, and struggled to wake up in time for early classes.

On November 12, 2019, after receiving a report that A.T. was threatening another student, Dr. Hester initiated Disciplinary Proceedings for Dormitory infractions against A.T. Plaintiffs allege that the report was false. Nevertheless, A.T. was suspended from school for violating TAMU's Code of Conduct. TAMU Administration sent A.T. information about the disciplinary process, the claims against her, and papers she was required to sign but did not understand. TAMU neither appointed anyone to assist A.T. in understanding the disciplinary process, nor allowed her parents to assist her in any meeting. A.T. was forced to leave the White Creek Dormitory. Although the disciplinary process did not uphold her suspension, A.T. was not permitted to return to the dormitory. Instead, A.T. was sent to the Gardens Apartments, which were not within walking distance of a cafeteria where she could use her meal plan ticket. A.T. had no food in her apartment and no way to get food. A.T. spent much of her time

alone in her room, forgotten by Aggie ACHIEVE Program Administrators. After multiple complaints by A.T.'s parents, TAMU agreed to modify the Dorm Infraction and General Disciplinary Policy to better address the needs of all Aggie ACHIEVE Program students.

Plaintiffs met with the Dean of the College of Education, Dr. Joyce Alexander to express concerns about safety and lack of supervision of Aggie ACHIEVE students in general and A.T. in particular. They specifically requested that a § 504 Accommodation Plan be developed for A.T. to help transition her back into the educational environment both academically and socially. Because they were particularly concerned about A.T.'s safety and her ability to be easily exploited, they asked that a resident mentor, graduate student, ACHIEVEmate, or another person be required to supervise A.T. more than her non-disabled peers. Plaintiffs suggested that the mentor for A.T. be required to receive special training about how to deal with a person with Down Syndrome. Neither Dr. Alexander nor anyone else responded to their request for a § 504 Accommodation Plan.

In February of 2020 A.T.'s father communicated directly with Dr. Hester on a number of occasions about ongoing concerns he had for A.T.'s safety. He asked that a plan be put in place to provide A.T. greater supervision, but no such plan was implemented. In early March of 2020 the COVID-19 pandemic forced A.T. to return home to live with her family and to take classes remotely. Plaintiffs planned for A.T. to return to the TAMU campus in the fall of 2021 and hoped that by then the supervision of students would be enhanced, and training for Resident Monitors and other staff would be improved. But nothing changed.

A.T. returned to the White Creek Dormitory for the 2021 fall semester. The dormitory consisted of separate apartments, each of which had four single bedrooms, a common living room, a kitchen, laundry facilities, and two full bathrooms. Each apartment housed three Aggie ACHIEVE students and one mentor. The mentor was a full-time student who was not required to supervise the Aggie ACHIEVE students. Instead, the mentor was there to help the Aggie ACHIEVE students adjust to independent living by assisting with cooking, keeping the apartment tidy, and emotional support.

*4 On September 14, 2021, a freshman male student, N.M. with an intellectual disability but not Down Syndrome, followed A.T. into her private bedroom. N.M. did not ask A.T.'s permission to have sex with her and A.T. did not consent to have sex with N.M. Instead, taking advantage of A.T.'s Down Syndrome, her passive nature, and lack of supervision, N.M. sexually assaulted A.T. N.M. bragged about having sexually assaulted A.T. to his male friends, J.E. and M.M.

J.E. was a large person weighing about 250 pounds who, like N.M., was a freshman male student with an intellectual disability, but not Down Syndrome. The night after N.M. sexually assaulted A.T., J.E. and M.M. manipulated A.T. into visiting their apartment after curfew. A.T. fell asleep but awoke when J.E. started to sexually assault her. She asked J.E. to stop many times but he did not stop. A.T. reported the sexual assault the next day.

### III. Analysis

TAMU seeks dismissal of all the causes of action asserted in Plaintiffs' Second Amended Complaint. TAMU argues that the claims for violation of the United States Constitution that Plaintiffs have asserted under 42 U.S.C. § 1983 should be dismissed because they are barred by sovereign immunity; that the claims Plaintiffs have asserted under Title IX should be dismissed because Plaintiffs fail to allege that TAMU was deliberately indifferent to any severe, pervasive, and objectively offensive conduct aimed at A.T. because of her sex, and that the claims Plaintiffs have asserted under § 504 of the RA and Title II of the ADA should be dismissed because they fail to allege facts capable of establishing that A.T. suffered any discrimination by reason of her disability.

**A. Claims for Constitutional Violations and Equitable Relief**

Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 for violation of rights guaranteed by the Fourteenth Amendment to United States Constitution. Plaintiffs allege that TAMU had a practice and custom of conscious and deliberate indifference to federal law, rules, and directives, and to TAMU's own policies and procedures regarding § 504 of the RA, the ADA, and Title IX. Plaintiffs allege that TAMU violated these rights by failing to train staff regarding federal laws, regulations, and directives, and their own policies and procedures regarding § 504 of the RA, the ADA, and Title IX, and by failing to supervise staff regarding the unique and individualized needs of Aggie ACHIEVE students, including A.T. and the young men who sexually assaulted her.[9] Plaintiffs seek

equitable relief requiring TAMU to "retain an Independent Third [ ] party to complete a Quality Assurance review [o]f the Aggie ACHIEVE Program in general and [whether] issues of human sexuality are taught to a person with a disability commensurate with the unique and individualized needs of that person." [10]

TAMU argues that Plaintiffs' § 1983 claims and request for equitable relief are subject to dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because those claims are barred by sovereign immunity pursuant to the Eleventh Amendment. [11] "As to the 12(b)(1) Motion relative to constitutional and equitable claims the TAMU argues the Court does not have jurisdiction over such a claim. A.T. agrees and abandons those claims." [12] Defendant's Motion to Dismiss Plaintiff's claims for violation of the United States Constitution pursuant to 42 U.S.C. § 1983, and for equitable relief will therefore be denied as moot.

**B. Title IX**

*5 Defendant seeks dismissal of Plaintiffs' Title IX claims under Federal Rule of Civil Procedure 12(b)(6) by arguing that

> [t]hey allege that A.T. was a victim of discrimination based on her sex and gender because TAMU (1) failed to provide adequate supervision to male Aggie ACHIEVE students; (2) failed to provide A.T. with appropriately tailored human sexuality education and social skills training; and (3) created an unsafe and hostile educational environment that made A.T. more vulnerable to sexual assault... These allegations do not rise to a violation of Title IX. [13]

Plaintiffs respond that their allegations satisfy the elements of a heightened risk claim under Title IX because

> A.T. can meet the elements that she was sexually harassed and sexually assaulted, that it was severe and pervasive, that staff with the ability to take corrective actions so as to attempt to prevent the sexual harassment and assaults failed to do so, and A.T. experienced a deprivation of equal access to public educational services ... [14]

1. Applicable Law

Subject to exceptions not applicable here, Title IX prohibits discrimination on the basis of sex in all federally-funded educational programs by providing that

> [n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). "A school that receives federal funding may be held liable for student-on-student sexual harassment." I.L. v. Houston Independent School District, 776 F. App'x 839, 842 (5th Cir. 2019) (citing Davis v. Monroe County Board of Education, 119 S. Ct. 1661, 1669-70 (1999), and Sanches v. Carrollton-Farmers Branch Independent School District, 647 F.3d 156, 165 (5th Cir. 2011)). To prove a typical Title IX claim based on student-on-student harassment, a plaintiff must show that the defendant

> (1) had actual knowledge of the harassment, (2) the harasser was under the [defendant's] control, (3) the harassment was based on the victim's

sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit, and (5) the [defendant] was deliberately indifferent to the harassment.

I.L., 776 F. App'x at 842 (quoting Doe v. Columbia-Brazoria Independent School District, 856 F.3d 681, 689 (5th Cir. 2017) (quoting Sanches, 647 F.3d at 165)). "Deliberate indifference under Title IX means that the school's response or lack of response was 'clearly unreasonable in light of the known circumstances.' " I.L., 776 F. App'x at 842 (quoting Sanches, 647 F.3d at 167-68). But Plaintiffs are not asserting a typical Title IX claim. Instead, citing Hernandez v. Baylor University, 274 F.Supp.3d 602 (W.D. Tex. 2017), Plaintiffs argue that their claim is a pre-assault claim, i.e., that TAMU created a heightened risk that A.T. would be assaulted. [15]

*6 While the Fifth Circuit has not recognized as cognizable a Title IX claim for creation of a general heightened risk of discrimination, it has not foreclosed the possibility that such a claim may be cognizable in the context of student-on-student sexual assault. See Poloceno v. Dallas Independent School District, 826 F. App'x 359, 363 (5th Cir. 2020)(per curiam). In Polocena the court acknowledged that both the Ninth and Tenth Circuits have recognized Title IX heightened risk claims in the context of student-on-student sexual harassment or assault. Id. & n. 5 (citing Simpson v. University of Colorado at Boulder, 500 F.3d 1170 (10th Cir. 2007); Karasek v. Regents of University of California, 956 F.3d 1093 (9th Cir. 2020)).

In Simpson a group of female plaintiffs alleged that the University of Colorado at Boulder's ("UCB") recruiting efforts included showing football recruits a "good time" by pairing them with female "Ambassadors," and promising at least some recruits an opportunity to have sex. 500 F.3d at 1173. Following a prior assault, but before the plaintiffs were assaulted, a local district attorney met with UCB officials to warn them of the risk that sexual assault would occur if recruiting was not adequately supervised. The district attorney told the officials that UCB needed to implement sexual-assault-prevention training for football players, and needed to develop policies for supervising recruits. Id. But following the meeting, UCB officials did not heed the warning and "did little to change [UCB's] policies or training." Id. Instead, "[t]he coaching staff ... [although] informed of sexual harassment and assault by players, ... responded in ways that were more likely to encourage than eliminate such misconduct." Id. at 1173-74. Describing the conduct by UCB officials as "sanction[ing], support[ing], even fund[ing], a program (showing recruits a 'good time') that, without proper control, would encourage young men to engage in opprobrious acts[,]" id. at 1177, the Tenth Circuit concluded that

> a funding recipient can be said to have "intentionally acted in clear violation of Title IX," Davis, [119 S. Ct. at 1671], when the violation is caused by official policy, which may be a policy of deliberate indifference to providing adequate training or guidance that is obviously necessary for implementation of a specific program or policy of the recipient.

Id. at 1178.

In Karasek three plaintiffs asserted an official policy claim based on allegations that the defendant university intentionally avoided Title IX reporting requirements by funneling sexual harassment reports through an informal investigation process. The Ninth Circuit, considering the elements of such an official policy claim, and citing Davis, 119 S. Ct. at 1674-75, held that:

> [A] pre-assault claim should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious, (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was "so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school."

956 F.3d at 1112.

Karasek requires the heightened risk to be known or obvious, but does not require the school to have actual knowledge of a particularized risk. Other courts, however, have required

schools to have actual knowledge of a particularized risk. See e.g., Does I-VIII v. University of Tennessee, 186 F.Supp.3d 788, 792, 794, 804-08 (M.D. Tenn. 2016) (female plaintiffs were sexually assaulted by male student athletes, the university had actual knowledge of previous sexual assaults, but covered them up so the athletes could continue to compete); Roskin-Frazee v. Columbia University, No. 17 Civ. 2032 (GBD), 2018 WL 6523721, at *5 (S.D.N.Y. November 26, 2018) ("Pre-assault cases have found that universities may be held responsible for pre-assault, deliberate indifference when they have 'actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators.' ") (citations omitted). Cases within the Fifth Circuit that have recognized Title IX pre-assault claims are based on allegations that the defendants failed to address sexually hostile environments after receiving reports of sexual assault. See Does 1–10 v. Baylor University, 240 F.Supp.3d 646, 662 (W.D. Tex. 2017); and Does 12-15, et al. v. Baylor University, 336 F.Supp.3d 763, 782-83 (W.D. Tex. 2018).

2. Application of the Law to the Plaintiffs' Allegations

**\*7** Relying on Hernandez, 274 F.Supp.3d 602, Plaintiffs argue that

> TAMU in the present case stands in the same shoes as did the Baylor University. Issues of sexual discrimination and the need for a specialized office to deal with sexual harassment and assaults, creates an inference, if nothing else, that [t]he TAMU was on notice to the general problem. Moreover, TAMU developed the Aggie Achieve [Program] and when inviting in a student like A.T. who was cognitively impaired, it is readily foreseeable she would be more easily victimized by her male peers as compared to the typical Co-Ed at TAMU creating this heightened risk as to her. In adding to the mix a number of male students who are equally cognitively impaired also with pre-adolescent type social skills it was quite frankly "an accident waiting to happen." In short, the Aggie Achieve program both created and permitted an environment to grow that created a heightened risk of sexual assault to A.T. The TAMU Defendant can't have it both ways. If A.T. does not have a claim of failure to keep safe from sexual assault under the ADA or Rehab Act because the harassment morphed from assault to sexual assault, then she surely has a plausible discrimination based upon sex claim pursuant to Title IX. [16]

TAMU replies that Plaintiffs' reliance on Hernandez is misplaced because Plaintiffs have not alleged facts showing that TAMU had knowledge of objectively offensive conduct before the alleged sexual assaults of A.T. and that TAMU could therefore not have been deliberately indifferent to that conduct. [17] The court agrees.

In Hernandez the plaintiff was sexually assaulted by a member of the Baylor football team. 274 F.Supp.3d at 610. The Title IX claims that the plaintiff brought against Baylor included pre-assault claims based on allegations that

> Baylor failed to address and actively concealed sexual violence committed by its football players for several years [ ]; that university staff were repeatedly and directly informed of sexual assaults committed by football players and neither reported the misconduct nor conducted appropriate investigations [ ]; and that those actions gave rise to an "overall perception that football was above the rules and that there was no culture of accountability for misconduct."

Id. at 614 (internal citations omitted). The plaintiff also alleged that Baylor knew of at least six previous assaults committed by her assailant against female students, and that Baylor was aware that he had been cited for misdemeanor sexual assault, but failed to take any protective action. Id. Baylor moved to dismiss, but the court held that the plaintiff had pled sufficient facts to raise a plausible inference that Baylor had been deliberately indifferent to sexual harassment of which it had actual knowledge that was so severe, pervasive, and objectively offensive that it could be said to

deprive the plaintiff of access to educational opportunities or benefits provided by the school. Id. at 615.

**\*8** The facts alleged in Plaintiffs' Second Amended Complaint are not analogous to the facts alleged in Hernandez or any of the other decisions that have recognized Title IX claims for creation of a heightened risk that the plaintiff would be sexually assaulted. Plaintiffs do not allege that TAMU staff received reports of sexual misconduct committed by Aggie ACHIEVE students, that TAMU failed to address or actively concealed reports of sexual misconduct committed by Aggie ACHIEVE students, or that TAMU received reports of sexual misconduct committed by A.T.'s assailants. Nor have Plaintiffs plausibly alleged the existence of a TAMU official policy or custom that created a heightened risk that women in the Aggie ACHIEVE Program would be sexually assaulted. Instead, Plaintiffs argue that

> [i]ssues of sexual discrimination and the need for a specialized office to deal with sexual harassment and assaults, creates an inference, if nothing else that [t]he TAMU was on notice to the general problem. Moreover, ... when inviting in a student like A.T. who was cognitively impaired, it is readily foreseeable she would be more easily victimized by her male peers as compared to the typical Co-Ed at TAMU creating this heightened risk as to her. [18]

But Plaintiff's allegation that "TAMU has a designated Title IX Officer to provide oversight to the University's compliance with Title IX mandates[, and a]mong other things ... investigates allegations [of] bullying and harassment based upon sex and gender, including and especially sexual assault," [19] is not sufficient to create a plausible inference that TAMU was deliberately indifferent to a heightened risk of sexual harassment in the Aggie ACHIEVE Program — of which it had actual knowledge — that was so severe, pervasive, and objectively offensive that it could be said to deprive A.T. of access to the educational opportunities or benefits provided by TAMU.

Missing from Plaintiffs' Second Amended Complaint are facts capable of showing that TAMU ignored reports of sexual assault or harassment within the Aggie ACHIEVE program, or that before A.T.'s alleged assaults Aggie ACHIEVE students reported sexual assaults, or that TAMU maintained a policy or custom of mishandling such reports. Moreover, Plaintiffs' argument that "TAMU developed the Aggie Achieve [Program] and when inviting in a student like A.T. who was cognitively impaired, it is readily foreseeable she would be more easily victimized by her male peers as compared to the typical co-Ed at TAMU," indicates that the heightened risk of which they complain is based on A.T.'s cognitive impairment and not her sex or gender. Nevertheless, assuming without deciding that the Fifth Circuit would recognize Title IX pre-assault claims for creation of a heightened risk as cognizable, the court concludes that Plaintiffs have failed to state such a claim against TAMU because they have failed to allege facts sufficient to allow a plausible inference that TAMU was deliberately indifferent to actual knowledge either that male Aggie ACHIEVE students in general or A.T.'s alleged assailants in particular, needed additional supervision to prevent sexual harassment of female Aggie ACHIEVE students. Accordingly, Defendant's motion to dismiss Plaintiffs' Title IX claim will be granted.

**C. Section 504 of the Rehabilitation Act and the ADA**
Defendant seeks dismissal of Plaintiffs' § 504 and ADA claims under Federal Rule of Civil Procedure 12(b)(6) by arguing that they

> have failed to state a claim under the ADA or the RA for two reasons. First, with respect to Plaintiffs' failure-to-accommodate claim, Plaintiffs did not request any accommodation for A.T. in direct or specific terms. Nor was any such accommodation open, obvious, and apparent to TAMU. Second, Plaintiffs fail to allege any facts demonstrating that A.T. was discriminated against by reason of her disability. [20]

**\*9** Plaintiffs respond that they have asserted three plausible claims for disability discrimination: claims for failure to

accommodate and failure to keep safe in violation of Title II of the ADA and § 504 of the RA; and a disparate impact claim in violation of § 504 of the Rehabilitation Act. [21]

1. Applicable Law

Under § 504 of the RA

> [n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794(a). The RA was enacted " 'to ensure that handicapped individuals are not denied jobs or other benefits because of prejudiced attitudes or ignorance of others.' " Delano- Pyle v. Victoria County, Texas, 302 F.3d 567, 574 (5th Cir. 2002), cert. denied, 124 S. Ct. 47 (2003) (quoting Brennan v. Stewart, 834 F.2d 1248, 1259 (5th Cir. 1988) (quoting School Board of Nassau County v. Arline, 107 S. Ct. 1123, 1129 (1987))). "The ADA is a federal anti-discrimination statute designed '[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.' " Id. at 574 (quoting Rizzo v. Children's World Learning Centers, Inc., 173 F.3d 254, 261 (5th Cir. 1999)). Similar to § 504 of the RA, Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "The close relationship between [§] 504 of the [RA] and Title II of the ADA means that precedents interpreting either law generally apply to both." Smith v. Harris County, Texas, 956 F.3d 311, 317 (5th Cir. 2020) (citing Delano-Pyle, 302 F.3d at 574). See also Kemp v. Holder, 610 F.3d 231, 234 (5th Cir. 2010)(per curiam) ("The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts."); Bennett- Nelson v. Louisiana Board of Regents, 431 F.3d 448, 454 (5th Cir. 2005), cert. denied, 126 S. Ct. 1888 (2006) ("The only material difference between the two provisions lies in their respective causation requirements."); Harrison v. Klein Independent School District, 856 F. App'x 480, 482 n. 2 (5th Cir. 2021) (per curiam) ("The causation standard under [§] 504 is 'solely by reasons' of disability, 'whereas the ADA applies even if discrimination is not the "sole reason" for the challenged action.' ") (citations omitted).

Both § 504 of the RA and Title II of the ADA allow private plaintiffs to enforce the statutory prohibitions on discrimination. See Frame v. City of Arlington, 657 F.3d 215, 223 (5th Cir. 2011)(en banc), cert. denied, 132 S. Ct. 1561 (2012) ("It is established that Title II and § 504 of the [RA] are enforceable through an implied private right of action."). To avoid dismissal Plaintiffs must allege facts sufficient to prove that

> (1) [A.T.] is a qualified individual within the meaning of the ADA; (2) that [she] is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of [her] disability.

**\*10** Smith, 956 F.3d at 317 (quoting Melton v. Dallas Area Rapid Transit, 391 F.3d 669, 671-72 (5th Cir. 2004), cert. denied, 125 S. Ct. 2273 (2005)). Plaintiffs can recover money damages only if they also allege and prove that TAMU intentionally discriminated in violation the ADA or the RA. See Delano-Pyle, 302 F.3d at 575 ("[I]n order to receive compensatory damages for violations of the Acts, a plaintiff must show intentional discrimination.").

2. Application of the Law to the Plaintiffs' Allegations

(a) TAMU Is Not Entitled to Dismissal of Plaintiffs' Failure-to-Accommodate Claim

"In addition to prohibiting discrimination, the ADA and the [RA] ... 'impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.' " Smith, 956 F.3d at 317 (quoting Bennett-Nelson, 431 F.3d at 454). To avoid dismissal on their failure-to-accommodate claim, Plaintiffs must allege facts sufficient to prove that "(1) [A.T.] is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." Smith, 956 F.3d at 317 (quoting Ball v. LeBlanc, 792 F.3d 584, 596 n. 9 (5th Cir. 2015)). "Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." Id. (citing Windham v. Harris County, 875 F.3d 229, 237 (5th Cir. 2017)). "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." Id. at 317-18 (quoting Windham, 875 F.3d at 237 (quoting Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir.), cert. denied, 117 S. Ct. 586 (1996))).

Relying primarily on Windham, 875 F.3d at 229, TAMU argues that Plaintiffs' failure-to-accommodate claim should be dismissed for failure to state a claim because Plaintiffs "have pled no facts demonstrating: (1) that they requested any accommodation in direct and specific terms; or (2) the existence of an accommodation that was open, obvious, and apparent."[22] In Windham, the Fifth Circuit analyzed whether giving a driver with a known neck condition a particular type of field sobriety test was excessive force. Asserting that "but for [the driver's] neck condition ... administration of the ... test would have been a perfectly reasonable exercise of police authority," 875 F.3d at 242-43, the court concluded that "no reasonable jury could find that the officers should have been on notice that [the driver's] neck condition was such that he would suffer injury if [the officer] administered the test."

Id. at 243. The "open, obvious, and apparent" standard is a "narrow exception" to "the generally applicable rule that '[i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one.' " Id. at 239 (quoting Taylor, 93 F.3d at 165).

**\*11** Plaintiffs argue that their failure-to-accommodate claim is plausible because TAMU knew that A.T. had a cognitive disability, and that "by and through her acceptance into the Aggie Achieve Program even more specifically knew of her limitations and accommodations needed to address such limitations. Her disabilities and need for related accommodations was open and obvious."[23] Acknowledging that "[t]here is a fair question about what accommodations were needed,"[24] Plaintiffs argue that A.T.'s

> parents answered that question. A.T.'s parents repeatedly asked for the most reasonable accommodations for their daughter, supervision commensurate with unique and individualized needs of their daughter. The requests became even more explicit when A.T. returned to campus after the COVID 19 Virus hit. Even with both, the obvious and the specific, TAMU did not provide the accommodations she needed.[25]

TAMU does not dispute that A.T. is a qualified individual with a disability and therefore satisfies the first element of a failure to accommodate claim. And apart from granting A.T. admission to the Aggie ACHIEVE Program, TAMU does not argue that it offered A.T. any reasonable accommodations for her disabilities as required to satisfy the third element of a failure to accommodate claim. TAMU's argument that Plaintiffs have failed to state an ADA or RA claim is directed to the second element of a failure-to-accommodate claim, i.e., that A.T.'s disability and its consequential limitations were known by the covered entity. But, as Plaintiffs argue, they have alleged facts capable of satisfying this element of their failure-to-accommodate claims in at least two ways.

First, Plaintiffs have alleged that A.T.'s disability and its consequential limitations were known to TAMU by virtue of A.T.'s admission to the Aggie ACHIEVE Program, a program expressly designed for young adults with intellectual and development disabilities,[26] and by virtue of the fact that A.T. was born with Down Syndrome, a genetic disorder usually associated with mild to moderate ID, and with characteristic physical traits that include short stature, poor muscle tone, and facial features such as slanted eyes and a flattened forehead

and nasal bridge.[27] Second, Plaintiffs allege that "[w]hile she is now twenty-one (21) years old [A.T.] appears to be closer to fourteen (14) or fifteen (15) years old,"[28] and that A.T.'s

> face and eyes are noticeably different. Her manner of communication is noticeably slower and simpler more akin to an emerging adolescent than a typical nineteen year old co-ed. While many students with disability evidence what is called pass and cover, meaning they attempt to pass as normal and cover up their disability[,] a person with Down Syndrom[e] may make this same attempt but is obviously not able to do so. It is overt that A.T. requires more supervision than her non-disabled peers and while she may have the formal legal capacity to make her own decisions, it is equally overt that capacity is diminished.[29]

Plaintiffs have therefore alleged facts capable of establishing that A.T.'s disability and limitations were not only known to TAMU but also that they were open, obvious, and apparent. Moreover, despite TAMU's arguments to the contrary, Plaintiffs have alleged facts that are capable of establishing that TAMU received direct and specific requests that A.T. receive reasonable accommodations for her disabilities on at least three occasions.

**\*12** Plaintiffs allege that A.T.'s parents made an initial request for accommodations

> [o]n or about August 12th 2019, [when] A.T. and her parents met the recently hired Aggie Achieve Program Director, Dr. Olivia Hester for the first time. At this meeting A.T.'s parents ... very specifically asked her how Aggie ACHIEVE students in general and how their daughter in particular would be provided accommodations to benefit from the college experience. They verbalized their particular concerns that planned supports and supervision was insufficient for A.T. and other students in the dorm but the response was A.T. and others were adults and would be treated as such.[30]

Plaintiffs allege that a second request for accommodations was made in the late fall of 2019 following disciplinary proceedings against A.T. for an alleged dormitory infraction. They allege that

> Plaintiffs met with the Dean of the College of Education, Dr. Joyce Alexander, to express concerns about and among other things, lack of supervision of Aggie ACHIEVE students and safety concerns both in general and specific to A.T.
>
> They very specifically requested that a [§] 504 Accommodation Plan be developed for A.T. to help transition her back into the educational environment both academically and socially. They were particularly concerned about A.T.'s safety and being easily exploited by others. Accordingly they asked that a "resident mentor, graduate student, or ACHIEVEmate or another person be required to supervise A.T. more than her non-disabled peers. They suggested that the "mentor" for A.T. be required to go through some special training on how to deal with a person with Down Syndrome.
>
> Neither Dr. Alexander nor anyone responded to this very specific request for an Accommodation Plan.[31]

Plaintiffs allege that a third request for accommodations was made in February of 2020 when "A.T.'s father communicated directly with Dr. Hester about ongoing concerns he had about the safety of his daughter. He asked that a plan be put in place to provide A.T. greater supervision but it was not."[32]

Plaintiffs have adequately alleged that they requested reasonable accommodations for A.T. on at least three different occasions. TAMU's argument that the requests were not direct or specific misapprehends the law. In Windham, the case on which TAMU primarily relies, the Fifth Circuit recognized that requesting and providing reasonable accommodations must be an interactive process. The court explained that "because the ADA does not require clairvoyance, the burden

falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms." 875 F.3d at 236-37. The court noted that "a plaintiff need not request, or even know, the particular reasonable accommodation [s]he ultimately requires. That judgment 'is best determined through a flexible, interactive process' involving both the plaintiff and the public entity." Id. at 237 n. 11 (quoting Taylor, 93 F.3d at 165).

In Pickett v. Texas Tech University Health Sciences Center, 37 F.4th 1013 (5th Cir. 2022), the Fifth Circuit recently stated that the need for an interactive process to determine a reasonable accommodation applies to public institutions of higher education. The Fifth Circuit analyzed whether a public graduate school of nursing violated the ADA by dismissing a disabled student for failing to satisfy academic requirements that the student alleged she would have been able to satisfy if she had received reasonable accommodations. The court explained that

> *13 in the employment context, we have noted that requesting and providing reasonable accommodations must be an "interactive process" that includes "the input of the employee as well as the employer." Loulseged v. Akzo Nobel Inc., 178 F.3d 731, 735 (5th Cir. 1999). That's for good reason. The objective of the reasonable-accommodation requirement is to find a solution that works for both parties. The same is true in education.

37 F.4th at 1033.

Pursuant to both Windham and Pickett, and by analogy to the employment context, the court concludes that Plaintiffs' allegations that direct and specific requests for A.T. to receive accommodations for her disabilities in the form of greater supervision were made in August of 2019 and February of 2020 to Dr. Hester, Aggie ACHIEVE Program Director, and in late fall of 2019 to Dr. Alexander, Dean of the College of Education, and that TAMU neither responded to those requests nor initiated an interactive process to identify reasonable accommodations, are sufficient to allow a plausible inference that TAMU knew of A.T.'s disability, its consequential limitations, and need for accommodation. See Loulseged, 178 F.3d at 736 (citing Taylor, 935 F.3d at 165 (duty to launch interactive process is triggered by request for an accommodation)). Accordingly, TAMU's motion to dismiss Plaintiffs' failure-to-accommodate claims will be denied.

(b) TAMU Is Entitled to Dismissal of Plaintiffs' Failure to Keep Safe Claim

Plaintiffs' Second Amended Complaint alleges that

> A.T. was also a victim of discrimination based upon disability because the TAMU Defendant failed to provide her, and the Aggie ACHIEVE male students who sexually assaulted her, appropriately modified human sexuality education and social skills training, which taken together created an unsafe and hostile educational environment for A.T. [33]

In support of this claim Plaintiffs point to three instances in which A.T. was harassed by fellow Aggie ACHIEVE students. The first instance occurred in the fall of 2019 when A.T. was allegedly bullied, yelled at, and shoved by one of her dorm mates. [34] The second instance occurred on September 14, 2021, when A.T. was sexually assaulted by freshman Aggie ACHIEVE student, N.M, [35] and the third instance occurred on September 15, 2021, when A.T. was sexually assault by freshman Aggie ACHIEVE student, J.E. [36]

The Fifth Circuit has not determined whether hostile educational environment claims are cognizable under the RA or the ADA. See Harrison, 856 F. App'x at 487 n. 6 ("Because we find the deliberate indifference element unmet here, we need not determine whether our precedent supports a hostile educational environment claim under the ADA or [RA]."). Nevertheless, in Estate of Lance v. Lewisville Independent School District, 743 F.3d 982 (5th Cir. 2014), the Fifth Circuit stated that to plead a claim for a hostile educational environment a plaintiff must allege that

> (1) [she] was an individual with a disability, (2) [she] was harassed

based on [her] disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of [her] education and created an abusive educational environment, (4) [Defendant] knew about the harassment, and (5) [Defendant] was deliberately indifferent to the harassment.

**\*14** Id. at 996 (quoting S.S. v. Eastern Kentucky University, 532 F.3d 445, 454 (6th Cir. 2008), and citing Davis, 119 S. Ct. at 1675 ("We thus conclude that funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.")).

Citing Woodberry v. Dallas Area Rapid Transit, No. 3:14-cv-03980-L, 2017 WL 840976, at \*6-7 (N.D. Tex. March 3, 2017), and Woods v. G.B. Cooley Hospital Service District, No. 07-0926, 2007 WL 4812054, at \*1-2 (W.D. La. Dec. 10, 2007), report and recommendation adopted by 2008 WL 11509443 (W.D. La. January 28, 2008), TAMU argues that the claim must be dismissed because the failure to prevent sexual assault does not constitute discrimination under the ADA or the RA. [37] Citing Strange v. Mansfield Independent School District, No. 4:18-cv-00101-O, 2018 WL 3950219, at \*3 (N.D. Tex. August 17, 2018), TAMU also argues that

> Plaintiffs do not allege that A.T. was singled out or treated differently from other students in the Aggie ACHIEVE Program because she was disabled. As another federal district court in this state previously held, alleged sexual assault cannot support a discrimination claim where there is no evidence that the state "subjected [a plaintiff] to discrimination because [she was] disabled." [38]

Asserting that TAMU "has characterized failure to keep safe claim as solely related to the sexual assault A.T. experienced upon her return to the University [in the fall of 2021]," [39] Plaintiffs argue that TAMU does not address their allegations of bullying and harassment that A.T. experienced in the fall of 2019, and that the court should therefore consider TAMU to have waived any argument that their hostile environment claim based on those allegations is subject to dismissal. [40] Citing Taylor v. Richmond State Supported Living Center, No. 4:11-3740, 2012 WL 6020372 (S.D. Tex. November 30, 2012), Plaintiffs argue that

> the facts and the reasonable inferences of the facts support the proposition that [A.T.] was bullied and harassed because she is cognitively impaired, has deficient social skills and is easily exploited. The fact that the exploitation was by other persons who were equally disabled is of no matter. [41]

In Taylor the court denied a motion to dismiss § 504 claims based on alleged physical abuse of a minor because the complaint sufficiently alleged that the mistreatment was "because of or due to his profound and unusual disabilities." Id. at \*5.

TAMU replies that even if Plaintiffs have alleged that A.T. was harassed based on her disability, the hostile educational environment claim must be dismissed because Plaintiffs have not alleged that the harassment A.T. suffered in the fall of 2019 was sufficiently severe or pervasive that it altered the condition of her education. [42]

#### (1) Plaintiffs Fail to Allege Facts Capable of Establishing that the Harassment A.T. Suffered in the Fall of 2019 was Severe or Pervasive

**\*15** "To plead a hostile-environment claim, a complaint must allege facts that could plausibly show continuous, nonepisodic abuse." Bryant v. Dayton Independent School District, No. H-21-1547, 2021 WL 3555947, \*8 (S.D. Tex. August 11, 2021). "The alleged harassment must have been so pervasive or severe that it 'altered [A.T.]'s conditions of [education] and create[d] an abusive [educational] environment.' " Id. (quoting Buckhanan v. Shinseki, No. 3:13-cv-278TSL-JMR, 2013 WL 5517903, at \* 7 (S.D. Miss. October 3, 2013) (quoting Hiner v. McHugh, 546 F. App'x 401, 408 (5th Cir. 2013)(per curiam)). In determining whether the alleged harassment was sufficiently severe or

pervasive to state a claim for hostile educational environment, courts consider the following factors: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or merely an offensive utterance; (4) whether the conduct interferes with educational performance; and (5) whether the complained-of conduct undermines the plaintiff's educational competence. The alleged harassment must be so severe and pervasive that it destroys the student's opportunity to succeed in the school, and it must be more than rude or offensive comments, teasing, or isolated incidents. Bryant, 2021 WL 3555947, at *8 (citing inter alia Hiner, 546 F. App'x at 408).

Plaintiffs' Second Amended Complaint does not allege facts from which it can plausibly be inferred that any harassment A.T. endured in the fall of 2019 was severe or pervasive. Plaintiffs allege that

> [t]he situation between A.T. and some of her dorm mates, C.O. in particular was deteriorating.
>
> For instance, there was another student named C.O. who was much, much bigger than A.T., less cognitively impaired, more verbal and more socially skilled. A.T. became fearful of C.O.
>
> A.T. and later her mother expressed those fears to the Program Director Hester but she did not address the issue. A.T. did not understand that she could file a formal complaint against [C.O.]
>
> A.T. started to become anxious and also depressed. She started to struggle to awaken on time for early classes. She told Program Director, Dr. Olivia Hester she was suicidal.
>
> Hester also failed to address A.T.'s emotional deterioration, help her access psychological services or a counselor, contact DISABILITY RESOURCES, help facilitate the initiation of a long-overdue [§] 504 Accommodation Plan or anything for that matter.
>
> Nor did Hester or anyone else for that matter investigate concerns A.T. was a victim of bullying and harassment.
>
> Things between A.T. and [C.O.] worsened. On at least one occasion [C.O.] yelled at A.T. and then shoved her. Not surprisingly the harassment between [C.O.] upon A.T. exacerbated A.T.'s anxiety.
>
> Even after this physical bullying incident became known to Hester and other ACHIEVE Staff, again no one investigated the concerns A.T. was a victim of bullying and harassment.[43]

Plaintiffs allege that A.T. became fearful of C.O., but do not allege facts showing why A.T. became fearful of C.O. Plaintiffs allege that A.T. started to become anxious and depressed but do not allege facts linking A.T.'s anxiety and depression to the situation with C.O. Plaintiffs allege that on one occasion C.O. yelled at A.T. and then shoved her, and that that incident exacerbated A.T.'s anxiety, but Plaintiffs do not allege that incident interfered with A.T.'s educational performance or undermined her educational competence. Because Plaintiffs' have not alleged facts showing that the harassment A.T. experienced in the fall of 2019 was sufficiently severe or pervasive to interfere with her educational performance or to undermine her educational competence, Plaintiffs have failed to state a plausible hostile educational environment claim based on the harassment A.T. experienced in the fall of 2019.

### (2) Plaintiffs Fail to Allege Facts Capable of Establishing that TAMU Was Deliberately Indifferent to the Harassment A.T. Suffered in the Fall of 2021

**\*16** The sexual assaults that Plaintiffs allege A.T. experienced in the fall of 2021 were sufficiently severe to interfere with her educational performance and undermine her educational competence. Nevertheless, the court concludes that Plaintiffs' hostile educational environment claim based on those sexual assaults either by themselves or together with the harassment that A.T. allegedly experienced in the fall of 2019, is subject to dismissal because Plaintiffs have failed to allege facts capable of raising a plausible inference that TAMU was deliberately indifferent to the alleged harassment. Estate of Lance requires Plaintiffs to plead facts giving rise to a plausible inference that TAMU was deliberately indifferent to known acts of harassment from A.T.'s peers. 743 F.3d at 996. Plaintiffs argue that their "failure to keep safe claim is construed under a deliberate indifference standard as contemplated by Davis, [119 S. Ct. at 1661], a Title IX case."[44] In Estate of Lance, the Fifth Circuit stated that the Davis decision instructs that

> courts should refrain from second-guessing the disciplinary decisions made by school administrators ... School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.

743 F.3d at 997 (quoting Davis, 119 S. Ct. at 1674). Neither negligence nor mere unreasonableness will suffice. Id. "To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety." Yarbrough v. Santa Fe Independent School District, No. 21-40519, 2022 WL 885093, at *2 (5th Cir. March 25, 2022) (quoting McClendon v. City of Columbia, 305 F.3d 314, 326 n. 8 (5th Cir. 2002)(en banc) (per curiam), cert. denied, 123 S. Ct. 1355 (2003)). Neither Plaintiffs' Second Amended Complaint nor their response includes factual content that demonstrates or allows the court to draw a plausible inference that TAMU knew of and disregard an excessive risk to A.T.'s health or safety.

The allegations that A.T. became fearful of C.O., that on at least one occasion C.O. yelled at A.T. and shoved her, and that this incident increased A.T.'s anxiety are not sufficiently threatening to create an inference that C.O. posed a risk of excessive harm to A.T. Nor do these allegations contain any facts allowing a plausible inference either that the harassment was based on A.T.'s disability or her sex or gender. Moreover, because the sexual assaults that A.T. experienced occurred approximately two years later, in the fall of 2021, and did not involve C.O. but, instead, freshman students, Plaintiffs have failed to allege facts capable of showing that the bullying and harassment that Plaintiffs allege occurred in the fall of 2019 was either severe or pervasive or in any way related to the sexual assaults A.T. experienced in the fall of 2021. Although the sexual assaults that A.T. experienced were undoubtedly severe, Plaintiffs have failed to allege facts capable of establishing that TAMU knew an excessive risk of sexual assault existed and disregarded that risk. Nor have Plaintiffs alleged facts capable of establishing that once TAMU knew about the sexual assaults, TAMU responded with deliberate indifference. Indeed, Plaintiffs Second Amended Complaint does not allege any facts about TAMU's response to the sexual assaults. And for the reasons stated in § III.B, above, the court has already concluded that Plaintiffs have failed to allege facts allowing a plausible inference either that TAMU knew that male Aggie ACHIEVE students, including A.T.'s alleged assailants, needed additional supervision to prevent sexual harassment and assault of female Aggie ACHIEVE students, including A.T, or that TAMU was deliberately indifferent to any such knowledge.

(c) TAMU Is Entitled to Dismissal of Plaintiffs' Disparate Impact Claim

*17 Plaintiffs' Second Amended Complaint alleges that "in addition and in the alternative to the above, [A.T.] was also a victim of disparate impact under Section 504, by the acts and omissions of the Defendant."[45] Defendant's Motion to Dismiss asserts that "Plaintiffs' claims should be dismissed in their entirety."[46] As Plaintiffs recognize, Defendant did not separately address the disparate impact claim asserted solely under § 504 of the R.A.[47] Asserting that the disparate impact claim is plausible, Plaintiffs argue that they have pled that A.T.

> was a victim of disparate impact a separate discrimination based upon disability claim. Disparate impact discrimination[ ] addresses practices or policies that are facially neutral in their treatment of a protected group[ ] (like A.T.) but, in fact, have a disproportionately adverse effect on such a protected group. In disparate impact cases, proof or finding of discriminatory motive is not required... The TAMU Defendant has failed to address this claim and as such, it is waived. See Audler v. CBC Innovis Inc., 519 F.3d 239, 255 (5th Cir. 2008), quoting Castro v. McCord, 259 F. App'x 664, 665 (5th Cir. 2007) ["A party waives an issue if he fails to adequately brief it."].[48]

Defendant replies that Plaintiffs' disparate impact claim fails for multiple reasons.[49]

Plaintiffs' disparate impact claim is subject to dismissal because it is nothing more than a conclusory, "unadorned, the defendant-unlawfully-harmed-me accusation" that fails to state a claim. Iqbal, 129 S. Ct. at 1949 (citing Twombly, 127 S. Ct. at 1965). While a complaint need not contain

detailed factual allegations to survive dismissal under Rule 12(b)(6), it must contain more than labels, conclusions, and formulaic recitation of the elements of a cause of action. 🚩 Twombly, 127 S. Ct. at 1965. Plaintiffs assert that "[A.T.] was also a victim of disparate impact," without pointing to any facially neutral policies or practices that have a disparate impact on her. These allegations are not sufficient to state a disparate impact claim. Accordingly, Defendant's Motion to Dismiss Plaintiffs' disparate impact claim will be granted. See 🚩 Smith v. City of Jackson, 125 S. Ct. 1536, 1545 (2005) ("it is not enough simply to allege that there is a disparate impact ... or point to a generalized policy that leads to such an impact. Rather, [plaintiffs are] responsible for isolating and identifying the specific ... practices that are allegedly responsible for any observed ... disparities").

### IV. Conclusions and Order

For the reasons stated in § III.A, above, Defendant's Motion to Dismiss Plaintiffs' constitutional claims and claims for equitable relief is **DENIED as MOOT**.

For the reasons stated in § III.B, above, Defendant's Motion to Dismiss Plaintiffs' Title IX claims is **GRANTED,** and those claims are **DISMISSED with PREJUDICE**.

For the reasons stated in § III.C.2(a), above, Defendant's Motion to Dismiss Plaintiffs' failure-to-accommodate claim asserted under § 504 of the Rehabilitation Act and Title II of the Americans' with Disabilities Act is **DENIED.**

For the reasons stated in § III.C.2(b), above, Defendant's Motion to Dismiss Plaintiffs' failure to keep safe claims based on creation of a hostile educational environment in violation of § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act is **GRANTED,** and those claims are **DISMISSED with PREJUDICE.**

**\*18**  For the reasons stated in § III.C.2(c), above, Defendant's Motion to Dismiss Plaintiffs' disparate impact claim asserted under § 504 of the Rehabilitation Act is **GRANTED,** and this claim is **DISMISSED with PREJUDICE.**

Accordingly, Defendant's Motion to Dismiss, Docket Entry No. 30, is **GRANTED in PART** and **DENIED IN PART.**

**All Citations**

Slip Copy, 2022 WL 5250294

---

### Footnotes

1   Plaintiffs' Second Amended Complaint, Docket Entry No. 28, p. 2 ¶ 2. All page numbers for docket entries refer to the pagination inserted at the top of the page by the court's electronic filing system, CM/ECF.

2   Id. at 22-23 ¶ 82.

3   Id. at 23 ¶ 84.

4   Id. at 23 ¶ 83.

5   The factual allegations are derived from Plaintiffs' Second Amended Complaint, Docket Entry No. 28, pp. 1-17, and accepted as true for purposes of analyzing Defendant's Motion to Dismiss.

6   See Plaintiffs' Second Amended Complaint, Docket Entry No. 28, p. 8 ¶ 12.

7   Id. at 5 ¶ 4.

8   Id. at 11-12 ¶¶ 22-28, refers to both "C.O." and "O.C.," as if they were the same person. For purposes of consistency, the court will refer to that individual as "C.O." See also Defendant's Motion to Dismiss, Docket Entry No. 30, p. 8 & n. 2 (same).

9   Plaintiffs' Second Amended Complaint, Docket Entry No. 28, pp. 17-18 ¶¶ 56-57.

10  Id. at 23 ¶ 84.

11  Defendant's Motion to Dismiss, Docket Entry No. 30, pp. 12-14.

12  Plaintiffs' Response, Docket Entry No. 33, p. 7 ¶ 2.

13  Defendant's Motion to Dismiss, Docket Entry No. 30, p. 22.

14  Plaintiffs' Response, Docket Entry No. 33, pp. 8 ¶ 4.

15  Id. at 27 ¶ 49.

16  Id. at 29 ¶ 51.

17  Defendant's Reply, Docket Entry No. 34, p. 6.

18  Plaintiffs' Response, Docket Entry No. 33, p. 29 ¶ 51.

19  Plaintiffs' Second Amended Complaint, Docket Entry No. 28, p. 8 ¶ 13.

20  Defendant's Motion to Dismiss, Docket Entry No. 30, p. 15.

21  Plaintiffs' Response, Docket Entry No. 33, p. 19 ¶ 33. See also id. at 7-8 ¶¶ 2-3, and 20-26 ¶¶ 36-46.

22  Defendant's Motion to Dismiss, Docket Entry No. 30, p. 18. See also Defendant's Reply, Docket Entry o. 34, p. 2 ("Plaintiffs did not request any accommodation in 'direct and specific terms.' ").

23  Plaintiffs' Response, Docket Entry No. 33, p. 22 ¶ 38.

24  Id.

25  Id.

26  Plaintiffs' Second Amended Complaint, Docket Entry No. 28, pp. 5 ¶ 4, and 9-11 ¶¶ 15-19.

27  Id. at 3-4 ¶ 1 & nn. 3-4.

28  Id. at 3 ¶ 1.

29  Id. at 8 ¶ 12.

30  Id. at 10 ¶ 18.

31  Id. at 14 ¶¶ 35-37.

32  Id. ¶ 38.

33  Id. at 19 ¶ 63.

34  Id. at 11-12 ¶¶ 22-28.

| | |
|---|---|
| 35 | Id. at 16 ¶¶ 47-48. |
| 36 | Id. aat 16-17 ¶¶ 49-51. |
| 37 | Defendant's Motion to Dismiss, Docket Entry No. 30, pp. 18-19. |
| 38 | Id. at 19-20. See also Defendant's Reply, Docket Entry No. 34, pp. 3-4 (arguing that Plaintiffs' "failure to keep safe" claim is not cognizable under the ADA or RA). |
| 39 | Plaintiff's Response, Docket Entry No. 33, p. 23 ¶ 40. |
| 40 | Id. ¶ 39. |
| 41 | Id. at 24 ¶ 42. See also id. at 7-8 ¶ 3. |
| 42 | Defendant's Reply, Docket Entry No. 34, p. 4. |
| 43 | Plaintiffs' Second Amended Complaint, Docket Entry No. 28, pp. 11-12 ¶¶ 22-29. |
| 44 | Plaintiffs' Response, Docket Entry No. 33, p. 21 ¶ 36. |
| 45 | Plaintiffs' Second Amended Complaint, Docket Entry No. 28, p. 20 ¶ 69. |
| 46 | Defendant's Motion to Dismiss, Docket Entry No. 30, p. 11. |
| 47 | Plaintiffs' Response, Docket Entry No. 33, p. 20 ¶ 35. |
| 48 | Id. at 26 ¶ 46. |
| 49 | Defendant's Reply, Docket Entry No. 34, p. 5. |

**End of Document**
© 2022 Thomson Reuters. No claim to original U.S. Government Works.